Page 1

1          IN UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF OHIO

3             EASTERN DIVISION

4               *  *  *

5  BIANCA MARCELLINO,

6  et al.,

7        Plaintiffs,

8      vs.            CASE NO. 1:21-cv-01338

9  GEAUGA COUNTY HUMANE

10  SOCIETY, et al.,

11        Defendants.

12             *  *  *

13        Deposition of BIANCA MARCELLINO,

14  Plaintiff herein, called by the Defendants for

15  cross-examination pursuant to the Rules of Civil

16  Procedure, taken before me, Karen M. Rudd, a

17  Notary Public in and for the State of Ohio, via

18  Zoom at 36196 Stevens Boulevard, Eastlake, Ohio,

19  on Monday, June 20, 2022, at 10:06 a.m.

20              *  *  *

21

22

23

24

25

Page 2

```
1                    EXAMINATION CONDUCTED        PAGE

2        BY MR. BARINGER:......................      4

3

4      (No exhibits marked)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

1   APPEARANCES:
2      On behalf of the Plaintiffs:
        (Via Zoom)
3
        By:  Michela J. Huth
4            Attorney at Law
             P.O. Box 17
5            Bolivar, Ohio 44612
             330 440-4027
6            michelahuth.esq@gmail.com
7      On behalf of the Defendants:
        (Via Zoom)
8
             Davis & Young
9
        By:  Matthew Baringer
10           Attorney at Law
             29010 Chardon Road
11           Willoughby Hills, Ohio 44092
             216 348-1700
12           mbaringer@davisyoung.com
13  ALSO PRESENT:
14           Karen Marcellino (Via Zoom)
             Giancarlo Marcellino (Via Zoom)
15
                        *   *   *
16
17
18
19
20
21
22
23
24
25

Page 4

1                    BIANCA MARCELLINO

2     of lawful age, Plaintiff herein, having been

3     first duly cautioned and sworn, as hereinafter

4     certified, was examined and said as follows:

5                    CROSS-EXAMINATION

6     BY MR. BARINGER:

7           Q.    All right.  Bianca, my name is Matt

8     Baringer.  I'm an attorney who represents the

9     Geauga County Humane Society, sometimes known as

10    Rescue Village, as well as some employees and

11    the directors there, Christian Courtwright, Ken

12    Clark, and Hope Brustein, B R U S T E I N.

13    We're here to take your deposition in this case,

14    in this matter, you filed against them.

15                 A couple preliminary things.

16    First, you mentioned your location.  I just

17    wanted to know, is there anyone else in the room

18    with you at this time?

19          A.    This is my parents' house, so I'm

20    downstairs at my parents' house.

21          Q.    Okay.  But they're not in the room?

22    They are parties to this case.  I just need to

23    know if they're in the room or not.

24          A.    Yes, they are present.

25          Q.    They are present?

Page 5

1             A.    Yes.

2             Q.    All right.  I just didn't hear you.

3      Okay.  And your parents are Giancarlo Marcellino

4      and Karen Marcellino?

5             A.    Yes.

6             Q.    Have you had your deposition taken

7      before?

8             A.    Not for this case.

9             Q.    In any case?

10             A.    Yes, I have had a deposition taken

11      before.

12             Q.    Okay.  So you know the ground

13      rules.  I'll go over them very briefly.  We're

14      doing this by Zoom, so it's even more important

15      that we not talk over each other.  So I'll

16      finish my question -- and you're doing a good

17      job of it.  I'll finish my question, and then

18      you answer -- I'll let you answer.  And once you

19      finish, then I'll ask my next question so it's

20      easy for the court reporter to take everything

21      down.

22             If you need to take a break at any

23      point, just let me know as long as there's not a

24      question pending.  If there is a question

25      pending, I'd ask you to just finish your answer

Page 6

1   to that question, and then we can take the

2   break.

3             What else.  Hold on.  Let me see.

4   Just in general, although we are by Zoom,

5   nodding the head and shaking the head yes and no

6   don't work good, because everything is being

7   taken down by the court reporter, and she can't

8   take that down.  And also uh-huhs --

9        A.   Okay.

10       Q.   -- are hard to take down on the

11  record.  So as best you can, if you're answering

12  yes or no, just please answer yes or no.  I'll

13  remind you sometimes and say is that a yes.

14  It's not me being rude, it's just me clarifying

15  for the record.  All right?

16       A.   Yes.

17       Q.   I first want to go through a little

18  bit of your background just real briefly.  Some

19  people ask why are you asking all these

20  questions.  It's just what we do in every case,

21  so --

22            All right.  You already stated your

23  name.  What is your current address?

24       A.   7224 Wilson Mills Road,

25  Chesterland, Ohio, 44026.

```
                                            Page 7
 1           Q.   All right.  And your date of birth?
 2           A.   September 24th, 1994.
 3           Q.   Okay.  Are you currently employed?
 4           A.   Yes.
 5           Q.   Who is your employer?
 6           A.   KeyBank.
 7           Q.   And what is your job title?
 8           A.   I'm a senior private client banker.
 9           Q.   And do you work out of a location
10   or at home or --
11           A.   Out of a location.
12           Q.   And where is that located, what
13   city?
14           A.   Mentor.
15           Q.   And prior to KeyBank, what was your
16   employment before then?
17           A.   I was a financial advisor at
18   Merrill Lynch, Pierce, Fenner & Smith.
19           Q.   And I guess I forgot to ask.  How
20   long have you been at KeyBank?
21           A.   I've been at KeyBank for
22   approximately six months.
23           Q.   And then Merrill Lynch, how long
24   were you there?
25           A.   I was at Merrill Lynch for
```

```
                                              Page 8
 1    approximately four years.
 2            Q.    Anything before Merrill Lynch?
 3            A.    Yes.  I worked for a company called
 4    Thrivent Financial for a while as a financial
 5    advisor, as well.
 6            Q.    Well, let me shift to your
 7    education.  Where did you go to high school?
 8            A.    I went to Eastlake North.
 9            Q.    And what year did you graduate?
10            A.    2012.
11            Q.    After Eastlake North, did you go to
12    college?
13            A.    Yes.  I went to Lake Erie College.
14            Q.    Did you graduate from there?
15            A.    Yes, I did.
16            Q.    What year?
17            A.    I graduated in 2016.
18            Q.    And what was your degree?
19            A.    I had a major in business
20    administration and a minor in equine studies.
21            Q.    Where is Lake Erie College?  In
22    Cleveland?
23            A.    Painesville, Ohio.
24                  (Clarification requested by the
25    court reporter.)
```

```
                                      Page 9
 1              THE  WITNESS:  Painesville, Ohio.
 2   BY MR. BARINGER:
 3          Q.   You were just breaking up there.
 4   Painesville, Ohio.  Okay.  After Lake Erie, any
 5   other secondary education?
 6          A.   Yes.  I passed my Series 6, my
 7   Series 63, my Series 7, and my Series 66, as
 8   well as my life and health insurance license,
 9   and my notary.
10          Q.   And I'm not in the financial
11   industry, but do you do like continuing
12   education classes?
13          A.   Yes, I do, for all of my licensing
14   that I keep active.
15          Q.   And are you married or single?
16          A.   I'm single.
17          Q.   Any children of your own?
18          A.   No.
19          Q.   Do you reside with anybody?
20          A.   I reside at 7224 Wilson Mills Road,
21   and one of my friends resides with me in a
22   separate residence on my property.
23          Q.   And what is his or her name?
24          A.   Her name is Marissa Cohn.
25          Q.   Marissa's last name, can you spell
```

1   it?

2          A.    C O H N.

3          Q.    How long has she resided on the

4   property?

5          A.    Approximately four years.

6          Q.    And her -- she is a friend, I

7   assume?

8          A.    She is a friend, and she also is --

9   does work for my parents at their barn.

10         Q.    Does she pay rent to you?

11         A.    She does pay rent to me.

12         Q.    Prior lawsuits.  Have you filed any

13  prior lawsuits?  Have you sued anybody?

14         A.    I'm sorry.  Could you rephrase the

15  question?  I'm not sure --

16         Q.    Yeah.  In this case, you're suing

17  the humane society.  I know you've had other

18  cases involving the humane society, so I guess

19  set those aside.  Do you have any other -- do

20  you have any other lawsuits where either you

21  sued someone or somebody has sued you?

22         A.    I'm not sure how to answer that

23  question.  I have had multiple cases that have

24  arose due to issues with a neighbor, as well as

25  the Geauga Humane Society.

Page 11

1          Q.    Okay.  So I think the issues with

2     the neighbor may have stemmed -- may be somewhat

3     related to some of the issues we're dealing with

4     today.  So I guess I'm asking has anybody sued

5     you totally unrelated to anything involving

6     animals, the humane society, a neighbor, just

7     another lawsuit that you have had?

8          A.    I have never been sued due to my

9     profession if that's the question.

10          Q.    Or your personal life.  Even a car

11     accident.

12          A.    No, I've never been sued.

13          Q.    Okay.

14          A.    There have been cases that have

15     arisen from my neighbor and these issues with

16     the humane society.  Aside from these cases, I

17     have never been sued.

18          Q.    Okay.  I'm going to ask you what

19     you did to prepare for your deposition.

20     Understanding that you probably talked to your

21     attorney, I don't -- and I'm not allowed to know

22     anything you guys discussed, so don't offer

23     anything there except to say yes, I -- you know,

24     I talked to my attorney.

25               So what did you do to prepare for

```
                                       Page 12
 1   your deposition, if anything?
 2           A.    I read through the complaint.
 3           Q.    Did you look at any other
 4   documents?
 5           A.    No.  I recall the dates and the
 6   instances very well.
 7           Q.    Did you talk to your parents about
 8   the deposition?
 9           A.    No.
10           Q.    All right.  I'm looking at your
11   complaint, and you mentioned that you reviewed
12   that.  So I'm going to go through it with you,
13   but first I just want to talk about some
14   preliminary issues.
15                 This case stems from your
16   convictions in Chardon Muni Court for two counts
17   of animal cruelty; is that correct?
18           A.    Correct.
19           Q.    And I just want to say we're not
20   here to relitigate those convictions, so I'm not
21   going to ask you much about those, but I do need
22   some background on those issues.  So first I
23   think you acknowledge that you were convicted --
24           A.    Yes.
25           Q.    -- of those two counts?  And that
```

1  was after a jury trial?

2          A.    Yes.

3          Q.    And were you represented by an

4  attorney during those proceedings?

5          A.    Yes.

6          Q.    And you testified in that case,

7  correct?

8          A.    Yes, I did.

9          Q.    And after the jury convicted you,

10  the judge imposed a sentence, correct?

11          A.    Correct.

12          Q.    And --

13          A.    It was following.  It wasn't that

14  day, it was following.  It was on March 5th.

15          Q.    Okay.  And what was your

16  understanding of the possible penalties for your

17  conviction, meaning what options did the judge

18  have in terms of sentencing you?

19          A.    I don't know.  I'm not an attorney

20  or a judge, so I don't know what the options

21  were for her at that time.

22          Q.    Well, did you know there was a

23  possibility that you could be sentenced to a

24  term of jail?

25          A.    I did know that that was a

```
                                            Page 14
 1   possibility just from them reading during the

 2   trial.

 3          Q.   And, in fact, you were sentenced to

 4   a term of 90 days in jail, but that entire 90

 5   days was suspended.  Do you understand that?

 6          A.   Correct.  The judge stated that it

 7   was suspended because I didn't have any priors,

 8   so they were going to impose the probation and

 9   then the 90 days if I did violate the probation.

10          Q.   She sentenced you to a term of

11   probation.  How long was that term?

12          A.   Five years.

13          Q.   And were you sentenced on March 5th,

14   2019?

15          A.   2019, correct.

16          Q.   So you are currently still on

17   probation?

18          A.   Correct.

19          Q.   Have you been violated for any

20   reason?

21          A.   I have not.

22          Q.   Have you had any violation

23   hearings?

