1            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION

3                       - - -

4    Bianca Marcellino,        )
                              )
5              Plaintiff,      )
                              )
6        vs.                   )   Case No. 1:21-CV-01338
                              )
7    Geauga County Humane      )
     Society,                  )
8                              )
               Defendant.      )
9

10                      - - -

11

12         Remote deposition of Hope Brustein, a witness

13    herein, called on behalf of the Plaintiff for oral

14    examination, pursuant to the Federal Rules of Civil

15    Procedure, taken before Steven Mengelkamp, court

16    reporter and Notary Public in and for the State of

17    Ohio, taken via Zoom, on Monday, July 25, 2022,

18    commencing at 1:30 p.m.

19                      - - -

20

21

22

23

24

25

```
 1    APPEARANCES:

 2    On behalf of the Plaintiff:

 3           Michela Huth, Esq.
             P.O. Box 17
 4           Bolivar, Ohio 44612
             330-440-4027
 5           Michelahuth.esq@gmail.com

 6

 7    On behalf of the Defendant:

 8           Matt Baringer, Esq.
             Davis & Young
 9           29010 Chardon Road
             Willoughby Hills, Ohio 44092
10           216-348-1700
             Mbaringer@davisyoung.com

11

12                          -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          INDEX
2  WITNESS:                              CROSS
3  Hope Brustein
4        By Ms. Huth                       4
5                     - - -
6
7                  E X H I B I T S
8  EXHIBIT:                             MARKED
9        A
10        B
11        C
12                     - - -
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                          PROCEEDINGS
 2                  (Zoom recording in progress.)
 3                          HOPE BRUSTEIN
 4     of lawful age, being first duly sworn, as
 5     hereinafter certified, was examined and testified as
 6     follows:
 7                  MS. HUTH:        Ms. Brustein, my name
 8          is Michela Huth.  I'm the attorney for the
 9          plaintiffs, Marcellinos.  I'm going to go
10          through some preliminary issues.
11                  THE WITNESS:     Could you just
12          clarify which Marcellinos?
13                  MS. HUTH:        The plaintiffs.
14                  THE WITNESS:     Oh, okay.
15                  MS. HUTH:        So please just answer
16          the questions I'm going to ask.  Any answers
17          like uh-huh or uh-uh, those won't suffice
18          because the court reporter and I don't know if
19          those are yeses or nos.  If you don't
20          understand a question, please ask me and I'll
21          either repeat it or rephrase it.
22                      CROSS EXAMINATION
23     By Ms. Huth:
24     So my first question to you is, are you taking any
25          medication today that would effect your
```

| 1 |   | ability to answer straightforward and |
|---|---|---|
| 2 |   | honestly? |
| 3 | A | No. |
| 4 | Q | Are you able to fully participate in this |
| 5 |   | deposition today? |
| 6 | A | Yes. |
| 7 | Q | Do you understand that this may go for a |
| 8 |   | number of hours and we'll take breaks, during |
| 9 |   | which breaks, under the federal rules, you're |
| 10 |   | not permitted to discuss the answers with your |
| 11 |   | attorney or anyone else; do you understand |
| 12 |   | that? |
| 13 | A | Yes. |
| 14 | Q | What is your residential address? |
| 15 | A | 2575 East 127th Street, Cleveland, Ohio 44120. |
| 16 | Q | What is your phone number? |
| 17 | A | 216-392-4914. |
| 18 | Q | Is that your cell phone? |
| 19 | A | Correct. |
| 20 | Q | Is that the same cell phone you had when you |
| 21 |   | worked for Geauga County Humane Society? |
| 22 | A | Yes. |
| 23 | Q | Could you just describe what your education is |
| 24 |   | for me? |
| 25 | A | Yes.  I graduated with a four year Bachelor's |

```
 1            degree.
 2   Q        From where?
 3   A        Antioch College.
 4   Q        Do you have any higher education other than
 5            college?
 6   A        No.
 7   Q        Other than your Bachelor's degree?
 8   A        No.
 9   Q        Do you have any certifications?
10   A        I am a Certified Animal Welfare Administrator.
11   Q        Where did you get that certification from?
12   A        That is given from the Association of Animal
13            Welfare Administrators.  It is the only
14            professional certification for executive or
15            higher levels of leadership and participation
16            in various forms of animal welfare
17            organizations.
18   Q        What is that organization again, I'm sorry?
19   A        The Association of Animal Welfare
20            Administrators, AAWA.
21   Q        Is that a national association?
22   A        Yes, that is.
23   Q        Let's go through your employment history just
24            quickly.
25   A        I might have to get my resume to refresh
```

**FINCUN-MANCINI -- THE COURT REPORTERS**
**(216) 696-2272 -- email@fincunmancini.com**

```
 1              myself; would that be all right?
 2     Q   You could produce your resume and that would
 3              suffice.  But let's just go back, I believe
 4              you worked at the SPCA in Texas; is that
 5              correct?
 6     A   No, that is not correct.
 7     Q   Have you worked for any SPCAs before?
 8     A   Yes, the Ulster County SPCA in Kingston, New
 9              York.
10     Q   When was that?
11     A   That was 2006 through June or July 2007.
12     Q   Where did you work after that?
13     A   I worked at Geauga Humane Society's Rescue
14              Village from August of 2007 until early July
15              2019.
16     Q   I just wanted to talk, is Geauga County Humane
17              Society the same thing as Geauga Humane
18              Society, which is the same thing as Rescue
19              Village?
20     A   Correct.
21     Q   What is the legal name of Geauga --
22     A   I believe, if I remember correctly, that on
23              the tax forms, it's Geauga County Humane
24              Society.  However, it is a private nonprofit
25              humane society.
```

```
1    Q      Why did you leave Geauga County Humane Society
2           employment?
3    A      Because it was a wonderful time in my life,
4           when I decided to go part time and semi-
5           retire.
6    Q      Are you working now?
7    A      Yes, I am.
8    Q      So Geauga Humane Society employment -- I'm
9           just going to say Humane Society, just so that
10          we all understand I'm talking about Geauga
11          Humane Society.  After Geauga Humane Society,
12          where did you work?
13   A      I work at an organization called the Music for
14          Healing and Transition Program.
15   Q      Do you still work there?
16   A      I do.
17   Q      Is that full time?
18   A      No, it is not.
19   Q      Part time?
20   A      Correct.
21   Q      What is your position at your current
22          employment?
23   A      Chief Administrative Officer.
24   Q      What was your position with Geauga County
25          Humane Society?
```

```
 1   A      Executive Director.
 2   Q      How much did you make in the last year working
 3          at Geauga County Humane Society?
 4   A      If I remember correctly, approximately
 5          $127,000.  Or you know, that was my last year
 6          of my full time employment.
 7   Q      Have you held any volunteer positions related
 8          to animal welfare?
 9   A      I sat on the board of the Neighborhood Pets
10          Organization in Cleveland, Ohio.  I was a
11          member of the Animal Community Emergency
12          Rescue Organization in Geauga County.  I was a
13          member of the advisory board to the
14          Veterinarians Association in New York State.
15          I was also on the Board of Directors of
16          Federated Humane Societies of Ohio.
17   Q      What about some organization called Animal
18          Welfare Foundation or it's some kind of animal
19          welfare?  I believe you were President on that
20          for a while.  Do you recall that?  Animal
21          Welfare Federation, it's an Ohio organization.
22   A      I do not recall that being the case.
23   Q      So we're going to talk, obviously, only about
24          the time frame you were there, because you
25          can't speak about the time frame after you
```

```
 1            were there.  So all my questions are geared
 2            towards that, just so we don't have to say
 3            every time while you were there; I don't have
 4            to preface it.
 5                  So in the last year you were there,
 6            what were the assets, if you know, of Geauga
 7            County Humane Society?
 8                  MR. BARINGER:    Objection.  Hope, you
 9            can answer when I say objection.  I'm just
10            preserving the record.  So if I say objection,
11            you go ahead and answer anyway.
12    A     I don't remember the details.
13    Q     When I say does Geauga County receive any
14            government grants, it's obviously referring to
15            the time frame that you were there.  So during
16            the time frame you were there, did Geauga
17            County Humane Society receive any government
18            grants?
19    A     No.
20    Q     Is the sole source of money that the Humane
21            Society receives solely through donations?
22    A     No.
23    Q     What are the other sources?
24                  MR. BARINGER:    Objection.  You can
25            answer.
```

```
1    A    Grants and foundations.
2    Q    Have you received any grants from ASPCA or
3         HSUS?
4    A    Oh boy.
5    Q    If you remember, obviously.  If you don't,
6         then just it.
7    A    I don't remember.
8    Q    You were the Executive Director during the
9         entire time you were employed by the Humane
10        Society, correct?
11   A    Correct.
12   Q    Was one of your duties as the Executive
13        Director to insure compliance with applicable
14        laws, regulations and organizational policies?
15   A    Yes.
16   Q    Was one of your duties to work with staff to
17        insure adherence to applicable laws,
18        regulations and protocols?
19   A    Could you explain protocols?
20   Q    It comes from your website, so I'll delete it,
21        but let me re-ask the question.
22             Was one of your duties to work with
23        staff to insure adherence to applicable laws
24        and regulations?
25   A    Yes.
```

1  Q     Can you identify your duties as the Executive
2        Director of the Humane Society?
3  A     My duties included giving oversight to the day
4        to day operations of Geauga Humane Society's
5        Rescue Village.  Those duties included
6        insuring that the determined high level
7        quality standards of care are made available
8        and implemented for all animals, regardless of
9        species, age or medical condition.  My duties
10       also included giving oversight to the day to
11       day financial operations, the day to day
12       actual building maintenance and functioning,
13       the day to day whatever human resource issues
14       might come up; to be a liaison and execute the
15       direction of the Board of Directors or
16       Trustees, as they refer to them, I still
17       believe, at Rescue Village; to be involved and
18       give levels of advice and oversight to the
19       humane law function that Geauga Humane carried
20       out on behalf of the courts of Geauga County.
21  Q     When you say Rescue Village, you mean Geauga
22        County Humane Society?
23  A     I will use that, just as you are, that we are
24        talking whatever phrase to be the same
25        organization.

**FINCUN-MANCINI -- THE COURT REPORTERS**
**(216) 696-2272 -- email@fincunmancini.com**

```
 1   Q      Sorry for interrupting you.  Go ahead.
 2   A      That's okay.  I was responsible for overseeing
 3          fundraising and development.  I was
 4          responsible for giving oversight to the
 5          development of new programs and services for
 6          the organization.
 7   Q      Is one of those duties to monitor animal
 8          welfare issues and insure compliance with
 9          applicable laws, regulations and
10          organizational policies?
11   A      Absolutely.
12   Q      One of your duties is to conduct annual
13          employee reviews, correct?
14   A      No.  The only employees that I had
15          responsibility for evaluating were direct
16          reports to me.
17   Q      Is a humane agent a direct report to you?
18   A      Yes.
19   Q      So Christian Courtwright directly reported to
20          you?
21   A      Yes.
22   Q      So you're his immediate supervisor?
23   A      I was.
24   Q      Did you have a supervisor when you worked
25          there?
```

14

| | | |
|---|---|---|
| 1 | A | I reported to the Board of Trustees. |
| 2 | Q | Have you ever disciplined any humane agents? |
| 3 | A | What do you mean, disciplined? |
| 4 | Q | Do you know what disciplined means? |
| 5 | A | It means different things in different |
| 6 | | circumstances. |
| 7 | Q | What does it mean to you? |
| 8 | A | I think discipline means when you begin to |
| 9 | | enter a hierarchy of possible actions that |
| 10 | | need to be taken to either help improve |
| 11 | | performance or to look at are there any other |
| 12 | | steps that need to be taken to both protect |
| 13 | | the agency, as well as to protect the rights |
| 14 | | of every employee. |
| 15 | Q | What you just said, was any of that conducted |
| 16 | | with Christian Courtwright? |
| 17 | A | Discipline, no. |
| 18 | Q | How many humane agents worked for Geauga |
| 19 | | Humane Society when you worked there? |
| 20 | A | We had one humane agent appointed by Judge |
| 21 | | Grendell in the Geauga courts. |
| 22 | Q | That's Christian Courtwright? |
| 23 | A | Correct. |
| 24 | Q | I'm going to talk a little bit about training. |
| 25 | | Do you know what the word, training, means? |

```
 1          The reason I ask is because in your
 2          interrogatories, you indicated it was an
 3          ambiguous --
 4     A    No, that was discipline, not training.  We
 5          haven't talked about training.
 6     Q    No, in your discovery responses, you said the
 7          word, training, was vague and ambiguous.  Do
 8          you know what training means?
 9     A    I believe that training has different
10          applications for different positions.  So for
11          example, no one can be certified by the Court
12          of Geauga County to be a certified humane
13          agent without a certain basic and ongoing
14          training.  Training consists of the OPOTA
15          training, which you know what that is, in the
16          State of Ohio, and that training, which was
17          not mandatory, but we viewed it as essential,
18          was to have ongoing advanced education to
19          insure of being -- the ability to be both
20          compliant with the law and to be compliant
21          with due process, to know which decisions can
22          be made by a humane agent, which can be made
23          by a court, and training in investigatory
24          techniques.  Yes, that's what would apply to
25          humane agents.
```

| | | |
|---|---|---|
| 1 | Q | Do you have training in legal research? |
| 2 | A | I actually had training, many, many years ago |
| 3 | | in Berkeley, California at the University of |
| 4 | | California, Berkeley Law School.  But I am not |
| 5 | | a legal researcher.  For that, we relied on |
| 6 | | legal advice. |
| 7 | Q | What continuing education do Geauga County |
| 8 | | humane agents receive, continuing education? |
| 9 | | Like in law, we have CLEs, continuing legal |
| 10 | | education.  What kind do they receive? |
| 11 | A | When I was at Geauga Humane Society, we |
| 12 | | invested in ongoing training.  I don't |
| 13 | | remember the name.  It was a very renowned |
| 14 | | organization nationally, that humane agents |
| 15 | | would go to.  I think it was called Code 3, |
| 16 | | but I'm not positive that that was the name. |
| 17 | | There were also ongoing continuing education |
| 18 | | in humane law in the State of Ohio and |
| 19 | | opportunities would come up coming from |
| 20 | | various places within animal welfare, |
| 21 | | including national conferences, etcetera. |
| 22 | Q | So during your time at the Humane Society, did |
| 23 | | you receive any formal or informal training |
| 24 | | related to the Constitutional laws applicable |
| 25 | | to your duties or duties of people who you may |

```
 1           have supervised?
 2    A      No.
 3    Q      Did you receive any training in statutory and
 4           case law related to animal welfare and humane
 5           law enforcement?
 6    A      I would not call it training.  I would call it
 7           generally educational offerings that were made
 8           to learn about what cases were most prominent
 9           in animal welfare, what trends, when it came
10           to humane law enforcement were going on, which
11           varied by state.
12    Q      Who would give that training to you?
13    A      That training might come from HSUS.  It might
14           come from legal authorities who deal with
15           prosecutions of humane law cases.  It might
16           come from other organizations that offer
17           training in those kinds of issues.
18    Q      During your time at the Humane Society, did
19           you understand the relevant statutory and
20           Constitutional laws as they pertain to humane
21           agents' inspections on people's property or
22           humane agents entering onto people's property?
23    A      Could you rephrase the question?
24    Q      As it relates to humane agents entries onto
25           private property, during your time there, did
```

| | | |
|---|---|---|
| 1 | | you understand what statutes applied to that |
| 2 | | kind of action by a humane agent, and what |
| 3 | | Constitutional laws might apply to those types |
| 4 | | of activities? |
| 5 | A | I believe so. |
| 6 | Q | Would you consider a humane agent a law |
| 7 | | enforcement officer? |
| 8 | A | Yes. |
| 9 | Q | So when I use law enforcement, I'm referring |
| 10 | | to humane agents, as well, just so you know. |
| 11 | | Have you received any training on |
| 12 | | humane agents or law enforcement entering onto |
| 13 | | a person's property? |
| 14 | A | I am familiar with that, yes. |
| 15 | Q | What training did you receive? |
| 16 | A | I received training from prosecutors in Ohio |
| 17 | | who would prosecute humane law cases and I was |
| 18 | | also familiar with the basic training that |
| 19 | | humane agents throughout the State got about |
| 20 | | plain view doctrine, where you get search |
| 21 | | warrants, what kind of reporting had to be |
| 22 | | made, etcetera. |
| 23 | Q | Have you given any training to Christian |
| 24 | | Courtwright or did you give any training to |
| 25 | | Christian Courtwright during your employment? |

```
 1   A      Did I give any, directly from myself?
 2   Q      Yes.
 3   A      No.
 4   Q      Do you make sure that the humane agents
 5          receive sufficient training to perform their
 6          work?
 7   A      Absolutely.
 8   Q      Do you supervise these humane agents to make
 9          sure they perform their work correctly?  I
10          mean in terms of supervision.  I understand
11          you're the supervisor.  Let's ask this:  How
12          closely do you oversee the activities of your
13          humane agents?
14   A      How do you measure that?  What are the
15          choices?
16   Q      I don't know, once a week, once a month, once
17          a year, every day.
18   A      It would depend on the case loads, the
19          particular cases.  It could be every day.  It
20          could be less often if there were no current
21          cases pending.  It would certainly be more if
22          the case went to the point of going to the
23          court, or permission to go on property, or to
24          seize animals, etcetera.
25   Q      Did Christian Courtwright receive intensive
```

| | | |
|---|---|---|
| 1 | | government based training during your time |
| 2 | | there? |
| 3 | A | He met all of the standards in the State of |
| 4 | | Ohio. |
| 5 | Q | So that's yes? |
| 6 | A | Yes. |
| 7 | Q | If you know, what specific training did |
| 8 | | Christian Courtwright receive regarding |
| 9 | | statutory and Constitutional law matters? |
| 10 | A | I cannot answer for him. |
| 11 | Q | You're his supervisor though, right? |
| 12 | A | But I'm not him. |
| 13 | Q | Pardon? |
| 14 | A | I said, yes, I was his supervisor, however, |
| 15 | | I was not him.  So I could insure that he did |
| 16 | | the OPOTA training and I would, and we would |
| 17 | | both, share information about upcoming |
| 18 | | training, webinars, things that we thought |
| 19 | | that we should also invest in, to make sure |
| 20 | | that he was not only up to date, but in an |
| 21 | | ongoing way, very clear about the requirements |
| 22 | | for properly carrying out the Ohio humane law |
| 23 | | statutes. |
| 24 | Q | Have you heard of the word SOP before? |
| 25 | A | As in standard operating procedure?  Clearly, |

| | | |
|---|---|---|
| 1 | | I have. |
| 2 | Q | Good.  Does the Humane Society have SOPs |
| 3 | | related to humane agents? |
| 4 | A | Do you mean established practices? |
| 5 | Q | Well, I mean SOP.  I saw that word used on |
| 6 | | some employment evaluations or reviews, and |
| 7 | | you know what it means.  Do you have any SOPs |
| 8 | | related to humane agent activities? |
| 9 | | MR. BARINGER:    Can I just interject |
| 10 | | for one second?  I know at the beginning of |
| 11 | | this, you said, limit your answer to the time |
| 12 | | she was there.  I just want the record, |
| 13 | | because it says, do you have -- |
| 14 | | MS. HUTH:        I know, I'm using the |
| 15 | | present tense.  I can use the past tense, but |
| 16 | | I just want everyone to understand, she can |
| 17 | | only answer to the time she's working there |
| 18 | | anyway. |
| 19 | | MR. BARINGER:    You clarified it in |
| 20 | | the beginning, I'm just -- |
| 21 | | MS. HUTH:        If I'm using the |
| 22 | | present tense, I mean for only the time you |
| 23 | | were there. |
| 24 | By Ms. Huth: | |
| 25 | Q | So did you have SOPs at the time, I just don't |

```
 1              want to have to keep repeating that?
 2   A     Yes, we did.
 3   Q     Related to humane agent activities?
 4   A     Correct.
 5   Q     What are those SOPs?
 6              MR. BARINGER:     Objection.
 7   A     Well, they would include, notably, the
 8         requirement that you need to go to the Court
 9         for getting a warrant that allows you to enter
10         people's property.  You need to use the
11         verdict of the Court in a cruelty case in
12         order to, for example, do follow-up, looking
13         to see what is going on, on that property, in
14         regards to the stipulations of the Court in
15         cases.  We also followed strict protocols that
16         involved legal counsel in the Courts as a
17         requirement.  That stood above anything that
18         Rescue Village would mandate itself.
19   Q     So those SOPs, are they written SOPs, or are
20         they formal, are they informal, are they
21         written?
22   A     I don't remember if we had them written, but
23         they are certainly formal in the sense that
24         there would not be a seizure of animals
25         without legal counsel and where required Court
```

23

| | | |
|---|---|---|
| 1 | | order. |
| 2 | Q | So they're formal SOPs, but they're not |
| 3 | | written down; is that what you're saying? |
| 4 | A | I don't remember if they were written down. |
| 5 | Q | Have you specifically been taught or been told |
| 6 | | or received training that you cannot enter a |
| 7 | | person's property unless you have a warrant? |
| 8 | A | We need to clarify that, because it is not a |
| 9 | | requirement to get a court order, for example, |
| 10 | | to knock on somebody's door and to inquire |
| 11 | | about issues concerning animals. Or, for |
| 12 | | example, our policy was to first, seek to |
| 13 | | educate; to second, seek to practically assist |
| 14 | | to keep people on the right side of the law |
| 15 | | and, obviously for, also, the well-being of |
| 16 | | the animals. The last step would be to |
| 17 | | intervene legally. |
| 18 | Q | Are those policies written policies? |
| 19 | A | We have spoken about them in writing. We've |
| 20 | | talked about them when we did education in the |
| 21 | | community, about what is the role of the |
| 22 | | humane agent, and we had an absolute value |
| 23 | | placed on due process. |
| 24 | Q | Were those written policies or unwritten |
| 25 | | policies? |

24

```
 1   A     They were spoken.  I do not remember if they
 2         were written policies, but they were certainly
 3         clear standards.
 4   Q     How does a humane agent that works for Geauga
 5         County Humane Society know about those
 6         unwritten policies?
 7   A     Because humane law is a very serious
 8         responsibility for the humane societies to
 9         take up in the State of Ohio, and it is
10         imperative that discussions regularly take
11         place between the humane agent, whoever his or
12         her leadership is, as well as consultation
13         with lawyers.
14   Q     So there's no written policy and the policy is
15         related to the --
16   A     I do not remember if there is a written
17         policy, but there is certainly protocol that
18         has to be followed.  So for example, in the
19         cold winter months, we would often, when
20         getting complaints about people keeping their
21         animals outside with inadequate shelter, we
22         could, to the best of our ability, distribute
23         igloos for dogs to stay in, and we would teach
24         people how do you keep those igloos a safe
25         place during bitterly cold weather.  We would
```

| | | |
|---|---|---|
| 1 | | ask and talk to people about establishing |
| 2 | | running water, shelter, etcetera, for outdoor |
| 3 | | animals, including horses and farm animals. |
| 4 | Q | Are these protocols written protocols or |
| 5 | | they're just something that -- |
| 6 | A | They are basic protocols that we very |
| 7 | | consciously put into practice and gave |
| 8 | | oversight to in all of the humane law work |
| 9 | | that Geauga Humane Society took on for Geauga |
| 10 | | County. |
| 11 | Q | I understand that, but were they written |
| 12 | | protocols? |
| 13 | A | I've said, I do not remember. |
| 14 | Q | I asked about policies before.  I'm asking |
| 15 | | about protocols now. |
| 16 | A | I said I do not remember if they were written, |
| 17 | | but they were certainly actively in use and |
| 18 | | repeatedly stuck to. |
| 19 | Q | Can you identify what training either you |
| 20 | | received or Christian Courtwright received |
| 21 | | that would have taught you or him about |
| 22 | | probation inspections? |
| 23 | A | It was always my understanding that permission |
| 24 | | to do probation inspections were a matter for |
| 25 | | the Court. |

| | | |
|---|---|---|
| 1 | Q | I understand that, but that's not what I |
| 2 | | asked.  I said, can you identify any training |
| 3 | | that either you and/or Christian Courtwright |
| 4 | | received regarding probation inspections? |
| 5 | A | The training I received started at the Ulster |
| 6 | | County SPCA and was repeated through |
| 7 | | connection with the court, as well as with |
| 8 | | legal counsel. |
| 9 | Q | I understand that, but I'm going to ask you |
| 10 | | the question; can you identify what training |
| 11 | | -- let's go step by step.  Have you received |
| 12 | | any training related to a humane agent |
| 13 | | entering a person's property to conduct an |
| 14 | | inspection?  I'm calling it -- |
| 15 | A | Yes, I did. |
| 16 | Q | You did? |
| 17 | A | Yes. |
| 18 | Q | What training was that? |
| 19 | A | The training that I received was required |
| 20 | | education to be able to be awarded an animal |
| 21 | | welfare -- the CAWA certificate, Certified |
| 22 | | Animal Welfare Administrator. |
| 23 | Q | So what specific training did you receive? |
| 24 | A | I received training and education through the |
| 25 | | Association of Animal Welfare -- |

```
 1   Q      I'm not asking where you received it.  I'm
 2          asking --
 3   A      I received it online.
 4   Q      I'm not asking where you received it.  I'm
 5          asking what training did you receive, specific
 6          training?
 7   A      I received specific training from --
 8   Q      I'm not asking you from who you received it.
 9          I'm asking you to tell me what training you
10          received regarding humane agents entering
11          private property to conduct a probation
12          inspection.  What specific training, not who,
13          when, how.
14   A      I can't answer your question, because without
15          the whos and wheres, there's no answer.
16   Q      Then go ahead.  Answer it with whos and wheres
17          if you're able to identify the training,
18          that's fine.
19   A      The training that I received was from Animal
20          Welfare, based of lawyers and prosecutors from
21          training I received in Ulster County, from
22          training I received in order to be awarded a
23          certificate called the Certified Animal
24          Welfare Administrator Certificate.
25   Q      I understand that, but my question to you is
```

```
 1           what specific training --
 2   A       I have no further answer.
 3   Q       Did you receive training specifically related
 4           to humane agents entering property to conduct
 5           probation inspections?
 6                   MR. BARINGER:     Objection.
 7   A       Yes.
 8   Q       What training was that?
 9                   MR. BARINGER:     Objection.
10   Q       Describe to me how you were trained in that
11           area?
12   A       I was trained by being required to be tested
13           from --
14   Q       I don't mean that.  I mean, tell me how they
15           trained you.  What did they teach you in the
16           training?  What was taught to you related to
17           probation inspections conducted by humane
18           agents?
19   A       My education trained me in understanding that
20           while a humane agent, who's certified by the
21           Court in the County where they will be
22           implementing, or charged with implementing
23           Ohio humane law statutes, that upon receiving
24           a complaint, complaint did not equal guilt,
25           but we had a responsibility to look into, and
```

```
1            sometimes that required a phone call,
2            sometimes that required a visit, that in order
3            to go anything beyond a visit to property, and
4            hopefully, either being able to legally view
5            the situation of animals, or be able to talk
6            to the owner, the property owner, the animal
7            owner, whoever was there, that to go any
8            further with any investigation, required Court
9            permission.  Which we would go to the Court in
10           Chardon, Ohio, who would issue permission for
11           that.  That was what I was taught.
12               Two, that in the wake of a guilty
13           verdict in the Court, it was up to the Court
14           to grant permission to do follow-up visits to
15           the place where the animals had been taken
16           from, to insure compliance with the Court
17           orders.
18    Q   Do you consider those follow-up visits the
19           same thing as a probation inspection?
20    A   I don't know how to answer that question.
21    Q   Do you know what a probation inspection is?
22    A   Would you tell me --
23               (Discussion off the record.)
24    Q   Let's just quickly talk about Bianca
25           Marcellino.  So when the Court ordered that
```