24          A.   No, I have not had any violation

25   hearings.
```

1         Q.    Have you had any -- any post

2   sentencing hearings regarding the terms of

3   probation?

4         A.    Yes, I did, when the judge wanted

5   to clarify the terms and added some additional

6   terms to my probation.

7         Q.    Okay.  Well, approximately when was

8   that?  If you were sentenced in March, when was

9   that?

10        A.    It was that summer.  I believe

11  approximately May of 2019.  I'm not a hundred

12  percent sure on the exact day.

13        Q.    Okay.  You mentioned that she added

14  terms.  Well, let's go back to the original

15  sentence.  What was your understanding of the

16  original terms of your probation?

17        A.    The original sentencing was that I

18  could not own, care for, reside on a property

19  with horses or have possession of horses.  That

20  was the sentencing.

21        Q.    Any other terms?

22        A.    No.  Well, other than the random

23  inspections, which she also stated.

24        Q.    And correct me if I'm wrong, I

25  believe the horses were ordered to be forfeited;

Page 16

1    is that correct?

2            A.   There were two horses that were the

3    subject of this case.  However, there were more

4    horses that were on the property that were not

5    seized because they were not -- they were not

6    seized.

7            Q.   Okay.  So the two horses that were

8    subject to the criminal case were forfeited, and

9    then you received a financial sanction?

10           A.   I'm sorry.  I'm not sure what that

11   is.

12           Q.   Did --

13           A.   Restitution?

14           Q.   Correct.

15           A.   They did charge me with

16   restitution.  However, it was overturned by the

17   appellate court.

18           Q.   Okay.  Yeah.  Now, you mentioned

19   the other term, the random inspections.

20           A.   Correct.

21           Q.   During your sentencing, you were

22   told what about random inspections?

23           A.   I was told that Christian or the

24   police could do random, unannounced inspections

25   of my property.

Page 17

1          Q.    Did you understand what that meant?

2          A.    I understood the verbiage.

3          Q.    What did you understand that meant

4    they could do?

5          A.    I understood that I was being told

6    that they could enter my property at any point.

7          Q.    With or without any reason, right?

8          A.    I didn't understand that, because I

9    didn't believe that that was reasonable.

10         Q.    You didn't understand that by

11   random, unannounced inspections, that that meant

12   that they could come to your property at any

13   time for any reason to ensure that you were

14   abiding by the terms of your probation?  You

15   didn't understand that?

16         A.    I did understand the verbiage, as I

17   stated.  However, the unreasonable search and

18   seizure, as part of the constitution, I didn't

19   understand how this could be a sentence.

20         Q.    Okay.  So you understood that was

21   the sentence and that was the order, but you

22   didn't agree with it, right?

23         A.    I didn't understand how the judge

24   could impose that due to the constitutional

25   rights that I had.

Page 18

1          Q.    Okay.  But she did, correct?

2          A.    Correct, she did.

3          Q.    And you appealed your sentence; is

4   that correct?

5          A.    Correct.

6          Q.    Or you appealed your conviction and

7   sentence?

8          A.    Correct.

9          Q.    And that went to the 11th District

10  Court of Appeals, correct?

11         A.    Correct.

12         Q.    And you were represented by

13  counsel --

14         A.    Correct.

15         Q.    -- in that case?

16         A.    Correct.

17         Q.    Who was your attorney for that

18  appeal?

19         A.    My attorney was Michela Huth and

20  Gregory Sasse.  Those are the two attorneys that

21  I've had throughout the case.

22         Q.    Have you ever read the opinion from

23  the Court of Appeals?

24         A.    I have not.

25         Q.    Were you advised about what the

Page 19

1    Court said in its opinion?

2           A.    I know that the restitution was

3    reversed.

4           Q.    Did you know that your convictions

5    were upheld?

6           A.    I do know that.  There was not

7    sufficient evidence to show the contrary, which

8    was suppressed prior to my court date and trial.

9           Q.    Okay.  So you know your convictions

10   were upheld?

11          A.    Correct.  I do believe I was told

12   that there was not sufficient evidence to prove

13   to the contrary, which would coincide with the

14   fact that my evidence was suppressed the morning

15   of my court hearing, and I wasn't able to use

16   any of my evidence for my trial.  And as the

17   appellate court states, you are not able to

18   reintroduce new evidence.  So since it was

19   suppressed at that time, I wasn't able to

20   provide the evidence that I had to support me at

21   my trial.

22          Q.    Well, you didn't appeal anything

23   from the trial court about suppression of

24   evidence, did you?

25          A.    I'm not the attorney.  My attorney

Page 20

1    filed the documents.

2            Q.    So if the Court's opinion doesn't

3    talk about -- anything about suppression of

4    evidence, that would indicate you didn't appeal

5    it?

6            A.    I am not sure how to answer that.

7    I didn't submit the documentation, my attorney

8    did.

9            Q.    You appealed your sentence in part,

10   didn't you?  You appealed the restitution.

11           A.    My attorney filed the documents for

12   the appeal.

13           Q.    Did you talk to them about what

14   kind of things you wanted to raise on appeal?

15           A.    We filed the appeal based on what

16   the attorney was -- I'm not sure how to answer

17   that question.

18           Q.    Well, you appealed the restitution,

19   but you didn't appeal the random inspections;

20   isn't that correct?

21           A.    I didn't file the appeal.  My

22   attorney appealed for me, the documents.

23           Q.    So we can rely on the Court's

24   opinion as to what was appealed or what was not;

25   wouldn't you agree?

Page 21

1          A.   I would have to review the
2    documentation to answer that question.
3          Q.   All right.
4          A.   I don't rely on the Court's
5    opinion.
6          Q.   You don't?
7          A.   No.  I would have to look at the
8    documentation.  I don't have it in front of me.
9    If I had it in front of me, I would be able to
10   answer your question.
11         Q.   Well, I can show it to you, but
12   let's move on.
13         A.   Okay.
14         Q.   So Christian, who is the humane
15   agent for Geauga County Humane Society, per the
16   Court's order was allowed to do random,
17   unannounced inspections of your property,
18   correct?
19         A.   Correct, that was the Court order.
20         Q.   Let's talk about when he first --
21   his first inspection.  I've got your complaint.
22   I don't know if you have it in front of you.  Do
23   you, by chance?
24         A.   I have copies of the complaint.
25         Q.   You do?

Page 22

1           A.    Yes, I do.

2                 MR. BARINGER:  Okay.  Okay.  That's

3     great.  I don't think we have to mark it,

4     because it's a pleading in the case.  So I'm not

5     going to mark it as an exhibit, Michela.

6                 MS. HUTH:  That's fine.

7                 MR. BARINGER:  Okay.  All right.

8                 MS. HUTH:  I don't know if we have

9     to mark the actual complaint of the case as an

10    exhibit.

11                MR. BARINGER:  Yeah.

12                MS. HUTH:  If you think we do, I

13    don't care.

14                MR. BARINGER:  I'm not going to,

15    because it's just a mess on Zoom to do it and

16    it's in the record.

17    BY MR. BARINGER:

18          Q.    All right.  So I'm looking at your

19    complaint.  The bottom of page four has the date

20    March 6, 2019.  If you turn the page, it talks

21    about -- I believe this was the first quote,

22    unquote, inspection; is that right?

23          A.    Correct.

24                (Clarification requested by the

25    court reporter.)

1        THE WITNESS:  Correct, it was

2   March 6th, 2019, was the date of the first

3   probation entry.  That was the day after my

4   sentencing, less than 24 hours later.

5   BY MR. BARINGER:

6        Q.   Okay.  Were you present when

7   Christian arrived?

8        A.   I was not.

9        Q.   Were you present at all when

10  Christian was there?

11       A.   I was on the phone with Christian

12  during the time, and I also had access to my

13  security cameras which showed what was going on.

14       Q.   So you were on your phone talking

15  to Christian and maybe others and watching in

16  real-time --

17       A.   Correct.

18       Q.   -- what was going on?

19       A.   Correct.

20       Q.   So why don't you tell me what

21  happened on that first date.

22       A.   Christian entered, along with

23  Chesterland PD.  He entered onto my parents'

24  property and proceeded to approach the facility

25  and the property.  He met my sister along the

Page 24

1   way.  She let him know that this was my parents'

2   property, and he was not allowed to be on my

3   parents' property.

4              Christian then proceeded to walk up

5   to my property and questioned the people that

6   were on my property, as well as my parents'

7   property, in regards to the horses that they

8   kept with me and if they were satisfied with

9   their care, which they, in turn, responded yes,

10  that they were very satisfied.

11         Q.    All right.  I think we're going to

12  have to step back, because this whole issue with

13  your property versus your parents' property is

14  obviously relevant to this case.  When did you

15  purchase your property at 7224 Wilson Mills?

16         A.    I purchased it in 2016.  It was

17  November, November of 2016.

18         Q.    And that included what is now your

19  parents' property, correct?

20         A.    I did purchase both properties.

21         Q.    Was that -- at the time you

22  purchased it, was it considered one lot or two

23  lots that you purchased?

24         A.    No, it was two parcels.  It's

25  always been two parcels.

Page 25

1          Q.   Okay.  But you purchased both?

2          A.   Yes, I did.

3          Q.   And when you purchased it, what

4    buildings were on the property?

5          A.   There was a house and a garage on

6    one parcel.  The other parcel was land.

7          Q.   Okay.  And at some point a barn

8    gets built on the property, correct?

9          A.   Correct.

10         Q.   When did that happen?

11         A.   That was in 2018.

12         Q.   Sorry, we're moving offices, so if

13   you hear a lot of noise in the background, it's

14   that.

15              All right.  In 2018, a barn gets

16   built on the property.  Who paid for the barn?

17         A.   My parents.

18         Q.   Was it built on the same parcel as

19   the house or a different parcel from the house?

20         A.   A different parcel.

21         Q.   When it was built, it was purchased

22   by your parents, who owned that parcel it was

23   built on?

24         A.   It was in the process of getting

25   transferred to my parents.

Page 26

1      Q.   When did it get transferred to your
2   parents?  When did the second parcel get
3   transferred?
4      A.   I don't know the exact date that it
5   transferred.  It transferred prior to my
6   criminal trial.
7      Q.   And your criminal trial was in?
8      A.   2019.  The beginning of 2019.
9      Q.   All right.  Was it February?
10     A.   Yes.
11     Q.   So prior to that, you had
12  transferred your property -- half of your
13  property -- I don't know if it's exactly half,
14  but one of the two parcels was transferred to
15  your parents with a barn already on the
16  property, correct?
17     A.   The parcel was transferred due to
18  them building the barn and them taking out the
19  loan, so it would only make sense that they
20  would own the property that they put a barn on.
21     Q.   It didn't have anything to do with
22  your criminal trial?
23     A.   Not at all.
24     Q.   How much did they pay you for that
25  land?

Page 27

1          A.    I gifted it to them.

2          Q.    So nothing?

3          A.    Nothing.  It was a gift.

4          Q.    Any occasion for the gift?

5          A.    No.  It was a gift.  They are my

6   parents.  I love them.

7          Q.    Had you always planned to do that

8   when you bought the property, split it in half

9   and give half to your parents?

10          A.    Yeah.  They were putting up a barn.

11   Wouldn't you want to own the property that you

12   have a building on?

13          Q.    Right.

14          A.    That seems reasonable.

15          Q.    Okay.  So the barn was for your

16   parents, not for you?

17          A.    It was my parents' barn, yes.  It

18   has always been my parents' barn.

19          Q.    Did your parents ever own another

20   barn?

21          A.    No.

22          Q.    Where is the property line in

23   relation to the barn?

24          A.    I don't have the surveying document

25   in front of me, and I'm not a surveyor, so I

Page 28

1   can't tell you the exact location.

2           Q.    So you don't know?

3           A.    Well, I do know.  I have the

4   documentation that we paid for, so I do have

5   documentation on it.  However, I'm not a

6   certified surveyor, so I don't feel comfortable

7   saying exactly where the coordinates are.

8           Q.    Okay.  And there's nothing

9   currently on the property marking the property

10  line, is there?

11          A.    Could you rephrase the question?

12          Q.    Yeah.  If I were to go to your

13  property right now, would there be any type of

14  fencing, any type of stakes?

15          A.    There are no trespassing signs on

16  my parents' property, as well as fencing

17  dividing the two properties, which Christian

18  Courtwright stated he knew where the property

19  line was.

20          Q.    Okay.  Well, that's what I'm asking

21  you.  Is there something on the property that

22  shows where the property line is?

23          A.    There is fencing and no trespassing

24  signs, and Christian Courtwright stated multiple

25  occasions that he knew where their property was

Page 29

1    and where the property line was.

2            Q.    I'm asking currently is there

3    anything that demarcates the property line?  So

4    if I come in there --

5            A.    There -- there are fences on the

6    property line and no trespassing signs.

7            Q.    Okay.  Where is that fence in

8    relation to the barn?

9            A.    The fence is towards my property in

10   relation to the barn.  So the barn would be on

11   the other side of the fence.

12            So if you were dictating the

13   property line like Christian did like this, he

14   said this is where the property line -- put his

15   hands up, put them forward, he crossed that

16   property line that he deemed as the property

17   line, which was where the fence was, to cross

18   over towards the opposite side of the fence to

19   look in my parents' barn, therefore, walking on

20   their property and trespassing where there were

21   no trespassing signs.

22            Q.    I'm just trying to find out how far

23   from the edge of that barn is the property line.

24   You say there is currently a fence there that is

25   supposed to --

Page 30

```
 1          A.   There's --
 2          Q.   How far is that from the barn?
 3          A.   According to Christian --
 4          Q.   No, no, no.
 5          A.   -- the property line --
 6          Q.   Where is the fence currently --
 7          A.   I stated I'm not a surveyor.  I'm
 8    not going to give you exact -- the barn is on
 9    the other side.  That is my answer.  I'm not a
10    surveyor.  I'm sorry.
11          Q.   I didn't ask you to -- I'm asking
12    how far -- you can estimate, how far the fence
13    is --
14          A.   I'm sorry.  I cannot estimate.  I'm
15    not a surveyor.  I don't feel comfortable
16    estimating and giving an answer that I don't
17    know the hundred percent certainty to.  I do
18    know that it is on the other side, my parents'
19    property, and Christian did cross that line.
20          Q.   How do you know if you don't even
21    know where the property line is?
22          A.   He pulls in the driveway, and the
23    driveway is clearly on their property with no
24    trespassing signs.  So in the first instance of
25    pulling in the driveway, he already trespassed.
```

Page 31

1          Q.    Oh, so that's when he trespassed,
2    when he drove up the driveway?
3          A.    He trespassed the entire time.  I'm
4    just saying that that was a clear indication of
5    trespassing.  The police even have pictures of
6    the no trespassing signs on the gate.
7                He knew that it was their property.
8    He stated he knew it was my parents' property
9    multiple times prior to that and proceeded to
10   enter it with no trespassing signs, go up and --
11   I mean, multiple cases.
12         Q.    And he was there with the police?
13         A.    There were instances where he was
14   not there with police.
15         Q.    Well, this first one, you said he
16   came there with police.  The police drove --
17         A.    He did come with the police.
18         Q.    -- on your parents' property?
19         A.    You are correct.
20         Q.    They trespassed.
21         A.    Yes, they did.
22         Q.    Why aren't you suing them?
23         A.    The police were there escorting
24   Christian.  The police didn't come to harass me.
25         Q.    Oh, so it's not about trespassing,

Page 32

1    it's about harassment?

2           A.   No, it's about trespass.

3           Q.   Well, you don't own that property.

4    You don't have a trespass claim against him.

5           A.   I'm not an attorney.  I can't

6    answer that.  I'm sorry.

7           Q.   All right.  Back to the -- I'm just

8    trying to say you say there is currently a fence

9    on the property dividing -- or marking the

10   property line.  Can you tell me if it's five

11   feet away from the barn?

12          A.   I already said I'm not a surveyor.

13   I do apologize greatly, but I'm not a surveyor,

14   and I cannot answer that question.

15          Q.   I'm just asking -- I'm not asking

16   if it's accurate.  I'm asking -- I'm not asking

17   for a surveyor opinion.  I'm asking --

18          A.   I don't feel comfortable answering

19   the question.  I don't know the exact -- as I

20   stated prior, I do know that he did trespass,

21   because he did cross over significantly.

22          Q.   I understand you think that.  I

23   just want to know how far the fence is from the

24   barn.

25          A.   Christian also said that, and he

```
                                                 Page 33
```

1   did think that, and he did state where the line

2   was in his opinion, and he did cross it.

3          Q.    Are you just not going to answer my

4   question?

5          A.    I did answer.  I'm sorry.  I can't

6   answer the way that you would like me to.  I

7   cannot answer that.  I told you my answer to the

8   question.

9          Q.    You can answer -- you can give me

10   your best estimate as to how far --

11          A.    I cannot.

12          Q.    You can't.  You can't tell me if

13   it's --

14          A.    I'm not a surveyor.  I apologize.

15          Q.    All right.  I'll start out, is it

16   20 feet away?

17          A.    I'm not a surveyor.  I do

18   apologize.

19          Q.    It could be 20 feet?

20          A.    What?

21          Q.    It could be 20 feet?

22          A.    There is a pasture fence that

23   dictates where the property line should -- is,

24   an approximate, and I don't know the approximate

25   distance from there to the barn, but it is on

1    the other side, so you would be trespassing,

2    which Christian did agree to in the video that I

3    have of him.

4                MS. HUTH:  Matt, she has answered

5    the question over and over and over that she

6    doesn't know and she's not comfortable, and then

7    you keep asking her again, again and again and

8    again.

9                MR. BARINGER:  Well, respectfully,

10   she hasn't answered it, but it is what it is.

11               THE WITNESS:  I did answer it.

12   There is a pasture fence that separates the

13   properties.  I'm not a surveyor.  I cannot give

14   you the exact distance.  However, Christian

15   stated he knew where the property line was and

16   then proceeded to cross that.

17   BY MR. BARINGER:

18        Q.   All right.  I'm going to just ask

19   you one more time and knowing that you're not

20   going to answer it.  How far is that fence away

21   from the edge of the barn?

22        A.   I'm going to answer --

23               MS. HUTH:  Objection.  Objection.

24   You've asked that question about four times, and

25   she has given you the same response, and now

Page 35