| | | |
|---|---|---|
| 1 | | she has to subject herself to random |
| 2 | | unannounced inspections and then Christian |
| 3 | | Courtwright goes onto her property, do you |
| 4 | | call that a probation inspection or do you |
| 5 | | call that a follow-up?  Just so I know what |
| 6 | | words to use. |
| 7 | A | I think that I would have referred to it as a |
| 8 | | follow up to the guilty verdict. |
| 9 | Q | Have you been trained about any, maybe, legal |
| 10 | | constraints on follow-up -- should we call |
| 11 | | them follow-up inspections just so we both |
| 12 | | know what we're talking about; does that work? |
| 13 | A | That's fine, sure. |
| 14 | Q | Have you received any training as to what laws |
| 15 | | are applicable to follow-up inspections? |
| 16 | A | I have not received specific training because |
| 17 | | we relied on the letter of the law that was |
| 18 | | handed down in the event of animal cruelty |
| 19 | | guilty verdicts in the Court itself. |
| 20 | Q | The letter of the law meaning a Court Order? |
| 21 | A | I mean, the decision -- |
| 22 | Q | The Court Order sentencing. |
| 23 | A | The sentencing and the Court Orders or Court |
| 24 | | permission, in this case. |
| 25 | Q | You're calling that the letter of the law? |

```
1    A    I have typically thought -- I have never
2         called that the letter of the law.  I just
3         looked at it as, in the case of
4         Ms. Marcellino, two guilty verdicts in animal
5         cruelty and then sentencing by the judge,
6         which included permission to do follow-up
7         visits, unannounced, without stipulations to
8         how many or time frame.
9    Q    Could you identify any training that Christian
10        Courtwright has received in follow-up
11        inspections?  And when we say follow-up
12        inspections, we mean inspections conducted by
13        the humane agent after sentencing, just so
14        we're all on the same page.
15   A    Well, it wasn't just after sentencing.  It was
16        follow-up inspections, whatever language you
17        want to use, based on the Court, not on
18        Christian.
19   Q    Right.  So can you identify what training
20        Christian has received as to what laws apply
21        to follow-up inspections?
22   A    I think he's received training through ongoing
23        education and through many, many, many years
24        of experience, including in Geauga County and
25        working with prosecutors, as well as the
```

| | | |
|---|---|---|
| 1 | | courts. |
| 2 | Q | So he has received training in what laws apply |
| 3 | | to follow-up inspections? |
| 4 | A | What I said is, I cannot answer as to whether |
| 5 | | he's received, for example, went to a class |
| 6 | | with certification.  What I'm saying is when |
| 7 | | you are very concerned with due process and |
| 8 | | sticking to the letter of the law, you learn |
| 9 | | through repeated experience what you can do |
| 10 | | and what you cannot do, and we were very |
| 11 | | serious about staying in compliance, both |
| 12 | | because we worked with the legal system of |
| 13 | | Geauga County.  Without them, we have no power |
| 14 | | to do any follow-up visits.  That was their |
| 15 | | decision and we implemented that right. |
| 16 | | So I would say that if you do this work |
| 17 | | and you believe, as we do or did -- I can't |
| 18 | | really speak for now, but I would assume it |
| 19 | | hasn't changed, that in the implementation of |
| 20 | | something like follow-up visits, you also have |
| 21 | | to be very cognizant and respectful of due |
| 22 | | process for not just the accused, but the |
| 23 | | convicted. |
| 24 | Q | Are you aware if Christian Courtwright has |
| 25 | | received any training related to follow-up |

```
 1              inspections, any formal training?  I stress
 2              that as formal training.
 3      A       Which means what?
 4      Q       Has 1Christian Courtwright received any
 5              training related to follow-up inspections?
 6      A       Yes.
 7      Q       What specific training has he received?
 8      A       One, he received training through the act of
 9              actually carrying out his job according to the
10              law, and understanding what that law gave him
11              permission to do and what that law did not
12              give him permission to do.  That would fit
13              into your definition of formal training.
14      Q       Do you recall producing some documents in the
15              discovery responses that related to what
16              training Courtwright has received, Animal
17              Agriculture 101, Animal Control Officer
18              Training Manual; do you recall those?
19      A       I do not recall.
20      Q       Do you know what training Courtwright
21              received, what formal training Courtwright
22              received?
23                   MR. BARINGER:    Objection.  You can
24              answer, again.
25      A       The memory I had of his training is the OPOTA
```

```
 1              training, ongoing continuing education both in
 2              the State of Ohio and national.
 3    Q    Can you identify which training specifically
 4              trained him in follow-up inspections?
 5                   MR. BARINGER:    Objection.  You can
 6              answer again.
 7    A    My memory includes what I've told you.
 8    Q    So nothing else to add?
 9    A    I don't remember beyond that, no.
10    Q    I might have asked you this, but you don't
11              create training and provide training to the
12              employees of the Humane Society, correct?
13    A    We do.
14    Q    I'm asking you, as the Executive Director, did
15              you create any training that you then provided
16              to the humane agents or was their training
17              fully --
18    A    Oh.  One, we only had one humane agent.  Two,
19              I did not provide training, I provided
20              oversight.
21    Q    Were there any financial constraints as to
22              what training you or Christian Courtwright
23              might want to take, in terms of the expenses
24              of the training or could you and Christian
25              Courtwright have taken any training that you
```

| | | |
|---|---|---|
| 1 | | had chosen?  Or were there financial |
| 2 | | constraints? |
| 3 | A | Well, I don't think those are the two choices. |
| 4 | | I think that the decisions when it came to |
| 5 | | budget matters were, one, we took great pride |
| 6 | | in having accepted the responsibility that the |
| 7 | | State of Ohio offers for humane societies to |
| 8 | | be in charge for assuring the enforcement of |
| 9 | | Ohio humane law statutes.  When and where we |
| 10 | | deemed it important to get training, we would |
| 11 | | work to make sure that that training was |
| 12 | | available. |
| 13 | Q | So if you believed that they needed the |
| 14 | | training, there were no financial constraints? |
| 15 | A | I was there for many, many years and you'd |
| 16 | | have to look at the budget for each year.  If |
| 17 | | there are constraints, they had the potential |
| 18 | | to be bypassed, they had the potential to be |
| 19 | | fund raised for, but in general, Rescue |
| 20 | | Village was very fortunate and was able to, |
| 21 | | for example, send Christian to Code 3 advanced |
| 22 | | training, multiple times.  That is a very |
| 23 | | expensive proposition, but well worth it and |
| 24 | | highly respected. |
| 25 | Q | In that advanced training, did he learn about |

1           probation inspections or follow-up

2           inspections?

3     A     I do not know.

4     Q     But you were his supervisor, correct?

5     A     I did not attend the trainings.

6     Q     You didn't know what he was being taught?

7           MR. BARINGER:    Objection.  Go ahead.

8     A     You know, if I knew what was being taught, it

9           would be in broad strokes, by looking at the

10          booklet that they put out.  That covered a lot

11          of ground, and no, I am not aware of the

12          details of that training.

13    Q     How do you know, if you're not aware of what

14          training he did or did not receive, how do you

15          know whether or not he was receiving training

16          that would cover all aspects of humane law?

17    A     Because if you work in animal welfare for well

18          over a decade, you become very familiar with

19          what are the really top notch offering, what's

20          most respected in the field, and that's how I

21          knew that it was worthwhile and worth both,

22          the financial investment and the time.

23    Q     But you don't know if that training educated

24          him on follow-up inspections or probation

25          inspections, correct?

| | | |
|---|---|---|
| 1 | A | I don't know, and if I did know, I no longer |
| 2 | | remember the details. |
| 3 | Q | Who pays Christian Courtwright; is that Geauga |
| 4 | | County Humane Society or does the County pay |
| 5 | | for him? |
| 6 | A | The County pays, I think when I left, |
| 7 | | approximately $25-50 a month, maybe it could |
| 8 | | have been a little higher.  But the humane |
| 9 | | agents in Ohio who are in counties where the |
| 10 | | humane societies have taken responsibility |
| 11 | | through the courts, are paid by the humane |
| 12 | | society itself. |
| 13 | Q | So the Humane Society does receive some |
| 14 | | government funding then, correct? |
| 15 | A | Possibly when I was first there, $250 a year. |
| 16 | Q | So when you said that they don't receive |
| 17 | | government funding, you forgot about that the |
| 18 | | humane agents are paid by the County? |
| 19 | | MR. BARINGER:    Objection. |
| 20 | A | You know what, if you want to say that I'm |
| 21 | | skirting the government funding, then -- |
| 22 | Q | I'm not saying you're skirting anything. |
| 23 | A | No, let me finish.  I'm saying that paying |
| 24 | | humane agents so that they can actually live |
| 25 | | and do their work is on the responsibilities |

```
 1            of the humane societies, and we took that on
 2            voluntarily and gladly.
 3    Q       So Christian Courtwright does receive some
 4            money from the government, correct, for his
 5            salary, or Geauga County Humane Society
 6            receives government money to pay for --
 7    A       No, Geauga County Humane Society receives
 8            nothing from the government.
 9    Q       So Christian Courtwright receives it directly
10            from the County?
11    A       His $25-50 or whatever, correct.
12    Q       They send it straight to him, not to the
13            Humane Society?
14    A       That's correct, to the best of my
15            recollection.
16    Q       Would you consider Christian Courtwright to be
17            a probation officer, as part of his duties?
18                 MR. BARINGER:     Objection.  You can
19            answer if you know.
20    A       A probation officer is an actual officer of
21            the Court.  Christian Courtwright was
22            certified by Judge Grendell, to be a humane
23            agent for the purposes of enforcing Ohio
24            humane law statutes in Geauga County, with no
25            jurisdiction outside of that county.
```

| | | |
|---|---|---|
| 1 | Q | Would you agree that Bianca Marcellino, from |
| 2 | | the point that she was sentenced forward to |
| 3 | | the current date, that she is a probationer? |
| 4 | | MR. BARINGER:   Objection.  You can |
| 5 | | answer. |
| 6 | A | I don't recall the Judge's language in that. |
| 7 | Q | Do you know what the word, probationer, means? |
| 8 | A | Probationer? |
| 9 | Q | A person who's on probation.  Do you know what |
| 10 | | a person who's on probation; do you know what |
| 11 | | that means? |
| 12 | A | Only the fact from knowing some people who |
| 13 | | have been on probation. |
| 14 | Q | What does it mean that they are on probation? |
| 15 | A | Well, typically, it would mean that you would |
| 16 | | have to report to a probation officer and keep |
| 17 | | them abreast of whereabouts, employment, and |
| 18 | | sticking with whatever the stipulations of the |
| 19 | | probationary period. |
| 20 | Q | Do you know what community control means? |
| 21 | A | Of the police? |
| 22 | Q | No.  Do you know what the two words mean, |
| 23 | | community control? |
| 24 | A | I only know it only in the context of saying |
| 25 | | community control has been existing when it |

```
 1            comes to monitoring police brutality,
 2            community control --
 3    Q      No, that's not what I'm referring to, sorry.
 4    A      I don't know what you're referring to.
 5    Q      Are you aware that Bianca had certain
 6            community control conditions as part of her
 7            sentence?
 8    A      I do not remember.
 9    Q      You mentioned something about Christian
10            Courtwright having the authority from the
11            Court to conduct random and unannounced
12            inspections, correct?
13    A      Correct.
14    Q      Was that a condition of her community control
15            or probation terms?
16    A      I'm not aware, nor do I remember, if that term
17            was used.
18    Q      When Christian Courtwright enters a
19            probationer's property or a person under
20            community control, who is his supervisor when
21            he's performing that actual act?
22    A      Since I don't know what community control
23            means, I can't answer that question and I do
24            not remember if the term, probation, was used
25            in relationship to Bianca Marcellino.  I can't
```

```
 1              answer the question.  I'm unable to.
 2    Q     So when Christian Courtwright enters Bianca
 3          Marcellino's property to conduct these follow-
 4          up inspections, are you his supervisor for
 5          that specific act of entering her property to
 6          conduct a post sentencing follow-up
 7          inspection?
 8    A     I give definite oversight to it and get
 9          reports about it.
10    Q     So you are his supervisor for that activity,
11          is what you're saying?
12    A     I was always his supervisor, except I would be
13          trumped by the Court, the prosecutors and the
14          law.  That's what I had to answer to, as well
15          as the Constitution, County decisions and the
16          County Court system and legal advice.
17    Q     So who told Christian Courtwright to conduct a
18          follow-up inspection on Bianca's property?
19    A     The Court gave Christian Courtwright the right
20          to do that and it was our expectation that
21          since recidivism is highly likely, not
22          inevitable, but highly likely in the case of
23          people convicted of multiple counts or any
24          counts of animal cruelty, that is an important
25          right in this case that the Court offered in
```

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | order to make sure that there was no further                 |
| 2  |   | cruelty to other animals.                                    |
| 3  | Q | So when you say that there's a high rate of                  |
| 4  |   | recidivism, is that a statistic that you got                 |
| 5  |   | from somewhere?                                              |
| 6  | A | From years and years and years of doing this.                |
| 7  |   | But as I said, you can't assume that with                    |
| 8  |   | anybody.  It's not an assumption.  That would                |
| 9  |   | not only be just unfair, but it is not the                   |
| 10 |   | case in all cases.  Some people learn from                   |
| 11 |   | their mistakes and they change their ways.  In               |
| 12 |   | this case, if I remember it correctly, Bianca               |
| 13 |   | Marcellino was forbidden from having horses on               |
| 14 |   | her property, caring for them, etcetera.  That               |
| 15 |   | was important to make sure that that decision                |
| 16 |   | of the Court was honored.                                    |
| 17 | Q | So because of recidivism, that's why Christian               |
| 18 |   | Courtwright came onto Bianca's property after                |
| 19 |   | she was sentenced to conduct the follow-up                   |
| 20 |   | inspections?                                                 |
| 21 |   | MR. BARINGER:    Objection.                                  |
| 22 | A | No.  No, that's stringing together what I'm                  |
| 23 |   | saying.  I'm saying the Court gave that                      |
| 24 |   | permission for a reason.  I don't fully get                  |
| 25 |   | inside the head of a judge, because the Judge                |

```
 1              is an independent part of the process of
 2              humane law enforcement in the State of Ohio.
 3              She was found guilty.  The Judge allowed
 4              follow-up visits, unannounced and without a
 5              limit on how often.  We're in that situation
 6              of an accusee being found guilty.  We didn't
 7              find her guilty.  She was found guilty in a
 8              court of law and given our charge, because we
 9              are also responsible to the State of Ohio, and
10              if we do not insure that we enforce anti-
11              cruelty law and make sure when the Court gives
12              permission, that those offenses are not
13              repeated, which you do not know until you do
14              these kinds of follow ups.
15    Q        So you're saying that Christian Courtwright
16              has permission from the Court to enter Bianca
17              Marcellino's property to conduct a follow-up
18              inspection; is that what you're saying?
19    A        Yes.
20    Q        I'm wording that correct?
21    A        Yes.
22    Q        What happens if a Court order was contrary to
23              what the law allowed, would Christian
24              Courtwright still follow the Court order?
25                   MR. BARINGER:    Objection.  You can
```

```
 1            answer.
 2    A       I would say this, if that is an issue, it is
 3            not for Geauga Humane, myself or Christian to
 4            determine if a Judge's order is incorrect.
 5    Q       So you follow the Judge's order regardless,
 6            whether or not it is correct or not under the
 7            law?
 8    A       Well, look, people violate the law when it
 9            comes to animal cruelty whether they're
10            correct in doing so or not, whether they're
11            aware of it or not.
12    Q       I'm not asking about other people.  We don't
13            have another time.
14    A       I'm making analogy.  A judge in any particular
15            animal cruelty case, if you think that they're
16            wrong in doing that, it would be up to you to
17            take it up in a court of law, not up to Geauga
18            Humane Society or a humane agent.
19    Q       So regardless of whether or not the Court
20            order follows the law or not, Geauga County
21            Humane Society, it's humane agents, and you,
22            will follow the Court order?
23                 MR. BARINGER:    Objection.
24    A       Are you asking me if Geauga Humane would
25            overrule a Court order?
```

| 1  | Q | No, that's not what I'm asking.  I'm asking if |
|----|---|---|
| 2  |   | you would follow a Court order that violates |
| 3  |   | the law? |
| 4  | A | I'm not aware of any Court order in this that |
| 5  |   | requires which violated any law. |
| 6  | Q | But I'm asking you if the Court order was |
| 7  |   | contrary to Constitutional law or statutory |
| 8  |   | law or case law, correct me if I'm wrong, your |
| 9  |   | testimony is that you would follow that Court |
| 10 |   | order, correct? |
| 11 | A | I would say this, that the starting point when |
| 12 |   | you leave the court of law with a guilty |
| 13 |   | verdict, is that it's a legitimate verdict and |
| 14 |   | the very common permission to grant follow-up |
| 15 |   | visits is within the legal purview of the |
| 16 |   | Judge's. |
| 17 | Q | So you're saying that the Court order we're |
| 18 |   | referring to in Bianca Marcellino's case that |
| 19 |   | says random, unannounced inspections should |
| 20 |   | occur, that it doesn't matter if it violates |
| 21 |   | the law because it's in the Court order that |
| 22 |   | Christian Courtwright -- |
| 23 | A | It's a totally loaded question because what |
| 24 |   | you're implying is that the posture of all the |
| 25 |   | lawyers and of the humane agencies they work |

```
 1              for is not to trust the County Courts in
 2              determining legally, fairly, what is both, and
 3              if there's a trial and a jury, the jury
 4              determined that.  If that were the stance in
 5              terms of it, we would have total chaos.  We
 6              understand that cruelty to animals is a real
 7              thing, unfortunately.  Everyone wishes it
 8              different.
 9   Q    I hate to interrupt you, but I'm going to
10        depose you for seven hours if needed, because
11        that's allowed by the federal rules.
12   A    I've got seven hours.
13   Q    I'm asking you a question and you're talking
14        about all these other things.  Maybe you
15        should just focus on my answer.
16   A    They're the same question.  Because it has
17        never been up to you, me or anyone on this
18        screen to determine whether or not the Court
19        was in violation of the United States
20        Constitution.  If that is an issue to
21        somebody, they need to take it up with the
22        Court, not with me.
23   Q    You and Christian Courtwright will abide by
24        the Court order regardless of whether not; is
25        that correct?
```

```
 1              MR. BARINGER:     Objection.
 2  A    I cannot give you the answer that you want.
 3  Q    You don't know what answer I want.
 4              MR. BARINGER:     Objection, she's
 5        answered it.
 6  A    I think I've answered your question, is that
 7        if you believe that that order was in
 8        violation of the Constitution, take it up with
 9        the Court.
10  Q    I'm not asking if I believe.  I'm asking if
11        you believe it was in violation of the
12        Constitution -- (voices interrupting each
13        other) -- I'm not done.
14              If you believed it was violation of the
15        Constitution or if Christian Courtwright
16        believed it was in violation of the
17        Constitution, will you still, nevertheless,
18        follow that Court order?
19  A    You just asked two different questions.  One
20        was, did you believe it was in violation --
21  Q    No, I said if you did believe it was in
22        violation.  You did not believe the Court
23        order was in violation of the Constitution,
24        correct?
25  A    Correct.
```

| | | |
|---|---|---|
| 1 | Q | You did not believe the Court order was in |
| 2 | | violation of any statutory Ohio laws, correct? |
| 3 | A | Correct. |
| 4 | Q | You did not believe that the Court order |
| 5 | | violated any case law in Ohio, correct? |
| 6 | A | Correct, but I am not a lawyer and I wasn't |
| 7 | | prosecuting in Court. |
| 8 | Q | But you're supervising Christian Courtwright, |
| 9 | | correct? |
| 10 | A | But Christian Courtwright was not responsible |
| 11 | | for whether or not the Court in Chardon, where |
| 12 | | case law is a massive issue when it comes to |
| 13 | | any law, no less humane law.  I am saying to |
| 14 | | you that we believed that the Court was |
| 15 | | legitimate, that due process was honored and |
| 16 | | that the right to do follow-up visits on |
| 17 | | people convicted of animal cruelty in this |
| 18 | | case was legitimate and that we had an |
| 19 | | obligation to our duty to do and conduct |
| 20 | | follow-up visits. |
| 21 | Q | Can you identify for me, just list what formal |
| 22 | | written policies and procedures that the |
| 23 | | Humane Society has?  For example, I believe |
| 24 | | you have a manual handbook.  Would you |
| 25 | | consider that employee policy? |

```
 1                  MR. BARINGER:     Objection.
 2                  MS. HUTH:          I know asked multiple
 3          questions.
 4    Q     Is the employee handbook a policy?
 5    A     It depends.
 6    Q     It depends on what?
 7    A     What topic you're talking about.
 8    Q     I'm talking about the employee manual
 9          handbook.  Does that contain policies?
10    A     The employee manual was by and large, an HR
11          manual for employees, in my recollection.
12    Q     At the time you worked there, did that
13          employee manual include the public records
14          policy?
15                  MR. BARINGER:     Objection.
16    A     I don't remember.  It was a big manual.
17    Q     Do you know what a policy is?
18                  MR. BARINGER:     Objection.
19    Q     When I ask you if you have policies and
20          procedures, do you understand what I mean?
21    A     I believe I do.
22    Q     So would you consider the employee manual to
23          be a policy?
24    A     I consider an employee manual to be an HR
25          requirement for any sized organization that
```

```
 1              has employees.  That stipulates everything
 2              from vacation policy, any kind of --
 3    Q         I'm not asking about that.
 4                   MR. BARINGER:      Objection.  She's
 5              answering the question.
 6                   MS. HUTH:           There's a time limit
 7              here in this deposition.
 8    A         Wait, wait, wait.  The employee manual -- I've
 9              got seven hours, okay.  I've got eight.
10    Q         You're not answering the questions.
11    A         I'm answering your question.  The employee
12              manual, as I recollect, at Geauga Humane
13              Society, Rescue Village, the last time it was
14              revised, it was done through an
15              HR professional, human resources.  That's what
16              the employee manual focused on, everything
17              from overtime and vacation pay, to what an
18              employee does with a grievance, to all of
19              that.  It was something every employee was
20              given.  Every employee had to sign off that
21              they reviewed it with somebody and were clear,
22              and we encouraged every employee to utilize
23              it.
24    Q         Does Geauga County Humane Society, at the time
25              you worked there, have any policies and
```

```
1              procedures related to humane law enforcement?
2    A    We did have, obviously, approaches that we
3         took regularly and carefully.  So for example,
4         we would not have gone ahead with the seizure
5         of Bianca Marcellino's abused animals without
6         permission of the Court.  So I would say if
7         you want to constitute that as a policy, that
8         is my commitment and it was our commitment as
9         an agency, and Christian had a commitment to
10        due process.  We did not give in to public
11        pressure to prosecute.  We did not prosecute
12        under all --
13   Q    I'm not asking --
14   A    These are policies.  These are how we
15        operated, consistently.
16   Q    Are they written policies?
17   A    I do not recall, as I said, I don't know, an
18        hour ago.
19   Q    I'm asking you if the one you just described,
20        is there a written policy on that?
21   A    I am going to repeat; I do not recall.
22   Q    Any other policies?
23             MR. BARINGER:    That's so vague.
24        She's answered about these policies.
25             MS. HUTH:       I'm asking are there
```

```
 1            any other policies.
 2                  MR. BARINGER:     You've asked it --
 3                  MS. HUTH:          Talking objections
 4            are not allowed.
 5      By Ms. Huth:
 6      Q     Hope, are there any other policies and
 7            procedures?
 8                  MR. BARINGER:     Objection.
 9      A     In general, we have, for example, we have --
10      Q     No, I'm asking.  No, my question --
11      A     Don't interrupt me before I answer.
12      Q     My question was not in general.  My first
13            question was are there any policies and
14            procedures related to humane law enforcement.
15            That remains my question.
16                  MR. BARINGER:     She answered it.
17      Q     I'm asking are there any others than the one
18            you just said?
19      A     Well, yes.
20      Q     Go ahead, tell me about them.
21      A     If you do not have permission from the Court
22            to do follow-up visits, you may not do them.
23      Q     Is that a written policy?
24      A     I do not recall if these things were written,
25            but they were what we based ourselves on, over
```

```
 1            and over, despite the bellicosity of people
 2            who were accused, despite the --
 3    Q       Are there any other policies?
 4    A       Let me finish.  Despite whatever people might
 5            have wanted to do, we're guided by law.
 6    Q       Any other written policies or unwritten
 7            policies related to humane law enforcement?
 8    A       Humane law enforcement, we had the policy of
 9            seeking to do what we could to assist people
10            who we got complaints about.
11    Q       Was that a written policy?
12    A       I do not recall, but we practiced it
13            diligently.  And that is very important
14            because we were not known for easily just
15            prosecuting everybody, because where we could
16            resolve things through verbal agreements with
17            people, education and practical assistance, we
18            did.  For example, highly suggesting that a
19            veterinarian be brought in to certain cases --
20    Q       Listen, I'm not asking about this.
21                MS. HUTH:          Matt --
22    A       You asked me about what we do.
23    Q       I'm asking humane law enforcement, if there's
24            any written or unwritten --
25    A       That is part of humane law enforcement, in the
```

```
 1              viewpoint and practice of Geauga Humane.  It
 2              was based on due process.  It was based on
 3              education, assistance and prosecution where
 4              necessary, in order to successfully and
 5              dutifully enforce Ohio humane law statutes.
 6              Which it was the State of Ohio, not Rescue
 7              Village, who determined that that was by and
 8              large could be in the hands of humane
 9              societies.
10    Q    Those are unwritten policies, correct?
11    A    I do not recall.
12    Q    So there might be those policies in writing?
13              MR. BARINGER:    She doesn't remember.
14    A    I taken the effort -- I don't remember.
15              MS. HUTH:    She's a 30(b)(6)
16         witness here, Matt.
17              MR. BARINGER:    She said she doesn't
18         remember.
19              THE WITNESS:    What's a 30(6)(b)
20         witness?
21              MS. HUTH:    Your attorney can
22         talk to you about that.
23              MR. BARINGER:    Don't worry about it,
24         Hope.
25              THE WITNESS:    Oh no, I'm not
```

```
 1              worried about any of this.  Look, I want to
 2              share -- look I haven't been there for years.
 3              I am trying to share with you honestly,
 4              forthrightly and with great integrity, how the
 5              humane law enforcement operated at Geauga
 6              Humane Society.  I cannot vouch for any other
 7              humane society, but I can say that we were
 8              highly respectful of due process and we were
 9              highly respectful of our duty to Ohio State
10              humane law statutes.
11   By Ms. Huth:
12   Q    So you don't know whether or not there's any
13              written policies and procedures regarding
14              entries onto private property?
15   A    I do not recall.
16   Q    So you do not know whether there's any written
17              or unwritten policies and procedures regarding
18              entries onto private property by humane
19              agents, correct?
20   A    I do not recall, that is correct.
21   Q    Are you a policy maker?  Were you a policy
22              maker during your time at the Humane Society?
23              Every question I ask is solely during your
24              time at the Humane Society.
25   A    Of course.  Well, I was part of making policy.
```

```
 1          Policy is generally not a thing that belongs
 2          in the hands of one person.  So for example,
 3          policy about decisions on euthanasia of
 4          animals we did by committee.  We had certain
 5          viewpoints, for example, suffering of animals
 6          that had no good outcome, despite whatever
 7          care might be offered to that animal.
 8               MR. BARINGER:    Hope.  She just asked
 9          if you were a policy maker.  You answered, you
10          said you were one of --
11               THE WITNESS:    A part of it.  I was
12          a part.
13               MR. BARINGER:    Part of it.  Let her
14          ask her next question.
15   Q      Did you ever have any committee meetings about
16          policy related to humane agents entering onto
17          private property to conduct follow-up
18          inspections?
19   A      Did I ever have discussions with more than
20          just Christian?
21   Q      No, I asked did you ever have any committee
22          meetings on creating policy regarding humane
23          agents doing follow-up inspections on private
24          property?
25   A      No.
```

```
 1    Q      So do you have any written or unwritten
 2           policies related to humane agents conducting
 3           follow-up inspections on private property?
 4    A      I do not recall.
 5    Q      So how does a humane agent that you supervise,
 6           meaning specifically Christian Courtwright,
 7           know what the parameters are when he goes and
 8           does a follow-up inspection?
 9    A      One, he has to have permission of the Court.
10    Q      So that's the only deciding factor, correct,
11           is if he has permission of the Court that he
12           can go onto the property?
13    A      If he has permission of the Court, he can
14           conduct a follow-up visit, unannounced in this
15           case.
16    Q      In this case and in other cases too, correct?
17    A      It really depends on the case and the decision
18           of the Court.
19    Q      Do you know the dates that Christian
20           Courtwright entered onto Bianca's property
21           after she was sentenced?
22    A      No, I do not recall.
23    Q      But you do know that he entered Bianca's
24           property after she was sentenced, correct?
25    A      After she was sentenced and got permission to
```

```
 1            do follow-ups, yes.
 2    Q      So after she was sentenced, you were aware
 3            that Christian Courtwright entered onto
 4            Bianca's property, correct?
 5    A      After she was sentenced and there was
 6            permission from the Court to do follow-up
 7            visits, yes.
 8    Q      That permission from the Court came in what
 9            form, the Court orally told him that, an
10            orally told you that or they put it in
11            writing?
12    A      I do not recall.
13    Q      So if a Court orally tells Christian
14            Courtwright he can do random, unannounced
15            inspections onto someone's property, then
16            that's acceptable to you and to the Humane
17            Society?
18                 MR. BARINGER:    Objection.
19    A      What's a Court orderly?
20    Q      You don't know what Court order means?
21    A      Oh, Court order.  I thought you said orderly,
22            I'm sorry.
23                 If there is a written order from the
24            Court, permission from the Court, then yes.
25    Q      Was there written permission from the Court in
```

```
 1          Bianca's case?
 2   A      I believe so, but I don't recall.
 3   Q      When you worked there, would you have known
 4          whether there was a written order?
 5   A      If I knew that, then I would have recalled the
 6          answer to this past question.
 7   Q      As his supervisor and the Executive Director
 8          of the Humane Society, you would have wanted
 9          to see what it said in writing prior to him
10          entering someone's property --
11   A      And I may well have.  I don't recall.
12   Q      Have you ever read any case law?  Have you
13          ever read any cases before?  Have you ever
14          read any legal cases before?
15   A      By reading them, what do you mean?
16   Q      Have you had a legal case in front of you and
17          put your eyes on it and read it?
18   A      Yes.
19   Q      Was that during your time at the Humane
20          Society you read case law?
21   A      I am going to answer yes, but I don't remember
22          the details.
23   Q      Did you ever read any case law related to
24          conducting inspections on someone's property
25          who has been sentenced?
```

```
 1   A      As I just said, I don't recall.
 2              MR. BARINGER:     Hope, you doing okay
 3          or do you need a break?
 4              THE WITNESS:     I'm fine.  Probably
 5          in about 15 minutes, I need to use the
 6          restroom.
 7              MS. HUTH:          I'll take a quick
 8          break too for that too.  We can do it at the
 9          same time.
10   Q      Would you agree that one of Christian
11          Courtwright's duties is to stay current on
12          case law and statutory law as it develops?
13   A      I'm not sure what I think of that or what
14          I thought of that.  I don't really recall.  I
15          believe that, as you well know, animal welfare
16          case law in the State of Ohio is very
17          controversial.
18   Q      I'm not asking about any controversial law.
19          I'm simply asking is whether or not one of
20          Christian Courtwright's duties, at that time
21          that you were there, obviously, that's what
22          we're talking about this entire deposition,
23          one of his duties is to stay current on case
24          law development, whether new laws come into
25          play, that that's one of his duties is to stay
```

```
 1            current?
 2   A    Certainly, yes, and he kept very abreast of
 3        any new laws, any new legislation, pending and
 4        whatnot, and also because -- yes.
 5   Q    Was that one of your duties too, to stay
 6        current on case law and statutory
 7        developments?
 8   A    I stayed as up to date as I could.
 9   Q    How would you stay up to date; would someone
10        tell you about it or would you go onto Lexis
11        and research it, or would you read a paper, or
12        how does that work?
13   A    It worked for me in several ways.  I was on
14        the board of what was then called Ohio
15        Federated Humane Societies, and we regularly
16        stayed abreast of developments at the
17        statehouse concerning laws, legislation, House
18        Bills, etcetera, what they were what the
19        implications were.  At times, we would issue
20        position papers as Ohio Federated Humane
21        Societies.  These could range on many
22        different aspects of humane law and I would do
23        it by reading.  I would do it by discussions
24        and meetings.  I would do it, if necessary, by
25        contacting our lawyer to learn more and I
```

```
 1              tried to stay above the breast of it, while
 2              not losing our focus on actually enforcing
 3              humane law.  You know, it's a big county for
 4              one humane agent to cover.
 5    Q    So then would you go to Christian Courtwright
 6              and tell him about these develops or would he
 7              do his own independent learning?
 8    A    I think there was both.
 9    Q    How did he do his own independent learning; do
10              you know?
11    A    I really couldn't tell you since it was
12              independent.
13    Q    But you're his supervisor, right?
14                   MR. BARINGER:    Objection.  Is there
15              a question?
16    A    I don't know your point or your question.
17    Q    So I'm asking, but you were his supervisor,
18              correct?
19    A    We've already established I was his
20              supervisor.
21    Q    So you would tell him about changes of law,
22              like meet with him on a weekly basis or
23              monthly basis, just depending as needed; is
24              that how that worked?
25    A    He was kept abreast of major things I learned,
```

```
 1              and especially through the statewide
 2              organizations who were very cognizant of what
 3              was going on in Columbus, and we obviously
 4              followed cases that involved other humane
 5              societies, outcomes if there were any.
 6    Q         Did you have access during your time at the
 7              Humane Society to Lexis and Westlaw?
 8    A         Not directly.
 9    Q         Does Christian Courtwright?
10    A         I don't know.
11    Q         Did Christian Courtwright during the time that
12              you worked there?
13    A         I don't know.
14    Q         You're his --
15    A         I don't know.  It's not just I don't recall; I
16              don't know.
17    Q         Christian Courtwright does not supervise
18              anyone, correct?  Or did not.  Obviously, I'm
19              talking about the time that you were there.
20    A         We had somebody who didn't assist in
21              prosecutions, but occasionally, if we found 25
22              abandoned sick cats, we had somebody who
23              assisted with bringing those cats into the
24              shelter, and especially when we didn't even
25              know who the owner of those cats was.
```