```
 1   you're asking it a fifth time.  Go ahead if you
 2   can answer, Bianca.
 3              THE WITNESS:  I'm going to answer
 4   the same way I did the last four times.  There's
 5   a fence that runs along the property line.  It
 6   is a pasture fence, and Christian did indicate
 7   with his arms that he knew where the property
 8   line was, and it went alongside that fence.  He
 9   actually stated that, as well, and then
10   proceeded to cross it and go on the other side
11   to where the barn is and look in every single
12   window, stated he knew that it was my parents'
13   barn and that he knew it was my parents'
14   property, it was in plain view, and he was
15   looking.
16   BY MR. BARINGER:
17        Q.   All right.  Well, let's go back to
18   the March 6th date.  He didn't do any of that on
19   the March 6th date, correct?
20        A.   He did enter my parents' property
21   on March 6th.
22        Q.   Oh.  But the video that you shared
23   with us, that wasn't on the March 6th date where
24   he's allegedly --
25        A.   I did share videos of March 6th.
```

1          Q.    Okay.

2          A.    Not the video that I'm discussing

3    with the property line, but I did share a video

4    of March 6th, yes.

5          Q.    Okay.  All right.  That's my -- all

6    right.  So on March 6th, did he go by that barn?

7          A.    He did go on my parents' property,

8    yes.

9          Q.    All right.  I know you say he drove

10   up the driveway.  Did he go --

11         A.    He trespassed.

12         Q.    -- by the barn?

13         A.    He trespassed.  He went up their

14   driveway.

15         Q.    Did he go by the barn?

16         A.    We went up towards -- he went up

17   towards the barn, walked up, questioned people

18   on the property, as well as my property, and my

19   parents' property.

20         Q.    How far did he go up?  Did he go up

21   to the side of the barn?

22         A.    My property is about 2,000 feet

23   deep.  He went past my house.  Much more near

24   the barn than the street, we'll put it that way.

25         Q.    Did he go along the side?

Page 37

1           A.   I'm sorry.  Could you say that

2   again?

3           Q.   You've got the front of the barn,

4   right, and then you've got the side.  It's a

5   rectangle.  Did he go from the street?

6           A.   No, he did not go up to the barn

7   and look in the windows on March 6th if that's

8   the question.  He did not do that on March 6th.

9           Q.   That's what I was asking.

10          A.   He walked up the driveway and

11  trespassed, questioned people on my parents'

12  property, and questioned people on my property.

13          Q.   And at that time, there were horses

14  on your property?

15          A.   It was less than 24 hours after my

16  sentencing.  They were in the process of moving.

17          Q.   Yeah, and he was pretty respectful.

18  He said -- he was pretty respectful.  He said we

19  want to give you time to move these to your

20  parents' property.

21               MS. HUTH:  Is that a question?

22               THE WITNESS:  They were not my

23  horses.  They were boarders' horses.

24  BY MR. BARINGER:

25          Q.   But you knew you couldn't have any

Page 38

1   horses on your property, and he said we've got

2   to get these horses off your property.

3          A.   If you've ever seen a horse or

4   moved a horse, you don't just put them in the

5   back of your car and drive them away.  It takes

6   some time.  It was less than 24 hours after my

7   sentencing.

8          Q.   Okay.  He didn't say he was going

9   to violate you for it, did he?

10          A.   He made statements.  He did not

11  directly tell me that he was going to violate me

12  on March 6th.  However, he had in other

13  instances later on.

14          Q.   Okay.  But the first time he comes

15  out, it's the first day after you've been

16  sentenced, and he comes to look at the property,

17  and he says there's horses on your property, you

18  can't have them on your property, let's get them

19  off.

20          A.   He looked at the property and

21  trespassed on my parents' property, yes.

22          Q.   Okay.  You said he knew about the

23  transfer.  Did you tell him about the transfer?

24          A.   Actually, yes, and he said that he

25  knew about it, as well, because my sister called

Page 39

1    me, which she was a minor at the time, and he

2    was questioning her without my parents present,

3    as well.  So after he was questioning my

4    16-year-old sister about the property and the

5    animals and questions that she apparently had to

6    answer, she called me, and I did speak with

7    Christian.  And he actually -- I do believe his

8    words were that I've made it very clear that he

9    understood that that was my parents' property --

10            Q.    Anyway --

11            A.    -- and that he was not to do

12   inspections on my parents' property, only mine.

13            Q.    Okay.  All right.  March 9th was

14   the next date, page six, paragraph 18.  You say

15   Christian entered your neighbor's property and

16   monitored your property from their property for

17   about two hours; is that correct?

18            A.    Correct.

19            Q.    All right.  He didn't enter your

20   property, correct?

21            A.    Correct.

22            Q.    He didn't enter your parents'

23   property, correct?

24            A.    Correct, he just monitored the

25   properties.

Page 40

1          Q.    March 14th is the next one.  Why
2     don't you tell me what happened then.
3          A.    Well, again, I was not present.
4     However, I was threatened to be violated.  I was
5     at work.  My father was there.  My sister was
6     there.  My sister was in my parents' barn taking
7     care of my parents' horses, and Christian pulled
8     onto my parents' property.  My father told him
9     that it was their property, and he was not
10    permitted on it, and that they had to move.
11              The officer then agreed to move to
12    the other side of the property.  So then
13    Christian and the officers moved to the other
14    side of the property.  They walked to the back
15    of my property, questioned my father, and told
16    him -- Christian had told him that he needed to
17    see who was in the barn, because Bianca was in
18    the barn.  And my father proceeded to tell him
19    that Bianca was not in the barn and that it was
20    Bella.  And Christian then threatened to violate
21    my probation if my father did not make my sister
22    come out of his barn.
23              My father didn't believe that he
24    legally had to do that, and the property was not
25    subject to Christian's searches.  However, he

Page 41

1    feared that Christian would violate me, so he

2    asked my sister to come out of the barn.  At

3    that time, she did come out of the barn.

4                    And they had called me -- my dad

5    had called me, and I then spoke to Christian and

6    went over the fact that he has no right to

7    question people on my parents' property or do

8    inspections of their property.  And at that

9    time, he said that, unfortunately, I was wrong.

10          Q.    You weren't present for any of

11   this, correct?

12          A.    I was not home.  I was on the

13   phone.

14          Q.    Were you monitoring it via security

15   camera, as well?

16          A.    Correct, I do have security

17   cameras.

18          Q.    When you were on the phone, were

19   you also watching on camera?

20          A.    Yes, I had the camera up, but I was

21   talking on the phone, as well.

22          Q.    Where was he talking to your dad

23   at, which property?

24          A.    In the back.

25          Q.    Which property?

Page 42

1          A.    On my property, because he was

2    asked to leave my parents' property.

3          Q.    Okay.

4          A.    But he was on my parents' property,

5    and then the officer had said we're going to go

6    over to Bianca's property, so let's go to

7    Bianca's property.

8                After my dad had said they were

9    trespassing and they were not allowed on the

10   property, they went over to my property and

11   walked to the back of my property observing my

12   parents' property and threatening my father to

13   make my sister come out of the barn or saying

14   that they would blindly violate my probation.

15         Q.    When you say officer, are you

16   talking about Christian, or are you talking

17   about -- was there police there too?

18         A.    The police.  I refer to Christian

19   as Christian Courtwright.

20         Q.    Okay.  So the cops were with him on

21   this occasion, as well?

22         A.    Correct, and they did ask him to

23   move from my parents' property to my property.

24         Q.    And he did?

25         A.    Correct, with the assistance of the

Page 43

1    police.

2           Q.    Well, I mean, they didn't forcibly,

3    did they?

4                 MS. HUTH:  What was the question?

5    I'm sorry.  I didn't hear the question.  What

6    was the question?

7    BY MR. BARINGER:

8           Q.    They didn't forcibly have to move

9    Christian off your property -- off of your

10   parents' property, did they?

11          A.    They asked him.  They said that

12   they were going to move to the side and for him

13   to come up with them.  And he did, because my

14   father said they were trespassing and they were

15   not allowed to be on the property.

16          Q.    Okay.  And then your father went

17   onto your property, and they had a conversation

18   with Christian on your property?

19          A.    Correct, while he observed my

20   parents' property and was threatening my father

21   to make my sister come out of my father's barn

22   on my father's property to prove that I was not

23   there --

24          Q.    Right.

25          A.    -- or he would violate me if my dad

Page 44

1   did not have my sister walk out.

2           Q.    Because it would have been a

3   violation if you were in that barn caring for

4   horses, wouldn't it?

5           A.    But I was not.

6           Q.    I know.

7           A.    And he had no reason to believe

8   that I was.  And my father did not have any

9   legal responsibility.  It was not his -- it was

10  not his probation.

11          Q.    Okay.  But Christian is there to

12  make sure you are complying with probation, and

13  there's a barn --

14          A.    On the -- for me.

15          Q.    I'm sorry, you broke up.

16          A.    On my property for me.  He wanted

17  my father to forcibly have my sister walk out of

18  my father's barn on my father's property to

19  prove that I was not in my father's barn.

20          Q.    But just so it's clear, you were

21  ordered not to care for any horses no matter on

22  your property or any other property; isn't that

23  true?

24          A.    I believe the order was I was not

25  able to own, care for, reside on, or have

Page 45

1   possession of horses.  That was the order.

2           Q.   And you weren't violated?

3           A.   I have not been violated.

4           Q.   April 9th is the next one.

5   Courtwright enters your neighbor's property for

6   two hours again.  So he didn't go on your

7   property at this time or your parents'?

8           A.   I'm sorry, what date?

9           Q.   It's page eight, April 14th.

10          A.   Correct.

11          Q.   July 13th, it sounds like he came

12  to do a random inspection, eventually spoke to

13  you, and performed a search of your property,

14  correct?

15          A.   Correct, that is what is on here

16  for July 13th, 2019.

17          Q.   And nothing in there about entering

18  your parents' property, correct?

19          A.   No, there's nothing in here for

20  that date about entering my parents' property.

21          Q.   December 21st, why don't you go

22  ahead and tell me what happened on that date.

23          A.   On December 21st, 2019, Christian

24  entered my property.  I was in the shower, as it

25  was in the morning.  I wasn't expecting it.  And

1   he asked if I was home.  My friend stated that I

2   was home.  She came and got me.  I came to the

3   door.  I had a robe on with my towel in -- my

4   hair up, because I was in the shower and had to

5   jump out of the shower.  My sister Bella was

6   present, as well.

7               I opened the door, spoke with

8   Christian.  He informed me he was there to do a

9   random probation inspection.  I asked him if I

10  had the option to say no.  He told me I had no

11  option to say no.

12              And as we walked around the barn --

13  to the back of the barn, we walked to the --

14  it's a little part like on the back of my house.

15  We walked all the way around.  He did look over

16  the property from that point, but he did not

17  proceed to walk to the back at all.  He said

18  that we were good, and we walked back up to the

19  front.

20        Q.   And didn't enter your parents'

21  property on that occasion, correct?

22        A.   Not on that occasion, no.

23        Q.   It sounds like he came to do an

24  inspection, waited for you to get out of the

25  shower, did the inspection, said we're all good,

Page 47

1  correct?

2          A.    Correct.  I jumped out of the

3  shower in my towel, walked around the back,

4  showed him what he wanted to see, which was my

5  attached garage to my house, and then he walked

6  back to the front of the property with me

7  stating that that was all.

8          Q.    So then that's December.  Three

9  months go by.  March 14th, 2020, he comes and

10  leaves his business card on your front door.  Is

11  that all that he did?

12          A.    Correct, he pulled up the driveway

13  and left his business card on my front door,

14  knocked on my door, and then left.

15          Q.    And it sounds like -- paragraph 69

16  through 72, it sounds like he just said I'm

17  trying to make this easy on you and me, right?

18          A.    You're correct, he did state

19  that -- he said he was trying to make it

20  convenient, so that rather than trying to catch

21  each other, if I'm going to be home, that he

22  would do them on the weekends since I did work

23  during the week, and he indicated that these

24  were random checks to make sure that I'm still

25  in compliance with the terms of my probation,

Page 48

1   and that probation checks are required, and he

2   is allowed to do random, unannounced inspections

3   to make sure that I'm compliant with the order.

4           Q.    Then we get to July 10th, 2020.

5   And this seems to be the date of -- a

6   significant amount occurred on this date,

7   correct?

8           A.    I would agree.

9           Q.    So he shows up.  What happened?

10          A.    So I'll start off by saying I was a

11  little shocked that he showed up, because it was

12  a Friday and a workday for me, and it was at

13  approximately 9:02 a.m.  He did indicate, as you

14  had said in the last probation check where he

15  came and left his card, that he would be making

16  these quote, unquote, convenient so that he

17  would catch me on Saturdays or Sundays.  And

18  this was a Friday, so I was actually in the

19  shower getting ready for work at the time, which

20  was very unconvenient.

21              So I was still in my pajamas.  I

22  threw my pajamas on, went to the door, saw the

23  defendant, Christian Courtwright.  He was at my

24  door.  He had his Geauga Humane Society vehicle,

25  so I knew, you know, that he was there.  I went

Page 49

1  to the door.  He indicated that he was there to

2  do a random probation inspection.

3           So, again, I was a little shocked

4  that it was a workday, because I was getting

5  ready to go to work.  However, I was told that I

6  had no choice, and I had to do them.  So I asked

7  if I had the right to refuse, and that was not

8  an option according to Christian Courtwright.

9           So we started to walk around the

10  side of the house.  I did ask him why he was at

11  my house and if he had received any calls or had

12  any suspicion that I was violating my probation

13  at that time.  He indicated and actually

14  responded no.

15           So then I did confirm that he did

16  not have any calls or reason to come to the

17  property, he was just there doing regular

18  checks.  There were no complaints or anything of

19  that nature.

20           At that point, we continued to walk

21  to the back of the property.  He walked into my

22  attached garage, took a look, and then saw that

23  there were no horses or animals and that the

24  barn was being used for storage.

25           He then indicated he wanted to walk

Page 50

1   to the back of my property.  I had asked him

2   why, because all of the times prior to that he

3   had said he didn't need to walk back there,