1   Q       So he would supervise those people?
2   A       He would be part of that.  It was quite a
3           group effort.  To seize animals takes a lot of
4           different people and jobs coming together to
5           work on behalf of the animals.
6   Q       So for example, if you were aware that
7           Christian Courtwright was doing something
8           incorrectly, you would address with him, I
9           assume; would you agree?
10  A       Yes.
11  Q       Do you recall any times where you addressed
12          any issues with him related to his report
13          writing, maybe, or anything like that?
14  A       The one issue that I addressed with Christian,
15          and I'm not laughing at your question, was the
16          need to improve communications.  Inside the
17          shelter, because this has to do with that, if
18          you brought in 125 dogs from one house, a
19          great amount of coordination had to take
20          place, and that coordination had to start to
21          go into gear including as a possibility as
22          soon as you knew it.  You needed to get the
23          clinic involved.  You need to get animal care
24          attendants involved.  You need to do all of
25          that.  So communications is very critical for

```
1              a humane agent, that over the course of a
2              year, may or may not bring in large numbers of
3              animals in various health conditions.
4     Q        You conducted annual performance evaluations
5              with Christian Courtwright, correct?
6     A        Correct.
7     Q        Do you recall any issues with him, such as
8              failure to keep reports or logs or anything
9              like that?
10    A        There was the communication issues and one of
11             the thing that -- and this is a very
12             challenging things and I had a lot of sympathy
13             for him.  When you have one agent to cover a
14             county and thousands upon thousands of animals
15             and potentially, and it would vary, hundreds
16             of complaints, it is very difficult to conduct
17             all of those that you need in the most timely
18             fashion.  So my issue was not the quality of
19             reports, the quality of logs.  There were
20             moments when I wished they had gotten filled
21             out quicker.
22    Q        Other than that you're a defendant in the
23             Marcellino lawsuit, correct?
24    A        This lawsuit, yes.
25    Q        So other than this lawsuit, did you ever have
```

```
1              any notice that perhaps the random,
2              unannounced inspections might not be in
3              compliance with the law?
4    A    I don't recall getting any notice of that at
5              all.
6    Q    Did you authorize Christian Courtwright to
7              enter onto Bianca Marcellino's property after
8              she was sentence?
9    A    The Court authorized it.
10   Q    No, I'm asking if you authorized it.
11   A    Did I give a nod to, yes, you may do this and
12             carry out a follow-up inspection, yes.
13   Q    So you gave a nod to him is what you said?
14   A    Yes.
15   Q    Was that a nod, like a head nod or a yes, you
16             can go in?
17   A    Well, you could follow the terms of
18             inspections, yes.
19   Q    I'm not understanding.
20   A    I'm saying the Court authorized him.
21   Q    So you didn't authorize him?
22   A    He didn't me -- he needed the Court to
23             authorize him.  Without the Court, I had no
24             basis of authorizing him to do any of that.
25             That's on the Judge.
```

```
1   Q      So you did not authorize him to enter onto her
2          property?
3   A      I did not authorize him.  I'm saying if I
4          authorized, and this needs to be clear,
5          permission to conduct such follow-up visits
6          must come from the Court.  Having had that
7          given by the Court, and if I recall, the Judge
8          was Terry Stupica, having been given that
9          authorization, Christian would inform me, I'm
10         conducting a follow-up visit.  By a nod, my
11         understanding was that it was authorized by
12         the Judge; it wasn't just something that we
13         dreamt up, and that by a nod, I would say,
14         okay.
15  Q      So Christian would say, I'm going to conduct
16         an inspection and you would nod and say okay?
17  A      Well, I don't know if I physically nodded my
18         head, that's a little sarcastic.
19  Q      You're the one that used the word nod.  I
20         didn't put the word nod in your mouth.
21  A      Okay, then why don't we, you and I, withdraw
22         it.  Did I permit him to do it, with
23         authorization from the Court?  Yes.
24  Q      During your time there, obviously, did
25         Christian Courtwright keep you apprised of
```

```
1              each time he was going to conduct a follow-up
2              inspection?  Did he come to you and say, hey,
3              I'm going to there this morning?
4    A    I don't recall all the dates and the time, but
5              he always would report when he was doing that,
6              because this was a major case in Geauga
7              County, a very public case, a lot of
8              publicity, which was not on purpose, but we
9              got it anyway.
10              MS. HUTH:        Can we have about ten
11             minutes, just real quick?
12              MR. BARINGER:    Yeah, how about 3:15.
13              THE WITNESS:     Sounds good to me.
14              (Zoom recording stopped.)
15              (Recess taken.)
16              (Zoom recording resumed.)
17   By Ms. Huth:
18   Q    During your time at the Humane Society, did
19             you keep any records regarding Christian
20             Courtwright's entries onto Bianca Marcellino's
21             property after she was sentenced?
22   A    I don't recall.
23   Q    Do you recall if Christian Courtwright kept
24             any records about his inspections on her
25             property after she was sentenced?
```

```
 1   A      I don't recall.
 2   Q      Correct me if I'm wrong, but you had weekly
 3          meetings with Christian Courtwright, correct?
 4   A      Sometimes we had more frequent, depending on
 5          what was going on, and other times, we would
 6          have them a little less frequently, because
 7          there were times when there were no complaints
 8          coming in.
 9   Q      Do you recall if at those meetings you
10          discussed any inspections on her property,
11          subsequent to her being sentenced?
12   A      Subsequent is after, sorry.
13   Q      I'm only talking about after she was
14          sentenced, if you recall.
15   A      I do recall that we had some discussions about
16          it.
17   Q      Were any of those discussions put in writing?
18          Did anyone take any notes or anything?
19   A      I don't recall.
20   Q      Do you recall what the topic of those
21          discussions were in those weekly meetings
22          about Marcellino?
23   A      Well, when they were weekly or if they were
24          more or whatever, and when it came follow-up
25          inspections, we would discuss what did you do,
```

```
 1              because follow-up inspections need to, as much
 2              as you can humanly know every piece of the
 3              situation, stay within certain boundaries in
 4              terms of where you can go and where you can't
 5              go, what you can do, what you can't do, and
 6              wanting to make sure, also that that was being
 7              done well, to the best of his ability and if
 8              anything's changed in the situation, if
 9              there's any further issues concerning animals.
10              So that would be the kind of thing we would
11              discuss.
12      Q      Do you know who Bianca's parents are?
13      A      I don't know them.
14      Q      You don't know their names?
15      A      I know I saw them.  I don't know their names.
16      Q      Karen and Giancarlo?
17      A      Okay.
18      Q      They're plaintiffs in the lawsuit that you're
19              a defendant of.
20      A      Right.
21      Q      Are you aware that Bianca quitclaimed a piece
22              of her property to her parents prior to
23              sentencing?
24      A      I believe I recall that.
25      Q      Was there any discussion about the parents'
```

```
 1              property and Christian Courtwright?
 2   A    I know that the parents' property was not
 3        subject to the follow-up agreement, because
 4        they were not the plaintiff's in the cruelty
 5        cases.
 6   Q    Do you know if the parents were subject to
 7        this Court order that you're referring to that
 8        allowed random, unannounced inspections?
 9   A    They weren't being charged with animal
10        cruelty, so I did not consider them subject to
11        the permission from the Court to follow-up
12        agreements.  It was Bianca.
13   Q    So if Christian Courtwright had entered the
14        parents' property or had viewed what was on
15        the parents' property, would that be part of
16        his duties to conduct this follow-up
17        inspection on Bianca's property?  Did you
18        understand my question?
19   A    I'm not sure.  I will say this, that we were
20        clear that the property that was transferred
21        was now owned by Bianca's parents, and I'm
22        sorry I forget their names, I obviously saw
23        them at the trial, but I don't have the legal
24        case in front of me.
25   Q    Was part of Christian Courtwright's follow-up
```

```
1           inspections --
2     A     On her parents' property?
3     Q     Yes.
4     A     No.
5     Q     Would he have had a right to inspect what was
6           going on, on the parents' property as part of
7           his inspection of Bianca's property and
8           Bianca?
9     A     You mean in terms of with his eyes, if he saw
10          stuff?
11    Q     Sure.
12    A     I mean, I don't fully really recollect, but we
13          were very firm about that it was Bianca and
14          her property that was subject to the follow-up
15          visit authorization from the Court.
16    Q     We, meaning you and the Special Prosecutor,
17          Jeffrey Holland; is that who we is?
18    A     Christian and I.  For example, if I had been
19          asked, can a follow-up visit be done on
20          Bianca's parents' property, it would have
21          never been asked, but had it been in some
22          strange circumstance, the answer would be no.
23    Q     Were you ever made aware that he was on Bianca
24          parents' property?  Did he step foot on Bianca
25          parents' property?
```

```
 1   A      I don't think he was aware that he went on
 2          their property.
 3   Q      Was there any discussion about any accusations
 4          that he might have gone on their property?
 5   A      I don't recall.
 6   Q      Were you aware that he had looked into the
 7          barn that's on Bianca parents' property?
 8   A      I don't recall.  Was he aware it was their
 9          property?
10   Q      I don't know.
11   A      I mean, this was years ago, so I don't know
12          recall.  He certainly did not do follow-ups
13          with the intention as much as I understood, to
14          do anything having to do with her parents.
15   Q      Are you aware that there was a barn that was
16          once on Bianca's property that was then
17          transferred to her parents' property?
18   A      I recall being aware of that, yes.
19   Q      Did Christian Courtwright ever tell you that
20          he looked at the horses in that barn after
21          Bianca was sentenced?
22   A      I don't recall.
23   Q      So those meetings that you said were weekly
24          and sometimes happened more often, no one took
25          any notes or anything like that?
```

```
 1  A     I don't recall.

 2  Q     Who attended those meetings?

 3  A     That would be attended by myself and

 4        Christian, and I'm trying to think if there

 5        was any participation by any other major

 6        staff.  I don't recall.

 7  Q     So no notes were taken during the meeting.

 8        Were any reports or any --

 9  A     Well, I didn't say no notes were taken.  I

10        said I don't recall.

11  Q     Were there any follow-up reports made from

12        each meeting, that you know of?

13  A     I believe so, but I don't recall the details

14        of that.

15  Q     You believe that there were some kind of

16        follow-up reports, but you don't recall?

17  A     Well, no, I said I don't recall.  I don't

18        recall.

19  Q     Are these weekly meetings or more than weekly

20        meetings required by the policies and

21        procedures of the Humane Society?

22  A     It was our practice to meet regularly,

23        including so that I would be kept abreast of

24        were there any significant things developing,

25        in regards to complaints, possible bringing in
```

```
 1          of any animals, any things that needed to go
 2          to the Court, issues of going further with an
 3          investigation, issues of education.  All those
 4          kinds of things.  So the quantity, the
 5          frequency of those meetings, there were never
 6          -- we never stopped having meetings.  How
 7          frequent would vary depending on what,
 8          specifically, was going on.
 9    Q     Were these weekly meetings conducted just
10          because you wanted them to be or was there
11          some kind of written policy that said we
12          should have weekly meetings with the humane
13          agents?
14    A     As I said, I don't recall if there was a
15          written policy, but for the time when I was
16          there, there was a policy of discussing
17          developments, making sure that there was
18          coactivity to implementing the humane law
19          function at Geauga Humane Society.
20    Q     So those were maybe unwritten informal
21          policies; is that you would more accurately
22          describe them?
23    A     I don't recall.
24    Q     Do you recall if they were in writing?
25    A     I don't recall.
```

1   Q      So when Christian Courtwright decides to

2          conduct a follow-up inspection on Bianca's

3          property after she was sentenced, do you know

4          how that occurred?  Would that be something

5          that he just woke up one day and said, well,

6          I'm going to do it today, or did you say, hey,

7          go and inspect, or did the probation officer

8          say go?  Do you know how that kind of came

9          about?

10  A      What I recollect was that we communicated

11         often and I would ask him, rate what's

12         happening in terms of follow-up on Bianca

13         Marcellino, because this was a serious case.

14         Two findings of guilty for animal cruelty --

15  Q      They are all serious, aren't they?

16  A      Well, obviously, they are.  But as I said

17         earlier, it's not like we are always

18         prosecuting cases.  So yes, this was a serious

19         case.  That doesn't mean that other cases were

20         not serious.

21  Q      So you would say to him, hey, have you

22         conducted a follow-up lately?  Is that how it

23         would work?

24  A      Yeah, what's going on, because look, it's very

25         serious when people get, not just charged,

```
 1              I mean, you don't control the outcome of a
 2          trial, but when guilty is the verdict on two
 3          counts, it's important to do follow-up because
 4          we are charged with stopping and preventing
 5          cruelty to animals.
 6     Q    You wouldn't tell him how to go about his
 7          inspection, you would just say, hey, have you
 8          done one lately?  I think you need to do one.
 9          Is that how that worked?
10     A    Well, how to do inspection was governed by not
11          only what you had permission to do and what
12          you didn't have permission to do, but of the
13          procedures that humane agents were doing a
14          good job do to follow the law.
15     Q    What procedures are those?
16     A    Those procedures have to do with who, what,
17          where, when, how, that you're not privileged
18          to knowingly and intentionally just go on
19          anybody's property.  This was a permission to
20          go on Bianca's property.  You needed to, if
21          the property owner was there and you could
22          find the person, we certainly wanted that
23          person to know that you were conducting a
24          visit.  You couldn't go around and see
25          something hypothetically wrong with animals
```

1       and just take those animals, because, for

2       example, a guilty verdict for specific animals

3       doesn't give you that right to do that.  So

4       these were the kinds of things.

5            The intent is to prevent, is to one,

6       make sure that the terms that were set by the

7       Judge, including lack of ownership or caring

8       for horses at all.  So those were the things

9       that were important.

10  Q   So those important things, were they in

11      writing?

12  A   I don't recall.

13  Q   Were those important things something that you

14      made up as you were working there or that were

15      already in place prior to you working there?

16  A   These things are, I believe, hopefully in

17      place with any responsible humane society in

18      Ohio, enforcing Ohio humane law statutes.

19      That you were working in, not just the spirit

20      of the law, but in the letter of the law, and

21      because somebody is found guilty, it doesn't

22      give you the freedom to go beyond what the

23      Court is authorizing.

24  Q   So correct me if I'm wrong, but you did

25      testify that you conducted annual employee

```
 1            reviews for Christian Courtwright, correct?
 2   A        Correct.
 3   Q        Did Christian Courtwright create monthly
 4            reports of his humane law enforcement
 5            activity?
 6   A        Well, you know, he had his logs, which I
 7            considered to be reports.
 8   Q        What are those logs?  What are they and what
 9            do they look like?  In a notebook, on a
10            computer?
11   A        Well, you know, the Humane Society's, the logs
12            of the work of the humane agents, and I don't
13            have any idea where it's at today, were
14            starting to be in transition from handwritten
15            logs and there was hopes, but we never
16            completed this, to get it to be computerized
17            logs that were part of what was then, the most
18            robust computer program, and that was
19            PetPoint.  So I don't recall fully how far we
20            got in that, but for the majority of time I
21            was at Rescue Village, those were handwritten
22            logs.
23   Q        Did he give you those logs?
24   A        He gave me those logs and I could request
25            those logs.
```

```
 1   Q      What did you do with those logs after he gave
 2          them to you?
 3   A      They were locked in a locked cabinet in a
 4          locked office.
 5   Q      Whose office?
 6   A      Christian Courtwright's.
 7   Q      Were those logs in existence at the time that
 8          you left employment at the Humane Society?
 9   A      I believe so.  I don't recall.
10   Q      Are you aware of the public records laws in
11          Ohio?  Are you currently aware of the Ohio
12          public records laws?
13   A      I tried to stay abreast of them.  Currently, I
14          don't know what the current law --
15   Q      At the time that you worked for the Humane
16          Society, were you aware of the public records
17          laws?
18   A      In terms of what had to be made available to
19          the public?
20   Q      Yes.
21   A      I was.
22   Q      How about in terms of retention of the public
23          records by the Humane Society?
24   A      Well, we had, at least as far as I knew, we
25          had the wonderful habit of keeping all of the
```

```
1              logs.  We didn't put a statute of limitations
2              on how long they were kept.  These questions
3              came up a lot, because, obviously, adoption
4              records, medical records, humane law records,
5              euthanasia, you name it.  We were working on
6              making sure we had retention policies.  If we
7              were to err, it would be on the side of
8              keeping things too long.
9    Q    Were those retention policies in writing?
10   A    I don't recall, but I know that a project that
11             we had identified was to develop a more
12             comprehensive records retention policy for
13             everything, including so that we didn't have
14             to -- humane law didn't build up so many logs
15             that it was hard to hold on to, but other
16             things, you're talking large amounts of paper.
17             So it was good to know that we only kept
18             medical records, for example, for six years or
19             seven years.  I forget which.
20   Q    At the time that you worked for the Humane
21             Society, were you aware that the Ohio law
22             required the Humane Society to have a public
23             records policy?
24   A    You mean a records retention policy, which is
25             what we called it?
```

| | | |
|---|---|---|
| 1 | Q | (Inaudible.) |
| 2 | A | I wasn't aware that it was required by law, |
| 3 | | but I was aware that we, as an agency, wanted |
| 4 | | to develop that, and where that all went, I |
| 5 | | don't know. |
| 6 | Q | So the logs that you refer to that Christian |
| 7 | | Courtwright may have created, would he have |
| 8 | | created a log every time he had conducted a |
| 9 | | follow-up inspection on Bianca's property |
| 10 | | after she was sentenced? |
| 11 | A | Would he have?  I don't know.  Would I have |
| 12 | | preferred?  Yes. |
| 13 | Q | You don't recall seeing any written logs by |
| 14 | | him related to the probation inspections of |
| 15 | | Bianca's property after she was sentenced? |
| 16 | A | I don't recall. |
| 17 | Q | So the computer system, at the time you worked |
| 18 | | there, obviously, so if Christian Courtwright |
| 19 | | was typing something up on his computer and |
| 20 | | saved the document on his computer, did you |
| 21 | | have some sort of interoffice computer network |
| 22 | | system that it would be backed up or anything |
| 23 | | like that? |
| 24 | A | You know what, here's what I don't recall, as |
| 25 | | sort of what I said, which is, in animal |

1          welfare, things were just starting to get

2          moved over onto computerized record keeping,

3          and the two main areas that were changing, the

4          first one was adoptions, and that did get

5          changed.  The second two areas were the

6          clinic, the medical capacity, because there's

7          lots of record keeping required, obviously, in

8          an in-house clinic in a shelter.  Then we had

9          hoped to go over to computerized record

10         keeping for humane law.

11              When I was there, my recollection was

12         that that was a slow process, because it's a

13         very big deal to transfer records from manual

14         records onto the computer.

15    Q    When you were there, was Christian Courtwright

16         using the software called Petpoint?