4   because there was nothing back there other than

5   gravel and all the way back to the woods.  So he

6   never needed to do that before.  So he told me I

7   didn't have the option to say no.

8              So we walked back.  My property

9   goes about 2,000 feet deep and it's adjacent to

10  my parents' property.  As we were walking,

11  Christian did see that there was nothing on my

12  property.  He proceeded to look at my parents'

13  property the entire time we were walking to the

14  back.

15             I did indicate that I was videoing.

16  He was aware that I was videoing.  I told him

17  multiple times that there were no animals on my

18  property that he can see.  He had told me again

19  at that point that there were no calls or

20  complaints or any reason to believe that I was

21  violating my probation at that time, and that he

22  is allowed to do random inspections per the

23  Court and that's what he was doing.

24             He proceeded to walk down the

25  property line observing my parents' barn and

Page 51

1   pastures.  He actually stated that that's what

2   he was doing, as well.

3               I asked if he had received any

4   calls or complaints regarding my parents'

5   property.  At that time, he had not received any

6   calls or complaints regarding my parents'

7   property.  He stated that it was now in plain

8   sight that he was on my property.

9               So while he was walking, he

10  motioned with his hands and picked his arms up,

11  pushed his arms straight down indicating a line

12  of where he deemed the property line to be,

13  which was alongside the pasture fence, and then

14  proceeded to cross that line as seen in the

15  video.  He crossed that line and approached my

16  parents' barn.

17              I indicated to him that he had, A,

18  walked onto my parents' property; B, that he was

19  trespassing; C, that he was not allowed to be on

20  that property; and, D, that I would call the

21  police.  Christian at that point said go ahead

22  and call them.

23              He then proceeded to walk down my

24  parents' property looking -- he looked in every

25  single window of my parents' barn.  This was all

Page 52

1  on video, as well.  During this time, I

2  continued to tell him that he was trespassing,

3  he is not allowed to go onto my parents'

4  property or be observing their barn.  It's not

5  part of the probation visits, which he had

6  stated in multiple instances prior to that.

7          Q.    Let me stop you there.

8          A.    We walked down the --

9          Q.    Sorry.

10         A.    You're good.

11         Q.    How do you know he was trespassing?

12  How do you know he crossed the property?

13         A.    Because he crossed where the

14  pasture fence was.

15         Q.    Well, but you can't -- okay.  How

16  far was that from the edge of the barn?  I'm

17  trying to figure that out.

18         A.    Sir, I don't know the approximate --

19              MS. HUTH:  Isn't that the same

20  question you asked five times before?

21              MR. BARINGER:  Yeah.

22              MS. HUTH:  Okay.  So she has

23  already -- you've asked and answered.  Do you

24  want her to answer again?

25              MR. BARINGER:  No.  No, she doesn't

Page 53

1   have to.

2   BY MR. BARINGER:

3         Q.   Okay.  Maybe I was confused,

4   though, a little bit.  There is no -- the

5   pasture fence is behind the barn, correct, in

6   relation to the road?

7         A.    In relation to the road, the

8   pasture fence is behind the barn.

9         Q.   I don't know if it's -- I don't

10  want to get into directions, but, I mean --

11        A.    It doesn't run alongside of the

12  barn if that's what you're asking.  There's a

13  clear space in between the pasture fence and the

14  barn.

15        Q.   Okay.  There's no fence alongside

16  the barn even today?

17        A.    There's -- there is a fence along

18  the property line, which Christian crossed and

19  clearly indicated that he knew where the

20  property line was and that he was crossing it to

21  look in my parents' barn.

22        Q.   I get that, but I've seen the

23  video, you've seen the video.  When he is next

24  to the -- when he's alongside the barn, I'll

25  say, alongside it, there is no fence there.

Page 54

1          A.   He already deemed the property

2    line.  He indicated with his arms and then

3    proceeded to cross where the property line was.

4          Q.   I'm just trying to figure out if

5    there's a fence there.

6          A.    There's significant space between

7    the fence and the barn.  You would -- any

8    reasonable person would know that they crossed

9    that line --

10         Q.   I understand that's --

11              (Clarification requested by the

12   court reporter.)

13              THE WITNESS:  Which he did indicate

14   that he did know that he crossed the property

15   line.

16              (Thereupon, an off-the-record

17   discussion was held.)

18   BY MR. BARINGER:

19         Q.   I understand what you're saying.  I

20   just want to know is there a physical fence

21   today?  I'm looking at Google Maps, and there is

22   no fence alongside the barn where he was shown

23   in the video.  Am I correct there is no fence

24   there?

25         A.   There is a fence behind the barn,

Page 55

1   which runs along the property line, which is

2   near the barn, which Christian indicated he did

3   know where the property line was and it went

4   straight along that fence line and then

5   proceeded to cross where that fence line is.

6          Q.   Do you understand what I'm asking

7   about --

8          A.   I do, and I answered.

9          Q.   I'm asking alongside the barn

10  where he was shown in the video, I'm asking if

11  there is a physical fence there.  I'm just

12  asking --

13         A.   There's a fence along the property

14  line, which Christian crossed to observe my

15  parents' barn.

16         Q.   Are there any stakes alongside the

17  barn marking where the property line --

18         A.   There is a fence line along the

19  property line and no trespassing signs --

20         Q.   Where are the --

21         A.   -- as I stated earlier.

22         Q.   Where are the no trespassing signs?

23         A.   At the front gate and around the

24  property.

25         Q.   Are there ones alongside the barn

Page 56

1    where Christian is shown in the video being

2    alongside the barn?

3            A.   There's a fence line that separates

4    the properties, the pasture fence line, which I

5    stated.

6            Q.   Do you want to admit there's no

7    fence alongside the barn?

8            A.   There is a fence along the property

9    line.

10           MS. HUTH:   Sorry, what was the

11   question, Matt?

12   BY MR. BARINGER:

13           Q.   I know there's a pasture fence

14   behind the barn.  I'm asking if there is a fence

15   alongside the barn, the right side of the barn

16   if you're looking from the street?  That's all

17   I'm asking.  There is or there isn't a fence

18   there.

19           A.   There is no fence alongside of the

20   barn.  It is along the back where the property

21   is where Christian picked his hands up and

22   indicated a straight line from that pasture

23   fence to the road and then proceeded to cross

24   where his hands were and he indicated the

25   property line was.  And he indicated that he

Page 57

1  knew that he was going over towards the barn and

2  that it was in plain view.

3       Q.   Okay.  Thank you.  I think I asked

4  this, but -- the same question, I just want to

5  make sure.  Are there any other demarcations

6  alongside that barn that state where the

7  property line is, along the barn, physically

8  there, not the pasture?  That's all I'm asking.

9       A.   The barn is clearly on the opposite

10  side of the pasture fence, which he deemed that

11  he knew where that was and that that was the

12  property line.  So we established where the

13  property line was.

14            He then crossed it, knowingly and

15  willingly crossed it, to observe my parents'

16  barn and look in every single window, which

17  there are ten, and proceeded to -- as I

18  continued to tell him that he was trespassing,

19  and he proceeded to say that he was in plain

20  view and he was looking in each window.

21       Q.   And you keep saying that he said I

22  know I'm crossing the property line.  He never

23  said that.

24       A.   I didn't say that he knew that he

25  was crossing the property line.  I said that he

Page 58

1   did know that he crossed where he indicated the

2   property line was.  Yes, he did.

3         Q.    Well, did he say I know I'm across

4   the property line?

5         A.    He indicated with his arms where

6   the property line was and then proceeded to walk

7   across it.

8         Q.    Actually, he said the complete

9   opposite.  He said I know where the property

10  line is, and I'm not going to cross it, right?

11        A.    He did not say he knew where the

12  property line was and that he was not going to

13  cross it.

14        Q.    That's not what the video says?

15        A.    At the time that he trespassed on

16  my parents' property, he did not state that.

17        Q.    Have you reviewed the video?

18        A.    Yes, I have, and I do know what

19  you're talking about, and that was when we were

20  further in the back of the property.  And then

21  we walked up, and he stated where the property

22  line was and then proceeded to cross it.

23        Q.    Is that on the video?

24        A.    If you review the --

25              (Clarification requested by the

Page 59

1  court reporter.)

2  BY MR. BARINGER:

3          Q.   Is that on the --

4          A.   If you review the --

5          Q.   Sorry.  Is that --

6          A.   Yes.

7          Q.   Sorry.  Is that on the video?

8          A.   Yes, it's all on the video.

9          Q.   Okay.  So the cops come, talk to

10  you, talk to Christian.  What happens?

11          A.   We walked the chief back to observe

12  what Christian had observed, explained exactly

13  what happened to the chief.  We called my

14  parents.  We did file a report, and we

15  videotaped everything, and then my parents were

16  on their way, and my parents did arrive at that

17  time.

18          Q.   And what happened?  Did Christian

19  get in trouble?

20          A.   Well, the officer stated that they

21  were going to send it up for review, because

22  they didn't know -- it was a very blurred line.

23  Because if they were to enter the property, it

24  would be -- they would have to have probable

25  cause.  So they were going to take reports and

Page 60

1    send it up for review.

2          Q.    Did you tell them that the Court

3    had ordered random, unannounced inspections of

4    your property?  Did you tell the police that?

5          A.    They were well aware at that point.

6    They had assisted in prior instances, as we

7    discussed earlier.  And they also were aware of

8    the property line.  My parents -- they were

9    aware that my parents owned the adjacent

10   property, as well.

11         Q.    Did he violate you, Christian, for

12   anything on that day?

13         A.    No.  I did ask the chief to get on

14   video that I did not do anything wrong, because

15   I was in fear that he would violate me or try

16   and harass my parents.  And Chief did actually

17   walk over on video and asked him if there was

18   anything wrong.  Christian stated there wasn't

19   anything wrong.

20         Q.    And things got a little heated,

21   didn't they?

22         A.    I would say it's a matter of

23   perception.  There was no heat.

24         Q.    You were pretty upset, right?

25         A.    I was upset.  I think that anybody

Page 61

1   would be upset in a situation like that.

2          Q.    You said some pretty nasty things

3   to Christian, right, and about Christian?

4          A.    No, I don't recall that at all.

5   And I don't believe it's in the complaint,

6   because I didn't see anything nasty that I had

7   said.

8          Q.    You didn't call him a piece of

9   shit?

10         A.    I definitely did not.  Where --

11  could you show me where in the complaint that I

12  said that?

13         Q.    It's not in the complaint.

14         A.    Oh, so it's not in the complaint.

15         Q.    No, you wouldn't put that --

16         A.    I just --

17         Q.    -- in your complaint, would you?

18                (Clarification requested by the

19  court reporter.)

20                THE WITNESS:  I thought we were

21  going off of the complaint.  Could you show me

22  where in the complaint that I called him a,

23  quote, piece of shit?

24  BY MR. BARINGER:

25         Q.    It's not in the complaint.

Page 62

1          A.    Oh, okay.  Yeah, I did not call him

2    that, that's why.

3          Q.    Your mom was there too, right?

4          A.    My mom was there after the fact.

5    She wasn't privy to the beginning, because we

6    did not know he was coming or that he would

7    enter her property.

8          Q.    Was your dad there later?

9          A.    Later.

10         Q.    Was a boyfriend there too?

11         A.    I didn't have a boyfriend there.

12    My brother was there.

13         Q.    What's your brother's name?

14         A.    My brother's name is Carlo.

15         Q.    So Christian leaves, doesn't

16    violate you, right?

17         A.    He stated to the chief that I

18    didn't do anything wrong.

19         Q.    And that is the last time he has

20    done an inspection on your property, right?

21         A.    Correct.

22         Q.    And that was on July 10th, 2020.

23    You have not had --

24         A.    Correct.

25         Q.    -- a single inspection done of your

Page 63

1   property since that date, right?

2          A.    You are correct.

3          Q.    Because you caused such a fuss that

4   they just gave up?

5          A.    I don't agree.

6          Q.    You sued them in this case, right?

7                MS. HUTH:  You're asking if she

8   sued?

9   BY MR. BARINGER:

10         Q.    You've sued Christian and the

11  humane society in this case, right?

12         A.    Correct, we did sue.

13         Q.    You tried to have him removed as a

14  humane agent in the probate court, right?

15         A.    Correct, we did bring a case to

16  probate.

17         Q.    You lost that, right?

18         A.    The case was dismissed.

19         Q.    You filed a lot of things with the

20  court, the criminal court, correct, after your

21  conviction?

22         A.    Could you clarify what a lot is?

23         Q.    All right.  You filed something to

24  modify your sentence.  Do you recall that?

25         A.    Correct.  Yes.

Page 64

1         Q.    What did you want modified?

2         A.    The terms.

3         Q.    Which terms?

4         A.    The terms that violated my rights.

5         Q.    What was the term that violated

6    your rights?

7         A.    Random, unannounced inspections.

8         Q.    So the Court denied that, right?

9         A.    Correct.

10        Q.    What else did you file?  You

11   mentioned before that you had a probation

12   hearing.  I won't say it was a violation

13   hearing.  It was to clarify the terms of your

14   probation, right?

15        A.    It was not a violation hearing,

16   correct.

17        Q.    And you were present at that with

18   counsel?

19        A.    Yes, I was present.  It was -- yes.

20        Q.    And the judge threatened to find

21   you in contempt, right?

22        A.    I'm sorry.  Could you repeat that?

23        Q.    Didn't the judge say that she was

24   going to hold you in contempt?

25        A.    Yes, I did -- the judge said that

Page 65

1  after I had questioned my rights.

2          Q.    And she didn't hold you in contempt

3  though, did she?

4          A.    No, she did not.

5          Q.    When was that; do you recall?

6          A.    I don't recall the exact date.

7          Q.    So do you have any dealings with

8  the probation department at all?

9          A.    No, the probation department had

10  done my one review of my probation, indicated

11  that I was not in violation, and that I was

12  compliant, and that's all.

13          Q.    So for going on two years now,

14  probation has been out of your life, right?

15          A.    I would not say out of my life.  I

16  still have probation, I just have been

17  compliant.

18          Q.    All right.  You don't have to check

19  in with them at all?

20          A.    No, the probation department did

21  not deem that it was necessary for me to check

22  in with them.

23          Q.    And Christian hasn't done any more

24  inspections and, as far as you know, doesn't

25  plan to, correct?