17    A    I don't -- I have no idea how much or how

18         little he was using Petpoint.  What I just

19         said was my belief is that we, because it

20         wouldn't have just been him, were not yet

21         basing record keeping for Humane Law on

22         computers.  And the computers, with Petpoint,

23         you can designate permissions about who has

24         access to what.  But I still think that there

25         was -- I don't really recall where all that

```
 1              was at the time.
 2    Q     So if Christian deleted a file on his
 3              computer, would there be a backup of that on
 4              your interoffice system, or your network?
 5    A     If we were doing reports on a computer, if he
 6              deleted them, I have no idea if would have
 7              deleted.  I don't believe, like I said, I
 8              believe manual, handwritten logs were, if not
 9              the way we kept records at that time when I
10              was there, it was the over whelmingly
11              predominant way.
12    Q     I'm going to show the screen and Steve, I'm
13              going to have this marked as Exhibit A.  I'll
14              mark them at the end and send them to you like
15              I did last time.
16                  (Exhibit A marked for identification.)
17                  Hope, can you see the document?
18    A     Yes, the share screen is working.
19    Q     Do you see the document that says attachment 5
20              at the top?
21    A     Correct, yes I do.
22    Q     I'm just going to scroll down slowly.  Do you
23              recognize this document?
24    A     I don't recall having seen it, but I may have.
25    Q     Scroll down slowly.  It's got Robert Cont's
```

```
 1              name, Sofia Applegate, Roberta Ann, Officer
 2              Amanda Lester, and it's got some dates it says
 3              probation checks on them?
 4    A         Mmm-hmm.
 5    Q         Does this document look familiar to you?  You
 6              said no?
 7    A         No, I'm saying I don't recall.  I may have
 8              seen it and I may not have.
 9    Q         Does this document have any familiarity with
10              you?  I mean does this look like this might be
11              a log that he was supposed to do, or anything
12              like that?
13    A         I don't have an answer to that because I may
14              have seen it, but I don't recall the
15              circumstances.  And these are going back to
16              2015, '16.
17    Q         There's some up here.  Bianca's is at the
18              bottom right here, hold on -- right there.
19              Bianca Marcellino, you see those?  That's
20              around the time you were -- that's more
21              recent, right? 2019, July of 2020?
22    A         Right.
23    Q         Do you recall seeing anything like what's in
24              front of you, before?
25    A         I wouldn't have seen the 2020 entries on this
```

```
 1          paper because I wasn't there.  And I don't
 2          recall.
 3    Q     That's Exhibit A.  Matt, would you agree that
 4          the Humane Society is subject to the Ohio
 5          Public Records Laws?
 6    A     Yes, in general I would agree.
 7    Q     During the time you worked there, did the
 8          Humane Society have a poster hung in any
 9          location that described their public records
10          policy?
11    A     I don't recall.  We had a place where we
12          posted, put up a lot of posters, but I don't
13          recall.
14    Q     Do you recall what your policy was on
15          retaining the retention policy on the logs
16          that Christian Courtwright completed?
17    A     I already said that, and I'll say it again.
18          We were in the midst of developing retention,
19          but when it came to medical issues and when it
20          came to Humane Law, we erred on the side of
21          not getting rid of anything while were in
22          development of these policies.  We kept
23          everything.
24    Q     Do you know if Christian Courtwright kept any
25          records of the time that he spent during the
```

```
 1              day as part of his enforcement activities?
 2    A    I don't recall.
 3    Q    Was he required to keep a record, or notation,
 4              or logs of what he did during the day?
 5    A    What he was required to do, because there was
 6              a set of three or two, I don't know how many
 7              categories there were.  There was part of his
 8              job was to also patrol the County, and that
 9              actually did lead to both finding animals that
10              needed assistance, as well as doing a follow
11              through or follow up on phone calls or
12              complaints that we got, as well as any kinds
13              of follow ups, such as the Bianca Marcellino
14              case, etcetera.  And we would talk about, kind
15              of what was going on.  We were even looking
16              at, at one point how much time and how many
17              miles does he report, because he reported on
18              the number of miles he traveled, etcetera.  So
19              that's what I remember.
20    Q    Everything you just described right now, is
21              that something that's in writing or is that
22              just some sort of informal guide?
23    A    I don't recall.
24    Q    Would Christian Courtwright be permitted to
25              have conducted any surveillance on Bianca's
```

```
 1            property?  So, after Bianca was sentenced,
 2            Christian Courtwright entered upon Michelle
 3            Nicastro's property and conducted surveillance
 4            on Bianca's property.  Were you aware of that?
 5     A      I'm sorry, can you repeat that?  My mind was
 6            wondering.
 7     Q      That's okay, no problem.
 8                   MR. BARINGER:     Sorry, I've got plug
 9            in, I'm about to die.
10     Q      After Bianca was sentenced, Christian
11            Courtwright entered upon Michelle Nicastro's
12            property.  Do you know who Michelle Nicastro
13            is?
14     A      I don't remember.  Is that a neighbor?
15     Q      Yeah, the neighbor that complained constantly
16            about Bianca.  Let me ask this, were you aware
17            that Christian Courtwright sat on Michelle
18            Nicastro's property and conducted surveillance
19            on Bianca's property?
20     A      I don't recall.
21     Q      Would Christian Courtwright have been
22            permitted to -- during your time there,
23            obviously, was Christian Courtwright permitted
24            to conduct surveillance on Bianca's property?
25            Other than walking on to it, was he permitted
```

```
1              to sit on a neighbor's property and watch
2              Bianca's property and Bianca?
3    A    I don't recall us having spoken about that.
4    Q    Were you aware that he did that?
5    A    I don't recall.
6    Q    Mr. Courtwright was required to clock in and
7              clock out when he began and ended work with
8              the Humane Society, correct?
9    A    Well, one of the things about having one
10             Humane Agent for all of a county where there's
11             lots of animals, which I guess is true of any
12             county, really, is that the clock wasn't
13             necessarily what determined when you were on
14             work or when you were out.  For example, there
15             were times when late at night the Dog Warden
16             would contact the Humane Agent in regards to
17             say an accident where there were animals
18             concerning.
19   Q    But how about for follow up inspections, would
20             he be required to be on the clock for that?
21             Was there a --
22   A    No.  He was not, in general, required to be on
23             the clock.  Now we did try to take into
24             account a job where you're not required to be
25             on the clock can get to be so many hours that
```

```
 1            it's kind of too much.  And the work of Humane
 2            Agents can't be just on the clock because
 3            situations with animals can come up at
 4            anytime.
 5     Q      But you don't recall if he told you that he
 6            was surveilling her property from the
 7            neighbors?
 8     A      I do not recall.
 9     Q      When Christian Courtwright would conduct
10            follow up inspections on Marcellino's
11            property, on Bianca's property, would each
12            time he tell you that he was going before he
13            went or would he tell you that he went after
14            he went?  Just as much as your remember,
15            obviously.  I guess at what point did he tell
16            you that he was conducting an inspection on
17            her property?  Would it be before he went or
18            after?
19     A      My recollection is before, but I am not
20            positive.
21     Q      Have you ever spoken to any attorney other
22            than the attorneys in this federal case about
23            Ohio laws that pertains to follow up
24            inspections or probation inspections?
25     A      Could you rephrase that? Other than?
```

```
 1   Q      Yes, other than Matt Baringer and the
 2          attorneys in this federal case, have you ever
 3          spoken to any other attorney about what laws
 4          apply to follow up inspections or probation
 5          inspections?
 6   A      I don't recall exactly.  I might have spoken
 7          with one of the county prosecutors and I may
 8          have spoken with a special prosecutor, Jeffrey
 9          Holland, but I don't recall, you know Humane
10          Law is a big topic as are the question of what
11          the Courts authorize and what they don't.
12   Q      At the time obviously, that you worked there,
13          did the Humane Society have any policies that
14          required Courtwright to take notes during
15          those follow up inspections?
16   A      I don't recall.
17   Q      Was Christian Courtwright required to take
18          notes during the follow up inspections, and
19          when I mean during I mean as he was conducting
20          them?
21   A      I don't know.
22   Q      Do you ever recall him having any notebooks?
23   A      I recall that he sometimes used notebooks for
24          writing logs.
25   Q      And those are the same ones that would have
```

```
 1            been in that locked file cabinet?
 2   A    I don't recall.
 3   Q    Did you ever actually, and I might have asked
 4        you and I apologize, did you ever actually
 5        read his notes in his notebook or his logs?
 6        Like actually put your eyes on them?  I know
 7        you said that he --
 8   A    Yes.
 9   Q    You did, okay.  But you don't recall if they
10        had any probation inspection or follow up
11        inspection notes on them, correct?
12   A    Right, I don't recall that.
13   Q    When Christian Courtwright conducted his
14        follow up inspections on Marcellino's
15        property, had you had any specific
16        conversations with him that said the parent's
17        property is here, don't cross the line?
18   A    In my recollection, I don't believe that
19        Bianca Marcellino really informed us, or the
20        Court, that her property line had changed.
21        But again, my recollection is not very strong
22        of that.
23   Q    You understand when I'm talking about the
24        Court Order that I'm talking about the order
25        from Judge Stupica that you said authorized
```

```
 1            Christian Courtwright to conduct the
 2            inspections, right?  You understand that I'm
 3            referring to that Court Order?
 4    A       Yes.
 5    Q       Is it you position that a court order is an
 6            exception to the search warrant requirement?
 7                    MR. BARINGER:    Objection.
 8    A       I have no position on that.
 9    Q       Is the court order an exception to the search
10            warrant requirement?
11                    MR. BARINGER:    Objection.
12    A       I am not aware.
13    Q       However, prior to this you said that the court
14            order trumps everything.  That if the court
15            order says that they can conduct random,
16            unannounced inspections then that's what you
17            have to follow and that's what Christian has
18            to follow?
19    A       I was saying the only thing I could say is
20            unless and until the court order was proved in
21            Court to have been in violation of something
22            that it is in good standing.
23    Q       Did you ever advise Christian Courtwright that
24            he should or should not take notes during
25            these follow up inspections?
```

```
 1    A      I don't recall.
 2    Q      Does Christian Courtwright ever use his
 3           personal vehicle to conduct follow up
 4           inspections or pervasion inspections?
 5    A      I'm not aware.  We have an Agency vehicle, but
 6           that Agency truck might be in use for some
 7           other reason, so I don't know the answer to
 8           that.
 9    Q      Was he permitted to use his personal vehicle
10           to conduct follow up inspections?
11    A      Specifically, I don't know.
12    Q      Was there any policy on usage of a Humane
13           Agent's personal vehicles?
14    A      I don't recall.
15    Q      Are you aware of whether or not the probation
16           department of the Chardon Municipal Court ever
17           told Christian Courtwright to conduct any
18           follow up inspections?
19    A      Not aware one way or another.
20    Q      Were you ever in communication with the
21           probation department after Bianca's sentencing
22           about Bianca?
23    A      No.
24    Q      Have you ever spoken to the probation
25           officers?
```

95

```
 1   A       About?

 2   Q       About Bianca?

 3   A       No.

 4   Q       Do you recall the dates that Christian

 5           Courtwright entered on to Bianca's property?

 6           Did I ask her that?

 7               MR.BARINGER:      Objection.

 8               MS. HUTH:         Did I ask her that?

 9               MR. BARINGER:     Yeah.

10   Q       You said you didn't know, right?

11   A       Right.

12   Q       You gave the dates that he entered upon

13           Bianca's property in your answer to discovery.

14           Where would you have gotten those dates from

15           to answer the discovery?

16   A       Oh my God, I don't recall this at all.

17               MR. BARINGER:     Objection.

18   Q       Do you recall answering the discovery that was

19           propounded upon you by the Marcellino's?

20   A       When was their discovery?  I mean, I'm

21           serious.  I have no recollection.

22   Q       Do you remember answering interrogatories and

23           requests for admissions, or anything like

24           that?

25   A       Yes.
```

| | | |
|---|---|---|
| 1 | Q | And in one of those interrogatories it asked |
| 2 | | you to provide the dates that Christian |
| 3 | | Courtwright entered upon Bianca's property |
| 4 | | after sentencing; do you remember that? |
| 5 | A | I don't recall. |
| 6 | Q | So you don't recall the dates? |
| 7 | A | The day, right. |
| 8 | Q | But you did answer those questions.  You |
| 9 | | answered the interrogatories.  You must have |
| 10 | | gotten those dates from somewhere, right? |
| 11 | | MR. BARINGER:    Objection.  She got |
| 12 | | them through her attorney, it's pretty |
| 13 | | obvious.  Move on. |
| 14 | | MS. HUTH:        You gave her the |
| 15 | | dates? |
| 16 | | MR. BARINGER:    Yeah. |
| 17 | Q | Hope, are you aware if Bianca ever violated |
| 18 | | the terms of that court order that we're |
| 19 | | referring to? |
| 20 | A | Do you mean did she take in horses? |
| 21 | Q | What did the court order say?  She wasn't |
| 22 | | allowed to have horses?  Is that what it said? |
| 23 | A | I believe so.  I know for me and for my life, |
| 24 | | this is a long time ago, so I don't recall all |
| 25 | | of the things in the order, and I also |

```
 1            certainly at this point don't recall whether
 2            or not -- what did you ask me?  Did she
 3            violate it?
 4    Q      If you were aware that Bianca violated the
 5            terms of her probation or community control?
 6    A      She did?
 7    Q      No, I'm asking.  Do you know if she did or did
 8            not?
 9    A      I don't know.  I think at one point a question
10            came up to the Court about that issue, but I
11            don't recall what prompted that exactly or
12            what exactly was the outcome.
13    Q      Did you attend Bianca's sentencing?
14    A      At the end of the trial?
15    Q      Her sentencing?
16    A      At the end of the trial?
17    Q      It would have been after trial, yes.
18    A      The only reason I'm asking is because I want
19            to make sure there wasn't something after I
20            left that went on around another (inaudible).
21    Q      After she was tried, the jurors --
22    A      I was present, yes.
23    Q      And you have actually seen that court order,
24            correct?
25    A      I saw it, but I don't recall all of he detail.
```

| | | |
|---|---|---|
| 1 | Q | Do you, if you know, do you know if Bianca |
| 2 | | consented to Christian Courtwright entering |
| 3 | | her property to conduct these follow up |
| 4 | | probation inspections? |
| 5 | A | I don't recall. |
| 6 | Q | Have you been to Bianca's house? |
| 7 | A | No. |
| 8 | Q | So you wouldn't know where the property line |
| 9 | | is between her parents and her house because |
| 10 | | you haven't been there, correct? |
| 11 | A | I would say that's correct. |
| 12 | Q | Did you ever look at the auditor's records to |
| 13 | | see where the property line was between her |
| 14 | | parents and her house? |
| 15 | A | I don't recall looking at them. |
| 16 | Q | Do you believe that the general authority of |
| 17 | | the Humane -- so I think you and I are on the |
| 18 | | same page on this, and you mentioned this |
| 19 | | before that Humane Agents are given authority |
| 20 | | through the statute, correct? I believe it's |
| 21 | | chapter 1717; would you agree? |
| 22 | A | I believe that's true. |
| 23 | Q | So do you believe that the authority -- |
| 24 | A | Well they're given the choice. They may take |
| 25 | | on the responsibility. They're not required |

```
 1          to.

 2    Q     But once they're a Humane Agent they're

 3          required to?

 4    A     I don't have the answer to that because the

 5          agency, right, obviously, I don't know the

 6          details of this, but I do know that there

 7          were, at least several years ago, some

 8          agencies considering no longer enforcing

 9          becoming the enforcer of the statutes in their

10          county.

11    Q     What I'm understanding you saying is you can

12          be a Humane Society, but you don't have to

13          have Humane Agents that enforce Humane Law?

14    A     My understanding of the law in the State of

15          Ohio is that there's the word may.  There's

16          not a requirement that Humane Agencies take

17          that responsibility.

18    Q     That's correct.  So do you believe that the

19          authority given to a Human Agent by statute in

20          the State of Ohio gives Christian Courtwright

21          the authority to enter onto Bianca's property

22          to conduct follow up inspections?

23                MR. BARINGER:    Objection.

24    A     Not without the permission of the Court.

25    Q     So if the Court Order did not exist he
```

```
 1              wouldn't be allowed to go onto the property?
 2    A         Yeah, I would fairly say if the Court Order
 3              did not exist.
 4    Q         I don't know if I asked you this, but do you
 5              keep written record of the training that
 6              Christian Courtwright received during your
 7              time?
 8    A         I certainly kept notes of it because one, I
 9              was a firm believer in the need for continuing
10              education and for staying abreast of things.
11              And as you know, animal welfare, that training
12              can be very formal, like with Code 3.  It can
13              be a, well I think back then we weren't
14              Zooming until the COVID, right?  Zoom calls
15              weren't happening much in those days.  They
16              were taking place in libraries or whatever
17              when there'd be education opportunities around
18              humane law or things like that.
19    Q         Do you know what the word reasonable suspicion
20              means?
21    A         I know more about reasonable doubt than I know
22              reasonable suspicion, and I do think it's also
23              up to the Court if there is a reason to
24              authorize a warrant to go on someone's
25              property.
```

| | | |
|---|---|---|
| 1 | Q | Does Christian Courtwright need reasonable |
| 2 | | suspicion in any of his main law enforcement |
| 3 | | activities? |
| 4 | | MR. BARINGER:    Objection. |
| 5 | A | No, I think the questions, I mean, I don't |
| 6 | | want to -- I'm not putting words in your |
| 7 | | mouth.  I think, and I believe this abides by |
| 8 | | the law and by Due Process, and we always |
| 9 | | operated by this.  It's not enough to get a |
| 10 | | lot of suspicions by virtue of a bunch of |
| 11 | | phone calls to seek to seize animals or to |
| 12 | | prosecute.  Because that's a very serious |
| 13 | | matter.  So, at the key model points, the |
| 14 | | Courts become instrumental in decisions, and |
| 15 | | so as not be arbitrary, there wouldn't have |
| 16 | | been a case, an ongoing case that's still |
| 17 | | going on now, if there wasn't the basis for a |
| 18 | | trial, which in deed did find her guilty of |
| 19 | | animal cruelty.  But it's not, I think if you |
| 20 | | want -- I don't know the legal term, |
| 21 | | reasonable suspicion.  I do know in a trial |
| 22 | | about reasonable doubt. |
| 23 | Q | Do you know what reasonable cause means? |
| 24 | A | Probable cause or reasonable? |
| 25 | Q | No, reasonable cause. |

```
 1   A     I don't think I could give you the firm, legal
 2         definition.
 3   Q     How about reasonable grounds?
 4               MR. BARINGER:     Objection.
 5   A     What is it that you want to know from me?
 6               MR. BARINGER:     Do you know what
 7         reasonable grounds means?
 8               MR. BARINGER:     Objection.  What
 9         context?
10               MS. HUTH:          It's a talking
11         objection, Matt.
12               (voices speaking over one another.)
13   Q     Have you ever heard of the words reasonable
14         suspicion before?
15               MR. BARINGER:     Objection.  On what
16         context?
17   Q     Have you ever, in your entire life, heard of
18         the word reasonable suspicion used before?
19               MR. BARINGER:     Objection.
20   A     My life is too long.  My life is too long.
21         I've heard millions of terms.
22   Q     Were you ever trained in what reasonable
23         suspicion means?
24               MR. BARINGER:     Objection.
25   A     I never went to law school.
```

| | | |
|---|---|---|
| 1 | Q | I didn't ask that.  I said in all your |
| 2 | | training that you've received when you worked |
| 3 | | for the Humane Society, were you ever trained |
| 4 | | in what reasonable suspicion means? |
| 5 | A | Trained in it?  No. |
| 6 | Q | How about reasonable grounds or reasonable |
| 7 | | cause?  Were you ever trained on what those |
| 8 | | words mean? |
| 9 | | MR. BARINGER:    Objection. |
| 10 | | MS. HUTH:        Matt, you can shake |
| 11 | | your head all you want. |
| 12 | | MR. BARINGER:    You've not given her |
| 13 | | any context. |
| 14 | | MS. HUTH:        Talking objection. |
| 15 | | Not permitted. |
| 16 | A | Look, if you're asking me is there a legal |
| 17 | | term by those names that would have sparked |
| 18 | | going to the Court for a search warrant, we |
| 19 | | had reasons to believe that animals were being |
| 20 | | seriously abused to the point -- |
| 21 | Q | I'm not asking about that. |
| 22 | | MR. BARINGER:    Objection.  Let her |
| 23 | | answer. |
| 24 | A | I don't know what you're asking. |
| 25 | | MR. BARINGER:    You're asking her |

```
 1          vague --
 2                  MS. HUTH:        I'm asking her if she
 3          knows what reasonable suspicion means.
 4                  MR. BARINGER:     You're asking her
 5          vague --
 6                  MS. HUTH:         Talking objections.
 7                  THE WITNESS:     It's too vague.
 8     Q    Did you ever learn in training what the legal
 9          term reasonable suspicion means?
10                  MR. BARINGER:     In what context?
11     A    I don't know.
12                  MS. HUTH:         Talking objection.
13     A    Reasonable suspicion for charges?  Reasonable
14          suspicion for --
15     Q    How about reasonable suspicion to enter a
16          person's property to conduct a follow up or
17          probation inspection?
18     A    I do not believe, short of the Court giving
19          you authority, that whatever term you want to
20          use, there is not going to be -- we went for a
21          court order to be able to go and seek
22          information on her property.  We found,
23          including through a veterinarian that we were
24          reasonably suspicious that these animals would
25          die and that it was our obligation, given the
```

```
1              Courts certification from Judge Grendell, to
2              prevent the unnecessary death of animals.  And
3              the Court permitted us to go on that property.
4    Q    So you know what reasonable suspicion means
5              because you just used it right.
6                   MR. BARINGER:     Objection.
7    A    I don't know, you tell me.
8    Q    You just used it, so do you know what it
9              means?
10                  MR. BARINGER:     Objection.
11                  THE WITNESS:     This is badgering,
12             you know why?  Because the plain fact that
13             we're missing here is that whatever
14             terminology you may be fluent in as a lawyer,
15             I am very clear that we were not about to
16             violate the rights of anybody.  And that the
17             Court made very important decisions.  And that
18             we don't run the Court.  We are agents for
19             humane enforcement.  And the suspicion started
20             with witnesses.  They went further than that
21             through interactions with Bianca herself, with
22             veterinarians taking a look at these horses.
23             She was then brought to trial.  She was found
24             guilty.  Not by me.  Not by Christian.  Not by
25             you.  But by a court of law.  We wouldn't have
```

```
 1              conducted follow up visits without the
 2              permission and authority of the Court.  That
 3              probably sums up the reality, whether or not
 4              that phrase was taught to me or not.  Because
 5              our charge, within due process, was to stop
 6              cruelty to animals that was being perpetrated
 7              by the accused, despite offers of assistance.
 8              Despite advise, in terms of veterinarians and
 9              whatever.  And then it took a legal course
10              through the Courts.  To do anything other than
11              that, to have not followed up, should the
12              outcome be in the future or now for whatever
13              is the range of the statute, that there are
14              more horses who are treated with cruelty, and
15              there's a prosection.  Had we not followed up,
16              our name would be looked at with contempt.  We
17              followed our duty.
18      Q      Are you aware of any laws that govern entries
19              on to private property for the purpose of
20              conducting follow ups or probation
21              inspections?
22      A      I believe that they can not be done without
23              the authorization of the Court.
24      Q      So you are aware of laws or you're not aware?
25      A      I'm saying that I believe that it is up to the
```

```
 1            Court to legally authorize follow up visits.
 2      Q     Do you know of any statutes that govern follow
 3            up inspections or probation inspections?
 4      A     I don't know the names of statutes.
 5      Q     Are you aware of any statutes that govern
 6            probation inspections and follow up
 7            inspections?
 8      A     This is what I know.
 9      Q     So it's no or yes, I didn't hear that.  You
10            are aware or you're not?
11      A     I know that it has to be authorized by the
12            Court.
13      Q     I didn't ask that.  I said are you aware of
14            any statutes that exist that govern probation
15            inspections or follow up inspections, no or
16            yes?
17      A     I'm going to say I don't recall because you're
18            putting me in corner, right?
19      Q     I'm just asking if you're aware of any laws?
20      A     Would you like to tell me which laws they are
21            and I can tell you if I'm aware?
22      Q     Yeah, I will, but I want to ask if you're
23            aware of any first.
24      A     I won't know until I hear what they are.
25      Q     How about this statute, do you see it?
```

```
 1   A     That is a factor to consider when granting
 2         probation, that to me the title of it
 3         indicates that that is for the judge.
 4   Q     Are you familiar with that statute?
 5   A     Nope, because it looks to me like it's for the
 6         judge.
 7   Q     You've never seen that statute before?
 8   A     I don't recall.
 9   Q     And how about this, have you ever seen this
10         language here.  Hold on.
11              MR. BARINGER:     She's never seen the
12         statue.
13              MS. HUTH:        Yeah, I understand
14         she's never seen it.  I'm asking if she's
15         familiar with the wording in the statute, if
16         you could just let me conduct my deposition
17         I'd appreciate it.
18              MR. BARINGER:     How can she know
19         what's (inaudible) if she's never seen the
20         statute?
21              MS. HUTH:        Talking objection
22         again.
23   Q     Okay.  I've highlighted a section. Does that
24         look familiar?  Have you ever seen any
25         language?
```

```
 1   A      I don't recall having seen this statute?

 2   Q      And you never recall seeing any language that

 3          says that reasonable grounds to believe the

 4          offender is non abiding?  That's not familiar

 5          to you?

 6   A      I'm not familiar.  I don't recall seeing this

 7          statute.

 8                 MS. HUTH:        Steve, this 295102 is

 9          going to be Exhibit B.

10                 THE WITNESS:     Can you go back to

11          it, because I have a question.

12                 MS. HUTH:        Sure.

13                 THE WITNESS:     Can you share screen?

14                 MS. HUTH:        Sure, do you see it?

15                 THE WITNESS:     Where it says the

16          revised code shall provide the offender with a

17          written notice and informs the offender that

18          authorized probation officers or adult parole

19          authority field officers with supervisory

20          responsibilities over the offender, blah blah

21          blah blah blah blah, blah blah blah blah blah,

22          grounds to believe that sounds to me and reads

23          to me like it is the decision of the probation

24          officer or the community control, whoever's

25          responsible for this.  This is not a statute
```

```
 1            that guides the Humane Society, and that is
 2            why the Humane Society required, or had to of
 3            had an authorization in this case from the
 4            judge to do follow up visits.
 5   Q        Okay.  But you've never seen this statute
 6            before, right?
 7   A        I don't recall having seen it.
 8   Q        You never learned about that statute in
 9            training then, obviously, right?  If you
10            haven't seen it before?  Or you just don't
11            recall?
12   A        I don't recall having seen it.
13   Q        So what about this, on Exhibit B, says -- so
14            you see A in front of you, during the period
15            of a misdemeanor --
16   A        You're not sharing the screen, I'm sorry.
17   Q        It's okay.  So this section right here.  You
18            want to read that?  You can read it to
19            yourself.
20   A        So what is your question?
21   Q        You were talking to me about that other
22            section and your interpretation of it.  What's
23            your interpretation of this section?
24            MR. BARINGER:    Objection.  You can
25            answer.
```

| | | |
|---|---|---|
| 1 | A | I don't think it's up to me to have an |
| 2 | | interpretation of it. |
| 3 | Q | But you were talking about the other section |
| 4 | | and interpreted it before, the other high |
| 5 | | lighted section. |
| 6 | A | I didn't interpret it, I said I couldn't |
| 7 | | recall having seen it and that it appeared to |
| 8 | | me to be a statute governing the actions of |
| 9 | | the Courts or those connected with the guilty |
| 10 | | verdict.  That this was, that we was -- I mean |
| 11 | | what I'm going to go back to was we had a |
| 12 | | person found guilty on two counts of animal |
| 13 | | cruelty in a Court that allowed for random |
| 14 | | follow up visits.  This doesn't determine |
| 15 | | that, right?  Let's not forget, we didn't make |
| 16 | | up the guilty verdict. |
| 17 | Q | So, let's say that the statute I just showed |
| 18 | | you, Exhibit B, governs follow up inspections |
| 19 | | on a person's property after they've been |
| 20 | | sentenced, like Marcellino. |
| 21 | A | Does it?  Like I said, I don't -- |
| 22 | Q | Let's just say hypothetically it does. |
| 23 | A | No, no.  I can't deal in hypotheticals. |
| 24 | | Cruelty is either real or its the -- |
| 25 | Q | We're not talking about cruelty, we're talking |

```
 1              about probationary inspections.  So --
 2    A    That was a ruling by a judge.  It is not up to
 3         me to interpret whether that judge correctly
 4         read that statute.
 5    Q    So whatever the judge says goes?
 6    A    We don't live in Nazi Germany, and I don't
 7         believe that everything that judges do or
 8         lawyers do is correct, but that doesn't mean
 9         that we don't deal with the Courts and assume
10         that this was a fair trial.
11    Q    I'm not talking about the trial, I'm talking
12         about the Court Order.
13    A    Are you saying am I doubtful that Judge
14         Stupica was following the law?
15    Q    Yes.
16    A    Am I doubtful of it?
17    Q    You asked me a question, I said yeah, but
18         you're being deposed.  Would you ever doubt
19         that Judge Stupica was following the law?
20    A    I have no reason to doubt it.  I don't have a
21         personal friendship.  I felt like Bianca got
22         to represent herself.  She had her witnesses.
23         There was a trial.  And it was Judge Stupica's
24         decision.  So if you have a problem with her
25         decision, maybe you need to go to her and not
```

| | | |
|---|---|---|
| 1 | | to Rescue Village. |
| 2 | Q | So whatever the Judge's order says then the |
| 3 | | Humane Agent follows, correct? |
| 4 | A | This is a morale issue and if -- |
| 5 | Q | (Inaudible) specifically as to Bianca's court |
| 6 | | order. |
| 7 | A | It is not my judge to determine or accuse.  If |
| 8 | | we had gotten a not guilty verdict, would I |
| 9 | | respect the decision? |
| 10 | Q | I'm not asking about a guilty or not verdict. |
| 11 | | I care about the Court Order. |
| 12 | A | But it has everything to do with your question |
| 13 | | because it works both ways.  There was no |
| 14 | | guarantee of an outcome in this trial.  In |
| 15 | | fact, it's very hard to get cruelty |
| 16 | | convictions.  It's very difficult.  The number |
| 17 | | of prosections versus any penalty for it is |
| 18 | | very lopsided.  If you're saying had she made |
| 19 | | a wrong judgement, or violated the statutes, |
| 20 | | would I go along with it?  If I sat with you |
| 21 | | over coffee and said that was a crappy |
| 22 | | decision, it wouldn't have meant to her beANS. |
| 23 | | The only thing is if you believe that she made |
| 24 | | the decision that violated the constitutional |
| 25 | | rights of an accused and convicted animal |

```
1              cruelty perpetrator then go deal with the
2              judge.
3    Q    If Bianca's court order does violate the
4              Constitution then the person that we have to
5              address it with is the Judge and not you, or
6              the Humane Society; is that what you're
7              saying?
8                   MR. BARINGER:    Objection.
9    A    We don't have the rights and privileges of
10             being a judge.  We have a limited scope of
11             responsibility and jurisdiction.  We could not
12             seize her animals without having the authority
13             to do so.
14   Q    Would you agree that Christian Courtwright has
15             to comply with statutory law?
16                  MR. BARINGER:    Objection.
17   A    I think that this question is loaded.
18   Q    I asked you a question, I'm waiting for an
19             answer.
20                  MR. BARINGER:    Objection.
21   A    Statutory law that applies to the Humane
22             Society?  Yes.
23   Q    You're saying he only has to abide by --
24   A    No, no, no, no, no.  I'm not going to get
25             caught in this where my opinion of Judge
```

```
 1              Stupica's decision is what's going to be

 2              proven --

 3    Q    I asked if Christian Courtwright has to abide

 4              by statutory law.

 5    A    A statutory law that applies to his job?  Yes.

 6    Q    What's that chapter, 1717?

 7    A    You know what?  I think that this is such an

 8              argumentation, to try to get to you or admit

 9              --

10    Q    Just answer the question, you're being

11              deposed.

12    A    I am answering the question.  It is so vague

13              and so general.

14    Q    So does Christian Courtwright have to abide --

15    A    No, he can violate every law in the book.  I

16              mean, come on.

17    Q    So the answer is yes?

18    A    No, the answer is neither yes, nor no.  If a

19              question in my humble opinion does not

20              actually give the person being deposed the

21              ability to answer with a yes or a no question,

22              because if I say no then you will argue that I

23              am saying we have no boundaries to what we can

24              do.  If I say yes, then you are going to use

25              statutes that are directed at guidING THE
```

1    Court and probation officers and whoever else

2    in how they handle this.  We are not

3    responsible for that, nor do we get to control

4    it, nor is our opinion relevant in whether

5    Terry Stupica is brought under sensor, as a

6    Judge for the action that she took.

7           If Christian Courtwright said to me, I

8    don't need to get any permission to go on

9    someone's property, I would say wrong, wrong,

10   wrong.  If you have no case, but just a hunch

11   that animal cruelty is what's at stake here, I

12   would say no.  There's tons of cases where we

13   get calls saying why haven't you taken those

14   horses?  And you know this law very well

15   because of cases you've been involved in. If

16   the condition of the horse does not meet, and

17   I forget what the name of the conditions are,

18   right, in terms of 1 through 10.  I cannot

19   authorize taking animals.  Even if I look at

20   them and they are bony and they don't look

21   good.  We have to follow.