```
                                          Page 66

 1          A.    I can't state what Christian plans

 2   to do, but I can state that since July 10th of

 3   2020, he has not done any more inspections.

 4          Q.    Well, haven't you won here?  Why

 5   don't you dismiss this case?

 6          A.    I'm sorry.  Could you repeat the

 7   question?

 8          Q.    Haven't you won here?  Why don't

 9   you dismiss this case?

10               MS. HUTH:  Wait, wait, wait.  Hold

11   on.  Objection.  Are you asking her for a

12   legal -- whether she has won as a legal

13   conclusion?

14               MR. BARINGER:  No.

15               MS. HUTH:  Is that what you're

16   asking?

17               MR. BARINGER:  I'll rephrase.

18   BY MR. BARINGER:

19          Q.    You felt Christian was harassing

20   you, right?

21               MS. HUTH:  I'm sorry.  What was the

22   question?

23   BY MR. BARINGER:

24          Q.    You felt Christian was harassing

25   you, right, with these inspections?
```

Page 67

1          A.    I felt like they went against my

2    civil rights.

3          Q.    And despite the Court order, you

4    still felt that way?

5          A.    Yes, I did.

6          Q.    Well, there's no more inspections

7    that they're doing, right?

8              MS. HUTH:  One minute.  So, Matt,

9    are you -- just objection to the form of the

10   question.  Are you saying there's not going to

11   be any more inspections?  I just didn't

12   understand the question.

13   BY MR. BARINGER:

14         Q.    Well, there's been none for going

15   on two years now, correct?  We've established

16   that.  Has anybody -- has anybody ever indicated

17   to you that inspections will resume?

18         A.    I never knew when Christian was

19   coming prior.  They were random, unannounced

20   inspections, so I would not have any indication

21   as to if he would be coming in the future.  I do

22   know that during the five years of my probation,

23   which he stated, that I will be seeing him the

24   entire five years of my probation or whoever the

25   humane officer is, which he did state, and I can

Page 68

1   find that if you would like that quote.

2            Q.    All right.  Let's talk about your

3   parents' barn.  Well, first of all, your

4   parents' property, the neighboring property, it

5   contains no living residence?

6            A.    No residence for a human.  There is

7   a barn.

8            Q.    So nobody resides at that

9   property -- I guess that's obvious -- correct?

10           A.    No.  No, no one resides there.

11           Q.    So how many horses, you know,

12   typically -- let's just say today, how many

13   horses are kept on that property?

14           A.    I don't know.  They're not my

15   horses and it's not my property.

16           Q.    How many -- how often do you go

17   into the barn?

18           A.    I don't.  It's against my

19   probation.

20           Q.    You've never been in that barn?

21           A.    I do not enter that barn, no.

22           Q.    But have you ever been in that

23   barn?

24           A.    No, I do not enter that barn.  It's

25   against my probation.  I've been compliant.

Page 69

1          Q.    What is the -- the horses, if there

2    are any in that barn, who do they belong to?

3          A.    I don't know.  It's not my barn.

4          Q.    You seemed familiar with the one

5    horse who had the wound on his nose in the

6    video.

7          A.    Correct, I did know that that was a

8    boarder horse at that time.  It was my friend

9    who was also present telling Christian that he

10   was trespassing, as well.

11         Q.    Do the horses ever come onto your

12   property?

13         A.    No.  That's against my probation.

14         Q.    You have your security system.  How

15   does that work?  First of all, when did you

16   install that?

17         A.    Years ago.  I don't know the exact

18   date.

19         Q.    Was it before or after your

20   convictions?

21         A.    It would have been, I believe,

22   before.

23         Q.    How does it work in terms of when

24   it decides to record?  Well, let's start with

25   that.  Is it always recording?

Page 70

1          A.    Yes.

2          Q.    And how -- does it store the

3    recordings?  I think the answer is yes, because

4    we have some of it, but kind of explain to me

5    how it stores it, how often, stuff like that.

6          A.    It stores videos based on the

7    videos that I would like to save.

8          Q.    Okay.  Well, let's say something

9    happened -- well, let's talk about this case.

10   Could you go back and get any and all videos

11   from July 10th, 2020?  Could you do that today?

12         A.    No, I could not.

13         Q.    So is there a time period where it

14   deletes them or something like that?

15         A.    Yes, at some point.

16         Q.    You don't know what the time frame

17   is?

18         A.    No, I do not, because I obtain the

19   videos that I need when it happens.

20         Q.    So you don't know -- if you went

21   into the system like today and wanted to look,

22   you don't know -- I mean, would there be like a

23   list of videos there that you could save and it

24   goes back a certain time, or you've never done

25   that?

1        A.   No.  I obtain the videos, like I

2  stated, when I need the videos at that time.

3        Q.   Okay.  So the videos that you

4  provided from the day in question, were those --

5  those weren't all the videos that you could have

6  obtained from that date, were they?

7        A.   Are you asking if I would have

8  saved the videos from when they were not on the

9  property?

10        Q.   Yeah.  You didn't go back and -- so

11  in other words, the videos that you provided us

12  were videos that you had previously saved.  You

13  didn't go back and like maybe in the last couple

14  of weeks and get those videos?

15        A.   Correct, I saved them -- I saved

16  them from the date that it happened.

17            MR. BARINGER:  If we can take a

18  five-minute break, if that's all right with

19  everybody.

20            (Recess taken.)

21  BY MR. BARINGER:

22        Q.   What is your understanding of --

23  you know, your parents are using the barn for

24  what?  Are they doing a rescue?  Are they

25  boarding horses?  I'm not a horse guy.  So what

Page 72

1  are they using the barn for?

2          A.    It's their personal barn.

3          Q.    So they own -- that's where they

4  keep their horses, if they own any?

5          A.    Correct.

6          Q.    Okay.  And you don't go in there

7  and pet the horses or anything?  I'm not saying

8  you care for them.

9          A.    I do not enter the barn.  It's a

10  violation of my probation.

11          Q.    You're seeking damages in this case

12  against the defendants, so I have to ask you

13  what kind -- what are your damages?  Let's start

14  with that.  What are the damages you're alleging

15  were caused in this case?

16          A.    I'm sorry.  Could you repeat the

17  question?

18          Q.    Yeah.  Your complaint says you're

19  seeking an award of compensatory, general, and

20  special damages according to proof at trial.  So

21  I'm just asking, you know, what type -- how were

22  you damaged in this case?

23          A.    My rights were violated.  My

24  constitutional rights were violated.

25          Q.    There was no physical damage to

Page 73

1   your property as a result of these inspections,

2   correct?

3           A.   The damage would be for the

4   violation of my constitutional rights.

5           Q.   I understand.  I just have to make

6   sure.  You're not saying Christian physically

7   damaged your property, right?

8           A.   I'm saying that the violations of

9   my constitutional rights would constitute the

10  damages for this case.

11          Q.   I understand.  No physical damage,

12  correct?

13          A.   The violations of my constitutional

14  rights would constitute the damages for this

15  case, yes.

16          Q.   Okay.  So --

17          A.   They would constitute -- yes, the

18  constitutional violation of my rights would be

19  my damages, correct.

20          Q.   Are you seeking like pain and

21  suffering as a result?

22          A.   I'm seeking damages for the

23  violation of my constitutional rights.

24          Q.   I'm asking you a specific question.

25  Okay?  I know that you want to give that answer,

Page 74

1  but -- you can answer it.  Is there any physical

2  damage to your property, yes or no?  I'm not

3  saying there has to be.  I'm just asking if

4  there is or isn't.

5          A.   If there is any physical damage to

6  my property?

7          Q.   Yes.

8          A.   No, there would not be physical

9  damage to my property.

10          MR. BARINGER:  Okay.  That's all I

11  have, Bianca.  I'll let your attorney instruct

12  you as to whether to waive or not.

13          MS. HUTH:  I don't think she's

14  going to waive right now.  That's something I'll

15  have to check with Richard.

16          (Thereupon, the deposition was

17  concluded at 11:41 a.m.)

18

19

20

21

22

23

24

25

Page 75