22           MR. BARINGER:    Let's move on.

23           MS. HUTH:        So Christian

24   Courtwright does have to abide by statutory

25   law or he doesn't?

```
 1              MR. BARINGER:     You've made the

 2         points here, okay?  You've made your point.

 3              MS. HUTH:  Answer it, Hope.

 4              MR. BARINGER:     Objection, you made

 5         your point.  Move on.

 6              MS. HUTH:         No, I'm not moving

 7         on, I haven't heard an answer yet.  Yes or no?

 8              MR. BARINGER:     Objection, move on.

 9    Q    Hope, did the Court Order that we're talking

10         about give Christian Courtwright reasonable

11         suspicion to enter Bianca's property to

12         conduct follow up inspections?

13              MR. BARINGER:     Objection.

14              (voices speaking over each other.)

15    Q    I'm sorry?  I didn't hear her.

16    A    The Court gave permission for follow up visits

17         without stipulating that the Court felt there

18         would be a violation or not.  It came because

19         of two guilty verdicts and following up to

20         make sure that the decision of the Court, that

21         Bianca could not own or care for horses, was

22         followed.  He had a responsibility to continue

23         to enforce that.  And not by making

24         pre judgements, but by doing and conducting

25         legitimate follow up visits for which he had
```

| | | |
|---|---|---|
| 1 | | permission. |
| 2 | Q | By the Judge?  Permission by the Judge, right? |
| 3 | A | Yes. |
| 4 | Q | So if a court order says that you should go |
| 5 | | break down someone's door and you know that |
| 6 | | that's not legal, would the Humane Society and |
| 7 | | Christian Courtwright and you abide by that |
| 8 | | court order? |
| 9 | | MR. BARINGER:    Objection. |
| 10 | A | I would immediately get counsel. |
| 11 | Q | Because you would think that it doesn't sound |
| 12 | | right, correct?  That it doesn't seem like |
| 13 | | it's legal? |
| 14 | A | No, because I wouldn't know what on earth is |
| 15 | | the motive and intent of the question. |
| 16 | Q | Did you get counsel when the Judge issued a |
| 17 | | random and unannounced inspection order onto |
| 18 | | Bianca's property? |
| 19 | A | No.  It was already result of a trial in which |
| 20 | | she was found guilty. |
| 21 | Q | So because she was found guilty then the Judge |
| 22 | | had authorization to (inaudible)orders? |
| 23 | A | I am not in charge of what the Judge has or |
| 24 | | has not authorization, but all over the |
| 25 | | Country, judges can, or not do I know what the |

```
 1              laws are; in Ohio, judges can and sometimes do
 2              authorize follow up visits.  And to my
 3              knowledge, that right has not been
 4              successfully challenged.
 5    Q    And is it your opinion that that's a legal
 6              order?  To conduct a random, unannounced
 7              inspection?
 8    A    It stands right now as a legal order, correct?
 9    Q    Why do you say that?  Because it's in the
10              court order?
11    A    Because we are not a lawyers group.  We are a
12              Humane Society who is authorized to enforce
13              Humane Law up to and including prosecutions.
14              And this was the decision of a judge who has
15              not been held in contempt by anybody.
16                   MR. BARINGER:    Next question?
17                   MS. HUTH:        Yeah, I know Matt.
18              Thanks a lot.  You want to take over, Matt?
19                   MR. BARINGER:    Oh, I'd love to.
20                   MS. HUTH:        Yeah, I know you
21              would.
22    Q    Did Christian Courtwright take any videos of
23              any camera?  Take any pictures or videos of
24              his inspections?
25    A    I don't recall.
```

1   Q    Does the Humane Society have a policy that the

2          Humane Agent's supposed to take pictures or

3          videos of follow up inspections?

4   A    Not that I recall.

5   Q    You don't recall if they have a policy or not?

6   A    Correct.

7   Q    Did you ever advise Christian Courtwright to

8          take pictures or videos of any follow up

9          inspections?

10  A    I don't recall.

11  Q    Are field notes the same things as these logs

12         that went into Christian Courtwright's

13         cabinet, file cabinet and got locked?  Is that

14         the same thing as a field note?

15  A    I don't know what you're -- I completely do

16         not understand your question about what got

17         lost or whatever --

18  Q    Do you know what field notes are?

19  A    Taken in the field.

20  Q    Have you ever heard of the term field notes

21         before?

22  A    My understanding of that term is notes that

23         you take in the field, which means on site or

24         wherever you're conducting whatever business.

25  Q    And those are the same logs that he would have

```
 1          in his cabinet, those written logs, correct?
 2   A      I don't recall.
 3   Q      Did Christian Courtwright ever take any field
 4          notes?
 5   A      I don't recall.
 6   Q      Would you agree that field note taking is an
 7          important investigative aid?
 8   A      I don't have an opinion on that.  If you're
 9          crawling on the ground to see horses in forty
10          below weather, or cows or sheep or dogs, I'm
11          not thinking that field notes are necessarily
12          going to be the main way that you keep
13          records.
14   Q      But do you agree that the records should be
15          kept sometime during or some there after on
16          the probation inspection or follow up;
17          wouldn't you?
18   A      I would say it would be preferable.
19   Q      Good practice?
20   A      Not always possible. Have you ever in part of
21          a seizure of 200 golden retrievers --
22   Q      Right, but people forget things over time so
23          it would be good practice to do --
24   A      Well you should do it in a timely fashion,
25          yes.  If at all possible.
```

```
1   Q     And the Humane Society at the time you worked
2         there had no written policy that that was
3         something that was required?
4   A     I will say again, I don't recall.
5               MS. HUTH:        Matt, give me five
6         minutes and I'll see what else I have.
7               MR. BARINGER:    Okay, I have 4:36.
8               MS. HUTH:        So let's do 4:40.
9               MR. BARINGER:    4:40, sounds good.
10              (Recess taken.)
11              MS. HUTH:        Are we ready?
12              MR. BARINGER:    Yes.
13  Q     So Hope, I just wanted to go over a couple
14        more things.  We  might have addressed them,
15        but just to get clarification.  So if there's
16        a case law that says that it's illegal to
17        enter upon property of a probationer, if there
18        was case law that exists that says it's
19        illegal to enter upon a probationer's property
20        without reasonable suspicion, would the Court
21        Order trump the case law?
22              MR. BARINGER:    Objection.  Asked and
23        answered.  You can answer, Hope.
24  A     I can't answer hypotheticals.
25  Q     So you're refusing to answer that question?
```

```
 1   A      No.  It's a hypothetical question.
 2   Q      Right, so answer it.
 3               MR. BARINGER:    Objection.
 4   A      Could you repeat the question?
 5   Q      If there was case law that indicated it was
 6          illegal to enter a probationer's property
 7          unless there was reasonable suspicion,
 8          reasonable cause or reasonable grounds that a
 9          person has been violating their probation
10          terms or committing a crime, would that case
11          law trump the Court's order allowing random,
12          unannounced inspections?
13               MR. BARINGER:    Objection.  She is
14          not answering.
15               MS. HUTH:       She's not answering
16          it?
17               MR. BARINGER:   She is not an
18          attorney, so her answer isn't (inaudible).
19   A      I can't answer it.  I'm not avoiding it.  I
20          can't answer it because --
21   Q      (Inaudible) how to answer that question?
22   A      No, he's not telling me.  I make my own
23          decisions about what I answer and what I
24          don't.  And my answer is I'm not mirroring
25          what Matt just said.  I am not an attorney.
```

124

```
 1          If such a hypothetical situation arose, and I
 2          don't know exactly why it would, I would
 3          proceed to go to an attorney and get legal
 4          counsel.
 5    Q     Did such a situation arise in Bianca's case?
 6    A     In Bianca's case there as a decision written
 7          by the Judge to allow for follow up visits,
 8          unannounced, without any stipulation as to
 9          number.
10    Q     I might have asked this, but I'm almost done.
11          So Exhibit B was the statute that I showed
12          you, correct?  Well, Exhibit B, the statute I
13          showed you, you never had seen that statute
14          before I showed it to you, correct?
15    A     No, I said I don't recall having seen it.
16    Q     You do or don't recall whether you were
17          trained on that statute?
18    A     I don't recall it.
19    Q     You don't recall if you were trained about
20          that statute?
21    A     Are you asking --
22              MR. BARINGER:    She's just asking if
23          you recall being trained.
24    A     I don't recall being trained in that statute.
25          Like I've said, ten times.
```

```
 1    Q      So this is Exhibit C, Matt, Marcellino Follow
 2           Up.  Do you recognize the document that I
 3           shared with you?
 4    A      I don't recall it.  I may well have seen it,
 5           but I don't recall it.
 6    Q      Did Courtwright do reports that look similar
 7           to this based upon his probation inspections
 8           or follow up inspections?
 9    A      I think some looked similar to this, some
10           didn't.
11    Q      You've never seen the one Exihibt C?
12    A      No, I said I don't recall.
13    Q      Was he required to do these kind of reports,
14           Exhibit C kind of reports for these follow up
15           inspections?
16    A      We expected reports on the follow up
17           inspections, correct.
18    Q      So he would have, this actually came from you
19           guys' discovery, the defendant's discovery, so
20           you would have received this from Christian
21           Courtwright?
22    A      I don't recall.
23    Q      Do you recall receiving from any other follow
24           ups?
25    A      Well these are, I had said before, I don't
```

126

```
 1              recall.
 2     Q     Do you recall Christian Courtwright producing
 3           any Excel Spreadsheets about, I don't know,
 4           monthly Excel Spreadsheet reports?
 5     A     The only thing I recall was that I had seen
 6           some spreadsheets that logged all of the
 7           complaint calls that we got and what was done
 8           with them.
 9     Q     How about follow up visits, were those
10           recorded?
11     A     I don't recall.
12     Q     Have you ever sued or been sued before?
13           Besides this lawsuit?
14              MR. BARINGER:    Objection, you can
15           answer.
16     A     Have I ever, personally?
17     Q     Yeah.
18     A     Together with the Humane Society on some HR
19           issues.
20     Q     What written policies does -- I'm almost done,
21           Matt. What written policies does the Humane
22           Society have related to probation inspections
23           or follow up inspections?
24     A     I don't recall.
25     Q     You don't know if there are any written or not
```

```
 1            written policies?
 2   A   No, I don't recall.  That's what I said a
 3            couple hours ago.
 4   Q   Do you recall Christian Courtwright teaching
 5            any seminars during your time at the Humane
 6            Society?
 7   A   We did some open events for community members
 8            to both meet the Humane Agent and learn about
 9            what the Humane Agent does.
10   Q   What about any seminars or workshops that he
11            would have taught?
12   A   What's the difference?
13   Q   He never conducted any seminars or workshops
14            with any other Humane Societies that you
15            recall?
16   A   You mean would he teach them for other Humane
17            Societies?
18   Q   Yeah, did Christian Courtwright ever teach
19            anyone else about the laws that apply to
20            Humane Law Enforcement, that you remember?
21   A   I don't recall.
22            MS. HUTH:        Okay, I guess that's
23            it, Matt.
24            MR. BARINGER:    Okay. Hope, I'll give
25            you a call to wrap this up.  You have a right
```

1        to have this transcript produced by the court

2        reporter and then you can review the

3        transcript.  The purpose of the --

4              MS. HUTH:      We are still on the

5        record, do we need to be on the record, Matt?

6              MR. BARINGER:    Yeah, just for this

7        because I need to get her to say whether she

8        waives.

9              The purpose of you reviewing it is not

10       to change your answers, it is to indicate

11       whether you believe it is accurate as to what

12       was said.  I generally advise my clients to

13       waive that right, but you do have that right.

14       So would you like to have it typed up and read

15       it or would you like to waive that right?

16            THE WITNESS:    No.  It would be too

17       long and I would fall asleep, so I waive my

18       right.  Thank you.  Then we're off the record

19       now and Hope, I'll call you.

20            (End of deposition.)

21                 - - -

22

23

24

25

```
 1   State of Ohio,          )
                             ) SS:   CERTIFICATE
 2   County of Cuyahoga,     )

 3        I, Steven E. Mengelkamp, Certified Digital

 4   Reporter and Notary Public in and for the State of

 5   Ohio, duly commissioned and qualified, do hereby

 6   certify that the within named witness, Hope

 7   Brustein, was by me first duly sworn to testify the

 8   truth, the whole truth, and nothing but the truth in

 9   the cause aforesaid; that the testimony then given

10   by the witness was by me electronically recorded in

11   the presence of said witness, afterward transcribed,

12   and that the foregoing is a true and correct

13   transcript of the testimony so given by the witness

14   as aforesaid.

15        I do further certify that this deposition was

16   taken at the time and place in the foregoing caption

17   specified, and was adjourned.

18        I do further certify that I am not a relative,

19   counsel, or attorney of either party, or otherwise

20   interested in the event of this action.

21

22

23

24

25
```

1          IN WITNESS WHEREOF, I have hereunto set my

2    hand and affixed my seal of office at Cleveland,

3    Ohio, on this 3rd day of August, 2022.



Steven E. Mengelkamp, Certified Digital
Reporter and Notary Public in and for the
State of Ohio.
My Commission expires February 12, 2026.

**$**

**$127,000 (1)**
9:5
**$250 (1)**
37:15
**$25-50 (2)**
37:7;38:11

**A**

**AAWA (1)**
6:20
**abandoned (1)**
63:22
**abide (6)**
46:23;114:23;
115:3,14;116:24;
118:7
**abides (1)**
101:7
**abiding (1)**
109:4
**ability (5)**
5:1;15:19;24:22;
70:7;115:21
**able (7)**
5:4;26:20;27:17;
29:4,5;35:20;104:21
**above (2)**
22:17;62:1
**abreast (7)**
39:17;61:2,16;
62:25;74:23;80:13;
100:10
**absolute (1)**
23:22
**Absolutely (2)**
13:11;19:7
**abused (2)**
51:5;103:20
**acceptable (1)**
58:16
**accepted (1)**
35:6
**access (2)**
63:6;83:24
**accident (1)**
89:17
**according (1)**
33:9
**account (1)**
89:24
**accurate (1)**
128:11
**accurately (1)**
75:21
**accusations (1)**
73:3
**accuse (1)**
113:7
**accused (4)**

32:22;53:2;106:7;
113:25
**accusee (1)**
43:6
**act (3)**
33:8;40:21;41:5
**action (2)**
18:2;116:6
**actions (2)**
14:9;111:8
**actively (1)**
25:17
**activities (6)**
18:4;19:12;21:8;
22:3;87:1;101:3
**activity (2)**
41:10;79:5
**actual (3)**
12:12;38:20;40:21
**actually (11)**
16:2;33:9;37:24;
62:2;87:9;92:3,4,6;
97:23;115:20;125:18
**add (1)**
34:8
**address (3)**
5:14;64:8;114:5
**addressed (3)**
64:11,14;122:14
**adherence (2)**
11:17,23
**Administrative (1)**
8:23
**Administrator (3)**
6:10;26:22;27:24
**Administrators (2)**
6:13,20
**admissions (1)**
95:23
**admit (1)**
115:8
**adoption (1)**
81:3
**adoptions (1)**
83:4
**adult (1)**
109:18
**advanced (3)**
15:18;35:21,25
**advice (3)**
12:18;16:6;41:16
**advise (4)**
93:23;106:8;120:7;
128:12
**advisory (1)**
9:13
**again (7)**
6:18;33:24;34:6;
86:17;92:21;108:22;
122:4
**age (2)**
4:4;12:9
**agencies (3)**

45:25;99:8,16
**agency (6)**
14:13;51:9;82:3;
94:5,6;99:5
**agent (28)**
13:17;14:20;15:13,
22;18:2,6;21:8;22:3;
23:22;24:4,11;26:12;
28:20;31:13;34:18;
38:23;44:18;57:5;
62:4;65:1,13;89:10,
16;99:2,19;113:3;
127:8,9
**agents (33)**
14:2,18;15:25;
16:8,14;17:22,24;
18:10,12,19;19:4,8,
13;21:3;27:10;28:4,
18;34:16;37:9,18,24;
44:21;55:19;56:16,
23;57:2;75:13;77:13;
79:12;90:2;98:19;
99:13;105:18
**agents' (1)**
17:21
**Agent's (2)**
94:13;120:2
**ago (6)**
16:2;51:18;73:11;
96:24;99:7;127:3
**agree (9)**
39:1;60:10;64:9;
86:3,6;98:21;114:14;
121:6,14
**agreement (1)**
71:3
**agreements (2)**
53:16;71:12
**Agriculture (1)**
33:17
**ahead (6)**
10:11;13:1;27:16;
36:7;51:4;52:20
**aid (1)**
121:7
**allow (1)**
124:7
**allowed (8)**
43:3,23;46:11;
52:4;71:8;96:22;
100:1;111:13
**allowing (1)**
123:11
**allows (1)**
22:9
**almost (2)**
124:10;126:20
**along (1)**
113:20
**always (6)**
25:23;41:12;68:5;
76:17;101:8;121:20
**Amanda (1)**

85:2
**ambiguous (2)**
15:3,7
**amount (1)**
64:19
**amounts (1)**
81:16
**analogy (1)**
44:14
**and/or (1)**
26:3
**Animal (39)**
6:10,12,16,19;9:8,
11,17,18,20;13:7;
16:20;17:4,9;26:20,
22,25;27:19,23;29:6;
30:18;31:4;33:16,17;
36:17;41:24;44:9,15;
48:17;56:7;60:15;
64:23;71:9;76:14;
82:25;100:11;
101:19;111:12;
113:25;116:11
**animals (36)**
12:8;19:24;22:24;
23:11,16;24:21;25:3,
3;29:5,15;42:2;46:6;
51:5;56:4,5;64:3,5;
65:3,14;70:9;75:1;
77:5,25;78:1,2;87:9;
89:11,17;90:3;
101:11;103:19;
104:24;105:2;106:6;
114:12;116:19
**Ann (1)**
85:1
**annual (3)**
13:12;65:4;78:25
**answered (7)**
47:5,6;51:24;
52:16;56:9;96:9;
122:23
**anti- (1)**
43:10
**Antioch (1)**
6:3
**anything's (1)**
70:8
**apologize (1)**
92:4
**appeared (1)**
111:7
**Applegate (1)**
85:1
**applicable (6)**
11:13,17,23;13:9;
16:24;30:15
**applications (1)**
15:10
**applied (1)**
18:1
**applies (2)**
114:21;115:5

**apply (4)**
15:24;18:3;31:20;
32:2;91:4;127:19
**appointed (1)**
14:20
**appreciate (1)**
108:17
**apprised (1)**
67:25
**approaches (1)**
51:2
**approximately (2)**
9:4;37:7
**arbitrary (1)**
101:15
**area (1)**
28:11
**areas (2)**
83:3,5
**argue (1)**
115:22
**argumentation (1)**
115:8
**arise (1)**
124:5
**arose (1)**
124:1
**around (4)**
77:24;85:20;97:20;
100:17
**asleep (1)**
128:17
**ASPCA (1)**
11:2
**aspects (2)**
36:16;61:22
**assets (1)**
10:6
**assist (3)**
23:13;53:9;63:20
**assistance (4)**
53:17;54:3;87:10;
106:7
**assisted (1)**
63:23
**Association (5)**
6:12,19,21;9:14;
26:25
**assume (4)**
32:18;42:7;64:9;
112:9
**assumption (1)**
42:8
**assuring (1)**
35:8
**attachment (1)**
84:19
**attend (2)**
36:5;97:13
**attendants (1)**
64:24
**attended (2)**
74:2,3

**attorney (9)**
4:8;5:11;54:21;
90:21;91:3;96:12;
123:18,25;124:3
**attorneys (2)**
90:22;91:2
**auditor's (1)**
98:12
**August (1)**
7:14
**authorities (1)**
17:14
**authority (10)**
40:10;98:16,19,23;
99:19,21;104:19;
106:2;109:19;114:12
**authorization (7)**
67:9,23;72:15;
106:23;110:3;
118:22,24
**authorize (10)**
66:6,21,23;67:1,3;
91:11;100:24;107:1;
116:19;119:2
**authorized (9)**
66:9,10,20;67:4,
11;92:25;107:11;
109:18;119:12
**authorizing (2)**
66:24;78:23
**available (3)**
12:7;35:12;80:18
**avoiding (1)**
123:19
**awarded (2)**
26:20;27:22
**aware (40)**
32:24;36:11,13;
40:5,16;44:11;45:4;
58:2;64:6;70:21;
72:23;73:1,6,8,15,18;
80:10,11,16;81:21;
82:2,3;88:4,16;89:4;
93:12;94:5,15,19;
96:17;97:4;106:18,
24,24;107:5,10,13,
19,21,23

**B**

**Bachelor's (2)**
5:25;6:7
**back (5)**
7:3;85:15;100:13;
109:10;111:11
**backed (1)**
82:22
**backup (1)**
84:3
**badgering (1)**
105:11
**BARINGER (84)**
10:8,24;21:9,19;

22:6;28:6,9;33:23;
34:5;36:7;37:19;
38:18;39:4;42:21;
43:25;44:23;47:1,4;
49:1,15,18;50:4;
51:23;52:2,8,16;
54:13,17,23;56:8,13;
58:18;60:2;62:14;
68:12;88:8;91:1;
93:7,11;95:9,17;
96:11,16;99:23;
101:4;102:4,6,8,15,
19,24;103:9,12,22,
25;104:4,10;105:6,
10;108:11,18;
110:24;114:8,16,20;
116:22;117:1,4,8,13;
118:9;119:16,19;
122:7,9,12,22;123:3,
13,17;124:22;
126:14;127:24;128:6
**barn (3)**
73:7,15,20
**based (7)**
20:1;27:20;31:17;
52:25;54:2,2;125:7
**basic (3)**
15:13;18:18;25:6
**basing (1)**
83:21
**basis (4)**
62:22,23;66:24;
101:17
**beANS (1)**
113:22
**become (2)**
36:18;101:14
**becoming (1)**
99:9
**began (1)**
89:7
**begin (1)**
14:8
**beginning (2)**
21:10,20
**behalf (2)**
12:20;64:5
**belief (1)**
83:19
**believer (1)**
100:9
**bellicosity (1)**
53:1
**belongs (1)**
56:1
**below (1)**
121:10
**Berkeley (2)**
16:3,4
**Besides (1)**
126:13
**best (3)**
24:22;38:14;70:7

**beyond (3)**
29:3;34:9;78:22
**Bianca (35)**
29:24;39:1;40:5,
25;41:2;42:12;43:16;
45:18;51:5;66:7;
68:20;70:21;71:12;
72:8,13,23,24;73:7,
21;76:12;85:19;
87:13;88:1,10,16;
89:2;92:19;94:22;
95:2;96:17;97:4;
98:1;105:21;112:21;
117:21
**Bianca's (36)**
41:18;42:18;57:20,
23;58:4;59:1;70:12;
71:17,21;72:7,20;
73:16;76:2;77:20;
82:9,15;85:17;87:25;
88:4,19,24;89:2;
90:11;94:21;95:5,13;
96:3;97:13;98:6;
99:21;113:5;114:3;
117:11;118:18;
124:5,6
**big (4)**
49:16;62:3;83:13;
91:10
**Bills (1)**
61:18
**bit (1)**
14:24
**bitterly (1)**
24:25
**blah (11)**
109:20,20,21,21,
21,21,21,21,21,21,21
**board (6)**
9:9,13,15;12:15;
14:1;61:14
**bony (1)**
116:20
**book (1)**
115:15
**booklet (1)**
36:10
**both (12)**
14:12;15:19;20:17;
30:11;32:11;34:1;
36:21;46:2;62:8;
87:9;113:13;127:8
**bottom (1)**
85:18
**boundaries (2)**
70:3;115:23
**boy (1)**
11:4
**break (3)**
60:3,8;118:5
**breaks (2)**
5:8,9
**breast (1)**

62:1
**bring (1)**
65:2
**bringing (2)**
63:23;74:25
**broad (1)**
36:9
**brought (4)**
53:19;64:18;
105:23;116:5
**BRUSTEIN (2)**
4:3,7
**brutality (1)**
40:1
**budget (2)**
35:5,16
**build (1)**
81:14
**building (1)**
12:12
**bunch (1)**
101:10
**business (1)**
120:24
**bypassed (1)**
35:18

**C**

**cabinet (5)**
80:3;92:1;120:13,
13;121:1
**California (2)**
16:3,4
**call (8)**
17:6,6;29:1;30:4,5,
10;127:25;128:19
**called (8)**
8:13;9:17;16:15;
27:23;31:2;61:14;
81:25;83:16
**calling (2)**
26:14;30:25
**calls (5)**
87:11;100:14;
101:11;116:13;126:7
**came (12)**
17:9;35:4;42:18;
58:8;69:24;76:8;
81:3;86:19,20;97:10;
117:18;125:18
**camera (1)**
119:23
**can (58)**
10:9,24;12:1;
15:11,21,22;21:9,15,
16;25:19;26:2,10;
31:19;32:9;33:23;
34:3,5;37:24;38:18;
39:4;43:25;48:21;
54:21;55:7;57:12,13;
58:14;60:8;66:16;
68:10;70:2,4,5;

72:19;83:23;84:17;
88:5;89:25;90:3;
93:15;99:11;100:12,
12;103:10;106:22;
107:21;108:18;
109:10,13;110:18,24;
115:15,23;118:25;
119:1;122:23;
126:14;128:2
**capacity (1)**
83:6
**care (5)**
12:7;56:7;64:23;
113:11;117:21
**carefully (1)**
51:3
**caring (2)**
42:14;78:7
**carried (1)**
12:19
**carry (1)**
66:12
**carrying (2)**
20:22;33:9
**case (48)**
9:22;17:4;19:18,
22;22:11;30:24;31:3;
41:22,25;42:10,12;
44:15;45:8,18;48:5,
12,18;57:15,16,17;
59:1,12,16,20,23;
60:12,16,23;61:6;
68:6,7;71:24;76:13,
19;87:14;90:22;91:2;
101:16,16;110:3;
116:10;122:16,18,21;
123:5,10;124:5,6
**cases (17)**
17:8,15;18:17;
19:19,21;22:15;
42:10;53:19;57:16;
59:13,14;63:4;71:5;
76:18,19;116:12,15
**categories (1)**
87:7
**cats (3)**
63:22,23,25
**caught (1)**
114:25
**cause (5)**
101:23,24,25;
103:7;123:8
**CAWA (1)**
26:21
**cell (2)**
5:18,20
**certain (5)**
15:13;40:5;53:19;
56:4;70:3
**certainly (10)**
19:21;22:23;24:2,
17;25:17;61:2;73:12;
77:22;97:1;100:8

**certificate (3)**
26:21;27:23,24
**certification (4)**
6:11,14;32:6;105:1
**certifications (1)**
6:9
**certified (8)**
4:5;6:10;15:11,12;
26:21;27:23;28:20;
38:22
**challenged (1)**
119:4
**challenging (1)**
65:12
**change (2)**
42:11;128:10
**changed (4)**
32:19;70:8;83:5;
92:20
**changes (1)**
62:21
**changing (1)**
83:3
**chaos (1)**
46:5
**chapter (2)**
98:21;115:6
**Chardon (3)**
29:10;48:11;94:16
**charge (4)**
35:8;43:8;106:5;
118:23
**charged (4)**
28:22;71:9;76:25;
77:4
**charges (1)**
104:13
**checks (1)**
85:3
**Chief (1)**
8:23
**choice (1)**
98:24
**choices (2)**
19:15;35:3
**chosen (1)**
35:1
**Christian (110)**
13:19;14:16,22;
18:23,25;19:25;20:8;
25:20;26:3;30:2;
31:9,18,20;32:24;
34:22,24;35:21;37:3;
38:3,9,16,21;40:9,18;
41:2,17,19;42:17;
43:15,23;44:3;45:22;
46:23;47:15;48:8,10;
51:9;56:20;57:6,19;
58:3,13;60:10,20;
62:5;63:9,11,17;64:7,
14;65:5;66:6;67:9,
15,25;68:19,23;69:3;
71:1,13,25;72:18;