```
 1   STATE OF OHIO          )
 2   COUNTY OF MONTGOMERY )  SS:   CERTIFICATE
 3                  I, Karen M. Rudd, a Notary
 4   Public within and for the State of Ohio, duly
 5   commissioned and qualified,
 6                  DO HEREBY CERTIFY that the
 7   above-named BIANCA MARCELLINO, was by me first
 8   duly sworn to testify the truth, the whole truth
 9   and nothing but the truth.
10                  Said testimony was reduced to
11   writing by me stenographically in the presence
12   of the witness and thereafter reduced to
13   typewriting.
14                  I FURTHER CERTIFY that I am not a
15   relative or Attorney of either party, in any
16   manner interested in the event of this action,
17   nor am I, or the court reporting firm with which
18   I am affiliated, under a contract as defined in
19   Civil Rule 28(D).
20
21
22
23
24
25
```

Page 76

1          IN WITNESS WHEREOF, I have hereunto set

2     my hand and seal of office at Dayton, Ohio, on

3     this 23rd day of June, 2022.

4                    _Karen M. Rudd_
                     _____

5

              KAREN M. RUDD

6             NOTARY PUBLIC, STATE OF OHIO

              My commission expires 5-21-2027

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                    Page 77
 1                   Veritext Legal Solutions
                        1100 Superior Ave
 2                         Suite 1820
                      Cleveland, Ohio 44114
 3                    Phone: 216-523-1313
 4
     June 29, 2022
 5
     To: Ms. Huth
 6
     Case Name: Marcellino, Bianca v. Geauga County Humane Society, et al.
 7
     Veritext Reference Number: 5289645
 8
     Witness:  Bianca Marcellino      Deposition Date:  6/20/2022
 9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
2
          ASSIGNMENT REFERENCE NO: 5289645
3         CASE NAME: Marcellino, Bianca v. Geauga County Humane
     Society, et al.
          DATE OF DEPOSITION: 6/20/2022
4         WITNESS' NAME: Bianca Marcellino
5         In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7         I have made no changes to the testimony
     as transcribed by the court reporter.
8
     _____          _____
9    Date                      Bianca Marcellino
10        Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
          They have read the transcript;
13        They signed the foregoing Sworn
              Statement; and
14        Their execution of this Statement is of
              their free act and deed.
15
          I have affixed my name and official seal
16
     this _____ day of_____, 20_____.
17
                   _____
18                 Notary Public
19                 _____
                   Commission Expiration Date
20
21
22
23
24
25

1                    DEPOSITION REVIEW
                 CERTIFICATION OF WITNESS
2
         ASSIGNMENT REFERENCE NO: 5289645
3        CASE NAME: Marcellino, Bianca v. Geauga County Humane
    Society, et al.
         DATE OF DEPOSITION: 6/20/2022
4        WITNESS' NAME: Bianca Marcellino
5        In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7        I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9        I request that these changes be entered
    as part of the record of my testimony.
10
         I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
    that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____        _____
    Date                    Bianca Marcellino
14
         Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
    the referenced witness did personally appear
16   and acknowledge that:
17        They have read the transcript;
         They have listed all of their corrections
18            in the appended Errata Sheet;
         They signed the foregoing Sworn
19            Statement; and
         Their execution of this Statement is of
20            their free act and deed.
21        I have affixed my name and official seal
22   this _____ day of_____, 20_____.
23            _____
             Notary Public
24
             _____
25           Commission Expiration Date

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 5289645

PAGE/LINE(S) /        CHANGE        /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


_____        _____

Date                      Bianca Marcellino

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

              _____

              Notary Public


              _____

              Commission Expiration Date

| & |
| --- |
| **&**  3:8 7:18 |

| 0 |
| --- |
| **01338**  1:8 |

| 1 |
| --- |
| **10:06**  1:19 |
| **10th**  48:4 62:22 66:2 70:11 |
| **1100**  77:1 |
| **11:41**  74:17 |
| **11th**  18:9 |
| **13th**  45:11,16 |
| **14th**  40:1 45:9 47:9 |
| **16**  39:4 |
| **17**  3:4 |
| **18**  39:14 |
| **1820**  77:2 |
| **1994**  7:2 |
| **1:21**  1:8 |

| 2 |
| --- |
| **2,000**  36:22 50:9 |
| **20**  1:19 33:16,19 33:21 78:16 79:22 80:22 |
| **2012**  8:10 |
| **2016**  8:17 24:16,17 |
| **2018**  25:11,15 |
| **2019**  14:14,15 15:11 22:20 23:2 26:8,8 45:16,23 |
| **2020**  47:9 48:4 62:22 66:3 70:11 |
| **2022**  1:19 76:3 77:4 |
| **216**  3:11 |
| **216-523-1313**  77:3 |
| **21st**  45:21,23 |
| **22261**  76:5 |

| 23rd  76:3 |
| --- |
| **24**  23:4 37:15 38:6 |
| **24th**  7:2 |
| **28**  75:19 |
| **29**  77:4 |
| **29010**  3:10 |

| 3 |
| --- |
| **330**  3:5 |
| **348-1700**  3:11 |
| **36196**  1:18 |

| 4 |
| --- |
| **4**  2:2 |
| **440-4027**  3:5 |
| **44026**  6:25 |
| **44092**  3:11 |
| **44114**  77:2 |
| **44612**  3:5 |

| 5 |
| --- |
| **5-21-2027**  76:6 |
| **5289645**  77:7 78:2 79:2 80:2 |
| **5th**  13:14 14:13 |

| 6 |
| --- |
| **6**  9:6 22:20 |
| **6/20/2022**  77:8 78:3 79:3 |
| **63**  9:7 |
| **66**  9:7 |
| **69**  47:15 |
| **6th**  23:2 35:18,19 35:21,23,25 36:4,6 37:7,8 38:12 |

| 7 |
| --- |
| **7**  9:7 |
| **72**  47:16 |
| **7224**  6:24 9:20 24:15 |

| 9 |
| --- |
| **90**  14:4,4,9 |
| **9:02**  48:13 |
| **9th**  39:13 45:4 |

| a |
| --- |
| **a.m.**  1:19 48:13 74:17 |
| **abiding**  17:14 |
| **able**  19:15,17,19 21:9 44:25 |
| **access**  23:12 |
| **accident**  11:11 |
| **accurate**  32:16 |
| **acknowledge** 12:23 78:11 79:16 |
| **act**  78:14 79:20 |
| **action**  75:16 |
| **active**  9:14 |
| **actual**  22:9 |
| **added**  15:5,13 |
| **additional**  15:5 |
| **address**  6:23 77:15 |
| **adjacent**  50:9 60:9 |
| **administration** 8:20 |
| **admit**  56:6 |
| **advised**  18:25 |
| **advisor**  7:17 8:5 |
| **affiliated**  75:18 |
| **affixed**  78:15 79:21 |
| **age**  4:2 |
| **agent**  21:15 63:14 |
| **ago**  69:17 |
| **agree**  17:22 20:25 34:2 48:8 63:5 |
| **agreed**  40:11 |
| **ahead**  35:1 45:22 51:21 |

| al  1:6,10 77:6 78:3 79:3 |
| --- |
| **allegedly**  35:24 |
| **alleging**  72:14 |
| **allowed**  11:21 21:16 24:2 42:9 43:15 48:2 50:22 51:19 52:3 |
| **alongside**  35:8 51:13 53:11,15,24 53:25 54:22 55:9 55:16,25 56:2,7,15 56:19 57:6 |
| **amount**  48:6 |
| **animal**  12:17 |
| **animals**  11:6 39:5 49:23 50:17 |
| **answer**  5:18,18,25 6:12 10:22 20:6 20:16 21:2,10 30:9,16 32:6,14 33:3,5,6,7,7,9 34:11,20,22 35:2,3 39:6 52:24 70:3 73:25 74:1 |
| **answered**  34:4,10 52:23 55:8 |
| **answering**  6:11 32:18 |
| **anybody**  9:19 10:13 11:4 60:25 67:16,16 |
| **anyway**  39:10 |
| **apologize**  32:13 33:14,18 |
| **apparently**  39:5 |
| **appeal**  18:18 19:22 20:4,12,14 20:15,19,21 |
| **appealed**  18:3,6 20:9,10,18,22,24 |

**appeals** 18:10,23
**appear** 78:11
  79:15
**appearances** 3:1
**appellate** 16:17
  19:17
**appended** 79:11
  79:18
**approach** 23:24
**approached** 51:15
**approximate**
  33:24,24 52:18
**approximately**
  7:22 8:1 10:5 15:7
  15:11 48:13
**april** 45:4,9
**arisen** 11:15
**arms** 35:7 51:10
  51:11 54:2 58:5
**arose** 10:24
**arrive** 59:16
**arrived** 23:7
**aside** 10:19 11:16
**asked** 34:24 41:2
  42:2 43:11 46:1,9
  49:6 50:1 51:3
  52:20,23 57:3
  60:17
**asking** 6:19 11:4
  28:20 29:2 30:11
  32:15,15,16,16,17
  34:7 35:1 37:9
  53:12 55:6,9,10,12
  56:14,17 57:8
  63:7 66:11,16
  71:7 72:21 73:24
  74:3
**assignment** 78:2
  79:2 80:2
**assistance** 42:25

**assisted** 60:6
**assume** 10:7
**attached** 47:5
  49:22 79:7
**attorney** 3:4,10
  4:8 11:21,24 13:4
  13:19 18:17,19
  19:25,25 20:7,11
  20:16,22 32:5
  74:11 75:15
**attorneys** 18:20
**authorize** 79:11
**ave** 77:1
**award** 72:19
**aware** 50:16 60:5
  60:7,9

**b**

**b** 4:12 51:18
**back** 15:14 24:12
  32:7 35:17 38:5
  40:14 41:24 42:11
  46:13,14,17,18
  47:3,6 49:21 50:1
  50:3,4,5,8,14
  56:20 58:20 59:11
  70:10,24 71:10,13
  77:15
**background** 6:18
  12:22 25:13
**banker** 7:8
**baringer** 2:2 3:9
  4:6,8 9:2 22:2,7
  22:11,14,17 23:5
  34:9,17 35:16
  37:24 43:7 52:21
  52:25 53:2 54:18
  56:12 59:2 61:24
  63:9 66:14,17,18
  66:23 67:13 71:17
  71:21 74:10

**barn** 10:9 25:7,15
  25:16 26:15,18,20
  27:10,15,17,18,20
  27:23 29:8,10,10
  29:19,23 30:2,8
  32:11,24 33:25
  34:21 35:11,13
  36:6,12,15,17,21
  36:24 37:3,6 40:6
  40:17,18,19,22
  41:2,3 42:13
  43:21 44:3,13,18
  44:19 46:12,13
  49:24 50:25 51:16
  51:25 52:4,16
  53:5,8,12,14,16,21
  53:24 54:7,22,25
  55:2,9,15,17,25
  56:2,7,14,15,15,20
  57:1,6,7,9,16 68:3
  68:7,17,20,21,23
  68:24 69:2,3
  71:23 72:1,2,9
**based** 20:15 70:6
**beginning** 26:8
  62:5
**behalf** 3:2,7
**believe** 15:10,25
  17:9 19:11 22:21
  39:7 40:23 44:7
  44:24 50:20 61:5
  69:21
**bella** 40:20 46:5
**belong** 69:2
**best** 6:11 33:10
**bianca** 1:5,13 4:1
  4:7 35:2 40:17,19
  74:11 75:7 77:6,8
  78:3,4,9 79:3,4,13
  80:20

**bianca's** 42:6,7
**birth** 7:1
**bit** 6:18 53:4
**blindly** 42:14
**blurred** 59:22
**boarder** 69:8
**boarders** 37:23
**boarding** 71:25
**bolivar** 3:5
**bottom** 22:19
**bought** 27:8
**boulevard** 1:18
**box** 3:4
**boyfriend** 62:10
  62:11
**break** 5:22 6:2
  71:18
**breaking** 9:3
**briefly** 5:13 6:18
**bring** 63:15
**broke** 44:15
**brother** 62:12
**brother's** 62:13,14
**brustein** 4:12
**building** 26:18
  27:12
**buildings** 25:4
**built** 25:8,16,18,21
  25:23
**business** 8:19
  47:10,13

**c**

**c** 10:2 51:19
**ca** 77:25
**call** 51:20,22 61:8
  62:1
**called** 1:14 8:3
  38:25 39:6 41:4,5
  59:13 61:22
**calls** 49:11,16
  50:19 51:4,6

[camera - correct]

**camera**  41:15,19
41:20
**cameras**  23:13
41:17
**car**  11:10 38:5
**card**  47:10,13
48:15
**care**  15:18 22:13
24:9 40:7 44:21
44:25 72:8
**caring**  44:3
**carlo**  62:14
**case**  1:8 4:13,22
5:8,9 6:20 10:16
12:15 13:6 16:3,8
18:15,21 22:4,9
24:14 63:6,11,15
63:18 66:5,9 70:9
72:11,15,22 73:10
73:15 77:6 78:3
79:3
**cases**  10:18,23
11:14,16 31:11
**catch**  47:20 48:17
**cause**  59:25
**caused**  63:3 72:15
**cautioned**  4:3
**certain**  70:24
**certainty**  30:17
**certificate**  75:2
79:11
**certification**  78:1
79:1
**certified**  4:4 28:6
**certify**  75:6,14
**chance**  21:23
**change**  77:13,14
79:8 80:3
**changes**  77:12
78:7 79:7,9

**chardon**  3:10
12:16
**charge**  16:15
**check**  48:14 65:18
65:21 74:15
**checks**  47:24 48:1
49:18
**chesterland**  6:25
23:23
**chief**  59:11,13
60:13,16 62:17
**children**  9:17
**choice**  49:6
**christian**  4:11
16:23 21:14 23:7
23:10,11,15,22
24:4 28:17,24
29:13 30:3,19
31:24 32:25 34:2
34:14 35:6 39:7
39:15 40:7,13,16
40:20 41:1,5
42:16,18,19 43:9
43:18 44:11 45:23
46:8 48:23 49:8
50:11 51:21 53:18
55:2,14 56:1,21
59:10,12,18 60:11
60:18 61:3,3
62:15 63:10 65:23
66:1,19,24 67:18
69:9 73:6
**christian's**  40:25
**city**  7:13
**civil**  1:15 67:2
75:19 78:5 79:5
**claim**  32:4
**clarification**  8:24
22:24 54:11 58:25
61:18

**clarify**  15:5 63:22
64:13
**clarifying**  6:14
**clark**  4:12
**classes**  9:12
**clear**  31:4 39:8
44:20 53:13
**clearly**  30:23
53:19 57:9
**cleveland**  8:22
77:2
**client**  7:8
**cohn**  9:24
**coincide**  19:13
**college**  8:12,13,21
**come**  17:12 29:4
31:17,24 40:22
41:2,3 42:13
43:13,21 49:16
59:9 69:11
**comes**  38:14,16
47:9
**comfortable**  28:6
30:15 32:18 34:6
**coming**  62:6 67:19
67:21
**commission**  76:6
78:19 79:25 80:25
**commissioned**
75:5
**company**  8:3
**compensatory**
72:19
**complaint**  12:2,11
21:21,24 22:9,19
61:5,11,13,14,17
61:21,22,25 72:18
**complaints**  49:18
50:20 51:4,6
**complete**  58:8

**completed**  77:15
**compliance**  47:25
**compliant**  48:3
65:12,17 68:25
**complying**  44:12
**concluded**  74:17
**conclusion**  66:13
**conducted**  2:1
**confirm**  49:15
**confused**  53:3
**considered**  24:22
**constitute**  73:9,14
73:17
**constitution**  17:18
**constitutional**
17:24 72:24 73:4
73:9,13,18,23
**contains**  68:5
**contempt**  64:21,24
65:2
**continued**  49:20
52:2 57:18
**continuing**  9:11
**contract**  75:18
**contrary**  19:7,13
**convenient**  47:20
48:16
**conversation**
43:17
**convicted**  12:23
13:9
**conviction**  13:17
18:6 63:21
**convictions**  12:16
12:20 19:4,9
69:20
**coordinates**  28:7
**copies**  21:24
**cops**  42:20 59:9
**correct**  12:17,18
13:7,10,11 14:6,15

14:18 15:24 16:1
16:14,20 18:1,2,4
18:5,8,10,11,14,16
19:11 20:20 21:18
21:19 22:23 23:1
23:17,19 24:19
25:8,9,9 26:16
31:19 35:19 39:17
39:18,20,21,23,24
41:11,16 42:22,25
43:19 45:10,14,15
45:18 46:21 47:1
47:2,12,18 48:7
53:5 54:23 62:21
62:24 63:2,12,15
63:20,25 64:9,16
65:25 67:15 68:9
69:7 71:15 72:5
73:2,12,19
**corrections** 77:12
79:17
**counsel** 18:13
64:18
**counts** 12:16,25
**county** 1:9 4:9
21:15 75:2 77:6
78:3,10 79:3,15
**couple** 4:15 71:13
**court** 1:1 5:20 6:7
8:25 12:16 16:17
18:10,23 19:1,8,15
19:17,23 21:19
22:25 50:23 54:12
59:1 60:2 61:19
63:14,20,20 64:8
67:3 75:17 78:7
**court's** 20:2,23
21:4,16
**courtwright** 4:11
28:18,24 42:19
45:5 48:23 49:8