**certificate (3)**
73:19;74:4;76:1;
79:1,3;80:6;82:6,18;
83:15;84:2;86:16,24;
87:24;88:2,10,17,21,
23;90:9;91:17;92:13;
93:1,17,23;94:2,17;
95:4;96:2;98:2;
99:20;100:6;101:1;
105:24;114:14;
115:3,14;116:7,23;
117:10;118:7;
119:22;120:7,12;
121:3;125:20;126:2;
127:4,18
**circumstance (1)**
72:22
**circumstances (2)**
14:6;85:15
**clarification (1)**
122:15
**clarified (1)**
21:19
**clarify (2)**
4:12;23:8
**class (1)**
32:5
**clear (6)**
20:21;24:3;50:21;
67:4;71:20;105:15
**Clearly (1)**
20:25
**CLEs (1)**
16:9
**Cleveland (2)**
5:15;9:10
**clients (1)**
128:12
**clinic (3)**
64:23;83:6,8
**clock (7)**
89:6,7,12,20,23,25;
90:2
**closely (1)**
19:12
**coactivity (1)**
75:18
**Code (4)**
16:15;35:21;
100:12;109:16
**coffee (1)**
113:21
**cognizant (2)**
32:21;63:2
**cold (2)**
24:19,25
**College (2)**
6:3,5
**Columbus (1)**
63:3
**coming (3)**
16:19;64:4;69:8
**commitment (3)**
51:8,8,9

**committee (3)**
56:4,15,21
**committing (1)**
123:10
**common (1)**
45:14
**communicated (1)**
76:10
**communication (2)**
65:10;94:20
**communications (2)**
64:16,25
**Community (13)**
9:11;23:21;39:20,
23,25;40:2,6,14,20,
22;97:5;109:24;
127:7
**complained (1)**
88:15
**complaint (3)**
28:24,24;126:7
**complaints (6)**
24:20;53:10;65:16;
69:7;74:25;87:12
**completed (2)**
79:16;86:16
**completely (1)**
120:15
**compliance (5)**
11:13;13:8;29:16;
32:11;66:3
**compliant (2)**
15:20,20
**comply (1)**
114:15
**comprehensive (1)**
81:12
**computer (9)**
79:10,18;82:17,19,
20,21;83:14;84:3,5
**computerized (3)**
79:16;83:2,9
**computers (2)**
83:22,22
**concerned (1)**
32:7
**concerning (4)**
23:11;61:17;70:9;
89:18
**condition (3)**
12:9;40:14;116:16
**conditions (3)**
40:6;65:3;116:17
**conduct (32)**
13:12;26:13;27:11;
28:4;40:11;41:3,6,
17;42:19;43:17;
48:19;56:17;57:14;
65:16;67:5,15;68:1;
71:16;76:2;88:24;
90:9;93:1,15;94:3,10,
17;98:3;99:22;
104:16;108:16;

**117:12;119:6**
**conducted (14)**
14:15;28:17;31:12;
65:4;75:9;76:22;
78:25;82:8;87:25;
88:3,18;92:13;106:1;
127:13
**conducting (9)**
57:2;59:24;67:10;
77:23;90:16;91:19;
106:20;117:24;
120:24
**conferences (1)**
16:21
**connected (1)**
111:9
**connection (1)**
26:7
**consciously (1)**
25:7
**consented (1)**
98:2
**consider (8)**
18:6;29:18;38:16;
48:25;49:22,24;
71:10;108:1
**considered (1)**
79:7
**considering (1)**
99:8
**consistently (1)**
51:15
**consists (1)**
15:14
**constantly (1)**
88:15
**constitute (1)**
51:7
**Constitution (8)**
41:15;46:20;47:8,
12,15,17,23;114:4
**Constitutional (6)**
16:24;17:20;18:3;
20:9;45:7;113:24
**constraints (5)**
30:10;34:21;35:2,
14,17
**consultation (1)**
24:12
**contact (1)**
89:16
**contacting (1)**
61:25
**contain (1)**
49:9
**contempt (2)**
106:16;119:15
**context (5)**
39:24;102:9,16;
103:13;104:10
**continue (1)**
117:22
**continuing (6)**

**16:7,8,9,17;34:1;**
100:9
**contrary (2)**
43:22;45:7
**Control (13)**
33:17;39:20,23,25;
40:2,6,14,20,22;77:1;
97:5;109:24;116:3
**controversial (2)**
60:17,18
**Cont's (1)**
84:25
**conversations (1)**
92:16
**convicted (4)**
32:23;41:23;48:17;
113:25
**convictions (1)**
113:16
**coordination (2)**
64:19,20
**corner (1)**
107:18
**correctly (5)**
7:22;9:4;19:9;
42:12;112:3
**counsel (6)**
22:16,25;26:8;
118:10,16;124:4
**counties (1)**
37:9
**Country (1)**
118:25
**counts (4)**
41:23,24;77:3;
111:12
**County (44)**
5:21;7:8,16,23;8:1,
24;9:3,12;10:7,13,17;
12:20,22;15:12;16:7;
24:5;25:10;26:6;
27:21;28:21;31:24;
32:13;37:4,4,6,18;
38:5,7,10,24,25;
41:15,16;44:20;46:1;
50:24;62:3;65:14;
68:7;87:8;89:10,12;
91:7;99:10
**couple (2)**
122:13;127:3
**course (3)**
55:25;65:1;106:9
**court (131)**
4:18;15:11,23;
19:23;22:8,11,14,25;
23:9;25:25;26:7;
28:21;29:8,9,13,13,
16,25;30:19,20,22,
23,23;31:17;38:21;
40:11;41:13,16,19,
25;42:16,23;43:8,11,
16,22,24;44:17,19,
22,25;45:2,4,6,9,12,

17,21;46:18,22,24;
47:9,18,22;48:1,4,7,
11,14;51:6;52:21;
57:9,11,13,18;58:6,8,
9,13,19,20,21,24,24,
25;66:9,20,22,23;
67:6,7,23;71:7,11;
72:15;75:2;78:23;
92:20,24;93:3,5,9,13,
14,20,21;94:16;
96:18,21;97:10,23;
99:24,25;100:2,23;
103:18;104:18,21;
105:3,17,18,25;
106:2,23;107:1,12;
111:13;112:12;
113:5,11;114:3;
116:1;117:9,16,17,
20;118:4,8;119:10;
122:20;128:1

courts (12)
12:20;14:21;22:16;
32:1;37:11;46:1;
91:11;101:14;105:1;
106:10;111:9;112:9

Court's (1)
123:11

Courtwright (97)
13:19;14:16,22;
18:24,25;19:25;20:8;
25:20;26:3;30:3;
31:10;32:24;33:4,16,
20,21;34:22,25;37:3;
38:3,9,16,21;40:10,
18;41:2,17,19;42:18;
43:15,24;45:22;
46:23;47:15;48:8,10;
57:6,20;58:3,14;
62:5;63:9,11,17;
64:7;65:5;66:6;
67:25;68:23;69:3;
71:1,13;73:19;76:1;
79:1,3;82:7,18;
83:15;86:16,24;
87:24;88:2,11,17,21,
23;89:6;90:9;91:14,
17;92:13;93:1,23;
94:2,17;95:5;96:3;
98:2;99:20;100:6;
101:1;114:14;115:3,
14;116:7,24;117:10;
118:7;119:22;120:7;
121:3;125:6,21;
126:2;127:4,18

Courtwright's (6)
60:11,20;68:20;
71:25;80:6;120:12

cover (3)
36:16;62:4;65:13

covered (1)
36:10

COVID (1)
100:14

cows (1)
121:10

crappy (1)
113:21

crawling (1)
121:9

create (3)
34:11,15;79:3

created (2)
82:7,8

creating (1)
56:22

crime (1)
123:10

critical (1)
64:25

CROSS (2)
4:22;92:17

cruelty (23)
22:11;30:18;31:5;
41:24;42:2;43:11;
44:9,15;46:6;48:17;
71:4,10;76:14;77:5;
101:19;106:6,14;
111:13,24,25;113:15;
114:1;116:11

current (8)
8:21;19:20;39:3;
60:11,23;61:1,6;
80:14

currently (2)
80:11,13

D

date (4)
20:20;39:3;61:8,9

dates (10)
57:19;68:4;85:2;
95:4,12,14;96:2,6,10,
15

day (14)
12:3,4,10,11,11,11,
13,13;19:17,19;76:5;
87:1,4;96:7

days (1)
100:15

deal (5)
17:14;83:13;
111:23;112:9;114:1

death (1)
105:2

decade (1)
36:18

decided (1)
8:4

decides (1)
76:1

deciding (1)
57:10

decision (14)
30:21;32:15;42:15;
57:17;109:23;

112:24,25;113:9,22,
24;115:1;117:20;
119:14;124:6

decisions (7)
15:21;35:4;41:15;
56:3;101:14;105:17;
123:23

deed (1)
101:18

deemed (1)
35:10

defendant (2)
65:22;70:19

defendant's (1)
125:19

definite (1)
41:8

definition (2)
33:13;102:2

degree (2)
6:1,7

delete (1)
11:20

deleted (3)
84:2,6,7

department (2)
94:16,21

depend (1)
19:18

depending (3)
62:23;69:4;75:7

depends (3)
49:5,6;57:17

depose (1)
46:10

deposed (3)
112:18;115:11,20

deposition (5)
5:5;50:7;60:22;
108:16;128:20

describe (3)
5:23;28:10;75:22

described (3)
51:19;86:9;87:20

designate (1)
83:23

despite (6)
53:1,2,4;56:6;
106:7,8

detail (1)
97:25

details (6)
10:12;36:12;37:2;
59:22;74:13;99:6

determine (4)
44:4;46:18;111:14;
113:7

determined (4)
12:6;46:4;54:7;
89:13

determining (1)
46:2

develop (2)

81:11;82:4

developing (2)
74:24;86:18

development (4)
13:3,5;60:24;86:22

developments (3)
61:7,16;75:17

develops (2)
60:12;62:6

die (2)
88:9;104:25

difference (1)
127:12

different (8)
14:5,5;15:9,10;
46:8;47:19;61:22;
64:4

difficult (2)
65:16;113:16

diligently (1)
53:13

direct (2)
13:15,17

directed (3)
115:25

direction (1)
12:15

directly (4)
13:19;19:1;38:9;
63:8

Director (6)
9:1;11:8,13;12:2;
34:14;59:7

Directors (2)
9:15;12:15

discipline (3)
14:8,17;15:4

disciplined (3)
14:2,3,4

discovery (8)
15:6;33:15;95:13,
15,18,20;125:19,19

discuss (3)
5:10;69:25;70:11

discussed (1)
69:10

discussing (1)
75:16

Discussion (3)
29:23;70:25;73:3

discussions (6)
24:10;56:19;61:23;
69:15,17,21

distribute (1)
24:22

doctrine (1)
18:20

document (7)
82:20;84:17,19,23;
85:5,9;125:2

documents (1)
33:14

Dog (1)

89:15

dogs (5)
24:23;64:18;
121:10

donations (1)
10:21

done (9)
47:13;50:14;70:7;
72:19;77:8;106:22;
124:10;126:7,20

door (2)
23:10;118:5

doubt (4)
100:21;101:22;
112:18,20

doubtful (2)
112:13,16

down (6)
23:3,4;30:18;
84:22,25;118:5

dreamt (1)
67:13

due (10)
15:21;23:23;32:7,
21;48:15;51:10;54:2;
55:8;101:8;106:5

duly (1)
4:4

during (29)
5:8;10:15;11:8;
16:22;17:18,25;
18:25;20:1;24:25;
55:22,23;59:19;63:6,
11;67:24;68:18;74:7;
86:7,25;87:4;88:22;
91:14,18,19;93:24;
100:6;110:14;
121:15;127:5

duties (18)
11:12,16,22;12:1,3,
5,9;13:7,12;16:25,25;
38:17;60:11,20,23,
25;61:5;71:16

dutifully (1)
54:5

duty (3)
48:19;55:9;106:17

E

earlier (1)
76:17

early (1)
7:14

earth (1)
118:14

easily (1)
53:14

East (1)
5:15

educate (1)
23:13

educated (1)

36:23
**education (18)**
 5:23;6:4;15:18;
 16:7,8,10,17;23:20;
 26:20,24;28:19;
 31:23;34:1;53:17;
 54:3;75:3;100:10,17
**educational (1)**
 17:7
**effect (1)**
 4:25
**effort (2)**
 54:14;64:3
**eight (1)**
 50:9
**either (6)**
 4:21;14:10;25:19;
 26:3;29:4;111:24
**else (5)**
 5:11;34:8;116:1;
 122:6;127:19
**Emergency (1)**
 9:11
**employed (1)**
 11:9
**employee (17)**
 13:13;14:14;48:25;
 49:4,8,10,13,22,24;
 50:8,11,16,18,19,20,
 22;78:25
**employees (4)**
 13:14;34:12;49:11;
 50:1
**employment (9)**
 6:23;8:2,8,22;9:6;
 18:25;21:6;39:17;
 80:8
**encouraged (1)**
 50:22
**end (4)**
 84:14;97:14,16;
 128:20
**ended (1)**
 89:7
**enforce (5)**
 43:10;54:5;99:13;
 117:23;119:12
**enforcement (19)**
 17:5,10;18:7,9,12;
 35:8;43:2;51:1;
 52:14;53:7,8,23,25;
 55:5;79:4;87:1;
 101:2;105:19;127:20
**enforcer (1)**
 99:9
**enforcing (4)**
 38:23;62:2;78:18;
 99:8
**enough (1)**
 101:9
**enter (12)**
 14:9;22:9;23:6;
 43:16;66:7;67:1;

99:21;104:15;
 117:11;122:17,19;
 123:6
**entered (9)**
 57:20,23;58:3;
 71:13;88:2,11;95:5,
 12;96:3
**entering (9)**
 17:22;18:12;26:13;
 27:10;28:4;41:5;
 56:16;59:10;98:2
**enters (2)**
 40:18;41:2
**entire (3)**
 11:9;60:22;102:17
**entries (6)**
 17:24;55:14,18;
 68:20;85:25;106:18
**equal (1)**
 28:24
**err (1)**
 81:7
**erred (1)**
 86:20
**especially (2)**
 63:1,24
**essential (1)**
 15:17
**established (2)**
 21:4;62:19
**establishing (1)**
 25:1
**etcetera (8)**
 16:21;18:22;19:24;
 25:2;42:14;61:18;
 87:14,18
**euthanasia (2)**
 56:3;81:5
**evaluating (1)**
 13:15
**evaluations (2)**
 21:6;65:4
**even (3)**
 63:24;87:15;
 116:19
**event (1)**
 30:18
**events (1)**
 127:7
**everybody (1)**
 53:15
**everyone (2)**
 21:16;46:7
**exactly (4)**
 91:6;97:11,12;
 124:2
**EXAMINATION (1)**
 4:22
**examined (1)**
 4:5
**example (18)**
 15:11;22:12;23:9,
 12;24:18;32:5;35:21;

48:23;51:3;52:9;
 53:18;56:2,5;64:6;
 72:18;78:2;81:18;
 89:14
**Excel (2)**
 126:3,4
**except (1)**
 41:12
**exception (2)**
 93:6,9
**execute (1)**
 12:14
**executive (7)**
 6:14;9:1;11:8,12;
 12:1;34:14;59:7
**Exhibit (10)**
 84:13,16;86:3;
 109:9;110:13;
 111:18;124:11,12;
 125:1,14
**Exihibt (1)**
 125:11
**exist (3)**
 99:25;100:3;
 107:14
**existence (1)**
 80:7
**existing (1)**
 39:25
**exists (1)**
 122:18
**expectation (1)**
 41:20
**expected (1)**
 125:16
**expenses (1)**
 34:23
**expensive (1)**
 35:23
**experience (2)**
 31:24;32:9
**explain (1)**
 11:19
**eyes (3)**
 59:17;72:9;92:6

**F**

**fact (3)**
 39:12;105:12;
 113:15
**factor (2)**
 57:10;108:1
**failure (1)**
 65:8
**fair (1)**
 112:10
**fairly (2)**
 46:2;100:2
**fall (1)**
 128:17
**familiar (9)**
 18:14,18;36:18;

85:5;108:4,15,24;
 109:4,6
**familiarity (1)**
 85:9
**far (2)**
 79:19;80:24
**farm (1)**
 25:3
**fashion (2)**
 65:18;121:24
**federal (4)**
 5:9;46:11;90:22;
 91:2
**Federated (3)**
 9:16;61:15,20
**Federation (1)**
 9:21
**felt (2)**
 112:21;117:17
**field (11)**
 36:20;109:19;
 120:11,14,18,19,20,
 23;121:3,6,11
**file (3)**
 84:2;92:1;120:13
**filled (1)**
 65:20
**financial (5)**
 12:11;34:21;35:1,
 14;36:22
**find (3)**
 43:7;77:22;101:18
**finding (1)**
 87:9
**findings (1)**
 76:14
**fine (3)**
 27:18;30:13;60:4
**finish (2)**
 37:23;53:4
**firm (3)**
 72:13;100:9;102:1
**first (7)**
 4:4,24;23:12;
 37:15;52:12;83:4;
 107:23
**fit (1)**
 33:12
**five (1)**
 122:5
**fluent (1)**
 105:14
**focus (2)**
 46:15;62:2
**focused (1)**
 50:16
**follow (55)**
 30:8;43:14,24;
 44:5,22;45:2,9;
 47:18;66:17;77:14;
 87:10,11,13;89:19;
 90:10,23;91:4,15,18;
 92:10,14;93:17,18,

25;94:3,10,18;98:3;
 99:22;104:16;106:1,
 20;107:1,2,6,15;
 110:4;111:14,18;
 116:21;117:12,16,25;
 119:2;120:3,8;
 121:16;124:7;125:1,
 8,14,16,23;126:9,23
**follow- (1)**
 41:3
**followed (7)**
 22:15;24:18;63:4;
 106:11,15,17;117:22
**following (3)**
 112:14,19;117:19
**follows (3)**
 4:6;44:20;113:3
**follow-up (54)**
 22:12;29:14,18;
 30:5,10,11,15;31:6,
 10,11,16,21;32:3,14,
 20,25;33:5;34:4;
 36:1,24;41:6,18;
 42:19;43:4,17;45:14;
 48:16,20;52:22;
 56:17,23;57:3,8,14;
 58:6;66:12;67:5,10;
 68:1;69:24;70:1;
 71:3,11,16,25;72:14,
 19;74:11,16;76:2,12,
 22;77:3;82:9
**follow-ups (2)**
 58:1;73:12
**foot (1)**
 72:24
**forbidden (1)**
 42:13
**forget (5)**
 71:22;81:19;
 111:15;116:17;
 121:22
**forgot (1)**
 37:17
**form (1)**
 58:9
**formal (10)**
 16:23;22:20,23;
 23:2;33:1,2,13,21;
 48:21;100:12
**forms (2)**
 6:16;7:23
**forthrightly (1)**
 55:4
**fortunate (1)**
 35:20
**forty (1)**
 121:9
**forward (1)**
 39:2
**found (10)**
 43:3,6,7;63:21;
 78:21;104:22;
 105:23;111:12;

118:20,21
**Foundation (1)**
  9:18
**foundations (1)**
  11:1
**four (1)**
  5:25
**frame (5)**
  9:24,25;10:15,16;
  31:8
**freedom (1)**
  78:22
**frequency (1)**
  75:5
**frequent (2)**
  69:4;75:7
**frequently (1)**
  69:6
**friendship (1)**
  112:21
**front (4)**
  59:16;71:24;85:24;
  110:14
**full (2)**
  8:17;9:6
**fully (5)**
  5:4;34:17;42:24;
  72:12;79:19
**function (2)**
  12:19;75:19
**functioning (1)**
  12:12
**fund (1)**
  35:19
**funding (3)**
  37:14,17,21
**fundraising (1)**
  13:3
**further (6)**
  28:2;29:8;42:1;
  70:9;75:2;105:20
**future (1)**
  106:12

### G

**gave (10)**
  25:7;33:10;41:19;
  42:23;66:13;79:24;
  80:1;95:12;96:14;
  117:16
**gear (1)**
  64:21
**geared (1)**
  10:1
**Geauga (44)**
  5:21;7:13,16,17,21,
  23;8:1,8,10,11,24;
  9:3,12;10:6,13,16;
  12:4,19,20,21;14:18,
  21;15:12;16:7,11;
  24:4;25:9,9;31:24;
  32:13;37:3;38:5,7,

24;44:3,17,20,24;
  50:12,24;54:1;55:5;
  68:6;75:19
**general (7)**
  35:19;52:9,12;
  86:6;89:22;98:16;
  115:13
**generally (1)**
  17:7;56:1;128:12
**Germany (1)**
  112:6
**Giancarlo (1)**
  70:16
**given (11)**
  6:12;18:23;43:8;
  50:20;67:7,8;98:19,
  24;99:19;103:12;
  104:25
**gives (2)**
  43:11;99:20
**giving (4)**
  12:3,10;13:4;
  104:18
**gladly (1)**
  38:2
**God (1)**
  95:16
**goes (3)**
  30:3;57:7;112:5
**golden (1)**
  121:21
**Good (10)**
  21:2;56:6;68:13;
  77:14;81:17;93:22;
  116:21;121:19,23;
  122:9
**govern (4)**
  106:18;107:2,5,14
**governed (1)**
  77:10
**governing (1)**
  111:8
**government (9)**
  10:14,17;20:1;
  37:14,17,21;38:4,6,8
**governs (1)**
  111:18
**graduated (1)**
  5:25
**grant (2)**
  29:14;45:14
**granting (1)**
  108:1
**grants (4)**
  10:14,18;11:1,2
**great (3)**
  35:5;55:4;64:19
**Grendell (3)**
  14:21;38:22;105:1
**grievance (1)**
  50:18
**ground (2)**
  36:11;121:9

**grounds (6)**
  102:3,7;103:6;
  109:3,22;123:8
**group (2)**
  64:3;119:11
**guarantee (1)**
  113:14
**guess (3)**
  89:11;90:15;
  127:22
**guide (1)**
  87:22
**guided (1)**
  53:5
**guides (1)**
  110:1
**guidING (1)**
  115:25
**guilt (1)**
  28:24
**guilty (23)**
  29:12;30:8,19;
  31:4;43:3,6,7,7;
  45:12;76:14;77:2;
  78:2,21;101:18;
  105:24;111:9,12,16;
  113:8,10;117:19;
  118:20,21
**guys' (1)**
  125:19

### H

**habit (1)**
  80:25
**handbook (3)**
  48:24;49:4,9
**handed (1)**
  30:18
**handle (1)**
  116:2
**hands (2)**
  54:8;56:2
**handwritten (3)**
  79:14,21;84:8
**happened (1)**
  73:24
**happening (2)**
  76:12;100:15
**happens (1)**
  43:22
**hard (2)**
  81:15;113:15
**hate (1)**
  46:9
**head (4)**
  42:25;66:15;67:18;
  103:11
**Healing (1)**
  8:14
**health (1)**
  65:3
**hear (3)**

107:9,24;117:15
**heard (6)**
  20:24;102:13,17,
  21;117:7;120:20
**held (2)**
  9:7;119:15
**help (1)**
  14:10
**hereinafter (1)**
  4:5
**here's (1)**
  82:24
**herself (3)**
  30:1;105:21;
  112:22
**hey (4)**
  68:2;76:6,21;77:7
**hierarchy (1)**
  14:9
**high (3)**
  12:6;42:3;111:4
**higher (3)**
  6:4,15;37:8
**highlighted (1)**
  108:23
**highly (6)**
  35:24;41:21,22;
  53:18;55:8,9
**history (1)**
  6:23
**hold (3)**
  81:15;85:18;
  108:10
**Holland (2)**
  72:17;91:9
**honestly (2)**
  5:2;55:3
**honored (2)**
  42:16;48:15
**HOPE (14)**
  4:3;10:8;52:6;
  54:24;56:8;60:2;
  84:17;96:17;117:3,9;
  122:13,23;127:24;
  128:19
**hoped (1)**
  83:9
**hopefully (2)**
  29:4;78:16
**hopes (1)**
  79:15
**horse (1)**
  116:16
**horses (11)**
  25:3;42:13;73:20;
  78:8;96:20,22;
  105:22;106:14;
  116:14;117:21;121:9
**hour (1)**
  51:18
**hours (6)**
  5:8;46:10,12;50:9;
  89:25;127:3

**House (2)**
  61:17;64:18;98:6,
  9,14
**HR (4)**
  49:10,24;50:15;
  126:18
**HSUS (2)**
  11:3;17:13
**human (3)**
  12:13;50:15;99:19
**Humane (193)**
  5:21;7:13,16,17,23,
  25;8:1,8,9,11,11,25;
  9:3,16;10:7,17,20;
  11:9;12:2,4,19,19,22;
  13:17;14:2,18,19,20;
  15:12,22,25;16:8,11,
  14,18,22;17:4,10,15,
  18,20,22,24;18:2,6,
  10,12,17,19;19:4,8,
  13;20:22;21:2,3,8;
  22:3;23:22;24:4,5,7,
  8,11;25:8,9;26:12;
  27:10;28:4,17,20,23;
  31:13;34:12,16,18;
  35:7,9;36:16;37:4,8,
  10,11,13,18,24;38:1,
  5,7,13,22,24;43:2;
  44:3,18,18,21,21,24;
  45:25;48:13,23;
  50:12,24;51:1;52:14;
  53:7,8,23,25;54:1,5,
  8;55:5,6,7,10,18,22,
  24;56:16,22;57:2,5;
  58:16;59:8,19;61:15,
  20,22;62:3,4;63:4,7;
  65:1;68:18;74:21;
  75:12,18,19;77:13;
  78:17,18;79:4,11,12;
  80:8,15,23;81:4,14,
  20,22;83:10,21;86:4,
  8,20;89:8,10,16;90:1;
  91:9,13;94:12;98:17,
  19;99:2,12,13,13,16;
  100:18;103:3;
  105:19;110:1,2;
  113:3;114:6,21;
  118:6;119:12,13;
  120:1,2;122:1;
  126:18,21;127:5,8,9,
  14,16,20
**humanly (1)**
  70:2
**humble (1)**
  115:19
**hunch (1)**
  116:10
**hundreds (1)**
  65:15
**hung (1)**
  86:8
**HUTH (44)**
  4:7,8,13,15,23;

21:14,21,24;49:2;
50:6;51:25;52:3,5;
53:21;54:15,21;
55:11;60:7;68:10,17;
95:8;96:14;102:10;
103:10,14;104:2,6,
12;108:13,21;109:8,
12,14;116:23;117:3,
6;119:17,20;122:5,8,
11;123:15;127:22;
128:4
**hypothetical (2)**
123:1;124:1
**hypothetically (2)**
77:25;111:22
**hypotheticals (2)**
111:23;122:24

## I

**idea (3)**
79:13;83:17;84:6
**identification (1)**
84:16
**identified (1)**
81:11
**identify (9)**
12:1;25:19;26:2,
10;27:17;31:9,19;
34:3;48:21
**igloos (2)**
24:23,24
**illegal (3)**
122:16,19;123:6
**immediate (1)**
13:22
**immediately (1)**
118:10
**imperative (1)**
24:10
**implementation (1)**
32:19
**implemented (2)**
12:8;32:15
**implementing (3)**
28:22,22;75:18
**implications (1)**
61:19
**implying (1)**
45:24
**important (10)**
35:10;41:24;42:15;
53:13;77:3;78:9,10,
13;105:17;121:7
**improve (2)**
14:10;64:16
**inadequate (1)**
24:21
**Inaudible (6)**
82:1;97:20;108:19;
113:5;123:18,21
**inaudibleorders (1)**
118:22

**include (2)**
22:7;49:13
**included (4)**
12:3,5,10;31:6
**includes (1)**
34:7
**including (9)**
16:21;25:3;31:24;
64:21;74:23;78:7;
81:13;104:23;119:13
**incorrect (1)**
44:4
**incorrectly (1)**
64:8
**independent (4)**
43:1;62:7,9,12
**indicate (1)**
128:10
**indicated (2)**
15:2;123:5
**indicates (1)**
108:3
**inevitable (1)**
41:22
**inform (1)**
67:9
**informal (4)**
16:23;22:20;75:20;
87:22
**information (2)**
20:17;104:22
**informed (1)**
92:19
**informs (1)**
109:17
**in-house (1)**
83:8
**inquire (1)**
23:10
**inside (2)**
42:25;64:16
**inspect (2)**
72:5;76:7
**inspection (25)**
26:14;27:12;29:19,
21;30:4;41:7,18;
43:18;57:8;66:12;
67:16;68:2;71:17;
72:7;76:2;77:7,10;
82:9;90:16;92:10,11;
104:17;118:17;
119:7;121:16
**inspections (78)**
17:21;25:22,24;
26:4;28:5,17;30:2,11,
15;31:11,12,12,16,
21;32:3;33:1,5;34:4;
36:1,2,24,25;40:12;
41:4;42:20;45:19;
56:18,23;57:3;58:15;
59:24;66:2,18;68:24;
69:10,25;70:1;71:8;
72:1;82:14;89:19;