**criminal** 16:8 26:6
26:7,22 63:20
**cross** 1:15 4:5
29:17 30:19 32:21
33:2 34:16 35:10
51:14 54:3 55:5
56:23 58:10,13,22
**crossed** 29:15
51:15 52:12,13
53:18 54:8,14
55:14 57:14,15
58:1
**crossing** 53:20
57:22,25
**cruelty** 12:17
**current** 6:23
**currently** 7:3
14:16 28:9 29:2
29:24 30:6 32:8
**cv** 1:8

**d**

**d** 51:20 75:19
**dad** 41:4,22 42:8
43:25 62:8
**damage** 72:25
73:3,11 74:2,5,9
**damaged** 72:22
73:7
**damages** 72:11,13
72:14,20 73:10,14
73:19,22
**date** 7:1 19:8
22:19 23:2,21
26:4 35:18,19,23
39:14 45:8,20,22
48:5,6 63:1 65:6
69:18 71:6,16
77:8 78:3,9,19
79:3,13,25 80:20
80:25

**dates** 12:5
**davis** 3:8
**davisyoung.com**
3:12
**day** 13:14 15:12
23:3 38:15 60:12
71:4 76:3 78:16
79:22 80:22
**days** 14:4,5,9
77:18
**dayton** 76:2
**dealing** 11:3
**dealings** 65:7
**dear** 77:10
**december** 45:21
45:23 47:8
**decides** 69:24
**deed** 78:14 79:20
**deem** 65:21
**deemed** 29:16
51:12 54:1 57:10
77:19
**deep** 36:23 50:9
**defendant** 48:23
**defendants** 1:11
1:14 3:7 72:12
**defined** 75:18
**definitely** 61:10
**degree** 8:18
**deletes** 70:14
**demarcates** 29:3
**demarcations** 57:5
**denied** 64:8
**department** 65:8,9
65:20 77:22
**deposition** 1:13
4:13 5:6,10 11:19
12:1,8 74:16 77:8
77:11 78:1,3 79:1
79:3

**despite** 67:3
**dictates** 33:23
**dictating** 29:12
**different** 25:19,20
**directions** 53:10
**directly** 38:11
**directors** 4:11
**discussed** 11:22
60:7
**discussing** 36:2
**discussion** 54:17
**dismiss** 66:5,9
**dismissed** 63:18
**distance** 33:25
34:14
**district** 1:1,2 18:9
**dividing** 28:17
32:9
**division** 1:3
**document** 27:24
**documentation**
20:7 21:2,8 28:4,5
**documents** 12:4
20:1,11,22
**doing** 5:14,16
49:17 50:23 51:2
67:7 71:24
**door** 46:3,7 47:10
47:13,14 48:22,24
49:1
**downstairs** 4:20
**drive** 38:5
**driveway** 30:22,23
30:25 31:2 36:10
36:14 37:10 47:12
**drove** 31:2,16 36:9
**due** 10:24 11:8
17:24 26:17
**duly** 4:3 75:4,8

## e

**e** 4:12
**earlier** 55:21 60:7
**eastern** 1:3
**eastlake** 1:18 8:8
  8:11
**easy** 5:20 47:17
**edge** 29:23 34:21
  52:16
**education** 8:7 9:5
  9:12
**eight** 45:9
**either** 10:20 75:15
**email** 77:17
**employed** 7:3
**employees** 4:10
**employer** 7:5
**employment** 7:16
**enclosed** 77:11
**ensure** 17:13
**enter** 17:6 31:10
  35:20 39:19,22
  46:20 59:23 62:7
  68:21,24 72:9
**entered** 23:22,23
  39:15 45:24 79:9
**entering** 45:17,20
**enters** 45:5
**entire** 14:4 31:3
  50:13 67:24 78:5
  79:5
**entry** 23:3
**equine** 8:20
**erie** 8:13,21 9:4
**errata** 77:13,18
  79:7,10,18 80:1
**escorting** 31:23
**established** 57:12
  67:15
**estimate** 30:12,14
  33:10

**estimating** 30:16
**et** 1:6,10 77:6 78:3
  79:3
**event** 75:16
**eventually** 45:12
**everybody** 71:19
**evidence** 19:7,12
  19:14,16,18,20,24
  20:4
**exact** 15:12 26:4
  28:1 30:8 32:19
  34:14 65:6 69:17
**exactly** 26:13 28:7
  59:12
**examination** 1:15
  2:1 4:5
**examined** 4:4
**executed** 79:10
**execution** 78:14
  79:19
**exhibit** 22:5,10
**exhibits** 2:4
**expecting** 45:25
**expiration** 78:19
  79:25 80:25
**expires** 76:6
**explain** 70:4
**explained** 59:12

## f

**facility** 23:24
**fact** 14:3 19:14
  41:6 62:4
**familiar** 69:4
**far** 29:22 30:2,12
  30:12 32:23 33:10
  34:20 36:20 52:16
  65:24
**father** 40:5,8,15
  40:18,21,23 42:12
  43:14,16,20 44:8
  44:17

**father's** 43:21,22
  44:18,18,19
**fear** 60:15
**feared** 41:1
**february** 26:9
**feel** 28:6 30:15
  32:18
**feet** 32:11 33:16
  33:19,21 36:22
  50:9
**felt** 66:19,24 67:1
  67:4
**fence** 29:7,9,11,17
  29:18,24 30:6,12
  32:8,23 33:22
  34:12,20 35:5,6,8
  51:13 52:14 53:5
  53:8,13,15,17,25
  54:5,7,20,22,23,25
  55:4,5,11,13,18
  56:3,4,7,8,13,14
  56:17,19,23 57:10
**fences** 29:5
**fencing** 28:14,16
  28:23
**fenner** 7:18
**fifth** 35:1
**figure** 52:17 54:4
**file** 20:21 59:14
  64:10
**filed** 4:14 10:12
  20:1,11,15 63:19
  63:23
**financial** 7:17 8:4
  8:4 9:10 16:9
**find** 29:22 64:20
  68:1 77:11
**fine** 22:6
**finish** 5:16,17,19
  5:25

**firm** 75:17
**first** 4:3,16 6:17
  12:13,22 21:20,21
  22:21 23:2,21
  30:24 31:15 38:14
  38:15 68:3 69:15
  75:7
**five** 14:12 32:10
  52:20 67:22,24
  71:18
**following** 13:13,14
**follows** 4:4
**forcibly** 43:2,8
  44:17
**foregoing** 78:13
  79:18
**forfeited** 15:25
  16:8
**forgot** 7:19
**form** 67:9
**forward** 29:15
  77:15
**four** 8:1 10:5
  22:19 34:24 35:4
**frame** 70:16
**free** 78:14 79:20
**friday** 48:12,18
**friend** 10:6,8 46:1
  69:8
**friends** 9:21
**front** 21:8,9,22
  27:25 37:3 46:19
  47:6,10,13 55:23
**further** 58:20
  75:14
**fuss** 63:3
**future** 67:21

## g

**garage** 25:5 47:5
  49:22

gate  31:6 55:23
geauga  1:9 4:9
  10:25 21:15 48:24
  77:6 78:3 79:3
general  6:4 72:19
getting  25:24
  48:19 49:4
giancarlo  3:14 5:3
gift  27:3,4,5
gifted  27:1
give  27:9 30:8 33:9
  34:13 37:19 73:25
given  34:25
giving  30:16
gmail.com  3:6
go  5:13 6:17 8:7
  8:11 12:12 15:14
  28:12 31:10 35:1
  35:10,17 36:6,7,10
  36:15,20,20,25
  37:5,6 42:5,6 45:6
  45:21 47:9 49:5
  51:21 52:3 68:16
  70:10 71:10,13
  72:6
goes  50:9 70:24
going  11:18 12:12
  12:21 14:8 22:5
  22:14 23:13,18
  24:11 30:8 33:3
  34:18,20,22 35:3
  38:8,11 42:5
  43:12 47:21 57:1
  58:10,12 59:21,25
  61:21 64:24 65:13
  67:10,14 74:14
good  5:16 6:6
  46:18,25 52:10
google  54:21
graduate  8:9,14

graduated  8:17
gravel  50:5
great  22:3
greatly  32:13
gregory  18:20
ground  5:12
guess  7:19 10:18
  11:4 68:9
guy  71:25
guys  11:22

**h**

h  10:2
hair  46:4
half  26:12,13 27:8
  27:9
hand  76:2
hands  29:15 51:10
  56:21,24
happen  25:10
happened  23:21
  40:2 45:22 48:9
  59:13,18 70:9
  71:16
happens  59:10
  70:19
harass  31:24
  60:16
harassing  66:19
  66:24
harassment  32:1
hard  6:10
head  6:5,5
health  9:8
hear  5:2 25:13
  43:5
hearing  19:15
  64:12,13,15
hearings  14:23,25
  15:2
heat  60:23

heated  60:20
held  54:17
hereinafter  4:3
hereunto  76:1
high  8:7
hills  3:11
hold  6:3 64:24
  65:2 66:10
home  7:10 41:12
  46:1,2 47:21
hope  4:12
horse  38:3,4 69:5
  69:8 71:25
horses  15:19,19,25
  16:2,4,7 24:7
  37:13,23,23 38:1,2
  38:17 40:7 44:4
  44:21 45:1 49:23
  68:11,13,15 69:1
  69:11 71:25 72:4
  72:7
hours  23:4 37:15
  38:6 39:17 45:6
house  4:19,20 25:5
  25:19,19 36:23
  46:14 47:5 49:10
  49:11
huhs  6:8
human  68:6
humane  1:9 4:9
  10:17,18,25 11:6
  11:16 21:14,15
  48:24 63:11,14
  67:25 77:6 78:3
  79:3
hundred  15:11
  30:17
huth  3:3 18:19
  22:6,8,12 34:4,23
  37:21 43:4 52:19
  52:22 56:10 63:7

66:10,15,21 67:8
74:13 77:5

**i**

important  5:14
impose  14:8 17:24
imposed  13:10
included  24:18
  77:13
incorporated
  79:12
indicate  20:4 35:6
  48:13 50:15 54:13
indicated  47:23
  49:1,13,25 51:17
  53:19 54:2 55:2
  56:22,24,25 58:1,5
  65:10 67:16
indicating  51:11
  77:13
indication  31:4
  67:20
industry  9:11
informed  46:8
inspection  21:21
  22:22 45:12 46:9
  46:24,25 49:2
  62:20,25
inspections  15:23
  16:19,22,24 17:11
  20:19 21:17 39:12
  41:8 48:2 50:22
  60:3 64:7 65:24
  66:3,25 67:6,11,17
  67:20 73:1
install  69:16
instance  30:24
instances  12:6
  31:13 38:13 52:6
  60:6
instruct  74:11

[insurance - mentioned]                                        Page 7

**insurance** 9:8
**interested** 75:16
**involving** 10:18
  11:5
**issue** 24:12
**issues** 10:24 11:1,3
  11:15 12:14,22

**j**

**j** 3:3
**jail** 13:24 14:4
**job** 5:17 7:7
**judge** 13:10,17,20
  14:6 15:4 17:23
  64:20,23,25
**july** 45:11,16 48:4
  62:22 66:2 70:11
**jump** 46:5
**jumped** 47:2
**june** 1:19 76:3
  77:4
**jury** 13:1,9

**k**

**karen** 1:16 3:14
  5:4 75:3 76:5
**keep** 9:14 34:7
  57:21 72:4
**ken** 4:11
**kept** 24:8 68:13
**keybank** 7:6,15,20
  7:21
**kind** 20:14 70:4
  72:13
**knew** 28:18,25
  31:7,8 34:15 35:7
  35:12,13 37:25
  38:22,25 48:25
  53:19 57:1,11,24
  58:11 67:18
**knocked** 47:14

**know** 4:17,23 5:12
  5:23 10:17 11:21
  11:23 13:19,20,22
  13:25 19:2,4,6,9
  21:22 22:8 24:1
  26:4,13 28:2,3
  30:17,18,20,21
  32:19,20,23 33:24
  34:6 36:9 44:6
  48:25 52:11,12,18
  53:9 54:8,14,20
  55:3 56:13 57:22
  58:1,3,9,18 59:22
  62:6 65:24 67:22
  68:11,14 69:3,7,17
  70:16,20,22 71:23
  72:21 73:25
**knowing** 34:19
**knowingly** 57:14
**known** 4:9

**l**

**lake** 8:13,21 9:4
**land** 25:6 26:25
**law** 3:4,10
**lawful** 4:2
**lawsuit** 11:7
**lawsuits** 10:12,13
  10:20
**leave** 42:2
**leaves** 47:10 62:15
**left** 47:13,14 48:15
**legal** 44:9 66:12,12
  77:1 80:1
**legally** 40:24
**letter** 77:19
**license** 9:8
**licensing** 9:13
**life** 9:8 11:10
  65:14,15
**line** 27:22 28:10
  28:19,22 29:1,3,6

29:13,14,16,17,23
30:5,19,21 32:10
33:1,23 34:15
35:5,8 36:3 50:25
51:11,12,14,15
53:18,20 54:2,3,9
54:15 55:1,3,4,5
55:14,17,18,19
56:3,4,9,22,25
57:7,12,13,22,25
58:2,4,6,10,12,22
59:22 60:8 77:13
79:7 80:3
**list** 70:23
**listed** 79:7,17
**listing** 79:7
**little** 6:17 46:14
  48:11 49:3 53:4
  60:20
**living** 68:5
**loan** 26:19
**located** 7:12
**location** 4:16 7:9
  7:11 28:1
**long** 5:23 7:20,23
  10:3 14:11
**look** 12:3 21:7
  29:19 35:11 37:7
  38:16 46:15 49:22
  50:12 53:21 57:16
  70:21
**looked** 38:20
  51:24
**looking** 12:10
  22:18 35:15 51:24
  54:21 56:16 57:20
**lost** 63:17
**lot** 24:22 25:13
  63:19,22
**lots** 24:23

**love** 27:6
**lynch** 7:18,23,25
  8:2

**m**

**m** 1:16 75:3 76:5
**madam** 77:10
**major** 8:19
**making** 48:15
**manner** 75:16
**maps** 54:21
**marcellino** 1:5,13
  3:14,14 4:1 5:3,4
  75:7 77:6,8 78:3,4
  78:9 79:3,4,13
  80:20
**march** 13:14
  14:13 15:8 22:20
  23:2 35:18,19,21
  35:23,25 36:4,6
  37:7,8 38:12
  39:13 40:1 47:9
**marissa** 9:24
**marissa's** 9:25
**mark** 22:3,5,9
**marked** 2:4
**marking** 28:9 32:9
  55:17
**married** 9:15
**matt** 4:7 34:4
  56:11 67:8
**matter** 4:14 44:21
  60:22
**matthew** 3:9
**mbaringer** 3:12
**mean** 31:11 43:2
  53:10 70:22
**meaning** 13:17
**meant** 17:1,3,11
**mentioned** 4:16
  12:11 15:13 16:18
  64:11

| | **n** | **o** | |
|---|---|---|---|
| **mentor**  7:14 | **n**  4:12 10:2 | **o**  10:2 | 39:13 42:3,20 |
| **merrill**  7:18,23,25 | **name**  4:7 6:23 | **objection**  34:23,23 | 43:16 44:11 52:15 |
| 8:2 | 9:23,24,25 62:13 | 66:11 67:9 | 52:22 53:3,15 |
| **mess**  22:15 | 62:14 77:6 78:3,4 | **observe**  55:14 | 57:3 59:9 62:1 |
| **met**  23:25 | 78:15 79:3,4,21 | 57:15 59:11 | 70:8 71:3 72:6 |
| **michela**  3:3 18:19 | **named**  75:7 | **observed**  43:19 | 73:16,25 74:10 |
| 22:5 | **nasty**  61:2,6 | 59:12 | **old**  39:4 |
| **michelahuth.esq** | **nature**  49:19 | **observing**  42:11 | **once**  5:18 |
| 3:6 | **near**  36:23 55:2 | 50:25 52:4 | **ones**  55:25 |
| **midwest**  77:17 | **necessary**  65:21 | **obtain**  70:18 71:1 | **opened**  46:7 |
| 80:1 | **need**  4:22 5:22 | **obtained**  71:6 | **opinion**  18:22 19:1 |
| **mills**  6:24 9:20 | 12:21 50:3 70:19 | **obvious**  68:9 | 20:2,24 21:5 |
| 24:15 | 71:2 | **obviously**  24:14 | 32:17 33:2 |
| **mine**  39:12 | **needed**  40:16 50:6 | **occasion**  27:4 | **opposite**  29:18 |
| **minor**  8:20 39:1 | **neighbor**  10:24 | 42:21 46:21,22 | 57:9 58:9 |
| **minute**  67:8 71:18 | 11:2,6,15 | **occasions**  28:25 | **option**  46:10,11 |
| **modified**  64:1 | **neighbor's**  39:15 | **occurred**  48:6 | 49:8 50:7 |
| **modify**  63:24 | 45:5 | **offer**  11:22 | **options**  13:17,20 |
| **mom**  62:3,4 | **neighboring**  68:4 | **office**  76:2 | **order**  17:21 21:16 |
| **monday**  1:19 | **never**  11:8,12,17 | **officer**  40:11 42:5 | 21:19 44:24 45:1 |
| **monitored**  39:16 | 50:6 57:22 67:18 | 42:15 59:20 67:25 | 48:3 67:3 |
| 39:24 | 68:20 70:24 | **officers**  40:13 | **ordered**  15:25 |
| **monitoring**  41:14 | **new**  19:18 | **offices**  25:12 | 44:21 60:3 |
| **montgomery**  75:2 | **nodding**  6:5 | **official**  78:15 | **original**  15:14,16 |
| **months**  7:22 47:9 | **noise**  25:13 | 79:21 | 15:17 |
| **morning**  19:14 | **north**  8:8,11 | **oh**  31:1,25 35:22 | **overturned**  16:16 |
| 45:25 | **northern**  1:2 | 61:14 62:1 | **owned**  25:22 60:9 |
| **motioned**  51:10 | **nose**  69:5 | **ohio**  1:2,17,18 3:5 | |
| **move**  21:12 37:19 | **notarized**  77:14 | 3:11 6:25 8:23 9:1 | **p** |
| 40:10,11 42:23 | **notary**  1:17 9:9 | 9:4 75:1,4 76:2,6 | **p.o.**  3:4 |
| 43:8,12 | 75:3 76:6 77:25 | 77:2 | **page**  2:1 22:19,20 |
| **moved**  38:4 40:13 | 78:10,18 79:15,23 | **okay**  4:21 5:3,12 | 39:14 45:9 77:13 |
| **moving**  25:12 | 80:23 | 6:9 7:3 9:4 11:1 | 77:15 79:7 80:3 |
| 37:16 | **note**  77:12 | 11:13,18 13:15 | **paid**  25:16 28:4 |
| **multiple**  10:23 | **november**  24:17 | 15:7,13 16:7,18 | **pain**  73:20 |
| 28:24 31:9,11 | 24:17 | 17:20 18:1 19:9 | **painesville**  8:23 |
| 50:17 52:6 | **number**  77:7,13 | 21:13 22:2,2,7 | 9:1,4 |
| **muni**  12:16 | **numbers**  79:7 | 23:6 25:1,7 27:15 | **pajamas**  48:21,22 |
| | | 28:8,20 29:7 36:1 | **paragraph**  39:14 |
| | | 36:5 38:8,14,22 | 47:15 |
| | | | **parcel**  25:6,6,18 |
| | | | 25:19,20,22 26:2 |

26:17
**parcels**  24:24,25
  26:14
**parents**  4:19,20
  5:3 10:9 12:7
  23:23 24:1,3,6,13
  24:19 25:17,22,25
  26:2,15 27:6,9,16
  27:17,18,19 28:16
  29:19 30:18 31:8
  31:18 35:12,13,20
  36:7,19 37:11,20
  38:21 39:2,9,12,22
  40:6,7,8 41:7 42:2
  42:4,12,23 43:10
  43:20 45:7,18,20
  46:20 50:10,12,25
  51:4,6,16,18,24,25
  52:3 53:21 55:15
  57:15 58:16 59:14
  59:15,16 60:8,9,16
  68:3,4 71:23
**part**  17:18 20:9
  46:14 52:5 79:9
**parties**  4:22
**party**  75:15
**passed**  9:6
**pasture**  33:22
  34:12 35:6 51:13
  52:14 53:5,8,13
  56:4,13,22 57:8,10
**pastures**  51:1
**pay**  10:10,11
  26:24
**pd**  23:23
**penalties**  13:16
**pending**  5:24,25
**people**  6:19 24:5
  36:17 37:11,12