90:10,24,24;91:4,5,
15,18;92:14;93:2,16,
25;94:4,4,10,18;98:4;
99:22;106:21;107:3,
3,6,7,15,15;111:18;
112:1;117:12;
119:24;120:3,9;
123:12;125:7,8,15,
17;126:22,23
**instrumental (1)**
101:14
**insure (8)**
11:13,17,23;13:8;
15:19;20:15;29:16;
43:10
**insuring (1)**
12:6
**integrity (1)**
55:4
**intensive (1)**
19:25
**intent (2)**
78:5;118:15
**intention (1)**
73:13
**intentionally (1)**
77:18
**interactions (1)**
105:21
**interject (1)**
21:9
**interoffice (2)**
82:21;84:4
**interpret (2)**
111:6;112:3
**interpretation (3)**
110:22,23;111:2
**interpreted (1)**
111:4
**interrogatories (4)**
15:2;95:22;96:1,9
**interrupt (2)**
46:9;52:11
**interrupting (2)**
13:1;47:12
**intervene (1)**
23:17
**into (9)**
25:7;28:25;33:13;
60:24;63:23;64:21;
73:6;89:23;120:12
**invest (1)**
20:19
**invested (1)**
16:12
**investigation (2)**
29:8;75:3
**investigative (1)**
121:7
**investigatory (1)**
15:23
**investment (1)**
36:22

**involved (6)**
12:17;22:16;63:4;
64:23,24;116:15
**issue (9)**
29:10;44:2;46:20;
48:12;61:19;64:14;
65:18;97:10;113:4
**issued (1)**
118:16
**issues (13)**
4:10;12:13;13:8;
17:17;23:11;64:12;
65:7,10;70:9;75:2,3;
86:19;126:19

## J

**Jeffrey (2)**
72:17;91:8
**job (5)**
33:9;77:14;87:8;
89:24;115:5
**jobs (1)**
64:4
**Judge (35)**
14:20;31:5;38:22;
42:25,25;43:3;44:14;
66:25;67:7,12;78:7;
92:25;105:1;108:3,6;
110:4;112:2,3,5,13,
19,23;113:7;114:2,5,
10,25;116:6;118:2,2,
16,21,23;119:14;
124:7
**judgement (1)**
113:19
**judgements (1)**
117:24
**judges (3)**
112:7;118:25;
119:1
**Judge's (5)**
39:6;44:4,5;45:16;
113:2
**July (3)**
7:11,14;85:21
**June (1)**
7:11
**jurisdiction (2)**
38:25;114:11
**jurors (1)**
97:21
**jury (2)**
46:3,3

## K

**Karen (1)**
70:16
**keep (10)**
22:1;23:14;24:24;
39:16;65:8;67:25;
68:19;87:3;100:5;

**121:12
keeping (7)**
24:20;80:25;81:8;
83:2,7,10,21
**kept (11)**
61:2;62:25;68:23;
74:23;81:2,17;84:9;
86:22,24;100:8;
121:15
**key (1)**
101:13
**kind (13)**
9:18;16:10;18:2,
21;50:2;70:10;74:15;
75:11;76:8;87:14;
90:1;125:13,14
**kinds (5)**
17:17;43:14;75:4;
78:4;87:12
**Kingston (1)**
7:8
**knew (5)**
36:8,21;59:5;
64:22;80:24
**knock (1)**
23:10
**knowing (1)**
39:12
**knowingly (1)**
77:18
**knowledge (1)**
119:3
**known (2)**
53:14;59:3
**knows (1)**
104:3

## L

**lack (1)**
78:7
**language (5)**
31:16;39:6;108:10,
25;109:2
**large (4)**
49:10;54:8;65:2;
81:16
**last (6)**
9:2,5;10:5;23:16;
50:13;84:15
**late (1)**
89:15
**lately (2)**
76:22;77:8
**laughing (1)**
64:15
**law (111)**
12:19;15:20;16:4,
9,18;17:4,5,10,15;
18:6,9,12,17;20:9,22;
23:14;24:7;25:8;
28:23;30:17,20,25;
31:2;32:8;33:10,10,

11;35:9;36:16;38:24;
41:14;43:2,8,11,23;
44:7,8,17,20;45:3,5,
7,8,8,12,21;48:5,12,
13,13;51:1;52:14;
53:5,7,8,23,25;54:5;
55:5,10;59:12,20,23;
60:12,12,16,18,24;
61:6,22;62:3,21;
66:3;75:18;77:14;
78:18,20,20;79:4;
80:14;81:4,14,21;
82:2;83:10,21;86:20;
91:10;99:13,14;
100:18;101:2,8;
102:25;105:25;
112:14,19;114:15,21;
115:4,5,15;116:14,
25;119:13;122:16,18,
21;123:5,11;127:20

**lawful (1)**
4:4
**laws (26)**
11:14,17,23;13:9;
16:24;17:20;18:3;
30:14;31:20;32:2;
48:2;60:24;61:3,17;
80:10,12,17;86:5;
90:23;91:3;106:18,
24;107:19,20;119:1;
127:19
**lawsuit (5)**
65:23,24,25;70:18;
126:13
**lawyer (3)**
48:6;61:25;105:14
**lawyers (5)**
24:13;27:20;45:25;
112:8;119:11
**lead (1)**
87:9
**leadership (2)**
6:15;24:12
**learn (7)**
17:8;32:8;35:25;
42:10;61:25;104:8;
127:8
**learned (2)**
62:25;110:8
**learning (2)**
62:7,9
**least (2)**
80:24;99:7
**leave (2)**
8:1;45:12
**left (3)**
37:6;80:8;97:20
**legal (26)**
7:21;16:1,5,6,9;
17:14;22:16,25;26:8;
30:9;32:12;41:16;
45:15;59:14,16;
71:23;101:20;102:1;

103:16;104:8;106:9;
118:6,13;119:5,8;
124:3
**legally (4)**
23:17;29:4;46:2;
107:1
**legislation (2)**
61:3,17
**legitimate (4)**
45:13;48:15,18;
117:25
**less (3)**
19:20;48:13;69:6
**Lester (1)**
85:2
**letter (6)**
30:17,20,25;31:2;
32:8;78:20
**level (1)**
12:6
**levels (2)**
6:15;12:18
**Lexis (2)**
61:10;63:7
**liaison (1)**
12:14
**libraries (1)**
100:16
**life (5)**
8:3;96:23;102:17,
20,20
**lighted (1)**
111:5
**likely (1)**
41:21,22
**limit (3)**
21:11;43:5;50:6
**limitations (1)**
81:1
**limited (1)**
114:10
**line (4)**
92:17,20;98:8,13
**list (1)**
48:21
**Listen (1)**
53:20
**little (5)**
14:24;37:8;67:18;
69:6;83:18
**live (2)**
37:24;112:6
**loaded (2)**
45:23;114:17
**loads (1)**
19:18
**location (1)**
86:9
**locked (5)**
80:3,3,4;92:1;
120:13
**log (2)**
82:8;85:11

**logged (1)**
126:6
**logs (25)**
65:8,19;79:6,8,11,
15,17,22,23,24,25;
80:1,7;81:1,14;82:6,
13;84:8;86:15;87:4;
91:24;92:5;120:11,
25;121:1
**long (6)**
81:2,8;96:24;
102:20,20;128:17
**longer (2)**
37:1;99:8
**look (17)**
14:11;28:25;35:16;
44:8;55:1,2;76:24;
79:9;85:5,10;98:12;
103:16;105:22;
108:24;116:19,20;
125:6
**looked (5)**
31:3;73:6,20;
106:16;125:9
**looking (4)**
22:12;36:9;87:15;
98:15
**looks (1)**
108:5
**lopsided (1)**
113:18
**losing (1)**
62:2
**lost (1)**
120:17
**lot (8)**
36:10;64:3;65:12;
68:7;81:3;86:12;
101:10;119:18
**lots (2)**
83:7;89:11
**love (1)**
119:19

## M

**main (3)**
83:3;101:2;121:12
**maintenance (1)**
12:12
**major (3)**
62:25;68:6;74:5
**majority (1)**
79:20
**maker (3)**
55:21,22;56:9
**making (5)**
44:14;55:25;75:17;
81:6;117:23
**mandate (1)**
22:18
**mandatory (1)**
15:17

**Manual (14)**
33:18;48:24;49:8,
10,11,13,16,22,24;
50:8,12,16;83:13;
84:8
**many (14)**
14:18;16:2,2;31:8,
23,23,23;35:15,15;
61:21;81:14;87:6,16;
89:25
**Marcellino (13)**
29:25;31:4;39:1;
40:25;42:13;65:23;
69:22;76:13;85:19;
87:13;92:19;111:20;
125:1
**Marcellinos (2)**
4:9,12
**Marcellino's (9)**
41:3;43:17;45:18;
51:5;66:7;68:20;
90:10;92:14;95:19
**mark (1)**
84:14
**marked (2)**
84:13,16
**massive (1)**
48:12
**Matt (14)**
53:21;54:16;86:3;
91:1;102:11;103:10;
119:17,18;122:5;
123:25;125:1;
126:21;127:23;128:5
**matter (3)**
25:24;45:20;
101:13
**matters (2)**
20:9;35:5
**may (17)**
5:7;16:25;52:22;
59:11;65:2,2;66:11;
82:7;84:24;85:7,8,
13;91:7;98:24;99:15;
105:14;125:4
**maybe (6)**
30:9;37:7;46:14;
64:13;75:20;112:25
**mean (33)**
12:21;14:3,7;
19:10;21:4,5,22;
28:14,14;30:21;
31:12;39:14,15,22;
49:20;59:15;72:9,12;
73:11;76:19;77:1;
81:24;85:10;91:19,
19;95:20;96:20;
101:5;103:8;111:10;
112:8;115:16;127:16
**meaning (3)**
30:20;57:6;72:16
**means (22)**
14:4,5,8,25;15:8;

21:7;33:3;39:7,11,
20;40:23;58:20;
100:20;101:23;
102:7,23;103:4;
104:3,9;105:4,9;
120:23
**meant (1)**
113:22
**measure (1)**
19:14
**medical (5)**
12:9;81:4,18;83:6;
86:19
**medication (1)**
4:25
**meet (4)**
62:22;74:22;
116:16;127:8
**meeting (2)**
74:7,12
**meetings (14)**
56:15,22;61:24;
69:3,9,21;73:23;74:2,
19,20;75:5,6,9,12
**member (2)**
9:11,13
**members (1)**
127:7
**memory (2)**
33:25;34:7
**mentioned (2)**
40:9;98:18
**met (1)**
20:3
**Michela (1)**
4:8
**Michelle (4)**
88:2,11,12,17
**midst (1)**
86:18
**might (19)**
6:25;12:14;17:13,
13,15;18:3;34:10,23;
53:4;54:12;56:7;
66:2;73:4;85:10;
91:6;92:3;94:6;
122:14;124:10
**miles (2)**
87:17,18
**millions (1)**
102:21
**mind (1)**
88:5
**minutes (3)**
60:5;68:11;122:6
**mirroring (1)**
123:24
**misdemeanor (1)**
110:15
**missing (1)**
105:13
**mistakes (1)**
42:11

**Mmm-hmm (1)**
85:4
**model (1)**
101:13
**moments (1)**
65:20
**money (3)**
10:20;38:4,6
**monitor (1)**
13:7
**monitoring (1)**
40:1
**month (2)**
19:16;37:7
**monthly (3)**
62:23;79:3;126:4
**months (1)**
24:19
**morale (1)**
113:4
**more (13)**
19:21;56:19;61:25;
69:4,24;73:24;74:19;
75:21;81:11;85:20;
100:21;106:14;
122:14
**morning (1)**
68:3
**most (4)**
17:8;36:20;65:17;
79:17
**motive (1)**
118:15
**mouth (2)**
67:20;101:7
**Move (4)**
96:13;116:22;
117:5,8
**moved (1)**
83:2
**moving (1)**
117:6
**MRBARINGER (1)**
95:7
**much (8)**
9:2;70:1;73:13;
83:17;87:16;90:1,14;
100:15
**multiple (3)**
35:22;41:23;49:2
**Municipal (1)**
94:16
**Music (1)**
8:13
**must (2)**
67:6;96:9
**myself (4)**
7:1;19:1;44:3;74:3

**N**

**name (8)**
4:7;7:21;16:13,16;

81:5;85:1;106:16;
116:17
**names (5)**
70:14,15;71:22;
103:17;107:4
**national (3)**
6:21;16:21;34:2
**nationally (1)**
16:14
**Nazi (1)**
112:6
**necessarily (2)**
89:13;121:11
**necessary (2)**
54:4;61:24
**need (20)**
14:10,12;22:8,10;
23:8;46:21;60:3,5;
64:16,23,24;65:17;
70:1;77:8;100:9;
101:1;112:25;116:8;
128:5,7
**needed (8)**
35:13;46:10;62:23;
64:22;66:22;75:1;
77:20;87:10
**needs (1)**
67:4
**neighbor (2)**
88:14,15
**Neighborhood (1)**
9:9
**neighbors (1)**
90:7
**neighbor's (1)**
89:1
**neither (1)**
115:18
**network (2)**
82:21;84:4
**nevertheless (1)**
47:17
**New (6)**
7:8;9:14;13:5;
60:24;61:3,3
**next (2)**
56:14;119:16
**Nicastro (1)**
88:12
**Nicastro's (3)**
88:3,11,18
**night (1)**
89:15
**nod (9)**
66:11,13,15,15;
67:10,13,16,19,20
**nodded (1)**
67:17
**non (1)**
109:4
**nonprofit (1)**
7:24
**Nope (1)**

108:5
**nor (4)**
40:16;115:18;
116:3,4
**nos (1)**
4:19
**notably (1)**
22:7
**notation (1)**
87:3
**notch (1)**
36:19
**note (2)**
120:14;121:6
**notebook (2)**
79:9;92:5
**notebooks (2)**
91:22,23
**notes (16)**
69:18;73:25;74:7,
9;91:14,18;92:5,11;
93:24;100:8;120:11,
18,20,22;121:4,11
**notice (3)**
66:1,4;109:17
**number (5)**
5:8,16;87:18;
113:16;124:9
**numbers (1)**
65:2

**O**

**Objection (57)**
10:8,9,10,24;22:6;
28:6,9;33:23;34:5;
36:7;37:19;38:18;
39:4;42:21;43:25;
44:23;47:1,4;49:1,15,
18;50:4;52:8;58:18;
62:14;93:7,11;95:7,
17;96:11;99:23;
101:4;102:4,8,11,15,
19,24;103:9,14,22;
104:12;105:6,10;
108:21;110:24;
114:8,16,20;117:4,8,
13;118:9;122:22;
123:3,13;126:14
**objections (2)**
52:3;104:6
**obligation (2)**
48:19;104:25
**obvious (1)**
96:13
**obviously (19)**
9:23;10:14;11:5;
23:15;51:2;60:21;
63:3,18;67:24;71:22;
76:16;81:3;82:18;
83:7;88:23;90:15;
91:12;99:5;110:9
**occasionally (1)**

63:21
**occur (1)**
45:20
**occurred (1)**
76:4
**off (3)**
29:23;50:20;
128:18
**offender (4)**
109:4,16,17,20
**offenses (1)**
43:12
**offer (1)**
17:16
**offered (2)**
41:25;56:7
**offering (1)**
36:19
**offerings (1)**
17:7
**offers (2)**
35:7;106:7
**office (2)**
80:4,5
**Officer (10)**
8:23;18:7;33:17;
38:17,20,20;39:16;
76:7;85:1;109:24
**officers (4)**
94:25;109:18,19;
116:1
**often (5)**
19:20;24:19;43:5;
73:24;76:11
**Ohio (37)**
5:15;9:10,16,21;
15:16;16:18;18:16;
20:4,22;24:9;28:23;
29:10;34:2;35:7,9;
37:9;38:23;43:2,9;
48:2,5;54:5,6;55:9;
60:16;61:14,20;
78:18,18;80:11,11;
81:21;86:4;90:23;
99:15,20;119:1
**once (5)**
19:16,16,16;73:16;
99:2
**one (45)**
11:12,16,22;13:7,
12;14:20;15:11;
21:10;33:8;34:18,18;
35:5;47:19;51:19;
52:17;56:2,10;57:9;
60:10,19,23,25;61:5;
62:4;64:14,18;65:10,
13;67:19;73:24;76:5;
77:8,8;78:5;83:4;
87:16;89:9,9;91:7;
94:19;96:1;97:9;
100:8;102:12;125:11
**ones (1)**
91:25

**ongoing (4)**
15:13,18;16:12,17;
20:21;31:22;34:1;
101:16
**online (1)**
27:3
**only (20)**
6:13;9:23;13:14;
20:20;21:17,22;
34:18;39:12,24,24;
42:9;57:10;69:13;
77:11;81:17;93:19;
97:18;113:23;
114:23;126:5
**onto (21)**
17:22,24;18:12;
30:3;42:18;55:14,18;
56:16;57:12,20;58:3,
15;61:10;66:7;67:1;
68:20;83:2,14;99:21;
100:1;118:17
**open (1)**
127:7
**operated (3)**
51:15;55:5;101:9
**operating (1)**
20:25
**operations (2)**
12:4,11
**opinion (5)**
114:25;115:19;
116:4;119:5;121:8
**OPOTA (3)**
15:14;20:16;33:25
**opportunities (2)**
16:19;100:17
**orally (3)**
58:9,10,13
**order (62)**
22:12;23:1,9;
27:22;29:2;30:20,22;
42:1;43:22,24;44:4,5,
20,22,25;45:2,4,6,10,
17,21;46:24;47:7,18,
23;48:1,4;54:4;
58:20,21,23;59:4;
71:7;92:24,24;93:3,5,
9,14,15,20;96:18,21,
25;97:23;99:25;
100:2;104:21;
112:12;113:2,6,11;
114:3;117:9;118:4,8,
17;119:6,8,10;
122:21;123:11
**ordered (1)**
29:25
**orderly (2)**
58:19,21
**orders (2)**
29:17;30:23
**organization (10)**
6:18;8:13;9:10,12,
17,21;12:25;13:6;

16:14;49:25

**organizational (2)**
11:14;13:10

**organizations (3)**
6:17;17:16;63:2

**others (1)**
52:17

**ourselves (1)**
52:25

**out (8)**
12:20;20:22;33:9;
36:10;65:21;66:12;
89:7,14

**outcome (5)**
56:6;77:1;97:12;
106:12;113:14

**outcomes (1)**
63:5

**outdoor (1)**
25:2

**outside (2)**
24:21;38:25

**over (15)**
36:18;52:25;53:1;
65:1;83:2,9;84:10;
102:12;109:20;
113:21;117:14;
118:24;119:18;
121:22;122:13

**overrule (1)**
44:25

**oversee (1)**
19:12

**overseeing (1)**
13:2

**oversight (7)**
12:3,10,18;13:4;
25:8;34:20;41:8

**overtime (1)**
50:17

**own (4)**
62:7,9;117:21;
123:22

**owned (1)**
71:21

**owner (5)**
29:6,6,7;63:25;
77:21

**ownership (1)**
78:7

---

**P**

**page (2)**
31:14;98:18

**paid (2)**
37:11,18

**paper (3)**
61:11;81:16;86:1

**papers (1)**
61:20

**parameters (1)**
57:7

**Pardon (1)**
20:13

**parents (7)**
70:12,22;71:6,21;
73:14;98:9,14

**parents' (11)**
70:25;71:2,14,15;
72:2,6,20,24,25;73:7,
17

**parent's (1)**
92:16

**parole (1)**
109:18

**part (18)**
8:4,19;38:17;40:6;
43:1;53:25;55:25;
56:11,12,13;64:2;
71:15,25;72:6;79:17;
87:1,7;121:20

**participate (1)**
5:4

**participation (2)**
6:15;74:5

**particular (2)**
19:19;44:14

**past (2)**
21:15;59:6

**patrol (1)**
87:8

**pay (3)**
37:4;38:6;50:17

**paying (1)**
37:23

**pays (2)**
37:3,6

**penalty (1)**
113:17

**pending (2)**
19:21;61:3

**people (19)**
16:25;23:14;24:20,
24;25:1;39:12;41:23;
42:10;44:8,12;48:17;
53:1,4,9,17;64:1,4;
76:25;121:22

**people's (3)**
17:21,22;22:10

**perform (2)**
19:5,9

**performance (2)**
14:11;65:4

**performing (1)**
40:21

**perhaps (1)**
66:1

**period (2)**
39:19;110:14

**permission (34)**
19:23;25:23;29:9,
10,14;30:24;31:6;
33:11,12;42:24;
43:12,16;45:14;51:6;
52:21;57:9,11,13,25;

58:6,8,24,25;67:5;
71:11;77:11,12,19;
99:24;106:2;116:8;
117:16;118:1,2

**permissions (1)**
83:23

**permit (1)**
67:22

**permitted (8)**
5:10;87:24;88:22,
23,25;94:9;103:15;
105:3

**perpetrated (1)**
106:6

**perpetrator (1)**
114:1

**person (10)**
39:9;10;40:19;
56:2;77:22,23;
111:12;114:4;
115:20;123:9

**personal (4)**
94:3,9,13;112:21

**personally (1)**
126:16

**person's (5)**
18:13;23:7;26:13;
104:16;111:19

**pertain (1)**
17:20

**pertains (1)**
90:23

**pervasion (1)**
94:4

**PetPoint (4)**
79:19;83:16,18,22

**Pets (1)**
9:9

**phone (6)**
5:16,18,20;29:1;
87:11;101:11

**phrase (2)**
12:24;106:4

**physically (1)**
67:17

**pictures (3)**
119:23;120:2,8

**piece (2)**
70:2,21

**place (8)**
24:11,25;29:15;
64:20;78:15,17;
86:11;100:16

**placed (1)**
23:23

**places (1)**
16:20

**plain (2)**
18:20;105:12

**plaintiffs (3)**
4:9,13;70:18

**plaintiff's (1)**
71:4

**play (1)**
60:25

**please (2)**
4:15,20

**plug (1)**
88:8

**point (11)**
19:22;39:2;45:11;
62:16;87:16;90:15;
97:1,9;103:20;117:2,
5

**points (2)**
101:13;117:2

**police (2)**
39:21;40:1

**policies (37)**
11:14;13:10;23:18,
18,24,25;24:2,6;
25:14;48:22;49:9,19;
50:25;51:14,16,22,
24;52:1,6,13;53:3,6,
7;54:10,12;55:13,17;
57:2;74:20;75:21;
81:6,9;86:22;91:13;
126:20,21;127:1

**policy (36)**
23:12;24:14,14,17;
48:25;49:4,14,17,23;
50:2;51:7,20;52:23;
53:8,11;55:21,21,25;
56:1,3,9,16,22;75:11,
15,16;81:12,23,24;
86:10,14,15;94:12;
120:1,5;122:2

**position (5)**
8:21,24;61:20;
93:5,8

**positions (2)**
9:7;15:10

**positive (2)**
16:16;90:20

**possibility (1)**
64:21

**possible (4)**
14:9;74:25;121:20,
25

**Possibly (1)**
37:15

**post (1)**
41:6

**posted (1)**
86:12

**poster (1)**
86:8

**posters (1)**
86:12

**posture (1)**
45:24

**potential (2)**
35:17,18

**potentially (1)**
65:15

**power (1)**

32:13

**practical (1)**
53:17

**practically (1)**
23:13

**practice (5)**
25:7;54:1;74:22;
121:19,23

**practiced (1)**
53:12

**practices (1)**
21:4

**pre (1)**
117:24

**predominant (1)**
84:11

**preface (1)**
10:4

**preferable (1)**
121:18

**preferred (1)**
82:12

**preliminary (1)**
4:10

**present (3)**
21:15,22;97:22

**preserving (1)**
10:10

**President (1)**
9:19

**pressure (1)**
51:11

**pretty (1)**
96:12

**prevent (2)**
78:5;105:2

**preventing (1)**
77:4

**pride (1)**
35:5

**prior (4)**
59:9;70:22;78:15;
93:13

**private (9)**
7:24;17:25;27:11;
55:14,18;56:17,23;
57:3;106:19

**privileged (1)**
77:17

**privileges (1)**
114:9

**Probable (1)**
101:24

**Probably (2)**
60:4;106:3

**probation (44)**
25:22,24;26:4;
27:11;28:5,17;29:19,
21;30:4;36:1,24;
38:17,20;39:9,10,13,
14,16;40:15,24;76:7;
82:14;85:3;90:24;
91:4;92:10;94:15,21,

24;97:5;98:4;104:17;
106:20;107:3,6,14;
108:2;109:18,23;
116:1;121:16;123:9;
125:7;126:22
**probationary (2)**
39:19;112:1
**probationer (4)**
39:3,7,8;122:17
**probationer's (3)**
40:19;122:19;
123:6
**problem (2)**
88:7;112:24
**procedure (1)**
20:25
**procedures (11)**
48:22;49:20;51:1;
52:7,14;55:13,17;
74:21;77:13,15,16
**proceed (1)**
124:3
**PROCEEDINGS (1)**
4:1
**process (12)**
15:21;23:23;32:7,
22;43:1;48:15;51:10;
54:2;55:8;83:12;
101:8;106:5
**produce (1)**
7:2
**produced (1)**
128:1
**producing (2)**
33:14;126:2
**professional (2)**
6:14;50:15
**Program (2)**
8:14;79:18
**programs (1)**
13:5
**progress (1)**
4:2
**project (1)**
81:10
**prominent (1)**
17:8
**prompted (1)**
97:11
**properly (1)**
20:22
**property (100)**
17:21,22,25;18:13;
19:23;22:10,13;23:7;
26:13;27:11;28:4;
29:3,6;30:3;40:19;
41:3,5,18;42:14,18;
43:17;55:14,18;
56:17,24;57:3,12,20,
24;58:4,15;59:10,24;
66:7;67:2;68:21,25;
69:10;70:22;71:1,2,
14,15,17,20;72:2,6,7,

14,20,24,25;73:2,4,7,
9,16,17;76:3;77:19,
20,21;82:9,15;88:1,3,
4,12,18,19,24;89:1,2;
90:6,11,11,17;92:15,
17,20;95:5,13;96:3;
98:3,8,13;99:21;
100:1,25;104:16,22;
105:3;106:19;
111:19;116:9;
117:11;118:18;
122:17,19;123:6
**proposition (1)**
35:23
**propounded (1)**
95:19
**prosection (1)**
106:15
**prosections (1)**
113:17
**prosecute (4)**
18:17;51:11,11;
101:12
**prosecuting (3)**
48:7;53:15;76:18
**prosecution (1)**
54:3
**prosecutions (3)**
17:15;63:21;
119:13
**Prosecutor (2)**
72:16;91:8
**prosecutors (5)**
18:16;27:20;31:25;
41:13;91:7
**protect (2)**
14:12,13
**protocol (1)**
24:17
**protocols (8)**
11:18,19;22:15;
25:4,4,6,12,15
**proved (1)**
93:20
**proven (1)**
115:2
**provide (4)**
34:11,19;96:2;
109:16
**provided (2)**
34:15,19
**public (11)**
49:13;51:10;68:7;
80:10,12,16,19,22;
81:22;86:5,9
**publicity (1)**
68:8
**purpose (4)**
68:8;106:19;128:3,
9
**purposes (1)**
38:23
**purview (1)**

45:15
**put (9)**
25:7;36:10;58:10;
59:17;67:20;69:17;
81:1;86:12;92:6
**putting (2)**
101:6;107:18

**Q**

**quality (3)**
12:7;65:18,19
**quantity (1)**
75:4
**quick (2)**
60:7;68:11
**quicker (1)**
65:21
**quickly (2)**
6:24;29:24
**quitclaimed (1)**
70:21
**quite (1)**
64:2

**R**

**raised (1)**
35:19
**random (11)**
30:1;40:11;45:19;
58:14;66:1;71:8;
93:15;111:13;
118:17;119:6;123:11
**range (2)**
61:21;106:13
**rate (2)**
42:3;76:11
**read (12)**
59:12,13,14,17,20,
23;61:11;92:5;
110:18,18;112:4;
128:14
**reading (2)**
59:15;61:23
**reads (1)**
109:22
**ready (1)**
122:11
**real (3)**
46:6;68:11;111:24
**reality (1)**
106:3
**really (9)**
32:18;36:19;57:17;
60:14;62:11;72:12;
83:25;89:12;92:19
**re-ask (1)**
11:21
**reason (6)**
15:1;42:24;94:7;
97:18;100:23;112:20
**reasonable (29)**