  41:7

**percent**  15:12
  30:17
**perception**  60:23
**performed**  45:13
**period**  70:13
**permitted**  40:10
**person**  54:8
**personal**  11:10
  72:2
**personally**  78:11
  79:15
**pet**  72:7
**phone**  23:11,14
  41:13,18,21 77:3
**physical**  54:20
  55:11 72:25 73:11
  74:1,5,8
**physically**  57:7
  73:6
**picked**  51:10
  56:21
**pictures**  31:5
**piece**  61:8,23
**pierce**  7:18
**plain**  35:14 51:7
  57:2,19
**plaintiff**  1:14 4:2
**plaintiffs**  1:7 3:2
**plan**  65:25
**planned**  27:7
**plans**  66:1
**pleading**  22:4
**please**  6:12 77:11
  77:11
**point**  5:23 17:6
  25:7 46:16 49:20
  50:19 51:21 60:5
  70:15
**police**  16:24 31:5
  31:12,14,16,16,17
  31:23,24 42:17,18

43:1 51:21 60:4
**possession**  15:19
  45:1
**possibility**  13:23
  14:1
**possible**  13:16
**post**  15:1
**preliminary**  4:15
  12:14
**prepare**  11:19,25
**presence**  75:11
**present**  3:13 4:24
  4:25 23:6,9 39:2
  40:3 41:10 46:6
  64:17,19 69:9
**pretty**  37:17,18
  60:24 61:2
**previously**  71:12
**prior**  7:15 10:12
  10:13 19:8 26:5
  26:11 31:9 32:20
  50:2 52:6 60:6
  67:19
**priors**  14:7
**private**  7:8
**privy**  62:5
**probable**  59:24
**probably**  11:20
**probate**  63:14,16
**probation**  14:8,9
  14:11,17 15:3,6,16
  17:14 23:3 40:21
  42:14 44:10,12
  46:9 47:25 48:1
  48:14 49:2,12
  50:21 52:5 64:11
  64:14 65:8,9,10,14
  65:16,20 67:22,24
  68:19,25 69:13
  72:10

**procedure**  1:16
  78:5 79:5
**proceed**  46:17
**proceeded**  23:24
  24:4 31:9 34:16
  35:10 40:18 50:12
  50:24 51:14,23
  54:3 55:5 56:23
  57:17,19 58:6,22
**proceedings**  13:4
**process**  25:24
  37:16
**production**  77:15
  77:17,22
**profession**  11:9
**proof**  72:20
**properties**  24:20
  28:17 34:13 39:25
  56:4
**property**  9:22
  10:4 15:18 16:4
  16:25 17:6,12
  21:17 23:24,25
  24:2,3,5,6,7,13,13
  24:15,19 25:4,8,16
  26:12,13,16,20
  27:8,11,22 28:9,9
  28:13,16,18,21,22
  28:25 29:1,3,6,9
  29:13,14,16,16,20
  29:23 30:5,19,21
  30:23 31:7,8,18
  32:3,9,10 33:23
  34:15 35:5,7,14,20
  36:3,7,18,18,19,22
  37:12,12,14,20
  38:1,2,16,17,18,20
  38:21 39:4,9,12,15
  39:16,16,20,23
  40:8,9,12,14,15,24
  41:7,8,23,25 42:1

42:2,4,6,7,10,10
42:11,12,23,23
43:9,10,15,17,18
43:20,22 44:16,18
44:22,22 45:5,7,13
45:18,20,24 46:16
46:21 47:6 49:17
49:21 50:1,8,10,12
50:13,18,25 51:5,7
51:8,12,18,20,24
52:4,12 53:18,20
54:1,3,14 55:1,3
55:13,17,19,24
56:8,20,25 57:7,12
57:13,22,25 58:2,4
58:6,9,12,16,20,21
59:23 60:4,8,10
62:7,20 63:1 68:4
68:4,9,13,15 69:12
71:9 73:1,7 74:2,6
74:9
**prove** 19:12 43:22
  44:19
**provide** 19:20
**provided** 71:4,11
**public** 1:17 75:4
  76:6 78:10,18
  79:15,23 80:23
**pulled** 40:7 47:12
**pulling** 30:25
**pulls** 30:22
**purchase** 24:15,20
**purchased** 24:16
  24:22,23 25:1,3,21
**pursuant** 1:15
**pushed** 51:11
**put** 26:20 29:14,15
  36:24 38:4 61:15
**putting** 27:10

**q**

**qualified** 75:5
**question** 5:16,17
  5:19,24,24 6:1
  10:15,23 11:9
  20:17 21:2,10
  28:11 32:14,19
  33:4,8 34:5,24
  37:8,21 41:7 43:4
  43:5,6 52:20
  56:11 57:4 66:7
  66:22 67:10,12
  71:4 72:17 73:24
**questioned** 24:5
  36:17 37:11,12
  40:15 65:1
**questioning** 39:2,3
**questions** 6:20
  39:5
**quote** 22:21 48:16
  61:23 68:1

**r**

**r** 4:12
**raise** 20:14
**random** 15:22
  16:19,22,24 17:11
  20:19 21:16 45:12
  46:9 47:24 48:2
  49:2 50:22 60:3
  64:7 67:19
**read** 12:2 18:22
  78:5,6,12 79:5,6
  79:17
**reading** 14:1
  77:19
**ready** 48:19 49:5
**real** 6:18 23:16
**reason** 14:20 17:7
  17:13 44:7 49:16
  50:20 77:14 79:8

80:3
**reasonable** 17:9
  27:14 54:8
**recall** 12:5 61:4
  63:24 65:5,6
**receipt** 77:18
**received** 16:9
  49:11 51:3,5
**recess** 71:20
**record** 6:11,15
  22:16 54:16 69:24
  79:9
**recording** 69:25
**recordings** 70:3
**rectangle** 37:5
**reduced** 75:10,12
**refer** 42:18
**reference** 77:7
  78:2 79:2
**referenced** 78:11
  79:15
**refuse** 49:7
**regarding** 15:2
  51:4,6
**regards** 24:7
**regular** 49:17
**reintroduce** 19:18
**related** 11:3
**relation** 27:23
  29:8,10 53:6,7
**relative** 75:15
**relevant** 24:14
**relitigate** 12:20
**rely** 20:23 21:4
**remind** 6:13
**removed** 63:13
**rent** 10:10,11
**repeat** 64:22 66:6
  72:16
**rephrase** 10:14
  28:11 66:17

**report** 59:14
**reporter** 5:20 6:7
  8:25 22:25 54:12
  59:1 61:19 78:7
**reporting** 75:17
**reports** 59:25
**represented** 13:3
  18:12
**represents** 4:8
**request** 79:9,11
**requested** 8:24
  22:24 54:11 58:25
  61:18
**required** 48:1
  77:25
**rescue** 4:10 71:24
**reside** 9:19,20
  15:18 44:25
**resided** 10:3
**residence** 9:22
  68:5,6
**resides** 9:21 68:8
  68:10
**respectful** 37:17
  37:18
**respectfully** 34:9
**responded** 24:9
  49:14
**response** 34:25
**responsibility**
  44:9
**restitution** 16:13
  16:16 19:2 20:10
  20:18
**result** 73:1,21
**resume** 67:17
**returned** 77:18
**reversed** 19:3
**review** 21:1 58:24
  59:4,21 60:1
  65:10 77:12 78:1

79:1
**reviewed** 12:11
58:17
**richard** 74:15
**right** 4:7 5:2 6:15
6:22 7:1 12:10
17:7,22 21:3 22:7
22:18,22 24:11
25:15 26:9 27:13
28:13 32:7 33:15
34:18 35:17 36:5
36:6,9 37:4 39:13
39:19 41:6 43:24
47:17 49:7 56:15
58:10 60:24 61:3
62:3,16,20 63:1,6
63:11,14,17,23
64:8,14,21 65:14
65:18 66:20,25
67:7 68:2 71:18
73:7 74:14
**rights** 17:25 64:4,6
65:1 67:2 72:23
72:24 73:4,9,14,18
73:23
**road** 3:10 6:24
9:20 53:6,7 56:23
**robe** 46:3
**room** 4:17,21,23
**rudd** 1:16 75:3
76:5
**rude** 6:14
**rule** 75:19
**rules** 1:15 5:13
78:5 79:5
**run** 53:11
**runs** 35:5 55:1

**s**

**s** 4:12 77:15 79:8,8
80:3

**sanction** 16:9
**sasse** 18:20
**satisfied** 24:8,10
**saturdays** 48:17
**save** 70:7,23
**saved** 71:8,12,15
71:15
**saw** 48:22 49:22
**saying** 28:7 31:4
42:13 48:10 54:19
57:21 67:10 72:7
73:6,8 74:3
**says** 38:17 58:14
72:18
**school** 8:7
**seal** 76:2 78:15
79:21
**search** 17:17
45:13
**searches** 40:25
**second** 26:2
**secondary** 9:5
**security** 23:13
41:14,16 69:14
**see** 6:3 40:17 47:4
50:11,18 61:6
**seeing** 67:23
**seeking** 72:11,19
73:20,22
**seen** 38:3 51:14
53:22,23
**seized** 16:5,6
**seizure** 17:18
**send** 59:21 60:1
**senior** 7:8
**sense** 26:19
**sentence** 13:10
15:15 17:19,21
18:3,7 20:9 63:24
**sentenced** 13:23
14:3,10,13 15:8

38:16
**sentencing** 13:18
15:2,17,20 16:21
23:4 37:16 38:7
**separate** 9:22
**separates** 34:12
56:3
**september** 7:2
**series** 9:6,7,7,7
**set** 10:19 76:1
**shaking** 6:5
**share** 35:25 36:3
**shared** 35:22
**sheet** 77:13 79:7
79:10,18 80:1
**shift** 8:6
**shit** 61:9,23
**shocked** 48:11
49:3
**show** 19:7 21:11
61:11,21
**showed** 23:13 47:4
48:11
**shower** 45:24 46:4
46:5,25 47:3
48:19
**shown** 54:22 55:10
56:1 77:16
**shows** 28:22 48:9
**side** 29:11,18 30:9
30:18 34:1 35:10
36:21,25 37:4
40:12,14 43:12
49:10 56:15 57:10
**sight** 51:8
**signature** 76:5
77:14
**signed** 78:13 79:18
**significant** 48:6
54:6

**significantly** 32:21
**signing** 77:19
**signs** 28:15,24
29:6,21 30:24
31:6,10 55:19,22
**sincerely** 77:21
**single** 9:15,16
35:11 51:25 57:16
62:25
**sir** 52:18 77:10
**sister** 23:25 38:25
39:4 40:5,6,21
41:2 42:13 43:21
44:1,17 46:5
**situation** 61:1
**six** 7:22 39:14
**smith** 7:18
**society** 1:10 4:9
10:17,18,25 11:6
11:16 21:15 48:24
63:11 77:6 78:3
79:3
**solutions** 77:1
80:1
**somebody** 10:21
**somewhat** 11:2
**sorry** 10:14 16:10
25:12 30:10,14
32:6 33:5 37:1
43:5 44:15 45:8
52:9 56:10 59:5,7
64:22 66:6,21
72:16
**sounds** 45:11
46:23 47:15,16
**space** 53:13 54:6
**speak** 39:6
**special** 72:20
**specific** 73:24
**spell** 9:25

**split** 27:8
**spoke** 41:5 45:12
  46:7
**ss** 75:2
**stakes** 28:14 55:16
**start** 33:15 48:10
  69:24 72:13
**started** 49:9
**state** 1:17 33:1
  47:18 57:6 58:16
  66:1,2 67:25 75:1
  75:4 76:6 78:10
  79:15
**stated** 6:22 14:6
  15:23 17:17 28:18
  28:24 30:7 31:8
  32:20 34:15 35:9
  35:12 46:1 51:1,7
  52:6 55:21 56:5
  58:21 59:20 60:18
  62:17 67:23 71:2
**statement** 78:13
  78:14 79:19,19
**statements** 38:10
**states** 1:1 19:17
**stating** 47:7
**stemmed** 11:2
**stems** 12:15
**stenographically**
  75:11
**step** 24:12
**stevens** 1:18
**stop** 52:7
**storage** 49:24
**store** 70:2
**stores** 70:5,6
**straight** 51:11
  55:4 56:22
**street** 36:24 37:5
  56:16

**studies** 8:20
**stuff** 70:5
**subject** 16:3,8
  40:25
**submit** 20:7
**subscribed** 78:10
  79:14 80:21
**sue** 63:12
**sued** 10:13,21,21
  11:4,8,12,17 63:6
  63:8,10
**suffering** 73:21
**sufficient** 19:7,12
**suing** 10:16 31:22
**suite** 77:2
**summer** 15:10
**sundays** 48:17
**superior** 77:1
**support** 19:20
**supposed** 29:25
**suppressed** 19:8
  19:14,19
**suppression** 19:23
  20:3
**sure** 10:15,22
  15:12 16:10 20:6
  20:16 44:12 47:24
  48:3 57:5 73:6
**surveying** 27:24
**surveyor** 27:25
  28:6 30:7,10,15
  32:12,13,17 33:14
  33:17 34:13
**suspended** 14:5,7
**suspicion** 49:12
**sworn** 4:3 75:8
  78:10,13 79:14,18
  80:21
**system** 69:14
  70:21

**t**

**t** 4:12
**take** 4:13 5:20,22
  6:1,8,10 59:25
  71:17
**taken** 1:16 5:6,10
  6:7 71:20
**takes** 38:5
**talk** 5:15 12:7,13
  20:3,13 21:20
  59:9,10 68:2 70:9
**talked** 11:20,24
**talking** 23:14
  41:21,22 42:16,16
  58:19
**talks** 22:20
**tell** 23:20 28:1
  32:10 33:12 38:11
  38:23 40:2,18
  45:22 52:2 57:18
  60:2,4
**telling** 69:9
**ten** 57:17
**term** 13:24 14:4
  14:10,11 16:19
  64:5
**terms** 13:18 15:2,5
  15:6,14,16,21
  17:14 47:25 64:2
  64:3,4,13 69:23
**testified** 13:6
**testify** 75:8
**testimony** 75:10
  78:6,7 79:6,9,12
**thank** 57:3
**things** 4:15 20:14
  60:20 61:2 63:19
**think** 11:1 12:23
  22:3,12 24:11
  32:22 33:1 57:3
  60:25 70:3 74:13

**thirty** 77:18
**thought** 61:20
**threatened** 40:4
  40:20 64:20
**threatening** 42:12
  43:20
**three** 47:8
**threw** 48:22
**thrivent** 8:4
**time** 4:18 13:21
  17:13 19:19 23:12
  23:16 24:21 31:3
  34:19 35:1 37:13
  37:19 38:6,14
  39:1 41:3,9 45:7
  48:19 49:13 50:13
  50:21 51:5 52:1
  58:15 59:17 62:19
  69:8 70:13,16,24
  71:2
**times** 31:9 34:24
  35:4 50:2,17
  52:20
**title** 7:7
**today** 11:4 53:16
  54:21 68:12 70:11
  70:21
**told** 16:22,23 17:5
  19:11 33:7 40:8
  40:15,16 46:10
  49:5 50:6,16,18
**totally** 11:5
**towel** 46:3 47:3
**transcribed** 78:7
**transcript** 77:11
  77:12 78:5,12
  79:5,11,17
**transfer** 38:23,23
**transferred** 25:25
  26:1,3,5,5,12,14
  26:17

**trespass** 32:2,4,20
**trespassed** 30:25
  31:1,3,20 36:11,13
  37:11 38:21 58:15
**trespassing** 28:15
  28:23 29:6,20,21
  30:24 31:5,6,10,25
  34:1 42:9 43:14
  51:19 52:2,11
  55:19,22 57:18
  69:10
**trial** 13:1 14:2
  19:8,16,21,23 26:6
  26:7,22 72:20
**tried** 63:13
**trouble** 59:19
**true** 44:23
**truth** 75:8,8,9
**try** 60:15
**trying** 29:22 32:8
  47:17,19,20 52:17
  54:4
**turn** 22:20 24:9
**two** 12:16,25 16:2
  16:7 18:20 24:22
  24:24,25 26:14
  28:17 39:17 45:6
  65:13 67:15
**type** 28:13,14
  72:21
**typewriting** 75:13
**typically** 68:12

**u**

**u** 4:12
**uh** 6:8
**unannounced**
  16:24 17:11 21:17
  48:2 60:3 64:7
  67:19
**unconvenient**
  48:20

**understand** 14:5
  17:1,3,8,10,15,16
  17:19,23 32:22
  54:10,19 55:6
  67:12 73:5,11
**understanding**
  11:20 13:16 15:15
  71:22
**understood** 17:2,5
  17:20 39:9
**unfortunately**
  41:9
**united** 1:1
**unquote** 22:22
  48:16
**unreasonable**
  17:17
**unrelated** 11:5
**upheld** 19:5,10
**upset** 60:24,25
  61:1
**use** 19:15

**v**

**v** 77:6 78:3 79:3
**vehicle** 48:24
**verbiage** 17:2,16
**veritext** 77:1,7
  80:1
**veritext.com.**
  77:17
**versus** 24:13
**video** 34:2 35:22
  36:2,3 51:15 52:1
  53:23,23 54:23
  55:10 56:1 58:14
  58:17,23 59:7,8
  60:14,17 69:6
**videoing** 50:15,16
**videos** 35:25 70:6
  70:7,10,19,23 71:1
  71:2,3,5,8,11,12

  71:14
**videotaped** 59:15
**view** 35:14 57:2,20
**village** 4:10
**violate** 14:9 38:9
  38:11 40:20 41:1
  42:14 43:25 60:11
  60:15 62:16
**violated** 14:19
  40:4 45:2,3 64:4,5
  72:23,24
**violating** 49:12
  50:21
**violation** 14:22,24
  44:3 64:12,15
  65:11 72:10 73:4
  73:18,23
**violations** 73:8,13
**visits** 52:5
**vs** 1:8

**w**

**wait** 66:10,10,10
**waited** 46:24
**waive** 74:12,14
**waived** 77:19
**walk** 24:4 44:1,17
  46:17 49:9,20,25
  50:3,24 51:23
  58:6 60:17
**walked** 36:17
  37:10 40:14 42:11
  46:12,13,15,18
  47:3,5 49:21 50:8
  51:18 52:8 58:21
  59:11
**walking** 29:19
  50:10,13 51:9
**want** 6:17 12:13
  12:19 27:11 32:23
  37:19 52:24 53:10
  54:20 56:6 57:4

  64:1 73:25
**wanted** 4:17 15:4
  20:14 44:16 47:4
  49:25 70:21
**watching** 23:15
  41:19
**way** 24:1 33:6
  35:4 36:24 46:15
  50:5 59:16 67:4
**we've** 38:1 67:15
**week** 47:23
**weekends** 47:22
**weeks** 71:14
**went** 8:8,13 18:9
  35:8 36:13,16,16
  36:23 41:6 42:10
  43:16 48:22,25
  55:3 67:1 70:20
**whereof** 76:1
**willingly** 57:15
**willoughby** 3:11
**wilson** 6:24 9:20
  24:15
**window** 35:12
  51:25 57:16,20
**windows** 37:7
**witness** 9:1 23:1
  34:11 35:3 37:22
  54:13 61:20 75:12
  76:1 77:8,11 78:1
  78:4,11 79:1,4,15
**witness'** 77:14
**won** 66:4,8,12
**woods** 50:5
**words** 39:8 71:11
**work** 6:6 7:9 10:9
  40:5 47:22 48:19
  49:5 69:15,23
**workday** 48:12
  49:4

**[worked - zoom]**                                    Page 14

| |
|---|
| **worked**  8:3 |
| **wound**  69:5 |
| **writing**  75:11 |
| **wrong**  15:24 41:9 |
| 60:14,18,19 62:18 |
| **y** |
| **yeah**  10:16 16:18 |
| 22:11 27:10 28:12 |
| 37:17 52:21 62:1 |
| 71:10 72:18 |
| **year**  8:9,16 39:4 |
| **years**  8:1 10:5 |
| 14:12 65:13 67:15 |
| 67:22,24 69:17 |
| **young**  3:8 |
| **z** |
| **zoom**  1:18 3:2,7 |
| 3:14,14 5:14 6:4 |
| 22:15 |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.