100:19,21,22;
101:1,21,22,23,24,
25;102:3,7,13,18,22;
103:4,6,6;104:3,9,13,
13,15;105:4;109:3;
117:10;122:20;
123:7,8,8
**reasonably (1)**
104:24
**reasons (1)**
103:19
**recall (131)**
9:20,22;33:14,18,
19;39:6;51:17,21;
52:24;53:12;54:11;
55:15,20;57:4,22;
58:12;59:2,11;60:1,
14;63:15;64:11;65:7;
66:4;67:7;68:4,22,
23;69:1,9,14,15,19,
20;70:24;73:5,8,12,
18,22;74:1,6,10,13,
16,17,18;75:14,23,
24,25;78:12;79:19;
80:9;81:10;82:13,16,
24;83:25;84:24;85:7,
14,23;86:2,11,13,14;
87:2,23;88:20;89:3,
5,90:5,8;91:6,9,16,
22,23;92:2,9,12;94:1,
14;95:4,16,18;96:5,6,
24;97:1,11,25;98:5,
15;107:17;108:8;
109:1,2,6;110:7,11,
12;111:7;119:25;
120:4,5,10;121:2,5;
122:4;124:15,16,18,
19,23,24;125:4,5,12,
22,23;126:1,2,5,11,
24;127:2,4,15,21
**recalled (1)**
59:5
**receive (17)**
10:13,17;16:8,10,
23;17:3;18:15;19:5,
25;20:8;26:23;27:5;
28:3;36:14;37:13,16;
38:3
**received (37)**
11:2;18:11,16;
23:6;25:20,20;26:4,5,
11,19,24;27:1,3,4,7,8,
10,19,21,22;30:14,
16;31:10,20,22;32:2,
5,25;33:4,7,8,16,21,
22;100:6;103:2;
125:20
**receives (4)**
10:21;38:6,7,9
**receiving (3)**
28:23;36:15;
125:23
**recent (1)**

85:21
**Recess (2)**
68:15;122:10
**recidivism (3)**
41:21;42:4,17
**recognize (2)**
84:23;125:2
**recollect (3)**
50:12;72:12;76:10
**recollection (7)**
38:15;49:11;83:11;
90:19;92:18,21;
95:21
**record (12)**
10:10;21:12;29:23;
83:2,7,9,21;87:3;
100:5;128:5,5,18
**recorded (1)**
126:10
**recording (3)**
4:2;68:14,16
**records (23)**
49:13;68:19,24;
80:10,12,16,23;81:4,
4,4,12,18,23,24;
83:13,14;84:9;86:5,9,
25;98:12;121:13,14
**refer (2)**
12:16;82:6
**referred (1)**
30:7
**referring (8)**
10:14;18:9;40:3,4;
45:18;71:7;93:3;
96:19
**refresh (1)**
6:25
**refusing (1)**
122:25
**regarding (7)**
20:8;26:4;27:10;
55:13,17;56:22;
68:19
**regardless (4)**
12:8;44:5,19;46:24
**regards (3)**
22:14;74:25;89:16
**regularly (4)**
24:10;51:3;61:15;
74:22
**regulations (4)**
11:14,18,24;13:9
**related (22)**
9:7;16:24;17:4;
21:3,8;22:3;24:15;
26:12;28:3,16;32:25;
33:5,15;51:1;52:14;
53:7;56:16;57:2;
59:23;64:12;82:14;
126:22
**relates (1)**
17:24
**relationship (1)**

40:25
**relevant (2)**
17:19;116:4
**relied (2)**
16:5;30:17
**remains (1)**
52:15
**remember (29)**
7:22;9:4;10:12;
11:5,7;16:13;22:22;
23:4;24:1,16;25:13,
16;34:9;37:2;40:8,
16,24;42:12;49:16;
54:13,14,18;59:21;
87:19;88:14;90:14;
95:22;96:4;127:20
**renowned (1)**
16:13
**repeat (4)**
4:21;51:21;88:5;
123:4
**repeated (3)**
26:6;32:9;43:13
**repeatedly (1)**
25:18
**repeating (1)**
22:1
**rephrase (1)**
4:21;17:23;90:25
**report (5)**
13:17;39:16;64:12;
68:5;87:17
**reported (3)**
13:19;14:1;87:17
**reporter (2)**
4:18;128:2
**reporting (1)**
18:21
**reports (15)**
13:16;41:9;65:8,
19;74:8,11,16;79:4,7;
84:5;125:6,13,14,16;
126:4
**represent (1)**
112:22
**request (1)**
79:24
**requests (1)**
95:23
**required (23)**
22:25;26:19;28:12;
29:1,2,8;74:20;
81:22;82:2;83:7;
87:3,5;89:6,20,22,24;
91:14,17;98:25;99:3;
110:2;122:3;125:13
**requirement (7)**
22:8,17;23:9;
49:25;93:6,10;99:16
**requirements (1)**
20:21
**requires (1)**
45:5

**Rescue (12)**
7:13,18;9:12;12:5,
17,21;22:18;35:19;
50:13;54:6;79:21;
113:1
**research (2)**
16:1;61:11
**researcher (1)**
16:5
**residential (1)**
5:14
**resolve (1)**
53:16
**resource (1)**
12:13
**resources (1)**
50:15
**respect (1)**
113:9
**respected (2)**
35:24;36:20
**respectful (3)**
32:21;55:8,9
**responses (2)**
15:6;33:15
**responsibilities (1)**
37:25;109:20
**responsibility (5)**
13:15;24:8;28:25;
35:6;37:10;98:25;
99:17;114:11;117:22
**responsible (7)**
13:2,4;43:9;48:10;
78:17;109:25;116:3
**restroom (1)**
60:6
**result (1)**
118:19
**resume (2)**
6:25;7:2
**resumed (1)**
68:16
**retaining (1)**
86:15
**retention (7)**
80:22;81:6,9,12,
24;86:15,18
**retire (1)**
8:5
**retrievers (1)**
121:21
**review (1)**
128:2
**reviewed (1)**
50:21
**reviewing (1)**
128:9
**reviews (3)**
13:13;21:6;79:1
**revised (2)**
50:14;109:16
**rid (1)**
86:21

**right (43)**
7:1;20:11;23:14;
31:19;32:15;41:19,
25;48:16;62:13;
70:20;72:5;78:3;
85:18,18,21,22;
87:20;92:12;93:2;
95:10,11;96:7,10;
99:5;100:14;105:5;
107:18;110:6,9,17;
111:15;116:18;
118:2,12;119:3,8;
121:22;123:2;
127:25;128:13,13,15,
18
**rights (4)**
14:13;105:16;
113:25;114:9
**Robert (1)**
84:25
**Roberta (1)**
85:1
**robust (1)**
79:18
**role (1)**
23:21
**rules (2)**
5:9;46:11
**ruling (1)**
112:2
**run (1)**
105:18
**running (1)**
25:2

**S**

**safe (1)**
24:24
**salary (1)**
38:5
**same (13)**
5:20;7:17,18;
12:24;29:19;31:14;
46:16;60:9;91:25;
98:18;120:11,14,25
**sarcastic (1)**
67:18
**sat (3)**
9:9;88:17;113:20
**saved (1)**
82:20
**saw (5)**
21:5;70:15;71:22;
72:9;97:25
**saying (25)**
23:3;32:6;37:22,
23;39:24;41:11;
42:23,23;43:15,18;
45:17;48:13;66:20;
67:3;85:7;93:19;
99:11;106:25;
112:13;113:18;

114:7,23;115:23;
116:13
**School (2)**
16:4;102:25
**scope (1)**
114:10
**screen (5)**
46:18;84:12,18;
109:13;110:16
**scroll (2)**
84:22,25
**search (4)**
18:20;93:6,9;
103:18
**second (3)**
21:10;23:13;83:5
**section (6)**
108:23;110:17,22,
23;111:3,5
**seeing (4)**
82:13;85:23;109:2,
6
**seek (4)**
23:12,13;101:11;
104:21
**seeking (1)**
53:9
**seem (1)**
118:12
**seize (4)**
19:24;64:3;101:11;
114:12
**seizure (3)**
22:24;51:4;121:21
**semi- (1)**
8:4
**seminars (3)**
127:5,10,13
**send (3)**
35:21;38:12;84:14
**sense (1)**
22:23
**sensor (1)**
116:5
**sentence (2)**
40:7;66:8
**sentenced (19)**
39:2;42:19;57:21,
24,25;58:2,5;59:25;
68:21,25;69:11,14;
73:21;76:3;82:10,15;
88:1,10;111:20
**sentencing (11)**
30:22,23;31:5,13,
15;41:6;70:23;94:21;
96:4;97:13,15
**serious (9)**
24:7;32:11;76:13,
15,18,20,25;95:21;
101:12
**seriously (1)**
103:20
**services (1)**

13:5
**set (2)**
78:6;87:6
**seven (2)**
46:10,12;50:9;
81:19
**several (2)**
61:13;99:7
**shake (1)**
103:10
**shall (1)**
109:16
**share (5)**
20:17;55:2,3;
84:18;109:13
**shared (1)**
125:3
**sharing (1)**
110:16
**sheep (1)**
121:10
**shelter (5)**
24:21;25:2;63:24;
64:17;83:8
**short (1)**
104:18
**show (1)**
84:12
**showed (4)**
111:17;124:11,13,
14
**sick (1)**
63:22
**side (3)**
23:14;81:7;86:20
**sign (1)**
50:20
**significant (1)**
74:24
**similar (2)**
125:6,9
**simply (1)**
60:19
**sit (1)**
89:1
**site (1)**
120:23
**situation (6)**
29:5;43:5;70:3,8,
124:1,5
**situations (1)**
90:3
**six (1)**
81:18
**sized (1)**
49:25
**skirting (2)**
37:21,22
**slow (1)**
83:12
**slowly (2)**
84:22,25
**Societies (11)**

9:16;24:8;35:7;
37:10;38:1;54:9;
61:15,21;63:5;
127:14,17
**Society (71)**
5:21;7:17,18,24,
25;8:1,8,9,11,11,25;
9:3;10:7,17,21;
11:10;12:2,22;14:19;
16:11,22;17:18;21:2;
24:5;25:9;34:12;
37:4,12,13;38:5,7,13;
44:18,21;48:23;
50:13,24;55:6,7,22,
24;58:17;59:8,20;
63:7;68:18;74:21;
75:19;78:17;80:8,16,
23;81:21,22;86:4,8;
89:8;91:13;99:12;
103:3;110:1,2;114:6,
22;118:6;119:12;
120:1;122:1;126:18,
22;127:6
**Society's (3)**
7:13;12:4;79:11
**Sofia (1)**
85:1
**software (1)**
83:16
**sole (1)**
10:20
**solely (2)**
10:21;55:23
**somebody (5)**
46:21;50:21;63:20,
22;78:21
**somebody's (1)**
23:10
**someone (1)**
61:9
**someone's (6)**
58:15;59:10,24;
100:24;116:9;118:5
**sometime (1)**
121:15
**sometimes (6)**
29:1,2;69:4;73:24;
91:23;119:1
**somewhere (2)**
42:5;96:10
**soon (1)**
64:22
**SOP (2)**
20:24;21:5
**SOPs (7)**
21:2,7,25;22:5,19,
19;23:2
**sorry (10)**
6:18;13:1;40:3;
58:22;69:12;71:22;
88:5,8;110:16;
117:15
**sort (3)**

82:21,25;87:22
**sound (1)**
118:11
**Sounds (3)**
68:13;109:22;
122:9
**source (1)**
10:20
**sources (1)**
10:23
**sparked (1)**
103:17
**SPCA (3)**
7:4,8;26:6
**SPCAs (1)**
7:7
**speak (2)**
9:25;32:18
**speaking (2)**
102:12;117:14
**Special (2)**
72:16;91:8
**species (1)**
12:9
**specific (11)**
20:7;26:23;27:5,7,
12;28:1;30:16;33:7;
41:5;78:2;92:15
**specifically (7)**
23:5;28:3;34:3;
57:6;75:8;94:11;
113:5
**spent (1)**
86:25
**spirit (1)**
78:19
**spoken (8)**
23:19;24:1;89:3;
90:21;91:3,6,8;94:24
**Spreadsheet (1)**
126:4
**Spreadsheets (2)**
126:3,6
**staff (3)**
11:16,23;74:6
**stake (1)**
116:11
**stance (1)**
46:4
**standard (1)**
20:25
**standards (3)**
12:7;20:3;24:3
**standing (1)**
93:22
**stands (1)**
119:8
**start (1)**
64:20
**started (2)**
26:5;105:19
**starting (3)**
45:11;79:14;83:1

**State (16)**
9:14;15:16;16:18;
17:11;18:19;20:3;
24:9;34:2;35:7;43:2,
9;54:6;55:9;60:16;
99:14,20
**statehouse (1)**
61:17
**States (1)**
46:19
**statewide (1)**
63:1
**statistic (1)**
42:4
**statue (1)**
108:12
**statute (23)**
81:1;98:20;99:19;
106:13;107:25;
108:4,7,15,20;109:1,
7,25;110:5,8;111:8,
17;112:4;124:11,12,
13,17,20,24
**statutes (15)**
18:1;20:23;28:23;
35:9;38:24;54:5;
55:10;78:18;99:9;
107:2,4,5,14;113:19;
115:25
**statutory (12)**
17:3,19;20:9;45:7;
48:2;60:12;61:6;
114:15,21;115:4,5;
116:24
**stay (9)**
24:23;60:11,23,25;
61:5,9;62:1;70:3;
80:13
**stayed (2)**
61:8,16
**staying (2)**
32:11;100:10
**step (4)**
23:16;26:11,11;
72:24
**steps (1)**
14:12
**Steve (2)**
84:12;109:8
**sticking (2)**
32:8;39:18
**still (7)**
8:15;12:16;43:24;
47:17;83:24;101:16;
128:4
**stipulates (1)**
50:1
**stipulating (1)**
117:17
**stipulation (1)**
124:8
**stipulations (3)**
22:14;31:7;39:18

**stood (1)**
22:17
**stop (1)**
106:5
**stopped (2)**
68:14;75:6
**stopping (1)**
77:4
**straight (1)**
38:12
**straightforward (1)**
5:1
**strange (1)**
72:22
**Street (1)**
5:15
**stress (1)**
33:1
**strict (1)**
22:15
**stringing (1)**
42:22
**strokes (1)**
36:9
**strong (1)**
92:21
**stuck (1)**
25:18
**stuff (1)**
72:10
**Stupica (5)**
67:8;92:25;112:14,
19;116:5
**Stupica's (2)**
112:23;115:1
**subject (6)**
30:1;71:3,6,10;
72:14;86:4
**subsequent (2)**
69:11,12
**successfully (2)**
54:4;119:4
**sued (2)**
126:12,12
**suffering (1)**
56:5
**suffice (2)**
4:17;7:3
**sufficient (1)**
19:5
**suggesting (1)**
53:18
**sums (1)**
106:3
**supervise (4)**
19:8;57:5;63:17;
64:1
**supervised (1)**
17:1
**supervising (1)**
48:8
**supervision (1)**
19:10

**supervisor (14)**
13:22,24;19:11;
20:11,14;36:4;40:20;
41:4,10,12;59:7;
62:13,17,20
**supervisory (1)**
109:19
**supposed (2)**
85:11;120:2
**sure (19)**
19:4,9;20:19;
30:13;35:11;42:1,15;
43:11;60:13;70:6;
71:19;72:11;75:17;
78:6;81:6;97:19;
109:12,14;117:20
**surveillance (4)**
87:25;88:3,18,24
**surveilling (1)**
90:6
**suspicion (18)**
100:19,22;101:2,
21;102:14,18,23;
103:4;104:3,9,13,14,
15;105:4,19;117:11;
122:20;123:7
**suspicions (1)**
101:10
**suspicious (1)**
104:24
**sworn (1)**
4:4
**sympathy (1)**
65:12
**system (5)**
32:12;41:16;82:17,
22;84:4

**T**

**talk (8)**
7:16;9:23;14:24;
25:1;29:5,24;54:22;
87:14
**talked (2)**
15:5;23:20
**talking (25)**
8:10;12:24;30:12;
46:13;49:7,8;52:3;
60:22;63:19;69:13;
81:16;92:23,24;
102:10;103:14;
104:6,12;108:21;
110:21;111:3,25,25;
112:11,11;117:9
**taught (8)**
23:5;25:21;28:16;
29:11;36:6,8;106:4;
127:11
**tax (1)**
7:23
**teach (4)**
24:23;28:15;

127:16,18
**teaching (1)**
127:4
**techniques (1)**
15:24
**telling (1)**
123:22
**tells (1)**
58:13
**ten (2)**
68:10;124:25
**tense (3)**
21:15,15,22
**term (8)**
40:16,24;101:20;
103:17;104:9,19;
120:20,22
**terminology (1)**
105:14
**terms (17)**
19:10;34:23;40:15;
46:5;66:17;70:4;
72:9;76:12;78:6;
80:18,22;96:18;97:5;
102:21;106:8;
116:18;123:10
**Terry (2)**
67:8;116:5
**tested (1)**
28:12
**testified (1)**
4:5
**testify (1)**
78:25
**testimony (1)**
45:9
**Texas (1)**
7:4
**Thanks (1)**
119:18
**there'd (1)**
100:17
**thinking (1)**
121:11
**though (1)**
20:11
**thought (4)**
20:18;31:1;58:21;
60:14
**thousands (2)**
65:14,14
**three (1)**
87:6
**throughout (1)**
18:19
**timely (2)**
65:17;121:24
**times (7)**
35:22;61:19;64:11;
69:5,7;89:15;124:25
**title (1)**
108:2
**today (4)**

4:25;5:5;76:6;
79:13
**together (3)**
42:22;64:4;126:18
**told (7)**
23:5;34:7;41:17;
58:9,10;90:5;94:17
**tons (1)**
116:12
**took (7)**
25:9;35:5;38:1;
51:3;73:24;106:9;
116:6
**top (2)**
36:19;84:20
**topic (3)**
49:7;69:20;91:10
**total (1)**
46:5
**totally (1)**
45:23
**towards (1)**
10:2
**trained (14)**
28:10,12,15,19;
30:9;34:4;102:22;
103:3,5,7;124:17,19,
23,24
**training (97)**
14:24,25;15:4,5,7,
8,9,14,14,15,16,23;
16:1,2,12,23;17:3,6,
12,13,17;18:11,15,
16,18,23,24;19:5;
20:1,7,16,18;23:6;
25:19;26:2,5,10,12,
18,19,23,24;27:5,6,7,
9,12,17,19,21,22;
28:1,3,8,16;30:14,16;
31:9,19,22;32:2,25;
33:1,2,5,7,8,13,16,18,
20,21,25;34:1,3,11,
11,15,16,19,22,24,25;
35:10,11,14,22,25;
36:12,14,15,23;
100:5,11;103:2;
104:8;110:9
**trainings (1)**
36:5
**transcript (2)**
128:1,3
**transfer (1)**
83:13
**transferred (2)**
71:20;73:17
**Transition (2)**
8:14;79:14
**traveled (1)**
87:18
**treated (1)**
106:14
**trends (1)**
17:9

**trial (14)**
46:3;71:23;77:2;
97:14,16,17;101:18,
21;105:23;112:10,11,
23;113:14;118:19
**tried (3)**
62:1;80:13;97:21
**truck (1)**
94:6
**true (2)**
89:11;98:22
**trump (2)**
122:21;123:11
**trumped (1)**
41:13
**trumps (1)**
93:14
**trust (1)**
46:1
**Trustees (2)**
12:16;14:1
**try (2)**
89:23;115:8
**trying (2)**
55:3;74:4
**Two (13)**
29:12;31:4;34:18;
35:3;39:22;47:19;
76:14;77:2;83:3,5;
87:6;111:12;117:19
**typed (1)**
128:14
**types (1)**
18:3
**typically (2)**
31:1;39:15
**typing (1)**
82:19

**U**

**uh-uh (1)**
4:17
**Ulster (3)**
7:8;26:5;27:21
**unable (1)**
41:1
**unannounced (14)**
30:2;31:7;40:11;
43:4;45:19;57:14;
58:14;66:2;71:8;
93:16;118:17;119:6;
123:12;124:8
**under (5)**
5:9;40:19;44:6;
51:12;116:5
**understood (1)**
73:13
**unfair (1)**
42:9
**unfortunately (1)**
46:7
**United (1)**

46:19
**University (1)**
16:3
**unless (3)**
23:7;93:20;123:7
**unnecessary (1)**
105:2
**unwritten (8)**
23:24;24:6;53:6,
24;54:10;55:17;57:1;
75:20
**up (76)**
12:14;16:19;20:20;
24:9;29:13;30:8;
41:4;44:16,17,17;
46:17,21;47:8;61:8,
9;67:13;76:5;78:14;
81:3,14;82:19,22;
85:17;86:12;87:11;
89:19;90:3,10,23;
91:4,15,18;92:10,14;
93:25;94:3,10,18;
97:10;98:3;99:22;
100:23;104:16;
106:1,3,11,15,25;
107:1,3,6,15;110:4;
111:1,14,16,18;
112:2;117:12,16,19,
25;119:2,13;120:3,8;
121:16;124:7;125:2,
8,14,16;126:9,23;
127:25;128:14
**upcoming (1)**
20:17
**upon (10)**
28:23;65:14;88:2,
11;95:12,19;96:3;
122:17,19;125:7
**ups (4)**
43:14;87:13;
106:20;125:24
**usage (1)**
94:12
**use (13)**
12:23;18:9;21:15;
22:10;25:17;30:6;
31:17;60:5;94:2,6,9;
104:20;115:24
**used (8)**
21:5;40:17,24;
67:19;91:23;102:18;
105:5,8
**using (4)**
21:14,21;83:16,18
**utilize (1)**
50:22

**V**

**vacation (2)**
50:2,17
**vague (6)**
15:7;51:23;104:1,

5,7;115:12
**value (1)**
23:22
**varied (1)**
17:11
**various (3)**
6:16;16:20;65:3
**vary (2)**
65:15;75:7
**vehicle (3)**
94:3,5,9
**vehicles (1)**
94:13
**verbal (1)**
53:16
**verdict (21)**
22:11;29:13;30:8;
45:13,17;77:2;78:2;
111:10,16;113:8,10
**verdicts (3)**
30:19;31:4;117:19
**versus (1)**
113:17
**veterinarian (2)**
53:19;104:23
**Veterinarians (9)**
9:14;105:22;106:8
**videos (4)**
119:22,23;120:3,8
**view (2)**
18:20;29:4
**viewed (2)**
15:17;71:14
**viewpoint (1)**
54:1
**viewpoints (1)**
56:5
**Village (11)**
7:14,19;12:5,17,
21;22:18;35:20;
50:13;54:7;79:21;
113:1
**violate (5)**
44:8;97:3;105:16;
114:3;115:15
**violated (6)**
45:5;48:5;96:17;
97:4;113:19,24
**violates (2)**
45:2,20
**violating (1)**
123:9
**violation (11)**
46:19;47:8,11,14,
16,20,22,23;48:2;
93:21;117:18
**virtue (1)**
101:10
**visit (7)**
29:2,3;57:14;
67:10;72:15,19;
77:24
**visits (21)**

29:14,18;31:7;
32:14,20;43:4;45:15;
48:16,20;52:22;58:7;
67:5;106:1;107:1;
110:4;111:14;
117:16,25;119:2;
124:7;126:9
**voices (3)**
47:12;102:12;
117:14
**voluntarily (1)**
38:2
**volunteer (1)**
9:7
**vouch (1)**
55:6

## W

**wait (3)**
50:8,8,8
**waiting (1)**
114:18
**waive (3)**
128:13,15,17
**waives (1)**
128:8
**wake (1)**
29:12
**walking (1)**
88:25
**Warden (1)**
89:15
**warrant (6)**
22:9;23:7;93:6,10;
100:24;103:18
**warrants (1)**
18:21
**watch (1)**
89:1
**water (1)**
25:2
**way (5)**
20:21;84:9,11;
94:19;121:12
**ways (3)**
42:11;61:13;
113:13
**weather (2)**
24:25;121:10
**webinars (1)**
20:18
**website (1)**
11:20
**week (1)**
19:16
**weekly (9)**
62:22;69:2,21,23;
73:23;74:19,19;75:9,
12
**Welfare (21)**
6:10,13,16,19;9:8,
18,19,21;13:8;16:20;

17:4,9;26:21,22,25;
27:20,24;36:17;
60:15;83:1;100:11
**well-being (1)**
23:15
**weren't (3)**
71:9;100:13,15
**Westlaw (1)**
63:7
**whatnot (1)**
61:4
**what's (12)**
36:19;54:19;58:19;
76:11,24;85:23;
108:19;110:22;
115:1,6;116:11;
127:12
**whelmingly (1)**
84:10
**whereabouts (1)**
39:17
**wheres (2)**
27:15,16
**wherever (1)**
120:24
**whoever's (1)**
109:24
**whos (2)**
27:15,16
**who's (3)**
28:20;39:9,10
**Whose (1)**
80:5
**winter (1)**
24:19
**wished (1)**
65:20
**wishes (1)**
46:7
**withdraw (1)**
67:21
**within (4)**
16:20;45:15;70:3;
106:5
**without (15)**
15:13;22:25;27:14;
31:7;32:13;43:4;
51:5;66:23;99:24;
106:1,22;114:12;
117:17;122:20;124:8
**WITNESS (15)**
4:11,14;54:16,19,
20,25;56:11;60:4;
68:13;104:7;105:11;
109:10,13,15;128:16
**witnesses (2)**
105:20;112:22
**woke (1)**
76:5
**wonderful (2)**
8:3;80:25
**wondering (1)**
88:6

**word (10)**
14:25;15:7;20:24;
21:5;39:7;67:19,20;
99:15;100:19;102:18
**wording (2)**
43:20;108:15
**words (5)**
30:6;39:22;101:6;
102:13;103:8
**work (22)**
7:12;8:12,13,15;
11:16,22;19:6,9;
25:8;30:12;32:16;
35:11;36:17;37:25;
45:25;61:12;64:5;
76:23;79:12;89:7,14;
90:1
**worked (22)**
5:21;7:4,7,13;
13:24;14:18,19;
32:12;49:12;50:25;
59:3;61:13;62:24;
63:12;77:9;80:15;
81:20;82:17;86:7;
91:12;103:2;122:1
**working (9)**
8:6;9:2;21:17;
31:25;78:14,15,19;
81:5;84:18
**works (2)**
24:4;113:13
**workshops (2)**
127:10,13
**worried (1)**
55:1
**worry (1)**
54:23
**worth (2)**
35:23;36:21
**worthwhile (1)**
36:21
**wrap (1)**
127:25
**writing (11)**
23:19;54:12;58:11;
59:9;64:13;69:17;
75:24;78:11;81:9;
87:21;91:24
**written (39)**
22:19,21,22;23:3,4,
18,24;24:2,14,16;
25:4,11,16;48:22;
51:16,20;52:23,24;
53:6,11,24;55:13,16;
57:1;58:23,25;59:4;
75:11,15;82:13;
100:5;109:17;121:1;
122:2;124:6;126:20,
21,25;127:1
**wrong (9)**
44:16;45:8;69:2;
77:25;78:24;113:19;
116:9,9,10

## Y

**year (8)**
5:25;9:2,5;10:5;
19:17;35:16;37:15;
65:2
**years (11)**
16:2;31:23;35:15;
42:6,6,6;55:2;73:11;
81:18,19;99:7
**yeses (1)**
4:19
**York (2)**
7:9;9:14

## Z

**Zoom (4)**
4:2;68:14,16;
100:14
**Zooming (1)**
100:14

## 1

**1 (1)**
116:18
**10 (1)**
116:18
**101 (1)**
33:17
**125 (1)**
64:18
**127th (1)**
5:15
**15 (1)**
60:5
**16 (1)**
85:16
**1717 (2)**
98:21;115:6
**1Christian (1)**
33:4

## 2

**200 (1)**
121:21
**2006 (1)**
7:11
**2007 (2)**
7:11,14
**2015 (1)**
85:16
**2019 (2)**
7:15;85:21
**2020 (2)**
85:21,25
**216-392-4914 (1)**
5:17
**25 (1)**
63:21

**2575 (1)**
5:15
**295102 (1)**
109:8

## 3

**3 (3)**
16:15;35:21;
100:12
**3:15 (1)**
68:12
**306b (1)**
54:19
**30b6 (1)**
54:15

## 4

**4:36 (1)**
122:7
**4:40 (2)**
122:8,9
**44120 (1)**
5:15

## 5

**5 (1)**
84:19