1

1           IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
2                       EASTERN DIVISION

3                          - - -

4    Bianca Marcellino,          )
                                 )
5                 Plaintiff,     )
                                 )
6          vs.                   )  Case No. 1:21-CV-01338
                                 )
7    Geauga County Humane        )
     Society,                    )
8                                )
                  Defendant.     )
9

10                         - - -

11

12          Remote deposition of Christian Courtwright, a

13   witness herein, called on behalf of the Plaintiff

14   for oral examination, pursuant to the Federal Rules

15   of Civil Procedure, taken before Steven Mengelkamp,

16   court reporter and Notary Public in and for the

17   State of Ohio, taken via Zoom, on Wednesday,

18   June 22, 2022, commencing at 10:00 a.m.

19                         - - -

20

21

22

23

24

25

**FINCUN-MANCINI -- THE COURT REPORTERS**
**(216) 696-2272 -- email@fincunmancini.com**

1    APPEARANCES:

2    On behalf of the Plaintiff:

3            Michela Huth, Esq.
             P.O. Box 17
4            Bolivar, Ohio 44612
             330-440-4027
5            Michelahuth.esq@gmail.com

6

7    On behalf of the Defendant:

8            Matt Baringer, Esq.
             Davis & Young
9            29010 Chardon Road
             Willoughby Hills, Ohio 44092
10           216-348-1700
             Mbaringer@davisyoung.com

11

12                        - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            INDEX
2   WITNESS:                                    CROSS
3   Christian Courtwright
4         By Ms. Huth                            4
5                        - - -
6
7                    E X H I B I T S
8   EXHIBIT:                                    MARKED
9         A - F                                  155
10        G                                      172
11        H                                      182
12        I & J                                  185
13        L                                      217
14        M - O                                  238
15        P                                      239
16                       - - -
17
18
19
20
21
22
23
24
25

```
 1                        PROCEEDINGS
 2              MS. HUTH:           Christian
 3       Courtwright, my name is Michela Huth.  I'm one
 4       of the attorneys for the plaintiffs IN
 5       Marcellino vs. Geauga County Humane Society,
 6       et al.  I'm going to be asking you a bunch of
 7       questions.
 8              I would just ask that you not nod, or
 9       uh-huh or uh-uh anything, because the court
10       reporter can't pick up nods, but also the
11       uh-huhs and uh-uhs, we don't know if that's a
12       yes or no.  So just please answer yes or no.
13              So I'm going to start with some
14       questions about just some basic initial
15       questions.
16                    CHRISTIAN COURTWRIGHT
17   of lawful age, being first duly sworn, as
18   hereinafter certified, was examined and testified as
19   follows:
20                     CROSS EXAMINATION
21   By Ms. Huth:
22   Q     Can you state your name for the record,
23         please?
24   A     It's Christian Courtwright.
25   Q     Where are you currently located, the physical
```

| | | |
|---|---|---|
| 1 | | location? |
| 2 | A | 154 -- |
| 3 | Q | I mean, where you're sitting right now? |
| 4 | A | I'm in Ken Clarke's office at his desk. |
| 5 | Q | In Geauga County Humane Society's facility. |
| 6 | A | Yes, ma'am. |
| 7 | Q | What's the address? |
| 8 | A | 15463 Chillicothe Road in Novelty, Ohio 44072. |
| 9 | Q | Who is with you in the room? |
| 10 | A | Our attorney, Matt Baringer and Ken Clarke. |
| 11 | Q | What did you to prepare for the deposition |
| 12 | | today? |
| 13 | A | Just met with the attorney. |
| 14 | Q | What is your residential address? |
| 15 | | MR. BARINGER:    Michela, I have to |
| 16 | | object.  There's a statute that says a peace |
| 17 | | officer's residential address shouldn't be |
| 18 | | disclosed in a public forum.  I'm happy to, |
| 19 | | you know, go to the court on that issue, and |
| 20 | | we can, if the court orders it to, I'll |
| 21 | | provide it, but he's not going to provide it |
| 22 | | right now. |
| 23 | Q | What's your phone number? |
| 24 | | MR. BARINGER:    Same objection. |
| 25 | A | I'm happy to share my work cell phone. |

| | | |
|---|---|---|
| 1 | Q | What is your work cell phone? |
| 2 | A | 440-669-5919. |
| 3 | Q | Have you ever been sued before? |
| 4 | A | No. |
| 5 | Q | Have you ever sued anyone before? |
| 6 | A | No. |
| 7 | Q | What's your date of birth? |
| 8 | A | 9-25-76. |
| 9 | Q | Let's go through a little bit of your |
| 10 | | employment history.  Go ahead, just explain |
| 11 | | your employment history to me, please.  Or |
| 12 | | just identify who you worked for and what |
| 13 | | years. |
| 14 | A | Going how far back? |
| 15 | Q | From the beginning when you started doing any |
| 16 | | sort of animal work? |
| 17 | A | My first place of employment was the SBC of |
| 18 | | Texas in Dallas, Texas. |
| 19 | Q | How long did you work there for? |
| 20 | A | I worked there for several years.  I moved |
| 21 | | back to Ohio and worked for the Cleveland |
| 22 | | Animal Protective League and then moved back |
| 23 | | to Texas to work for the same organization. |
| 24 | Q | What date, can you give me the dates of those |
| 25 | | employments, please? |

```
1   A    I don't  have my resume in front of me.  I

2        can't be specific about dates.  But they

3        started in early aughts.

4   Q    Did you work for the Medina SPCA?

5   A    I did.

6   Q    Was that as a Humane Officer?

7   A    Yes, that was.  It was in 2008, I believe.

8   Q    How long did you work for them?

9   A    About a year.

10  Q    And what was the reason that you no longer

11       worked for them?

12  A    A position opened up at Rescue Village, and I

13       wanted to work for this organization for a

14       long time.

15  Q    Were you a humane agent for Medina SPCA?

16  A    I was, yes.

17  Q    Are you a vet tech?

18  A    I am not.  I took some college level classes

19       at Cedar Valley College in Dallas.

20  Q    In your employment history, you said that you

21       were a vet tech for Cleveland APL.

22  A    Yeah, that was a job title.

23  Q    So, you're not a vet tech, but your job title

24       was vet tech?

25  A    Yeah.
```

**FINCUN-MANCINI -- THE COURT REPORTERS**
**(216) 696-2272 -- email@fincunmancini.com**

```
1    Q    Why is that?
2    A    I don't know.  I didn't make the job titles,
3         was just hired on.
4    Q    How much do you make a year?  Why are you
5         looking at why are you looking at your
6         attorney, Christian?  I'm asking you the
7         question.
8    A    He's my counsel.
9    Q    He'll object if there's an objection.
10   A    I make about 57,000 a year.
11   Q    Who pays your salary?
12   A    Geauga Humane Society.
13   Q    Do you receive any government funding for your
14        salary?
15   A    We get a $25 check every month from the
16        County.
17   Q    Have you ever been disciplined in any
18        employment?
19   A    Yes.
20   Q    Where, which job?
21   A    Here at Rescue Village.
22   Q    What was the reason?
23   A    Various job performance.  I think you have
24        copy of the employment file.
25   Q    I understand it was various issues, but I'm
```

```
 1        asking you to tell me,
 2   A    It was just I wasn't communicating properly
 3        with my supervisor.  It was reflected in
 4        employee review.  It put me on a performance
 5        improvement plan, which I completed.  And then
 6        the following year, I think I had a glowing
 7        employment review.
 8   Q    Did any of those disciplines relate to report
 9        writing?
10   A    Yes.
11   Q    What was the issue with report writing?
12   A    We had a shelter software that I wasn't using
13        to the full capacity.
14   Q    What's that shelter software called?
15   A    It's called PetPoint.
16   Q    Are any of the plaintiff's records contained
17        within PetPoint?
18   A    I believe there's an initial just dispatch
19        report in PetPoint.
20   Q    Did you provide that in discovery?
21   A    I don't know.
22             MS. HUTH:          Matt, I would like
23        those, please.  We never received any PetPoint
24        records.
25   Q    So you're saying the only PetPoint record is
```

```
1            the initial complaint; is that what you said?
2   A    It's a dispatch of the initial complaints.
3   Q    What's a dispatch mean?
4   A    The call was logged and the officer was sent
5            out.
6   Q    Who made that initial complaint?
7   A    Michelle Nicastro.
8   Q    So that's the only record in PetPoint for the
9            Marcellinos, for Bianca, for Karen or for
10           Giancarlo?
11  A    Correct.  We no longer use PetPoint.
12  Q    When did you stop using PetPoint?
13  A    About a year ago.
14  Q    So when you've been involved with the
15           Marcellino, that's the only information that
16           you have entered into PetPoint is the one you
17           just described on the complainant, Michelle
18           Nicastro?
19  A    Correct.
20  Q    There's no other information on PetPoint at
21           all about the Marcellinos?
22  A    Correct.
23  Q    Were you required to enter information about
24           the Marcellinos in PetPoint?
25  A    No.  PetPoint was more of a dispatch software
```

```
 1              for my purposes.  So it wasn't something that
 2              I used regularly.
 3      Q       You don't usually --
 4      A       I used it for the animal intakes.  It's more
 5              shelter software.
 6      Q       So you don't put any humane law enforcement
 7              reports in there?
 8      A       Correct.
 9      Q       Do you do any humane law enforcement reports
10              as part of your job?
11      A       Yes.
12      Q       What are those?
13      A       They're Excel spreadsheets, Word documents,
14              written reports, paper reports.
15      Q       Have you produced everything related to the
16              Marcellinos?
17      A       Yes.
18      Q       What are your job duties?
19      A       I investigate complaints of animal cruelty and
20              neglect in Geauga County, I work with the
21              shelter staff, I coordinate with law
22              enforcement and social service agencies within
23              the County.  That's probably about as succinct
24              as I can be.
25      Q       Who is your supervisor?
```

```
1    A    Ken Clarke.

2    Q    Who was your supervisor prior to Ken Clarke?

3    A    Hope Brustein.

4    Q    Is it part of your job duties to keep the

5         executive director, apprised of active

6         investigations and prosecutions?

7    A    Yes, I meet with Ken every week.

8    Q    So tell me a little bit about those weekly

9         meetings.

10   A    We just talk about the state of affairs in the

11        field.  I update them on complaints that I've

12        received, anything that seems like it's got

13        some legs underneath it, we talk about.  We

14        talk about my approach and the best way to

15        handle the various cases that come in.

16   Q    Are any meeting minutes taken or notes taken?

17   A    No.

18   Q    Nothing is logged onto a computer or on a

19        piece of paper?

20   A    No.

21   Q    So it's all by memory?  If I ask you about the

22        weekly meetings, that's your memory?

23   A    Correct.

24   Q    Did you ever discuss anything about the

25        Marcellinos in your weekly meetings?
```

```
1   A    Yes.
2   Q    Did you ever discuss anything about the
3        probation inspections in the meetings?
4   A    Yes.
5   Q    What did you discuss?
6   A    Well, when Ken first came on, I let him know
7        about any ongoing cases that we had, and
8        Marcellino was one of them.
9   Q    When did Kenneth Clarke become employed?
10  A    I don't know the exact date.
11  Q    So, prior to that, did you ever have weekly
12       meetings with Hope Brustein?
13  A    We met weekly, but we met.
14  Q    Did you ever discuss probation inspections on
15       Bianca Marcellino?
16  A    Yes.
17  Q    What did you discuss?
18  A    That it was terms of her probation that she
19       was sentenced by a Judge, and we were bound to
20       do them.  If I was going to the property, I
21       let her know that I was going out to the
22       property.
23  Q    Prior to going out to the property on that
24       day, you let her know that you were going to
25       the property?
```

| | | |
|---|---|---|
| 1 | A | On which day? |
| 2 | Q | Whatever day you did your probation |
| 3 | | inspections, you said you notified her? |
| 4 | A | Yes. |
| 5 | Q | You notified her a few weeks before, a day |
| 6 | | before? |
| 7 | A | Yeah, just for safety reasons, I would let her |
| 8 | | know that I would be going out there. |
| 9 | Q | That day?  For each probation inspection, you |
| 10 | | let her know? |
| 11 | A | Or before.  If I knew I was going on a |
| 12 | | Wednesday, I might tell her on a Tuesday.  If |
| 13 | | I was going out there on a Friday, you know, |
| 14 | | it might have been a couple of days before, |
| 15 | | but she would she would know if I was going |
| 16 | | out there. |
| 17 | Q | You never had a discussion?  It was just, hey, |
| 18 | | Hope, I'm going out, that was it? |
| 19 | A | I'm following the court order to do the court |
| 20 | | mandated probation checks. |
| 21 | Q | Did you ever have any discussion with Hope |
| 22 | | about why you were going out that day, |
| 23 | | specifically?  In other words, let me ask you |
| 24 | | this:  What's your process when you decide to |
| 25 | | conduct a probation inspection?  You just wake |

```
 1           up one morning and say, I'm going to go do an
 2           inspection or can you describe the process to
 3           me?
 4    A      It would depend on where the majority of my
 5           calls are going to be.  If the probationer
 6           lives in Chardon and I have a lot of activity
 7           in Chardon, I might work it into my daily log
 8           to go out there and do the probation check in
 9           Chardon.
10    Q      When you do your probation inspections, just
11           go through it with me.  How do you prepare
12           before you go out to the property?
13    A      I may reread the case.  If it's an older case,
14           I might familiarize myself with the details of
15           the case, read the sentencing notes, and then
16           each case is different.  So it depends on what
17           restrictions there are.  And then I'll go out
18           there and I'll meet with the individual.
19           We'll talk about how things are going.  We'll
20           walk through the property and send an email to
21           the Probation Department that I did the check,
22           let them know if I had any notes.  That's
23           usually it.
24    Q      So every probation inspection that you've
25           done, you sent an email to the Probation
```

```
 1        Department?
 2   A    If it was of note, yeah.  I mean, if I went to
 3        a property, no one was home, I may not advise
 4        Probation that I went out and knocked on a
 5        door.
 6   Q    So every entry that you made onto Bianca
 7        Marcellino property for purposes of probation
 8        inspection, you sent an email to the Probation
 9        Department?
10   A    Whenever I had contact with Marcellino, yes.
11              MS. HUTH:       I don't think I have
12        all those emails.  I have a July 10th section
13        of emails, but I don't have any other emails.
14        I mean, I've got emails, but I don't see any
15        emails on every probation entry that you did.
16              MR. BARINGER:    Okay, just make a
17        note and follow up with me.
18              MS. HUTH:       If you could provide
19        those.
20   Q    What Probation Department are you referring
21        to?
22   A    Chardon Municipal Court, the Probation
23        Department there.  It's the only one in our
24        County.
25   Q    Who are the probation officers there?
```

```
 1   A    Ann Elko is Marcellino's probation officer.
 2        She's the one that I've had most contact with.
 3        And Judy Basher.
 4   Q    You mean Thrasher?
 5   A    Judy Thrasher, sorry.  I believe it was a
 6        victim's advocate, but is now a supervisor in
 7        the Probation Department.
 8   Q    You're a law enforcement officer, correct?
 9   A    Yes.
10   Q    As part of those duties you have, are you
11        authorized to do probation inspections?
12   A    Yes.  It's usually in the sentencing that the
13        Humane Society officer is doing the random
14        unannounced inspections.
15   Q    Right, but I didn't ask that.  I asked as a
16        humane law enforcement officer, do you have
17        authority to conduct -- I'm not asking you
18        whether an order says you can or not.  I'm
19        asking, do you, Christian Courtwright, have
20        the authority to conduct probation inspections
21        as part of being a humane law enforcement
22        officer?
23   A    I believe I answered your question.
24   Q    Christian, do you have authority to conduct
25        probation inspections as part of your job?
```

18

```
 1    A    Ms. Huth, I said yes, and then I expounded on
 2         that answer by saying, it's in the probation
 3         sentencing that the Humane Officer goes out,
 4         not the probation officer in the office.
 5    Q    Yeah, I didn't ask that, but okay.  I didn't
 6         ask that, but thank you.
 7              So what gives you the authority to
 8         conduct probation inspections?  Is there case
 9         law?  Is it part of your certificate that you
10         get from the Probate court?  What,
11         specifically, gives you the authority to
12         conduct probation inspections?
13    A    That I'm a Humane Officer and a law
14         enforcement officer, and the Judge's orders.
15    Q    Which order is that?
16    A    In the sentencing.
17    Q    I understand that, but what's the date of that
18         order that you're referring?  We never
19         received that in discovery.  So I'm asking you
20         details on it.  What's the date of the order?
21    A    I don't have the sentencing in front of me,
22         but if we're talking specifically about Bianca
23         Marcellino, it was in her sentencing.
24    Q    What specifically --
25    A    You should have that.
```

```
1    Q    What, specifically, in her sentencing gave you
2         the authority to enter her property?
3    A    There will be random unannounced inspections
4         done by the Humane Officer.
5    Q    Do you know the exact language?
6    A    No.
7    Q    What does the Court order that you're
8         referring to, the sentencing order, give you
9         the right to do?
10   A    To make random unannounced inspections.
11   Q    For what purpose?
12   A    To ensure that they're caring for animals, and
13        I believe the language is something like,
14        clean, humane manner.
15   Q    Any animals?
16   A    Yes.
17   Q    Any animals, not just horses?
18   A    Not just horses, any animals.
19   Q    Are you allowed to enter her house when you
20        conduct a probation inspection?
21   A    I believe the order would allow me to enter
22        the property, yes.
23   Q    I didn't ask if you're allowed to enter the
24        property.  I asked if you're allowed to enter
25        her house.
```

| | | |
|---|---|---|
| 1 | A | The home is part of the property. |
| 2 | Q | The home, the actual building she lives in? |
| 3 | A | Yes. |
| 4 | Q | Have you ever entered her home? |
| 5 | A | Ms. Marcellino's? |
| 6 | Q | Yes. |
| 7 | A | Not for probation checks, no. |
| 8 | Q | Why not? |
| 9 | A | Since the sentence was specifically about the |
| 10 | | horses, I wanted to focus on the horses and |
| 11 | | try to keep the peace a little bit by not |
| 12 | | forcing myself into her home. |
| 13 | Q | But I just asked you if the sentencing focus |
| 14 | | specifically on horses, and you said, no, |
| 15 | | about two minutes ago. |
| 16 | A | She was found guilty of neglecting two horses. |
| 17 | Q | I understand that. |
| 18 | A | Wasn't allowed to keep, live with, reside with |
| 19 | | horses, so I was going to make sure that was |
| 20 | | happening. |
| 21 | Q | She's allowed to have other animals? |
| 22 | A | Yes. |
| 23 | Q | So what was the reason that you did not enter |
| 24 | | her home during probation inspections? |
| 25 | A | Well, as I said, I didn't think she was |

| | | |
|---|---|---|
| 1 | | keeping horses inside the home, and I didn't |
| 2 | | see a reason to cause problems by going inside |
| 3 | | of her home. |
| 4 | Q | Would you have had the authority, and I |
| 5 | | believe you just said that you do have |
| 6 | | authority to enter her home, correct? |
| 7 | A | I believe so, yes. |
| 8 | Q | But you just chose not to? |
| 9 | A | Correct. |
| 10 | Q | And that's because you didn't believe there |
| 11 | | were any horses in her house? |
| 12 | A | Correct. |
| 13 | Q | Do you have a college degree? |
| 14 | A | No. |
| 15 | Q | Why don't you just tell me what your education |
| 16 | | is? |
| 17 | A | I have some college.  I was going to college |
| 18 | | when I found this work, and it was a calling |
| 19 | | to me, so I stopped going to college and was |
| 20 | | focused on doing humane law enforcement. |
| 21 | Q | Where did you go to college? |
| 22 | A | I went to Tri-C, I took some college classes |
| 23 | | there; Indiana state University, I believe; |
| 24 | | Duquesne University, I took some online |
| 25 | | classes there; Cedar Valley College, and I |

```
 1            think that's about it.  I probably have enough
 2            college credits.
 3    Q    What were you focusing on, anything in
 4            particular?
 5    A    Social work.
 6    Q    In Interrogatory No. 3, it asks to describe in
 7            detail all employment reviews or meetings,
 8            either involving you or involving other
 9            persons.  Part of your answer was supplement
10            with any, at the bottom of it.  Do you know
11            what supplement with any means?
12    A    I don't understand the question.
13    Q    You answered discovery that was propounded
14            upon you by the plaintiffs, correct?
15    A    Correct, yes.
16    Q    Part of that discovery was what's called
17            interrogatories, correct?
18    A    Okay, yes.
19    Q    You don't remember answering the discovery?
20    A    There was a lot, so I don't know specifically
21            what you're talking to.  If you can show me
22            the document, I'd be happy to look.
23    Q    I mean, you have it.  It's Interrogatory No.
24            3.  At the end of the answer, you said
25            supplement with any, and I'm just asking what
```

```
 1        does supplement with any mean?
 2              MR. BARINGER:  If you want to show him
 3        the document and let him read his answer,
 4        that's fine.  He doesn't have to --
 5              MS. HUTH:         He needs to answer
 6        whether he knows what I mean.  If not, then
 7        I'll move on.
 8              MR. BARINGER:     He needs to read the
 9        document or read the full --
10              MS. HUTH:         I don't think you're
11        allowed to have talking objections either,
12        Matt.  Go ahead.
13   A    Unless you show me the document, there were
14        several pages we provided.  I don't know what
15        you're --
16              MS. HUTH:         I'm objecting to
17        talking objections, Matt.
18              THE WITNESS:      If you could share
19        your screen or --
20   Q    Let's talk a little bit about when you enter a
21        probationer's property to conduct inspections.
22        How do you determine where the property lines
23        are?
24   A    If there's a fence, if there's any sort of
25        indicator, it's usually, you know, the house
```

```
 1            sits on the property.
 2   Q    What about the Bianca Marcellino's property?
 3   A    Specifically in what regard?
 4   Q    The property line.  Where's her property
 5        lines?
 6   A    There's not a marked property line between her
 7        residence and the property that goes behind it
 8        and the property that she quitclaimed to her
 9        parents with the barn on it.
10            MS. HUTH:          I'm going to share
11        screen, Steve.  I've never done this before.
12   Q    Can you see the picture I have up?
13   A    Yes.
14   Q    Where is Bianca's property in this picture?
15   A    I'm pointing at it.
16   Q    I can't see.  I'm just saying can you describe
17        the buildings?
18   A    Yeah, I believe that's her residence in the
19        middle of the screen.  You don't have a marker
20        on it, so it's very difficult.  I mean, you
21        can be showing me anywhere on Wilson Mills.  I
22        don't know.
23   Q    Do you recognize any properties on the picture
24        that's in front of you?
25   A    No, I don't.  You don't have an address
```

```
 1              listed, I don't.
 2    Q    Hold on.  How about this one?  Do you
 3         recognize this property in front of you?
 4    A    Again, without a --
 5    Q    For the record, I'm telling you this is Bianca
 6         Marcellino's property on part of the map I'm
 7         showing you.
 8    A    I believe there's an address listed on the
 9         building.  Yeah.  So that would be
10         Ms. Marcellino's residence.
11    Q    Is where?
12    A    The bottom middle of the screen with 7224 on
13         the roof.
14    Q    Okay, and do you see a road going to the left
15         side of her property?  Looks like a driveway?
16    A    Sure, yeah.
17    Q    And it looks like the driveway continues back
18         to the right side of that big building there;
19         is that correct?
20    A    Yes, it's splits to the left and to the right,
21         yes.
22    Q    What is that big building at the top left of
23         your screen or in the top middle left?
24    A    That would be a horse barn.
25    Q    Whose property is that on?
```

| | | |
|---|---|---|
| 1 | A | That was Bianca Marcellino's property that she |
| 2 | | quitclaimed to her parents. |
| 3 | Q | Whose property does that barn sit on? |
| 4 | A | Ms. Marcellino's parents, Karen and Giancarlo |
| 5 | | Marcellino. |
| 6 | Q | Okay.  So do you see, it looks like there's a |
| 7 | | driveway going into the front of the barn? |
| 8 | A | Yes. |
| 9 | Q | Whose property is that, the driveway? |
| 10 | A | Giancarlo and Karen Marcellino. |
| 11 | Q | So do you see what looks like a driveway or |
| 12 | | road that curves around the barn to the right? |
| 13 | A | Yes. |
| 14 | Q | Whose driveway is that road? |
| 15 | A | That would be Bianca Marcellino's. |
| 16 | Q | How many feet off of the barn is the property |
| 17 | | line? |
| 18 | A | I would believe it goes right up against Ms. |
| 19 | | Marcellino's property line.  But without a |
| 20 | | survey to determine that, I can't say for |
| 21 | | certain. |
| 22 | Q | I'm sorry, where does the property line go? |
| 23 | A | I believe the barn goes very close to |
| 24 | | Ms. Marcellino's property. |
| 25 | Q | Like what, a couple feet, you think? |

```
 1   A     Maybe, if that.
 2   Q     Why do you believe that?
 3   A     Well, 'cause if you look at where
 4         Ms. Marcellino's house is and where the fence
 5         is to the backyard, it lines up pretty closely
 6         to the border of the barn.
 7   Q     Have you ever physically stepped onto Karen
 8         Marcellino and Giancarlo Marcellino's
 9         property?
10   A     Not knowingly or intentionally.
11   Q     Have you ever looked in the window of the barn
12         there?
13   A     Yes.
14   Q     Is the side of the barn on the parent's
15         property?
16   A     The side that my eyes looked at?
17   Q     The window.  Was the window that you looked
18         in, does that sit on Karen and Giancarlo's
19         property?
20   A     Yes.
21   Q     Why did you look in the windows of the barn?
22   A     Because I was walking the property line and
23         there were horses looking out the window.
24   Q     The property line, you said, is just a few
25         feet from the barn?
```

| | | |
|---|---|---|
| 1 | A | I don't even know if it's a few feet. |
| 2 | Q | How much, again, is the property line off from |
| 3 | | the barn? |
| 4 | A | It appears, according to the image that you're |
| 5 | | showing me, and in my experience out on the |
| 6 | | property, that the two are very close. |
| 7 | Q | How close is very close? |
| 8 | A | It could be it could be inches, it could be |
| 9 | | overlapping.  I don't know. |
| 10 | Q | So when you were looking in the window of the |
| 11 | | barn, whose property were you standing on? |
| 12 | A | Bianca Marcellino's. |
| 13 | Q | Do you recall an inspection on July 10, 2020? |
| 14 | A | Yes. |
| 15 | Q | Did you ever tell Bianca that you knew where |
| 16 | | the property line was? |
| 17 | A | I told her I had an idea where it was.  I |
| 18 | | don't think I said I know where it is. |
| 19 | Q | When you did that, was that somewhere near the |
| 20 | | fence on the property? |
| 21 | A | Somewhere near the -- |
| 22 | Q | Is there a fence on Bianca's property? |
| 23 | A | There's a pasture fence towards the back |
| 24 | | behind the barn. |
| 25 | Q | Do you remember gesticulating that you knew |

```
 1        where the property line was on July 10th?
 2   A    I remember standing, when we were doing the
 3        inspection, keeping myself lined up with
 4        Bianca Marcellino's home, which is on her
 5        property.  So if I was standing by the fence,
 6        I distinctly remember keeping myself lined up
 7        with her home.
 8   Q    Did Bianca tell you, you were on her parents'
 9        property at any time during any probation
10        inspection?
11   A    Yes.
12   Q    When she told you that, what was your
13        response?
14   A    I believed she wasn't being truthful with me.
15   Q    She was lying to you, you thought?
16   A    Yes, because I was walking on her property and
17        the probation check allowed me to walk on her
18        property.  Just because I was close to her
19        parents property --
20   Q    What was the purpose of looking in the windows
21        of the barn?
22   A    There were horses sticking their heads out the
23        windows.
24   Q    What was the purpose of putting your head
25        looking through the window of the barn?
```

| | | |
|---|---|---|
| 1 | A | I didn't stick my head through the window. |
| 2 | Q | Did you look in the windows? |
| 3 | A | I looked at the horses that were looking out |
| 4 | | the windows, yes, but I didn't stick my head |
| 5 | | or my body into the window. |
| 6 | Q | So you testified previously that the purpose |
| 7 | | of the probation inspections were to ensure |
| 8 | | that she did not have horses on her property; |
| 9 | | is that correct? |
| 10 | A | Yes. |
| 11 | Q | So on July 10th, what did you do on Bianca's |
| 12 | | property to determine that she did not have |
| 13 | | it's on her property? |
| 14 | A | We walked to the back of the house.  We walked |
| 15 | | down behind her house.  I wanted to make sure |
| 16 | | that there wasn't evidence that there were |
| 17 | | horses crossing over, and then I wanted to |
| 18 | | walk the whole fence line to make sure there |
| 19 | | wasn't evidence that there were horses coming |
| 20 | | over on her end of the property. |
| 21 | Q | Was there any evidence that there were horses |
| 22 | | coming or that she had horses? |
| 23 | A | There was not, no. |
| 24 | Q | So what was the purpose of going towards the |
| 25 | | barn? |

```
 1   A      To walk the property line.
 2   Q      I understand, but you can see whether they're
 3          horses or not, right?  They're not like small,
 4          like a frog.  You don't walk up to them and
 5          say, oh, is there a horse there under that
 6          bush?  My question is, did you determine on
 7          July 10, 2020, that Bianca had any horses on
 8          her property?
 9   A      Right, I answered that, and I said there was
10          no evidence that there were horses on Bianca
11          Marcellino's property.
12   Q      So the purpose of looking in the barn was for
13          what purpose?
14   A      To look at the horses that were over there.
15   Q      Right, but that's not Bianca's property,
16          though?
17              MR. BARINGER:      Objection.
18   Q      Were the horses on Bianca's property?
19   A      I believe you asked and I answered.  I said no
20          there were not.
21   Q      So I'm still trying to understand why you were
22          looking at the horses in someone else's
23          property in another barn on someone else's
24          property?
25              MR. BARINGER:      Objection.  You can
```

```
 1          answer again.
 2   A   Because there were horses sticking their heads
 3          out the window.  I was curious.  I like
 4          horses.  I've continually been concerned about
 5          the horses over there.  So walking the
 6          property line was part of my job to do the
 7          probation check, and there happens to be
 8          horses looking out the window at me, I'm going
 9          to look at them.
10   Q   At what point on July 10, 2020, during the
11          probation inspection, did you determine that
12          Bianca did not have any horses on her
13          property?
14   A   At the conclusion of it.
15   Q   When was that, when you left?
16   A   Yeah.
17   Q   So part of your probation inspection is to
18          look at neighbor's property?
19               MR. BARINGER:      Objection.  You can
20          answer.
21   A   I can't help where my eyes go.  I can't help
22          seeing things.  If I'm doing a probation check
23          and I happen to look at a neighbor's property
24          and see something of interest, I'm going to
25          look at it.
```

```
 1   Q    Would you agree that the purpose of your
 2        probation inspection was solely to determine
 3        whether or not Bianca had horses on her
 4        property?
 5   A    I wouldn't say the sole reason.
 6   Q    Was it one of the reasons?
 7   A    Yeah, it would be one of the reasons, yes,
 8        ma'am.
 9   Q    What were the other reasons for conducting the
10        probation inspection?
11   A    To ensure that she remained in continual
12        compliance with the order and to make sure
13        that any animals that she had contact with
14        were kept in a humane manner.
15   Q    So the court order permitted you to inspect
16        her other animals, as well, correct?
17   A    Correct.
18   Q    Did she have any animals at any probation
19        inspection that you went to her property?
20   A    I believe I met a cat at one point, and that
21        animal was healthy and well taken care of.  I
22        believe there's a Husky dog on the property
23        that I saw outside through the fence once, and
24        that dog seemed to be taken care of in a
25        humane manner.  I think there was a Lab at one
```

```
 1        point.
 2   Q    Were those dogs kept inside a house or
 3        outside?
 4   A    I don't know if they lived there full time, if
 5        they were Bianca's full time dogs.  I'm not
 6        sure.
 7   Q    So if part of your probation inspection was
 8        for you to ensure she was taking care of all
 9        animals, not just horses, why didn't you go
10        into her house?
11   A    I believe I answered that question already by
12        my focus was to make sure that there weren't
13        horses.  Even though the probation allows me
14        to ensure all animals are being taken care of,
15        in order to keep the peace.
16   Q    So you could have gone in to look at her dogs
17        because you said that the order allowed you to
18        look at all animals?
19   A    Correct, and the Probation Department never
20        asked me to go into her house.
21   Q    So let's talk about that.  Is the Probation
22        Department your supervisor?
23   A    When it comes to these probation checks, I
24        believe they play a supervisory role.  If they
25        tell me to go out to a property, I will go out
```

```
 1            to the property.  If they tell me to take a
 2            picture of something specific or have the
 3            probationer sign a form, or anything else, I'm
 4            going to do it, because I respect them as
 5            professionals.
 6    Q     Is it part of your job duties that you report
 7            to the Probation Department?
 8    A     Yes.
 9    Q     Where in your job duties does it say that?
10    A     It's through the court orders demanding the
11            probation checks.  I don't --
12    Q     I understand, but the court order doesn't say
13            anything about the Probation Department.  So
14            I'm asking you, where did you get the belief
15            that the Probation Department is the one that
16            dictates what you should do or don't do?
17    A     Through the judge's sentencing.
18    Q     Does it say the Probation Department is to
19            supervise the probation?
20    A     When they're put on probation, yes.
21    Q     Does the Probation Department conduct
22            inspections?
23    A     Not in the field, no.  Which is why they have
24            me do it.
25    Q     So you're their proxy Probation officer?
```

| | | |
|---|---|---|
| 1 | A | I don't know if I would put it that way.  I |
| 2 | | would say I'm the Humane Officer doing |
| 3 | | supplemental probation checks when it comes to |
| 4 | | animal welfare. |
| 5 | Q | In the times that you entered Bianca |
| 6 | | Marcellino's property, how many of those times |
| 7 | | did the Probation Department tell you to go |
| 8 | | for that inspection? |
| 9 | A | Just that one last time before the last |
| 10 | | inspection. |
| 11 | Q | What was that date? |
| 12 | A | The last inspection, the reason that we're |
| 13 | | here.  I believe that was July 10, 2020. |
| 14 | Q | So they told you to go out before July 10, |
| 15 | | 2020, and that's -- |
| 16 | A | Yeah.  I believe they had an in-person meeting |
| 17 | | scheduled.  My dates might be wrong here, but |
| 18 | | I believe it was scheduled on the 13th.  They |
| 19 | | were bringing her into the office to interview |
| 20 | | her, and they wanted to have an inspection |
| 21 | | done before they met with her. |
| 22 | Q | So the reason for you entering Bianca's |
| 23 | | property on July 10, 2020, was because the |
| 24 | | Probation Department told you to go? |
| 25 | A | Yeah, and she was for a probation check |

```
 1          anyway.
 2    Q     What do you mean by she was due for a
 3          probation check?
 4    A     I hadn't been out there for a while, and it
 5          was good to do a check again.
 6    Q     So I'm going to go back to a question I ask
 7          you before.  What makes you decide to do a
 8          probation check?
 9    A     As I said before, it depends on my schedule,
10          where --
11    Q     I'm not asking that.  I'm saying so you wake
12          up in the morning and you say, okay, well, we
13          know on the July 10, 2020, the reason for your
14          entry was because the Probation Department
15          told you to go in, correct?
16    A     Correct.
17    Q     So on the other inspections that you've done,
18          did the Probation Department tell you to enter
19          as well?
20                MR. BARINGER:     Michela, he was
21          trying answer.  He needs to be allowed to
22          finish his answer.
23    A     For Ms. Marcellino, the only inspection I did
24          at the request of the Probation Department was
25          on July 10th.
```

| | | |
|---|---|---|
| 1 | Q | And their reason for you going in was because |
| 2 | | there was an upcoming hearing? |
| 3 | A | No, an in-person meeting, an in-person |
| 4 | | probation meeting with her probation officer. |
| 5 | Q | Did COVID affect how you operate as a Humane |
| 6 | | Officer? |
| 7 | A | I think COVID affected everybody's job, yeah, |
| 8 | | so it certainly affected mine. |
| 9 | Q | I wasn't asking about anyone's job, I was |
| 10 | | asking about your job.  So how did it affect |
| 11 | | your job? |
| 12 | A | I had to be more careful when interacting with |
| 13 | | people.  I had to wear a mask wherever I went. |
| 14 | | I think that, specifically, for my job, it |
| 15 | | hurt a lot of people, and there were a lot of |
| 16 | | people that were operating on the edges of |
| 17 | | life that COVID really, really hurt them.  So |
| 18 | | my job became a lot of public outreach, doing |
| 19 | | food deliveries and assisting in transporting |
| 20 | | for spay-neuter services and just trying to |
| 21 | | help people as much as I could out in the |
| 22 | | community. |
| 23 | Q | How did it affect you as a Humane Officer, |
| 24 | | your Humane Officer duties?  I'm not asking |
| 25 | | shelter duties.  I'm not asking any other |

| | | |
|---|---|---|
| 1 | | duties.  Humane Officer duties. |
| 2 | A | As a Humane Officer, going out and helping |
| 3 | | people who were really, really desperate, who |
| 4 | | were very close to losing where they were |
| 5 | | living, if it meant me dropping off a couple |
| 6 | | bags of food to keep them going, that became a |
| 7 | | core function of my job. |
| 8 | Q | Did you conduct probation inspections during |
| 9 | | COVID? |
| 10 | A | I did, yes. |
| 11 | Q | What period of time was COVID, like a month? |
| 12 | A | It's still going.  So I don't think COVID's |
| 13 | | ever stopped.  But when the pandemic started, |
| 14 | | it affected my job, and I was still doing |
| 15 | | probation checks, yes. |
| 16 | Q | Were any policies changed during COVID related |
| 17 | | to your humane law enforcement duties? |
| 18 | A | Yeah, to maintain social distances and to wear |
| 19 | | masks, and you know, I think that was about |
| 20 | | it. |
| 21 | Q | Did you lose any staff during COVID? |
| 22 | A | Yes, but I wasn't part of those decisions and |
| 23 | | couldn't speak to who or when. |
| 24 | Q | So in terms of probation inspections, the way |
| 25 | | COVID affected you was you had to wear a mask |

```
 1            and do social distancing.  Anything else?
 2   A    No.
 3   Q    Why haven't you conducted a probation
 4        inspection since you testified that you go
 5        out -- I believe you testified you go out
 6        after you haven't done an inspection for a
 7        while, it's time to go out, correct?
 8   A    Correct.
 9   Q    Is there a time frame, a month or two between
10        those?
11   A    Conversations I've had with Probation
12        Department, they like them to be semi
13        regularly.  If I could do one a month, it
14        would be great, but time doesn't always allow
15        that to happen.
16   Q    Have you done any probation inspections since
17        July 10, 2020, on Bianca Marcellino and her
18        property?
19   A    No.
20   Q    Why not?
21   A    Because of how combative it got, I felt it was
22        counter productive.
23   Q    Aren't you trained to deal with combative
24        people?
25   A    Yeah, I am.  I'm not armed.  I tend to be a
```

```
 1          pacifist.  I talked with the Probation
 2          Department and they're in line with my
 3          thinking on this.
 4    Q    So it's the Probation Department that said not
 5          to go out anymore?
 6    A    No.  No, they didn't instruct me one way or
 7          the other.
 8    Q    You just decided that on your own?
 9    A    I spoke with the Probation Department.  They
10          know where I stand on this.  Yeah, I expressed
11          that I felt it was counter productive, and I
12          believe they agreed with me.
13    Q    Did you ever discuss not going out any further
14          with your supervisor?
15    A    Yes.
16    Q    With Hope Brustein?
17    A    With Ken Clarke.
18    Q    Because Ken Clarke was the Executive Director
19          on July 10, 2020?
20    A    There was no Executive Director on July 10th,
21          Hope was no longer with the agency.
22    Q    So you didn't have a supervisor on July 10,
23          2020?
24    A    No.  I mean, we had an interim group that was
25          acting as the organization's leadership, and I
```

```
 1          kept them apprised.
 2  Q    Who was in that group?  You can't look at your
 3          attorney for answers, I'm sorry, Christian.
 4              MR. BARINGER:     He can look wherever
 5          he wants.
 6              MS. HUTH:         I'm asking you to
 7          answer the question and not look at your
 8          attorney.
 9              MR. BARINGER:     He's allowed to look
10          wherever he wants.
11              MS. HUTH:         Matt, can you put
12          your video on so I can see you as well?  I
13          think I have a right to have you on the video
14          as part of this deposition.
15              THE WITNESS:      And I'm happy to
16          answer the question.
17              MS. HUTH:         Go ahead, Christian.
18  A    There was a leadership committee made up of, I
19          believe, it was Rebecca Bendlak, our
20          veterinarian, Dr. Volpe, and our shelter
21          manager, Erin Hawes.
22  Q    Those were your supervisors during the time
23          that Hope Brustein was not there and prior to
24          Kenneth Clarke coming into the --
25  A    I wouldn't say they were my supervisors.  They
```

```
 1          were the leadership committee for the
 2          organization.  I was the Humane Officer and I
 3          didn't report to them.  They didn't have any
 4          policy decisions on me.
 5     Q    When did Hope Brustein leave the organization?
 6     A    I don't know the date.
 7     Q    So you didn't have a supervisor from the time
 8          she left to the time Kenneth Clarke arrived?
 9     A    Correct.  Because I report to the executive
10          director, and there was no executive director.
11     Q    So that means that you didn't have a
12          supervisor to go to, to talk about whether or
13          not you should continue your inspections?
14     A    Correct.
15     Q    So you made that decision by yourself?
16     A    Based on the ask from the Probation
17          Department.
18     Q    The ask; what was the ask from the Probation
19          Department?
20     A    Complete an on-site probation check before
21          their in-person meeting with Ms. Marcellino.
22     Q    That's not what I was asking.  I was asking
23          that after Hope Brustein left your
24          organization and prior to Kenneth Clarke
25          coming in as the executive director, you did
```

44

| | | |
|---|---|---|
| 1 | | not have a supervisor, correct? |
| 2 | A | Correct. |
| 3 | Q | So it was your own decision that you made to |
| 4 | | not do probation inspections anymore on Bianca |
| 5 | | Marcellino's property? |
| 6 | A | Well, there was also a lawsuit, I think that |
| 7 | | you're familiar with, that followed shortly |
| 8 | | afterwards.  So I think it was prudent to |
| 9 | | stand back and let the lawsuit play out. |
| 10 | Q | Was that a decision you made by yourself, or |
| 11 | | did you consult with anyone else about that? |
| 12 | A | I didn't consult with anybody else. |
| 13 | Q | You made the decision to not conduct any more |
| 14 | | probation inspections because of the lawsuit? |
| 15 | A | For a few months until an executive director |
| 16 | | was appointed. |
| 17 | Q | Then when was an executive director appointed? |
| 18 | A | I don't know that exact date. |
| 19 | Q | Who is the executive director that was |
| 20 | | appointed? |
| 21 | A | Ken Clarke. |
| 22 | Q | Then did you start conducting probation |
| 23 | | inspections after Ken Clarke entered the |
| 24 | | picture? |
| 25 | A | No. |

```
1    Q    Why not?
2    A    I haven't conducted probation checks at
3         Ms. Marcellino's property.
4    Q    After Kenneth Clarke came on board as the
5         executive director, why did you not conduct
6         any more probation inspections?
7    A    Because of this lawsuit.
8    Q    Did Kenneth Clarke tell you not to conduct
9         probation inspections?
10   A    I think it was a mutual decision.
11   Q    When did you make that mutual decision?
12   A    I don't know the exact date.
13   Q    Was it in a weekly meeting?
14   A    I don't even know if it was a weekly meeting.
15        It was shortly after the lawsuit.
16   Q    Was it by email?
17   A    No.
18   Q    It was verbal?
19   A    Probably.
20   Q    Just like passing in the hallway, hey, Ken?
21   A    I don't know.  I don't have a memory of a
22        specific meeting.  I can't reference a
23        specific day, but the decision was made that
24        we weren't going to be going back out to that
25        property, until this lawsuit is settled.
```

```
 1   Q      You made that decision or someone else made

 2          that decision?

 3                 MR. BARINGER:       Objection.  You can

 4          answer again.

 5   A      I believe it was a decision made by myself as

 6          the only Humane Officer and my supervisor.

 7   Q      Kenneth Clarke?

 8   A      Yes.

 9   Q      Do you recall your 2016 employment review?

10   A      Yes.

11   Q      Do you recall that one of the criticisms was

12          violation of good practices governing logs and

13          reports?

14   A      Yes.

15   Q      What was that about?

16   A      I had a bad year.  I became the primary

17          caretaker of my mother, who had dementia --

18   Q      I'm not asking about what was going on in your

19          personal life, Mr. Courtwright.  I'm asking,

20          Brustein says you did a violation of good

21          practices governing logs and reports.

22   A      I'm answering the question.

23   Q      What did that mean, specifically logs and

24          reports?  What are logs?  Let's start there.

25   A      I don't know what that specifically was
```

```
 1              referencing to as logs.  I don't know what
 2              that means.
 3    Q    Would it recollect your memory if I opened the
 4              document, would that make a difference?
 5    A    Sure, yes.
 6    Q    Do you recognize the document in front of you?
 7    A    Yes.
 8    Q    It's a Christian Courtwright 2016 performance
 9              review, correct?
10    A    Yes.
11    Q    So in the paragraph that starts with the
12              beginning of the year, do you see that?
13    A    Yes.
14    Q    Do you see further down, it says violations of
15              good practices governing logs and reports?
16    A    Yes.
17    Q    Same paragraph.
18    A    I believe the logs and reports still
19              references the PetPoint software that we were
20              using.
21    Q    Other than PetPoint, do you have any logs?
22    A    I keep a daily log, a field log.
23    Q    So let's talk about that.  So you keep a daily
24              log of what you do each day?
25    A    If I'm going out in the field, yes.
```

```
 1   Q    So do you have daily logs for Bianca
 2        Marcellino?
 3   A    Maybe.  Maybe on a particular day, the day
 4        that we served a search warrant, I didn't keep
 5        a log for that because it was the one call,
 6        the one activity I had for the day.  It's a
 7        very informal just keeping track of where I
 8        was, the mileage that I did, and then I take
 9        that log and put it into an excel spreadsheet.
10             MS. HUTH:          So Matt, can you
11        produce that excel spreadsheet, please?  We
12        didn't get that in discovery.
13   Q    So did you make a log for every time you
14        entered Bianca Marcellino's property?
15   A    For a probation check, yes.  And for the
16        actual investigation that led to her criminal
17        prosecution.
18   Q    I'm not talking about that.  I'm talking about
19        logs on probation inspection.  You do have
20        logs of probation inspections?
21   A    You have all of the logs of the probation
22        checks.
23   Q    What were they?  I don't know what the logs
24        were.
25   A    The written notes --
```

49

```
 1   Q    Yeah, what are those?  I don't remember
 2        getting them.
 3   A    They were provided to you.
 4   Q    What did these look like, because I don't have
 5        that document?
 6   A    The logs are translated into an into a larger
 7        document, and then you have the larger
 8        document.  You don't have a handwritten logs
 9        that I have.
10   Q    So I want those handwritten logs.
11   A    I don't always keep the handwritten logs,
12        because once I enter them into the larger
13        document, I don't keep them.
14   Q    Where do they go?
15   A    I keep them now, but at that time, I didn't.
16   Q    Is a handwritten log a public record?
17   A    It is now.
18   Q    When you create these logs are those public
19        records?
20             MR. BARINGER:     Objection.  You can
21        answer if you know.
22   A    They are now, yes.
23   Q    What do you mean they are now?  What does that
24        mean?
25   A    When the public records into effect.
```

```
 1   Q    When you entered Bianca Marcellino's property,
 2        was the public record law in effect?
 3   A    Not at that time, I believe.
 4   Q    So you did do logs for each time you entered
 5        her property, and you said then you
 6        transferred them to an Excel spreadsheet, and
 7        then you destroyed the logs?
 8   A    Yes, I took notes when I was at her property,
 9        and then those notes get entered into a larger
10        document, and that larger document was shared
11        with you.  But you don't have my notes.
12   Q    Why not?
13   A    I don't -- you don't have the actual physical
14        notes, but you have what the notes were put
15        into.
16   Q    Why don't I have the actual physical notes?
17   A    I don't know.  I mean, a lot of those notes I
18        don't have anymore, because they're
19        handwritten on paper notes.  Then when I get
20        back into the office, I type out, I put into a
21        larger document, and those were shared with
22        you and they're shared with the Probation
23        Department.
24   Q    So you take these handwritten notes while
25        you're conducting the probation inspection or
```

```
 1          after?
 2    A     Yeah, after or I'm on a property and there's
 3          something of note that I need to write down,
 4          like they say a name.  I might write that down
 5          in a notebook.
 6    Q     So you have a notebook where you record what
 7          goes on at each probation inspection while
 8          you're conducting the probation inspection?
 9    A     Sometimes, yes.
10    Q     Where is that notebook?
11    A     I had several notebooks.
12                MS. HUTH:        So I'd like to see
13          all those notebooks, Matt.
14    Q     So did you make any notes when you entered
15          Bianca Marcellino's property or after you left
16          her property for probation inspections?
17    A     I wrote when I got back to the office, I wrote
18          the narrative, which you have.
19    Q     You wrote the narrative how?
20    A     In a Word document.
21    Q     You're saying you write that on one Word
22          document?
23    A     Yes.
24    Q     You're talking about the Word document where
25          you gave me dates of entries and their
```

```
 1         addresses at the top?
 2   A     Yes.
 3   Q     But I don't see any notes on there, where the
 4         notes?
 5   A     Those are the notes.
 6   Q     The date is the notes?
 7   A     Yes.
 8   Q     Let me show you the Word document.  Hold on,
 9         we're going to share it.
10             MR. BARINGER:    Are you asking about
11         notes regarding Bianca's property or notes
12         regarding other properties?
13   Q     So Christian?
14   A     Yes.
15   Q     So you see there Word document in front of
16         you?
17   A     Yes.
18   Q     Is this the document that you were talking
19         about here?  Let me understand it.  So you
20         have you take notes in your notebook during
21         probation inspections and sometimes
22         afterwards --
23   A     Sometimes.
24   Q     -- and then you go to your office and you look
25         at those notes and you type them into the
```

53

```
 1          computer?
 2   A      Correct.
 3   Q      When was this document created that is up on
 4          the screen?
 5   A      I don't know.
 6   Q      Did you create this document that's on the
 7          screen, this Word document?
 8   A      Yes.
 9   Q      When did you create it?
10   A      I don't know.  I don't know the exact date it
11          was created.
12   Q      Well, okay, let's go through it.  So Robert
13          Konst, it looks like you did probation
14          inspections in 2015 and 2016, correct?
15   A      Yes, ma'am.
16   Q      Did you create this Word document in 2015?
17   A      I don't believe so, no.
18   Q      So where did you get the information from
19          Robert Konst to put into this Word document?
20   A      From the Robert Konst files and the notes that
21          I took.
22   Q      So you have notes for Robert Konst?
23   A      Yes.
24   Q      What about Sophia Applegate, which is the
25          second one on there?
```

```
 1    A     Yes.

 2    Q     You have notes for her?

 3    A     Yes.

 4    Q     It's in your notebook, those notes?

 5    A     No, they would be in another Word document.

 6          This is a combination of all of those Word

 7          documents that I keep those notes.

 8    Q     So we want to see those Word documents as

 9          well.  So you created a Word document from

10          other Word documents?

11    A     Yes.

12              MR. BARINGER:     But we're not

13          providing them.

14              MS. HUTH:         Pardon?

15              MR. BARINGER:     You can request them,

16          but we're not providing them.

17    Q     So when you put Robert Konst's name in this

18          Word document, you don't remember when you

19          created this Word document, correct?

20    A     I believe it was for one of the discoveries.

21    Q     So recently, relatively recently?

22    A     Probably yes.

23    Q     So the information the information you gave

24          for Robert Konst in this Word document comes

25          from other Word documents, correct?
```

```
 1   A      Yes.

 2   Q      What is on those other Word documents?

 3   A      Simply that.

 4   Q      Just dates?

 5   A      Yes.

 6   Q      But you said you take notes in a notebook.

 7   A      Sometimes.

 8   Q      So the only information you have on these

 9          other Word documents are just dates of entry

10          and their name and address?

11   A      I believe your request was when did I do

12          probation checks, so that's what I provided to

13          you.  Some of those dates might have

14          additional narratives attached to them.

15   Q      Where are those narratives?

16   A      In a Word document for Robert Konst.

17   Q      So you have a Word document of a narrative for

18          Robert Konst, correct?

19   A      Correct.

20   Q      And that's on your computer?

21   A      Yes.

22          MS. HUTH:          We want those also.

23   Q      Sophia Applegate, do you have a Word document

24          for a narrative for her?

25   A      Yes.
```

| | | |
|---|---|---|
| 1 | Q | How about Roberta Ann? |
| 2 | A | Yes. |
| 3 | Q | Thomas and Amanda Lester? |
| 4 | A | Sure, yes. |
| 5 | Q | Emil Rapstine? |
| 6 | A | Yes. |
| 7 | Q | Patrick and Maureen Cox? |
| 8 | A | Yes. |
| 9 | Q | And Bianca Marcellino? |
| 10 | A | Yes. |
| 11 | Q | So you have Word document narratives for all |
| 12 | | of them? |
| 13 | A | Word documents, vet check reports, necropsy |
| 14 | | reports.  It's a whole file of anything that's |
| 15 | | involved in the case goes into it, which |
| 16 | | includes Word documents of the narratives of |
| 17 | | the investigation and any probation checks |
| 18 | | where something of interest happens. |
| 19 | Q | Did you provide those Word documents in |
| 20 | | discovery, the narrative Word documents? |
| 21 | A | For Ms. Marcellino, we did. |
| 22 | Q | What about the others? |
| 23 | A | I don't know. |
| 24 | | MS. HUTH:          Well, we're asking |
| 25 | | for those. |

1          MR. BARINGER:    You can request them.

2      We'll respond.  We're not going to produce

3      them, though.

4          MS. HUTH:        Why not?

5          MR. BARINGER:    Because they don't

6      deal with Bianca Marcellino.

7          MS. HUTH:        I asked for all

8      probation inspection documents and records,

9      Matt, and you knew that I was asking for all

10     probation documents on probation inspections.

11         MR. BARINGER:    Right.

12         MS. HUTH:        But now Christian is

13     saying there's Word documents that have

14     narratives for each of those people, and I

15     want to see those narratives.

16         MR. BARINGER:    You can request them

17     again.  I'll respond.  I'm telling you --

18         MS. HUTH:        I'm not requesting

19     them again.  I'm doing a position letter

20     tomorrow to the court because now Christian's

21     saying he has narratives and you never

22     provided them.

23  By Ms. Huth:

24  Q    So when your supervisor in the 2016 employment

25      review says that logs and reports, are the

```
 1            Word narratives the logs and reports or are
 2            the notebooks the logs and reports?
 3    A       It was the PetPoint software.
 4    Q       Who told you to take a notebook to probation
 5            inspections and write notes?
 6    A       I don't understand the question.  Who told me
 7            how to use a notebook?
 8    Q       No, who told you that you should take a
 9            notebook to the probation inspection sites?
10    A       I believe many officers carry notebooks with
11            them.
12    Q       Is that something you learned in training?
13    A       I don't know if a notebook was specifically
14            covered in training.
15    Q       Were any recordkeeping covered in training?
16    A       Yes.
17    Q       Explain what those are.
18    A       It's simply to document the facts that you
19            find in the field.  So if I meet John Smith,
20            who lives at 123 Main Street, and I have a
21            discussion about x, y, and z, my notes, I'll
22            say that I met John Smith, who lives at 123
23            Main Street, and we talked about x, y and z.
24    Q       So you have notebook notes for all the people
25            I just mentioned in the Word document?
```

```
 1        Lester, Cox --
 2   A    From 2015, Robert Konst?  No, those notebooks
 3        have come and gone.
 4   Q    Where are they?
 5   A    Probably in the garbage.
 6   Q    Why?
 7   A    Because these are impromptu handwritten notes
 8        in the field to help me remember John Smith's
 9        phone number.
10   Q    When you created the Word document I just
11        showed you, how did you remember Cox's phone
12        number and address?
13   A    Because it's something that was recorded from
14        the beginning.
15   Q    Where was it recorded?
16   A    From whatever initial complaints I got, and
17        then entered into the Cox file with my
18        narrative.
19   Q    So when you created the Word document that I
20        just showed you, was it by memory that you
21        remembered what dates you went to their
22        property?
23   A    No, it was in each of those individual
24        probationer's file.
25   Q    Actual piece of paper in their file or on your
```

| 1 | | computer? |
|---|---|---|
| 2 | A | A digital file. |
| 3 | Q | On your computer? |
| 4 | A | Yes. |
| 5 | Q | So you have files for each of the people that |
| 6 | | you have entered the property to conduct |
| 7 | | probation inspections on your computer? |
| 8 | A | Yes. |
| 9 | Q | Do those files include the narrative? |
| 10 | A | Yes. |
| 11 | Q | Those handwritten notes that you took, you |
| 12 | | said you threw them away? |
| 13 | A | From 2015, yeah.  Those notebooks don't exist |
| 14 | | anymore. |
| 15 | Q | How about 2016? |
| 16 | A | Those notebooks don't exist anymore. |
| 17 | Q | How about 2017? |
| 18 | A | I would say most of the notebooks are gone. |
| 19 | | They last maybe a couple of months to a couple |
| 20 | | of weeks. |
| 21 | Q | You only keep your notebooks for a couple of |
| 22 | | months to a couple weeks? |
| 23 | A | They fill up fast. |
| 24 | Q | What do you do with them? |
| 25 | A | Well, I used to just throw them away when they |

| 1 | | filled up, when I didn't need them anymore. |
|---|---|---|
| 2 | Q | You just threw them away in the garbage? |
| 3 | A | Yes. |
| 4 | Q | So when your notebook was full of all the |
| 5 | | notes you took of probation inspections, you |
| 6 | | just threw it away in the garbage? |
| 7 | A | No.  Those notebooks contained phone numbers |
| 8 | | that somebody might randomly give me or an |
| 9 | | address from somebody, and maybe in that |
| 10 | | notebook would be a note that I would take |
| 11 | | while I was at a property at a probation |
| 12 | | check.  But when I got back into the office, |
| 13 | | that information was put into the larger |
| 14 | | narratives.  That information was maintained. |
| 15 | Q | So when you created this Word document that I |
| 16 | | just showed you, where did you get the |
| 17 | | information to put onto that Word document? |
| 18 | | From the notebook or from the Word Document |
| 19 | | created from the notebook? |
| 20 | A | Correct. |
| 21 | Q | Correct what? |
| 22 | A | From the narrative of that case. |
| 23 | Q | The Word document narrative that was |
| 24 | | information you got from your notebook? |
| 25 | A | Right.  If I was at John Smith's property, |

```
 1              whether it was in a notebook or not, if I was
 2              at John Smith's property and we talked about
 3              x, y, and z, that would go into the narrative
 4              of being out at John Smith's property.  It may
 5              be information that wasn't put into a
 6              notebook.  It might be just, hey, I was at
 7              John Smith's house today, and we had a quick
 8              two-minute meeting, and I remembered it and
 9              entered it into the document.
10        Q     What about Roberta Ann?  It looks like you
11              conduct a probation inspection in 2018.  Do
12              you have those notebooks?
13        A     No.
14        Q     Do you have the notebooks for the Marcellino
15              inspections?
16        A     I don't think I took a notebook out there.
17        Q     So you're telling me that not every probation
18              inspection you take a notebook?
19        A     Right.  It's not every call I take a notebook
20              out.  I don't always need it.
21        Q     You didn't need it for the Marcellino
22              inspection?
23        A     No.
24        Q     What makes you decide that you're going to
25              bring a notebook with you on any given day of
```

63

```
 1        an inspection?
 2   A    If I'm talking with someone and some
 3        information comes up that I feel like I need
 4        to write down, because I'm not going to
 5        remember it, I'll grab my notebook and start
 6        taking notes.
 7   Q    Did you ever take any notes when you were on
 8        Bianca Marcellino's property?
 9   A    I don't know, maybe.
10   Q    You don't remember?
11   A    It was from 2018.
12   Q    Do you have those notes?
13   A    Probably not, if I did, because those
14        (inaudible) larger document.
15   Q    When you say you don't have those notebooks
16        and stuff, I mean, can you describe -- did you
17        literally throw them in the trash?  I'm just
18        curious.
19   A    I don't know.  Yes, maybe they went in the
20        trash, maybe they're sitting in the back of a
21        drawer.  I don't know.  These are --
22   Q    So they might still be around, those
23        notebooks?
24   A    They're small little hand note, note pads.
25   Q    So they might still be around?
```

| | | |
|---|---|---|
| 1 | A | Maybe. |
| 2 | Q | Have you looked for them? |
| 3 | A | No. |
| 4 | Q | Why not?  I asked you to produce all records |
| 5 | | that you had on probation inspections that |
| 6 | | you've conducted. |
| 7 | A | Because you have all of the records. |
| 8 | Q | I have records Emil Rapstine's records? |
| 9 | A | Whatever notes are taken in the notebook are |
| 10 | | put into the larger narrative, which you have. |
| 11 | Q | How do I have that document?  Who gave that |
| 12 | | document to me, Christian? |
| 13 | A | You have the Marcellino narratives. |
| 14 | Q | I didn't ask about Marcellino.  I asked about |
| 15 | | the other narratives. |
| 16 | | MR. BARINGER:    I did not produce |
| 17 | | those.  That's why you don't have them. |
| 18 | Q | So those notebooks might still be around; is |
| 19 | | that correct?  Is that what you testified to? |
| 20 | A | Probably not. |
| 21 | Q | Do you remember throwing the notebooks away? |
| 22 | A | No. |
| 23 | Q | Why did you say that they're not around if you |
| 24 | | don't remember?  Where are they, Christian? |
| 25 | | MR. BARINGER:    Come on, please, |

```
1            let's move on.
2     Q     Did you just misplace them?
3     A     No, I don't know where they are.  If you're
4            asking whether I threw them in the garbage or
5            they're sitting in the back of a drawer
6            somewhere, I don't know.  They're
7            inconsequential to me.
8     Q     They're inconsequential to you?
9     A     They just help me remember an individual phone
10           number at the time it's given to me, and then
11           that information is translated into a larger
12           narrative.
13    Q     Do you have a public record retention policy
14           in your organization?
15    A     Yes.
16    Q     Do you know what the retention policy is for
17           probation inspection records?
18    A     I don't know specifically.
19    Q     Has anyone ever given you a copy Of the public
20           record retention policy?
21    A     Yes.
22              MS. HUTH:            Well, I'd like a copy
23           of that too, Matt.
24              MR. BARINGER:     You can ask for it.
25           We can look for it.
```

```
 1   Q    When I refer to logs and reports, what's your
 2        understanding of what those are, the
 3        notebooks?
 4   A    No, I answered that.  I believe it was --
 5   Q    PetPoint?
 6   A    Yeah.
 7   Q    Any time logs and reports, it only refers to
 8        PetPoint?
 9   A    I think that was the problem in 2016.  I
10        wasn't using it as well as I should have.
11   Q    Were you ever trained to keep detailed
12        records?  Did you ever take any training that
13        told you to keep detailed records?
14   A    Yes.
15   Q    So you did have detailed records of every
16        single person you identified in the Word
17        document, correct.
18   A    Yes.
19   Q    You don't know where those are?
20             MR. BARINGER:    Objection.  He's
21        answered this.
22   Q    What do you call your annual employment
23        reviews?  Are those called performance
24        evaluations or annual reviews?  What's the
25        lingo?
```

| | | |
|---|---|---|
| 1 | A | Annual reviews, yes. |
| 2 | Q | Have you had an annual review every year? |
| 3 | A | I don't know if it was every year, but it was |
| 4 | | fairly regular. |
| 5 | Q | Did you have one in 2018? |
| 6 | A | No, I don't believe so. |
| 7 | Q | Why not? |
| 8 | A | I don't believe we had an executive director. |
| 9 | Q | The whole 2018 you had no executive director? |
| 10 | A | No, I'm sorry, I misspoke.  I was thinking of |
| 11 | | 2020 after Hope Brustein left.  2018, yes, I |
| 12 | | believe I had an employee review. |
| 13 | Q | We would like a copy of that.  What about |
| 14 | | 2019? |
| 15 | A | I don't know.  I don't recall specifically. |
| 16 | Q | Do you recall having any employment reviews in |
| 17 | | 2018 and 2019? |
| 18 | A | I don't know specifically if I did or didn't. |
| 19 | Q | How about 2020? |
| 20 | A | I don't believe so, no. |
| 21 | Q | How about 2021? |
| 22 | A | No. |
| 23 | Q | You didn't have an employment review in 2021 |
| 24 | | or you don't remember? |
| 25 | A | No, I didn't have, specifically, an employee |

```
 1        review.
 2   Q    Did you have any kind of employment anything
 3        else, not specifically?
 4   A    As I said, I met every week with Ken Clarke.
 5        So the employee review was sort of happening
 6        every week.  He was new to the agency, and I
 7        think he was getting the lay the land.
 8   Q    When was that?
 9   A    I don't understand your question.
10   Q    What year was that?
11   A    When Ken first started.
12   Q    What year was that?
13   A    '21, I believe.
14   Q    So he got the lay of the land.  It took him a
15        year to get the lay of the land to do
16        employment reviews?
17   A    I don't want to speak for Ken, but I was given
18        a raise and I met with Ken every week.
19   Q    So you had no employment review in 2021.  What
20        about 2022?
21   A    I would say every week was an employee review.
22   Q    What about 2022, did you do an employee -- but
23        you understand what I mean when I say your
24        employee reviews, right?
25   A    Yes.
```

69

```
 1   Q    You understand what those look like, where you
 2        do your self evaluation forms and you meet
 3        with your supervisor, I presume, and then she
 4        does an employment review document, correct?
 5        You've seen those?
 6   A    Yes.
 7   Q    But none were done in 2022 either, correct?
 8   A    2022 is now.
 9   Q    That is correct.
10   A    So I meet with Ken every week.
11   Q    Right, I know you said that, but I wasn't
12        asking about your weekly meetings.  I was
13        asking about your actual performance reviews.
14   A    2022 is ongoing.  I believe the employee
15        review, if there is one in 2022, will be
16        towards the end of the year.
17   Q    So you're going to have one at the end of this
18        year?
19   A    I don't know.
20   Q    Are you familiar with the document called your
21        employee manual handbook or employee handbook?
22   A    Yeah.
23   Q    In there, are employee reviews required?
24   A    I don't know.
25   Q    Have you read the manual?
```

```
1   A    Not for probably a decade.

2   Q    So it hasn't been updated for a decade?

3   A    Certain policies have certainly been updated,

4        but I when I sat down to read the employee

5        manual was when I got hired.

6   Q    When did you get hired?

7   A    2009.

8   Q    So I'm going to share screen with you on a

9        document that was produced by your attorney.

10            Do you recognize this document?  I'll

11       make it smaller for you.  Do you recognize

12       this document, the front page of this

13       document?

14  A    The rescue village handbook.

15  Q    Is there a date on it?

16  A    January 1, 2019.

17  Q    So you said you hadn't seen an employee

18       handbook that in 2009 was when you saw the

19       employee handbook?

20  A    When I was hired on in 2009, I familiarized

21       myself with the policies of the organization.

22       If policies were updated along the way, I was

23       made aware.

24  Q    Who made you aware?

25  A    My supervisor.
```

```
 1   Q    Did they make you aware of this employee
 2        handbook?
 3             MR. BARINGER:     He's answered the
 4        question.
 5             MS. HUTH:          No, he hasn't
 6        answered it, Matt.
 7   A    Yes.
 8   Q    Did they make you aware of this 2019 employee
 9        manual?
10   A    The employee handbook is a living document.
11        It changes as new science and new information
12        comes to light.  A professional organization
13        like Rescue Village will update it.  So I read
14        my initial employee handbook when I was hired
15        on, and as policies changed, I learned about
16        them, I read the new policies.
17   Q    You read the new policies.  How did -- did
18        someone email --
19   A    Yes.
20   Q    I'm sorry.
21   A    If new policies were updated, I read them,
22        yes.
23   Q    How did you receive those new policies, by
24        email or they hand delivered them to you?
25   A    Probably through an email.
```

```
1    Q    Who would have emailed them to you?
2    A    Either my supervisor or if the policy was
3         about a department, maybe that department head
4         would have sent the policy update.
5    Q    Have there been any policy updates related
6         humane law enforcement?
7    A    No.
8    Q    Have you read this January 1, 2019, employee
9         handbook?
10   A    Not in 2019 on January 1, no.
11   Q    Did you read it after January 1, 2019?
12   A    No.
13   Q    Do you know if your employee manual requires
14        annual reviews to be performed?
15   A    I don't know that.
16   Q    Did the employee manual that you read when you
17        first became employed in 2009, require annual
18        reviews?
19   A    I don't recall.
20   Q    Do you know whether or not employee annual
21        reviews are required?
22   A    I don't know if they're required.
23   Q    Do you keep time records?
24   A    We have an online clock-in system.
25   Q    So when you come in, in the morning, you clock
```

```
1           in, and when you leave at night, you clock
2           out?
3    A      Yes.
4    Q      Do you have any records of what you did during
5           that the day each day that you worked?
6    A      As far as clocking in and out?
7    Q      No.  So during the day when you work at for
8           Geauga County Humane Society as a Humane
9           Officer or agent, is there any record of what
10          you do during the day?
11   A      Yes.
12   Q      What is that record that you keep?
13   A      It would be an electronic record of my daily
14          activity.
15   Q      Where is that kept?  On what device is that
16          kept, on a computer?
17   A      On a computer.
18   Q      And what is the name of the document?
19   A      I mean, there are several documents, so it
20          would be -- there's a monthly report.
21   Q      So you do monthly reports?
22   A      Yes.
23   Q      Okay.  What else?
24   A      Then weekly and daily.
25   Q      So you do weekly reports and daily reports?
```

```
1    A      Yes.
2    Q      Where are those reports, on your computer at
3           your office?
4    A      Yes.  I don't know about the technology of
5           where that information is kept, but, yes,
6           I access it through my computer.
7    Q      You created those monthly reports and those
8           weekly reports, and the daily reports?
9    A      I did.
10   Q      And you created them on Word documents?
11   A      And Excel spreadsheets.
12   Q      All these monthly, weekly and daily reports
13          are Excel spreadsheets?
14   A      Yeah, the monthly one's an Excel spreadsheet.
15   Q      What about the weekly?
16   A      I think that's a Word document.
17   Q      What about the daily reports?
18   A      Yeah, that's a Word document.
19              MS. HUTH:          Matt, we would like
20          those, too.
21              MR. BARINGER:     You can request them,
22          but we're not providing all his reports.
23              MS. HUTH:          Well, you didn't
24          provide any reports.
25              MR. BARINGER:     We're not providing
```

```
 1          all his daily reports for every single day he
 2          does --
 3               MS. HUTH:          We will limit them to
 4          the time frame of Bianca Marcellino's
 5          probation inspections, which is what you and I
 6          discussed on the phone and we don't have Excel
 7          reports.  We don't have weekly reports, we
 8          don't have daily reports, we don't have
 9          handwritten log.
10               MR. BARINGER:     You have an entire
11          file of what he did at Bianca's property.
12          Maybe you want to start to ask him about
13          Bianca's property.  Let's get onto that.
14               MS. HUTH:          Maybe.
15               MR. BARINGER:     Yeah.
16               MS. HUTH:          Don't tell me how to
17          do the deposition, Matt.
18               MR. BARINGER:     What?
19               MS. HUTH:          Don't tell me how to
20          conduct my own deposition, Matt.
21   By Ms. Huth:
22   Q    So these monthly reports, weekly reports, and
23        daily reports, what is in these monthly
24        reports?
25   A    The number of new calls of calls.  They were
```

```
 1              the number of follow ups I did, the number of
 2              miles I drove and the animals, the number of
 3              animals that were removed.
 4    Q    What about weekly reports?
 5    A    Same thing.
 6    Q    What about the daily reports?
 7    A    Same thing.
 8    Q    So how come you have three different reports
 9              if they're all the same thing?
10    A    Because it's easy for me to keep track of it
11              that way.  So this is what I did on this day.
12              And then that day gets put into a weekly, and
13              then that one gets put into a monthly, and
14              then monthly goes into a yearly.
15    Q    So you have yearly reports as well?
16    A    Which are just the same numbers that I just
17              told you.
18    Q    Is the yearly report also an Excel document,
19              or is that a Word document?
20    A    Yes, it's an Excel.
21              MS. HUTH:        I'd like that too,
22              obviously, for the time frame of Bianca
23              probation inspections, Matt.
24    Q    Do you have a file drawer in your office?
25    A    Yes.
```

1    Q    Could those notebooks be in there?

2    A    No.

3    Q    Have you checked in there?

4    A    Yes.

5    Q    So you did look for these log these notebooks

6         before you --

7    A    No, I just know that they're not there.

8    Q    Where else could they be; do you know?

9    A    No.

10   Q    Is there another storage place in your office

11        that potentially the paperwork would go?

12   A    No.

13   Q    Old paperwork.

14   A    No.

15   Q    How would you know that?

16   A    Because they're little note pads.

17   Q    Does Geauga County Humane Society require you

18        to write these yearly, monthly, weekly and

19        daily reports?

20   A    Yeah, I submit them to my supervisor.

21   Q    So your supervisor has a copy of all those

22        reports?

23   A    Yes, my monthly reports and the annual

24        numbers.

25   Q    What about the weekly and daily reports?

```
1   A    I don't share them because he gets them in the

2        monthly report.  They're the same.

3   Q    You email those to him?

4   A    Again, I don't know the technology involved,

5        but they're shared through the computer.

6   Q    So it's like, what, on a drive or something?

7   A    Yeah.

8   Q    Like what, Google drive?

9   A    No, not a Google drive.

10  Q    Some kind of internal drive?

11  A    Networks and whatever that's beyond my pay

12       grade.

13  Q    So you put it into a folder called yearly

14       reports, and he just accesses it on the

15       computer system?

16  A    I don't know how he accesses it.  He has a

17       list of KPIs --

18  Q    What's KPI?

19  A    It's an acronym for Key Performance

20       Indicators.

21           MS. HUTH:           Matt, if you could

22       just turn your video, Matt, a little bit more

23       so I could see your face, Matt.  Because he

24       keeps looking over there, and I hear you

25       talking --
```

```
 1              I don't know what you're talking about
 2         to him, Matt.
 3              MR. BARINGER:     Wait, a second, wait
 4         a second.  He was searching for a word, okay.
 5         You think I was trying to --
 6              MS. HUTH:         I don't know.  I
 7         heard you talking.  All I'm saying is, please
 8         don't -- you need to be looking at me and
 9         answering these questions, Christian.  Your
10         attorney cannot answer these questions for
11         you.
12              THE WITNESS:      I wasn't looking at
13         my attorney.
14              MR. BARINGER:     Because he couldn't
15         remember what the acronym stood for.
16    By Ms. Huth:
17    Q    What does the acronym mean, Christian?
18    A    Key Performance Indicators.  It has specific
19         numbers about all shelter operations.  And in
20         that has just a couple numbers from the humane
21         law enforcement department.
22    Q    So in the yearly reports, monthly reports,
23         weekly reports, and daily reports, is anything
24         entered into those reports on people whose
25         property you've conducted probation
```

| | | |
|---|---|---|
| 1 | | inspections on? |
| 2 | A | No, there's not anything specific about |
| 3 | | probation.  It would just be logged as a |
| 4 | | follow up call. |
| 5 | Q | So there is something about probation |
| 6 | | inspections in there, you call them follow up |
| 7 | | calls? |
| 8 | A | Not specifically for probation.  It wouldn't |
| 9 | | have the key indicator that says this is how |
| 10 | | many probation checks I did. |
| 11 | Q | Oh, you do have an indicator on these reports, |
| 12 | | how many probation inspections saying? |
| 13 | A | I'm saying, no, it doesn't have that.  Just |
| 14 | | general follow up. |
| 15 | Q | So how would your supervisor or someone know, |
| 16 | | by looking at these reports, that that follow |
| 17 | | up was for probation or for presentence and |
| 18 | | preconviction visit; would there be a |
| 19 | | difference on the report? |
| 20 | A | No. |
| 21 | Q | So you wouldn't be able to differentiate? |
| 22 | A | It's supposed to be a snapshot of this is what |
| 23 | | the department did for the year. |
| 24 | Q | Your daily reports, weekly reports, and |
| 25 | | monthly reports also don't have any specific |

81

| | | |
|---|---|---|
| 1 | | information on probation inspections? |
| 2 | A | No. |
| 3 | Q | But they do contain the date you entered |
| 4 | | people's property to conduct probation |
| 5 | | inspections? |
| 6 | A | The monthly reports don't have that, no. |
| 7 | Q | How about the daily reports? |
| 8 | A | It's the same thing. |
| 9 | Q | And the weekly reports? |
| 10 | A | No. |
| 11 | Q | So any of the times you entered Bianca |
| 12 | | Marcellino's property to conduct a probation |
| 13 | | inspection, these reports -- |
| 14 | A | Probation inspections were such a small part. |
| 15 | Q | When you conduct a probation inspection on |
| 16 | | Bianca Marcellino's property, those dates that |
| 17 | | you entered will not be in the yearly, |
| 18 | | monthly, weekly or daily reports, correct? |
| 19 | A | Correct, because they're just numbers. |
| 20 | Q | What number? |
| 21 | A | How many new calls were there?  How many |
| 22 | | follow ups did you do?  How many animals did |
| 23 | | you remove? |
| 24 | Q | I thought you said the follow ups were in the |
| 25 | | reports. |

```
 1   A    Yeah, follow ups.  The number of follow ups I
 2        did.
 3   Q    Oh, not the dates or anything?
 4   A    Correct.
 5   Q    The only way you know those dates is because
 6        of your notebook?
 7   A    No, through the larger narrative.
 8   Q    So the narrative that you created from your
 9        notebook; the Word narrative that you created
10        from those notebooks that you don't have
11        anymore?
12   A    Not specifically from the notebooks.
13   Q    From where else?
14   A    From my experience being out there.
15   Q    So from your memory?
16   A    Sometimes, yes.
17   Q    How soon after you conduct the preparation
18        inspection do you create narrative in Word?
19   A    Right away.
20   Q    That day?
21   A    Yes.
22   Q    That narrative each day you go, is that a
23        different document or it gets goes into one
24        document?
25   A    Goes into one.  It might start as it's own,
```

```
 1            but then it gets merged into the larger one.
 2    Q      So you do have separate documents for each
 3            date?
 4    A      It might start off as one, just for editing
 5            purposes, and then I'll move it to the larger
 6            one and probably delete the old one.
 7    Q      So, you might not have deleted them; you might
 8            actually have those individual narratives
 9            prior to you combining them into the larger
10            narrative?
11    A      You have the individual narratives in the
12            larger narrative.
13    Q      Right, but you said you created a separate
14            Word document with those and then you combined
15            them all into one; is that correct?
16    A      Correct.
17    Q      So you have none of those independent Word
18            documents?
19    A      Probably not.
20    Q      Deleted them as well?
21    A      Probably.
22    Q      For Marcellino as well?
23    A      Probably.
24    Q      Christian, do you take field notes?
25    A      Sometimes.
```

```
 1   Q    Are those the same thing as that notebook
 2        you're talking about?
 3   A    Yeah.
 4   Q    Do you know what a field note is?
 5   A    Yeah.  My experience is just John Doe says,
 6        you got to talk to my neighbor, Jean Smith at
 7        123 Main Street.  So I write down Jane Smith,
 8        123 Main Street.
 9   Q    What are your reasons for taking these notes
10        in your notebook?  I mean, is there a reason
11        that you're doing it, or what's the purpose of
12        the notes?
13   A    Just help me remember.
14   Q    Help you remember for what purpose?
15   A    Because it might be a phone number and I'm not
16        going to remember the phone number.
17   Q    I'm not sure if I asked you this specifically,
18        but for every entry you made on Bianca's
19        property, you did write notes in a notebook or
20        you said you didn't?
21   A    I don't believe I did, no.
22   Q    You didn't have a notebook when you entered
23        her property, correct?
24   A    I don't believe so.
25   Q    So what did you use?  You went to your Word
```

```
 1           document after each probation inspection of
 2           Bianca's property, correct?
 3    A      Yes.
 4    Q      And you entered what occurred on that date in
 5           separate Word documents or one document?  On
 6           all the dates you entered, did they all go one
 7           document or separate documents?
 8    A      I don't remember the specifics of that, but it
 9           all wound up in the one document.
10    Q      It wound up in the one document, but where did
11           all that stuff come from in the one document,
12           from where, your memory?
13                MR. BARINGER:     I mean, he has
14           explained this over and over.  It's crystal
15           clear what happened here.
16                MS. HUTH:          To you it's crystal
17           clear, but I'm not clear.
18    Q      So did you create independent narratives for
19           Bianca Marcellino's property?
20    A      I don't remember specifically whether I did or
21           didn't.
22    Q      But you would have that on your computer, if
23           you did, correct?
24    A      Maybe.  Probably not.  I mean, I feel like
25           I answered this question already, so.
```

```
1    Q     You deleted them?

2    A     If I created a separate Word document to put

3          into a larger Word document, I probably didn't

4          keep that individually.

5    Q     So if you didn't take any notes or field

6          notes, or you didn't have your notebook at the

7          inspections of Bianca Marcellino's property,

8          how did you remember what to write in the

9          narrative?

10             MR. BARINGER:     You know this has

11         been asked and answered five, six, ten times.

12   Q     Christian, how did you know, was it based on

13         memory that you placed the information into

14         the Bianca's narrative?

15             MR. BARINGER:     Last time he's going

16         to answer.  Last time.

17   A     Yes.

18   Q     Do you have a photographic memory?

19   A     No.

20   Q     Would you agree that one of the reasons that

21         your training wants you to do field notes is

22         so that they're accurate, because memory is

23         fluid, we don't always remember everything;

24         would you agree?

25   A     Sure.
```

```
 1   Q    So do you believe that as part of your
 2        training, you were taught that it's important
 3        to take contemporaneous notes?
 4   A    I don't take contemporaneous notes at every
 5        property I go to, nor does many officers who
 6        work out in the field.  You have a
 7        conversation with somebody, and then you
 8        remember the conversation that you had with
 9        the person.
10   Q    Did you ever get any complaints about Bianca's
11        property after she was sentenced?
12   A    Yes.
13   Q    From who?
14   A    Michelle Nicastro, while she was still living
15        there, orders that she had living at that
16        front property.  Nothing that was ever, you
17        know, is she still going out there and taking
18        care of horses.  You know, it was never like
19        anything specific.
20   Q    Were those complaints logged anywhere?
21   A    Yes.
22   Q    Where?
23   A    They would have been logged in the narrative.
24   Q    So when someone calls and makes a complaint
25        about Bianca Marcellino, then you go to your
```

```
 1           computer and you write it in the narrative?
 2   A       Yes.
 3   Q       What happens if you're not at your computer
 4           and they call in a complaint, where do you
 5           write that down?
 6   A       It would still get logged in the narrative.
 7   Q       And you would just remember it and then when
 8           you get --
 9   A       Or I write it on my daily log.
10   Q       The daily log, is that the same thing as a
11           notebook?
12   A       Yeah.  I mean, it's a piece of paper.  I write
13           my mileage and the things that I've gone out
14           on for the day.
15   Q       I'm just confused.  Is the daily log different
16           than the notebook?
17   A       Yes.
18   Q       You made notations on the daily log for
19           probation inspections on Bianca Marcellino's
20           property?
21   A       If I was going out there on that day, yes.
22               MS. HUTH:        Okay, so we'd like to
23           see those daily logs, too.
24   Q       Those are different than your daily reports,
25           correct?
```

| 1  | A | It's the same information, but yeah. |
| 2  | Q | I think I asked you about logs before, and you |
| 3  |   | just referred to PetPoint. |
| 4  | A | That's what the 2016 employee review was |
| 5  |   | specifically about. |
| 6  | Q | So after 2016, Logs doesn't mean the PetPoint |
| 7  |   | report anymore, correct? |
| 8  | A | Right. |
| 9  | Q | Log means this daily log you're talking about? |
| 10 | A | That's not what that one meant in 2016. |
| 11 | Q | These daily logs, is that just something you |
| 12 |   | decided to do yourself? |
| 13 | A | Yeah. |
| 14 | Q | Your supervisor never suggested it or anything |
| 15 |   | like that? |
| 16 | A | No. |
| 17 | Q | Does Geauga County Humane Society have a |
| 18 |   | policy on humane agent recordkeeping? |
| 19 | A | It does now, yeah. |
| 20 | Q | Where is that policy? |
| 21 | A | It's our public records policy. |
| 22 | Q | I'm sorry, explain that. |
| 23 | A | We have a public records policy? |
| 24 | Q | Okay, I'd like a copy of that, obviously.  So |
| 25 |   | the public records policy talks about Humane |

```
1          agents doing daily logs?
2     A    Not the daily logs, it just talks about
3          recordkeeping.
4     Q    So do you have any policies related to humane
5          agent recordkeeping?
6     A    Yes.  \
7     Q    Where are those?
8     A    Where are those what?
9     Q    Where are those policies?  I haven't seen
10         those policies.  I mean, is that something you
11         have in your office, or did they email it to
12         you, or is it on the wall, or did your
13         supervisor show you it?
14    A    It's in a digital document.
15    Q    What's it called?
16    A    I don't know the name of the file.
17    Q    But it's a policy that deals with humane agent
18         recordkeeping?
19    A    Yes.
20    Q    I want to see that policy too.
21    A    It's public records request policy.
22    Q    I thought you said the public records policy
23         doesn't have any stuff on humane agents in it.
24    A    I don't believe I said that, no.
25    Q    Your public records policy, does it include
```

| | | |
|---|---|---|
| 1 | | recordkeeping, humane agent recordkeeping? |
| 2 | A | Yes.  I've answered this already.  Yes. |
| 3 | Q | So I want to see a copy of that policy, |
| 4 | | obviously.  And it's called your public |
| 5 | | records policy? |
| 6 | A | I think so.  I don't know the exact name. |
| 7 | Q | That will tell you that you should keep daily |
| 8 | | logs in there that policy? |
| 9 | A | I don't think it specifically says anything |
| 10 | | about day logs. |
| 11 | Q | Other than the public records policy, does |
| 12 | | your organization have any policies that deal |
| 13 | | with notetaking and reporting and daily logs |
| 14 | | and weekly logs and monthly reports? |
| 15 | A | No. |
| 16 | Q | The only policy Geauga County Humane Society |
| 17 | | has regarding any report taking, notetaking or |
| 18 | | field notes or anything, is your public |
| 19 | | records policy you just referred to? |
| 20 | A | Yes. |
| 21 | Q | Did Bianca ever violate her probation in any |
| 22 | | way? |
| 23 | A | Not in any way that I could prove, no. |
| 24 | Q | I recall some emails going to, I think it was |
| 25 | | Elko, Probation Officer Elko, that talked |

```
 1          about how you believe that there was a
 2          probation violation and that the Judge was
 3          going to check it out and review it.  Do you
 4          remember that?
 5    A     Yes.
 6    Q     What was that probation violation?
 7    A     I believe it was about the July 10th meeting.
 8          I think there were some reports that
 9          Ms. Marcellino was seen buying horse feed at a
10          feed store, and Ann Elko was getting reports
11          about that.  But you'd have to talk to Ann
12          Elko about --
13    Q     No, I'm talking to you because you're the one
14          that wrote the email.  Do you want me to show
15          you the email?  And in there specifically it
16          says that you believe there's probation
17          violation and then it's going to get reviewed
18          by the Judge.  I'm asking you specifically.
19    A     Yeah, it was about the July 10th meeting?
20    Q     What was the probation violation?
21    A     Her trying to obstruct me from conducting the
22          inspection.
23    Q     How did she obstruct you?
24    A     She put her body in front of mine and waved
25          her arms in front of my face.
```

| | | |
|---|---|---|
| 1 | Q | When you were doing what? |
| 2 | A | When I was walking on her property. |
| 3 | Q | Did she believe you were walking on her |
| 4 | | property? |
| 5 | A | She didn't like that I wanted to walk towards |
| 6 | | the back of the property because, I believe |
| 7 | | she said, I've never done that before.  And |
| 8 | | then when I was walking on the property line, |
| 9 | | she didn't want me to look at the horses that |
| 10 | | were in her barn. |
| 11 | Q | So you know where the property line is? |
| 12 | A | I don't know exactly where the property line |
| 13 | | is, no. |
| 14 | Q | You said when you were walking on the property |
| 15 | | line. |
| 16 | A | Right.  Where this imagined unmarked line |
| 17 | | might be. |
| 18 | Q | Yeah, where was that near the fence line where |
| 19 | | the fence was? |
| 20 | A | Probably. |
| 21 | Q | But I thought before, you testified you |
| 22 | | believed the property line ran right against |
| 23 | | the barn. |
| 24 | A | Which is right along where the fence is. |
| 25 | Q | Oh, the fence is right next to the barn? |

```
1    A      Yeah.
2    Q      How far is the fence from the barn?
3    A      The fence connects to the back of the barn.
4    Q      Right.  So the fence doesn't run along the
5           side of the barn, correct?
6    A      No.
7    Q      So where would the property line be if there's
8           no fence there?  You said the fence property
9           line runs along the fence line.  If the fence
10          isn't there, where's the property line?
11   A      It goes to the back of the barn, and then the
12          barn wall continues on that line where the
13          fence was.
14   Q      Were you able to complete your probation
15          inspection that day?
16   A      With some difficult, yes.
17   Q      You were able to go all around her property
18          and determine she didn't possess any horses,
19          correct?
20   A      Correct.
21   Q      So she didn't obstruct your probation
22          inspection?
23   A      It's not my determination to make.
24   Q      But in the email, didn't you say she committed
25          probation violation?
```

```
 1   A      I believe she did.
 2   Q      And that was by telling you to get off her
 3          parents' property?
 4   A      And, like I said, putting her body in front of
 5          mine and waving her hands in front of my face.
 6   Q      What was the final determination?  Who made
 7          the final determination on whether or not she
 8          violated her probation?
 9   A      I don't know that.
10   Q      Do you know what the Judge decided as to her
11          violating her probation?
12   A      I don't know what conversation was had or what
13          the outcome was.  I wasn't privy to that.
14   Q      When did you first learn that the barn sat on
15          her parents' property?
16   A      Shortly after she quitclaimed the parcel to
17          her parents.  So it's, I think, shortly before
18          her sentencing hearing.
19   Q      So you knew before her sentencing hearing that
20          the property had been transferred to her
21          parents that the barn sits on?
22   A      I'm not sure of the time line.  I think it was
23          a little bit before; maybe it was a little bit
24          after.  I don't recall specifically.
25   Q      Did you ever look at any Auditor records?
```

```
1   A      I did, yes.
2   Q      What did you learn from looking at those
3          Auditor records?
4   A      That there were two parcels and one no longer
5          belong to Bianca Marcellino.
6   Q      Now, so you claim that you know where the
7          property line is, correct?
8   A      I didn't claim that.  I said there's an
9          invisible line.  I have a rough idea of where
10         the property line might be.
11  Q      You never stepped over that rough property
12         line?
13  A      Not knowingly or intentionally.
14  Q      How many feet off of the barn is this property
15         line that you believe exists?
16  A      I don't even know if it could be measured in
17         feet.
18  Q      So what, one centimeter or something you
19         think?
20  A      From that to a couple of feet, I don't know.
21  Q      And you never stepped over that property line?
22  A      No, I didn't go beyond the fence.  I didn't
23         enter the barn.
24  Q      So when you looked in the windows at the barn,
25         that was not over -- where you believe the
```

| | | |
|---|---|---|
| 1 | | property line was, you did not believe that |
| 2 | | you were trespassing? |
| 3 | A | Correct. |
| 4 | Q | How did you determine where the property line |
| 5 | | was? |
| 6 | A | When I was walking the property line, I kept |
| 7 | | myself lined up with Ms. Marcellino's home. |
| 8 | Q | So that was the only determination is whether |
| 9 | | or not her home, the side of her house or |
| 10 | | something, where it extended to? |
| 11 | A | Right. |
| 12 | Q | From her house? |
| 13 | A | Yeah. |
| 14 | Q | The actual structure? |
| 15 | A | The actual structure of her house, yeah. |
| 16 | Q | So from where the structure, the one side of |
| 17 | | her house was, that's how you determined where |
| 18 | | the property line was, right? |
| 19 | A | I felt I was still on her property. |
| 20 | Q | Why did you feel that? |
| 21 | A | By using my eyes and looking at her home. |
| 22 | Q | Right, but, I mean, property lines don't |
| 23 | | always run right where a house is, do they? |
| 24 | A | From the Auditor website, it seems like a |
| 25 | | straight line that parcels out the two |

```
 1            individual properties.  There weren't any cut
 2            ins or cutouts based on the County records.
 3    Q    What was the very first date that you
 4            conducted a probation inspection?
 5    A    It was the day of or the day after her
 6            sentencing.
 7    Q    In your head, did you know where the property
 8            line was on that inspection date?
 9    A    Probably, yes.
10    Q    You drove up a driveway to enter the property
11            on that day, correct?
12    A    I probably park in a driveway, yes.
13    Q    Was there any no trespassing signs at the
14            beginning of the driveway?
15    A    I don't recall.
16    Q    Whose property was that?
17    A    I don't recall specifically where I parked.  I
18            probably parked on Bianca's driveway.
19                  MS. HUTH:        So, Matt, I just need
20            to take a ten-minute break.
21                  MR. BARINGER:    All right, that's
22            fine.
23                  MS. HUTH:        We come back, we'll
24            look at some videos.
25                  (Recess taken.)
```

```
 1    By Ms. Huth:
 2    Q    Christian, did you speak to anyone during the
 3         break?
 4    A    My attorney, yes.
 5    Q    What did you talk about?
 6              MR. BARINGER:     Objection.  Don't
 7         answer that.
 8    Q    Did you talk about the deposition with your
 9         attorney?
10              MR. BARINGER:     Objection.  Don't
11         answer that.
12    Q    Did you speak with anyone else besides your
13         attorney?
14              MR. BARINGER:     Objection.  Don't
15         answer that.
16    Q    So what are your hours that you work for
17         Geauga County Humane Society from the morning
18         to the evening?
19    A    I work Tuesday through Saturday.  You know, I
20         usually get in about eight o'clock.  I usually
21         leave at five.  I'm technically on call all
22         the time, so my hours vary.
23    Q    So do you always clock in and clock out?
24    A    Yes.
25    Q    So if you had to do something in the evening,
```

| | | |
|---|---|---|
| 1 | | how do you clock in? |
| 2 | A | Through an app. |
| 3 | Q | What's the app called? |
| 4 | A | I don't know. |
| 5 | Q | Do you have it on your phone now? |
| 6 | A | Yes. |
| 7 | Q | Can you look at it and tell me what the app |
| 8 | | is? |
| 9 | A | Heartland Time. |
| 10 | Q | H-e-a-r-t-l-a-n-d? |
| 11 | A | Yes, ma'am. |
| 12 | Q | T-i-m-e? |
| 13 | A | Yes, ma'am. |
| 14 | Q | So you recall some days you were on a woman |
| 15 | | named Michelle Nicastro's property? |
| 16 | A | Yes. |
| 17 | Q | After Bianca was sentenced? |
| 18 | A | Yes. |
| 19 | Q | Does Geauga County Humane Society provide you |
| 20 | | with a vehicle for your work? |
| 21 | A | Yes. |
| 22 | Q | Do you take that vehicle home? |
| 23 | A | I mean, not usually.  Sometimes, if I have a |
| 24 | | late call or an emergency. |
| 25 | Q | So you remember being on Michelle Nicastro's |

| | | |
|---|---|---|
| 1 | | property on April 14th of 2019? |
| 2 | A | Yes. |
| 3 | Q | You used your personal vehicle? |
| 4 | A | Yes. |
| 5 | Q | Why was that? |
| 6 | A | Because my work vehicle's large, white, |
| 7 | | clearly marked Humane Officer vehicle. |
| 8 | Q | So because the Humane vehicle's large, that's |
| 9 | | why you didn't use it? |
| 10 | A | And it was clearly marked as the Humane Agent |
| 11 | | vehicle. |
| 12 | Q | So why did you use your personal vehicle, |
| 13 | | then? |
| 14 | A | So Bianca Marcellino wouldn't know it was |
| 15 | | parked next door. |
| 16 | Q | Were you clocked in or clocked out on April |
| 17 | | 14th of 2019, when you were sitting on |
| 18 | | Nicastro's property in your vehicle? |
| 19 | A | I don't remember.  I probably was clocked out. |
| 20 | Q | So you weren't doing any official work at that |
| 21 | | point since you're clocked out? |
| 22 | A | Like I said, I don't remember whether I was |
| 23 | | clocked in or out. |
| 24 | Q | Do you get paid for any time after you clock |
| 25 | | out? |

102

```
 1    A     If I clocked in, I would have gotten paid.
 2    Q     But you don't remember if on that day you
 3          clocked in?
 4    A     I don't remember.
 5    Q     How about any other days that you were on
 6          Nicastro's property after --
 7    A     After hours, I don't know whether I was
 8          clocked in or not.
 9    Q     Do you have a calendar?
10    A     Do I have calendar, like a paper calendar?
11    Q     I don't care, paper, electronic, whatever it
12          is.
13    A     Yes.
14    Q     Paper ?
15    A     No, through Outlook there's a calendar.
16    Q     What do you record on that calendar?
17    A     Meetings.
18    Q     Do you record probation dates of probation
19          inspections?
20    A     No.
21    Q     Just meetings, internal meetings.
22    A     Yes.
23    Q     That's it.
24    A     Yes.
25    Q     So you wouldn't record any of the times you
```

```
1            entered Marcellino's property or any times you
2            observed from Nicastro's property, that
3            wouldn't be in your calendar?
4     A     No.
5     Q     When you conduct a probation inspection and
6            you enter onto someone's property, what do you
7            do, you knock on their door first, usually?
8     A     Yes.
9     Q     And if they're not there, what do you do?
10    A     I'll leave.  I might leave a business card.
11           I'll leave.
12    Q     You leave or you walk around?
13    A     If there's a reason for me to walk around, I
14           may walk around, but usually if I knock and
15           nobody answers, I'll leave.
16    Q     What would be a reason that you would walk
17           around if someone wasn't at their house?
18    A     If they had dogs outside, I'd walk around to
19           get a look at the dogs.
20    Q     Did you ever leave a business card at Bianca
21           Marcellino's door?
22    A     I don't know, maybe.
23    Q     Let's do this here.  We're going to go back to
24           that Word document that we looked at.  I don't
25           know if I could share two screens.  Hold on,
```

```
 1          give me a second.  Okay.  So I'm going to
 2          share the Word document again.
 3                   Do you see Patrick and Maureen Cox?
 4     A    Yes.
 5     Q    Actually, let's start in the beginning.  Let's
 6          start with Robert Konst.  So the days on this
 7          Word document are days that you conducted
 8          probation checks, correct?
 9     A    Yes.
10     Q    You did create a narrative for that person,
11          correct?
12     A    Yes.
13     Q    Do you recall providing some narratives in a
14          public records request?
15     A    Yeah.  To you?
16     Q    Prior to the lawsuit, do you remember, maybe,
17          Jeffrey Holland called you or emailed you?
18     A    Yeah, I believe so.  I believe there were some
19          narratives provided, yes.
20     Q    Did you ever provide the Konst narrative in
21          that records request?
22     A    I don't recall.
23     Q    Well, you didn't.  Just letting you know.
24                   MS. HUTH:          So course, we're
25          requesting that narrative again, as I said,
```

```
 1        Matt.
 2             MR. BARINGER:     You can bring it up
 3        with the court.  We're not providing it.
 4             MS. HUTH:          We will.
 5   Q    Let's talk a little bit about training on case
 6        law.  Do you receive any case law training?
 7   A    Yes.
 8   Q    So what training do you receive on case law?
 9        Do you know what case law means, first of all?
10   A    Yes.
11   Q    What training do you receive on case law?
12   A    I recently went through the OPATA training
13        again, just to refresh myself in that
14        training.  I believe Jeff Holland does a
15        section where he talks about the laws and he
16        talks about some case laws.
17   Q    Have you ever Learned any case laws regarding
18        probation inspections or command and control
19        inspections?
20   A    I don't think specifically.
21   Q    How about non-specifically?
22   A    No.
23   Q    Let's go through the training that you've
24        received.  Just why don't you list them for me
25        and the years you took them.
```

| | | |
|---|---|---|
| 1 | A | Do I have that document in front of me? |
| 2 | Q | I'm not asking you for a document.  I'm just |
| 3 | | asking you to tell me what training you've |
| 4 | | received. |
| 5 | A | I've been doing this work for 20 years.  It's |
| 6 | | a lot of training. |
| 7 | Q | How about training in the last five years? |
| 8 | A | I went through the OPATA training. |
| 9 | Q | What is OPATA? |
| 10 | A | The Ohio Peace Officer Training Academy. |
| 11 | Q | Did you learn about probation in that one? |
| 12 | A | No. |
| 13 | Q | Next one? |
| 14 | A | I believe I went through a couple of HSUS, |
| 15 | | large animal in livestock humane investigation |
| 16 | | courses. |
| 17 | Q | Any probation -- |
| 18 | A | Nothing specific with probation, no.  Maybe |
| 19 | | that's it in the past five years. |
| 20 | Q | So those, only two.  Is that what you said, |
| 21 | | two trainings in the past five years? |
| 22 | A | There's probably been -- there's the week long |
| 23 | | humane agent training and then probably a |
| 24 | | couple day trainings through HSUS. |
| 25 | Q | Who hosted that week long training? |

| | | |
|---|---|---|
| 1 | A | That was through the Ohio Federation and |
| 2 | | Humane Societies, I believe. |
| 3 | Q | So it was focused on Ohio law? |
| 4 | A | Yes. |
| 5 | Q | Did you have any training whatsoever in |
| 6 | | probation inspections in that training? |
| 7 | A | Not specifically about probation, no. |
| 8 | Q | Do you know what the exceptions to a search |
| 9 | | warrant are? |
| 10 | A | In regards to probation? |
| 11 | Q | Do you know when you should get a search |
| 12 | | warrant to enter someone's property and when |
| 13 | | you don't have to have a search warrant to |
| 14 | | enter someone's property? |
| 15 | A | Yes. |
| 16 | Q | When do you not have to have a search warrant |
| 17 | | to enter someone's property? |
| 18 | A | If there's a voluntary consent to search. |
| 19 | Q | Did Bianca Marcellino give you voluntary |
| 20 | | consent to search her property? |
| 21 | A | On the initial investigation, yes. |
| 22 | Q | At any time has Bianca Marcellino given you |
| 23 | | consent to search her property? |
| 24 | A | Yes. |
| 25 | Q | When? |

108

| | | |
|---|---|---|
| 1 | A | On the initial investigation in 2018. |
| 2 | Q | In 2018, she gave you consent to search her |
| 3 | | property? |
| 4 | A | Yeah.  I said I was there to look at the |
| 5 | | horses, and if I could see them, she walked me |
| 6 | | back to her barn, she showed them to me -- her |
| 7 | | property and her barn. |
| 8 | Q | So you're talking about the very first -- what |
| 9 | | date was? |
| 10 | A | I don't know the date off the top of my head. |
| 11 | Q | But it was your first probation inspection, |
| 12 | | she gave you consent? |
| 13 | A | No, it was the first investigation on her |
| 14 | | property when I first met Bianca Marcellino. |
| 15 | Q | You're talking about before sentencing? |
| 16 | A | Yes. |
| 17 | Q | I'm talking about post sentencing.  Did she |
| 18 | | ever give you consent to enter her property? |
| 19 | A | She would ask sometimes, do I need to let you |
| 20 | | on the property?  And I said yes, per your |
| 21 | | probation. |
| 22 | Q | Let me ask the question again.  After Bianca |
| 23 | | Marcellino was sentenced, did she ever give |
| 24 | | you consent to enter her property? |
| 25 | A | Yes. |

```
 1   Q     When?
 2   A     She would ask whether she has to let me on the
 3         property, and I said, yes, because of your
 4         probation, I have to do these inspections.
 5         And she says, okay.
 6   Q     Okay, after you told her that you had to do
 7         the inspections?
 8   A     Yes.
 9   Q     You know what consent means, right?
10   A     Yes.
11   Q     What does it mean?
12   A     That you're allowing it.
13   Q     So you're saying that she did give you
14         consent?
15   A     Yes.
16   Q     Because she did what?
17   A     If she said get off my property, I'm not
18         letting you do this probation check, get off
19         the property, I would have left.
20   Q     And would that have been a probation
21         violation?
22   A     I believe it would have been.
23   Q     So she didn't have a choice, correct?
24   A     She was sentenced.
25   Q     Do you know what reasonable grounds means?
```

```
 1    A      Yes.
 2    Q      Do you know what reasonable suspicion means?
 3    A      Yes.
 4    Q      Do you know what reasonable cause means?
 5    A      Yes.
 6    Q      Have you ever read any case law that would
 7           help you understand how to conduct a probation
 8           inspection?
 9    A      I follow the instructions that are in the
10           sentencing.
11    Q      So if there's case law that says that you're
12           not allowed to enter a property for a certain
13           reason, if the order says you can, then you're
14           going to follow the order and not the case
15           law?
16    A      I'm going to follow whatever our Municipal
17           Judge tells us to do.
18    Q      Are you familiar with any statutes that
19           dictate the parameters of a probation
20           inspection?
21    A      I don't.  This is above my pay grade.
22    Q      Knowing the laws above your pay grade?
23    A      Knowing probation laws?  That's Probation
24           Department.  I rely on them to give me good
25           instructions on how to do my probation checks.
```

```
 1   Q    So Probation Officer Elko is the one that told
 2        you how to conduct your probation inspections?
 3   A    She relies on me to go out there and do that
 4        portion of her probation, yes.
 5   Q    So every time you entered Bianca Marcellino's
 6        property, Probation Officer Elko was the one
 7        that told you to do it?
 8   A    Not every time, no.
 9   Q    So sometimes you don't rely upon them to
10        enter, you just do it on your own?
11   A    But it's under the direction for sentencing.
12   Q    No, I wasn't talking about her sentencing, I
13        was talking about the Probation Department.
14   A    The probation is part of her sentencing.
15   Q    You understand that Probation Department is
16        not her sentencing, correct?
17   A    It was a part of her sentence, was that she
18        was put on probation, and part of that
19        sentence was that there were unannounced
20        inspections done by the Humane Society, and
21        unfortunately, it's me that has to go out
22        there.
23   Q    The Probation Department can't go out there,
24        the probation officers?
25   A    They don't do on-site checks.
```

```
 1    Q    So no one has ever given you any training on
 2         how to conduct a probation inspection?
 3    A    No.
 4    Q    In all the training you've taken, no one has
 5         ever said these are the parameters of your
 6         probation inspection?
 7    A    No.
 8    Q    Have you ever heard anything about reasonable
 9         suspicion or reasonable grounds or reasonable
10         cause being required?
11    A    Nothing specifically about probation.
12    Q    Have you ever heard that in Ohio that you
13         cannot enter a probationer's property unless
14         you have reasonable grounds for reasonable
15         suspicion?
16    A    No.
17              MR. BARINGER:     Objection.
18              MS. HUTH:         All I asked is
19         whether he heard or not.
20              MR. BARINGER:     I just objected.
21    Q    So if I told you that there was a law in Ohio,
22         a Statute that specifically deals with
23         probation inspections and limits probation
24         inspections to reasonable cause and reasonable
25         grounds, would that change your --
```

| 1  | A | I would not rely on your legal advice. |
|----|---|------------------------------------------|
| 2  | Q | Would you be surprised if there was a law out |
| 3  |   | there that -- |
| 4  | A | I would not rely on your legal advice. |
| 5  | Q | No, I'm asking you, if I told you that there |
| 6  |   | was a law in Ohio that requires you to have |
| 7  |   | reasonable suspicion or reasonable cause or |
| 8  |   | reasonable grounds to enter probationer's |
| 9  |   | property, would that surprise you? |
| 10 |   | MR. BARINGER:    Objection.  You can |
| 11 |   | answer. |
| 12 | A | I would not rely on your legal advice. |
| 13 | Q | You need to answer the question. |
| 14 | A | I'm answering your question.  I wouldn't |
| 15 |   | believe a word of that. |
| 16 | Q | I'm not giving you legal advice.  I'm saying, |
| 17 |   | hypothetically, if there was a law that |
| 18 |   | required you to have reasonable grounds or |
| 19 |   | reasonable suspicion or reasonable cause to |
| 20 |   | enter a probationer's property to inspect -- |
| 21 | A | I would refer to my counsel and get their |
| 22 |   | advice. |
| 23 | Q | Has any counsel ever given you any advice on |
| 24 |   | probation inspections? |
| 25 |   | MR. BARINGER:    Objection.  Don't |

```
 1         answer that question.
 2    Q    Do you know who Jeffrey Holland is?
 3    A    Yes.
 4    Q    Did he teach some of your training classes?
 5    A    Yes.
 6    Q    Did he ever tell you anything about probation
 7         inspections?
 8              MR. BARINGER:     Objection.  Only with
 9         respect to training, general training he
10         provided you, no private conversations.  So
11         you can answer based on that.
12    A    Yeah, in the training, there's nothing
13         specific about probation.
14    Q    Did Jeffrey Holland ever tell you anything
15         about the parameters of probation inspections?
16              MR. BARINGER:     Objection.  Limited
17         to his training, he can answer.
18    A    Yes, just generally that when someone is
19         sentenced and there's a part in the probation
20         where we have to do it unannounced
21         inspections, that I'm required to do them.
22    Q    That was it?
23    A    Yes.
24    Q    So would you say for purposes of conducting
25         probation inspections, that the Probation
```

115

```
 1        Department is sort of the supervisor for your
 2        work, as opposed to, maybe, your supervisor at
 3        Geauga County Humane Society?
 4    A   I wouldn't say they're my supervisor, but
 5        they're a professional agency that I rely on
 6        for advice and direction.
 7    Q   Did Probation Officer Elko or Probation
 8        Officer Thrasher believe that Bianca had
 9        violated her probation on July 10th because of
10        the incidents on July 10, 2020?
11    A   You would have to talk to them.
12    Q   They never told you that they thought she was,
13        or anything like that?
14    A   No.
15    Q   If you believe that anyone violates their
16        probation as a result of probation inspection
17        or for whatever other reason, do you go
18        directly to the Judge, or do you go through
19        the Probation Department?
20    A   I would go through Jeff Holland's office first
21        and discuss my findings with them on whether
22        I'm right in my assessment or not, or to get
23        whatever advice they might have.
24    Q   And who is Jeff Holland?
25    A   Not really my assessment on whether they
```

```
 1            violated probation or not.  It's sort of up to
 2            the prosecuting attorney, the Probation
 3            Department and the Judge.
 4     Q      So not up to you?
 5     A      No.
 6     Q      And Jeffrey Holland is what, a special
 7            prosecutor?
 8     A      Yes.
 9     Q      Is he Geauga County Humane Society's attorney?
10     A      He's one of them, yes.
11     Q      What other attorney do you have?
12     A      Well, you've met Mr. Baringer and Todd Hicks
13            is also an attorney for Rescue Village.
14     Q      Do you go to Matt Baringer and ask him
15            probation advice?
16               MR. BARINGER:      Objection.  Don't
17            answer that.
18     Q      Is Jeffrey Holland the only attorney that you
19            go to, to ask for probation advice?
20     A      He is the special prosecutor, so he would be
21            the attorney involved, yes.
22     Q      Is he the only attorney you would go to ask
23            probation advice?
24     A      Dana Pannela, as well, who works in Jeff
25            Holland's office.
```

```
1    Q    And she is also, what, an assistant special
2         prosecutor?
3    A    Yes.
4    Q    The court order you keep referring to is her
5         sentencing entry; is that correct?
6    A    Yes.
7    Q    Do you believe that order gives you reasonable
8         suspicion to enter Bianca's property?
9              MR. BARINGER:     Objection.  You can
10        answer.
11   A    It gives me authority to go on the property.
12   Q    Does it give you any reasonable suspicion?
13   A    It probably would fall in there, sure.
14   Q    The court order give you reasonable suspicion
15        to enter her property?
16   A    Yes.
17   Q    How does the court order give you reasonable
18        suspicion to enter her property?
19             MR. BARINGER:     Objection.  You can
20        answer.
21   A    Because the individual is found guilty of
22        animal cruelty, so there's a suspicion that
23        they could be continuing with that behavior,
24        and it's up for the probation to make sure
25        that that isn't continuing, ongoing or
```

```
 1              starting up again.  So it's to make sure that
 2              Ms. Marcellino isn't keeping horses to which
 3              she could then neglect again.
 4      Q      Do you know if the Probation Department has
 5              ever conducted an inspection on Bianca's
 6              property, would you know that?  Do you know
 7              that?
 8      A      Them personally going out to a property, no.
 9              They don't do on-site checks, as far as I
10              know.
11      Q      For no one or just for Humane Society cases?
12      A      I don't know.
13      Q      But you only know based on that they've never
14              done probation inspections on any people that
15              you have done probation inspections on?
16      A      Correct.
17      Q      Because they tell you to go do it?
18      A      Correct.
19      Q      Or sometimes they don't tell you to go do it,
20              and you just decide to do it?
21      A      It's part of the sentencing, so yes, I have to
22              do that.
23      Q      But as to the specific day, sometimes they
24              don't tell you to go out, you just go out on
25              your own?
```

```
1    A     Yes.
2    Q     And your supervisor at Geauga County doesn't
3          say go out, you just do that on your own?
4    A     They may tell me to go out, the supervisor
5          can.
6    Q     Has any supervisor at Geauga County Humane
7          Society ever told you to go out to Bianca
8          Marcellino's property to do an inspection,
9          probation inspection?
10   A     I don't recall if there was any specific
11         direction about Bianca Marcellino.
12   Q     So what gave you a right to look at the horses
13         in Bianca's parents' barn?
14               MR. BARINGER:     Objection.  You can
15         answer.
16   A     They were sticking their heads out the window.
17         They were in plain view of where I was
18         standing.
19   Q     What does plain view mean?
20   A     They were in an area where I had lawful access
21         to be and I could see them clearly.
22   Q     When you say you were in an area that you had
23         a lawful access, lawful right to be, what was
24         that area, Bianca's property?
25   A     Yes.
```

120

| | | |
|---|---|---|
| 1 | Q | What was the purpose of being on Bianca's |
| 2 | | property on July 10, 2020? |
| 3 | A | To do the probation check. |
| 4 | Q | That probation check, the parameters of that |
| 5 | | probation check, were to ensure that she was |
| 6 | | not was not caring, owning or possessing any |
| 7 | | horses, correct? |
| 8 | A | Correct. |
| 9 | Q | Was there a reason that you approached the |
| 10 | | barn? |
| 11 | A | It was just there on the property line and |
| 12 | | there were horses looking out the window.  So |
| 13 | | yes, I'm going to be curious on what the |
| 14 | | condition of those horses are going to be. |
| 15 | Q | That barn does not sit on Bianca's property, |
| 16 | | correct? |
| 17 | A | It was quitclaimed to her parents prior to her |
| 18 | | sentence. |
| 19 | Q | So after Bianca was sentenced, the barn that |
| 20 | | contained the horses that you looked at on |
| 21 | | July 10, 2020 were on the parents' property, |
| 22 | | correct? |
| 23 | A | Correct. |
| 24 | Q | Those horses, do you know whose horses those |
| 25 | | were? |

121

```
 1    A     I don't know who those horses are.
 2    Q     What was the reason for looking to see whether
 3          or not the horses were okay?
 4    A     I'm a Humane Officer.
 5    Q     So you used someone else's property to go into
 6          someone else's.
 7                MR. BARINGER:      Objection.
 8    Q     So you used Bianca Marcellino's property on
 9          July 10, 2020, to look at her parents'
10          property?
11                MR. BARINGER:      Objection.  You can
12          answer.
13    A     Yes.
14    Q     Why?
15                MR. BARINGER:      Objection.  You can
16          answer.
17    A     Because the horses were looking out of the
18          window and I'm going to look at horses.
19    Q     Would you agree that you were using Bianca's
20          property to look at her parents' property and
21          her parents' horses?
22                MR. BARINGER:      Asked and answered.
23    A     I don't know if they are her parents' horses.
24    Q     So you used Bianca's property to look at
25          horses on someone else's property?
```

122

| | | |
|---|---|---|
| 1 | A | While I was on Bianca's property, I looked at |
| 2 | | the barn where there were horses. |
| 3 | Q | At the time you looked at the barn where there |
| 4 | | were horses, were you done looking at Bianca's |
| 5 | | property? |
| 6 | A | I was still on Bianca's property, so no. |
| 7 | Q | I'm not asking whether you were on it or not. |
| 8 | | I'm asking were you done looking around |
| 9 | | Bianca's property? |
| 10 | | MR. BARINGER:    He answered no. |
| 11 | A | No. |
| 12 | Q | What else did you have to do once you looked |
| 13 | | at the horses? |
| 14 | A | Well, I still had to walk through her property |
| 15 | | to get to my vehicle.  Bianca was yelling and |
| 16 | | screaming and calling the police.  So now I |
| 17 | | have to wait for the police to arrive. |
| 18 | Q | So at the time you looked in the windows on |
| 19 | | the barn on Bianca's parents' property, at |
| 20 | | that point, you had done the inspection on |
| 21 | | Bianca's property, and you were walking back |
| 22 | | to your car? |
| 23 | A | I wasn't done until I left the property. |
| 24 | Q | But did you look around Bianca's property any |
| 25 | | further after you left the barn? |

```
1    A    Yes.
2    Q    What did you look at?
3    A    As I walked back to my vehicle, my eyes still
4         see things, so I see her house, I see Bianca
5         yelling --
6    Q    But you had already looked at that area of
7         property to determine whether there were
8         horses or not, right?
9    A    Yes.
10   Q    So when you parked your car and you went on
11        Bianca's property, you had already determined
12        that the line of sight from your car to the
13        barn or wherever else, that she didn't have
14        any horses anywhere, correct?
15   A    Correct, on her property.
16   Q    Other than the court order, if you had
17        reasonable grounds, reasonable suspicion or
18        reasonable cause to believe that Bianca was
19        committing a crime, could you go onto her to
20        conduct a probation inspection?
21   A    Yes.
22   Q    But does the court order allow you to do that?
23   A    Yes.
24   Q    Where does it say that you can go onto her
25        property other than to look at horses?
```

| | | |
|---|---|---|
| 1 | A | By doing random unannounced inspections. |
| 2 | Q | So your random unannounced inspections, in |
| 3 | | addition to the court order allowing you to |
| 4 | | determine whether or not she owns, possesses, |
| 5 | | harbors or keeps horses, also allows you to go |
| 6 | | on for other reasons? |
| 7 | A | If there's a complaint that she has horses and |
| 8 | | that she's -- |
| 9 | Q | I didn't ask that.  I said if you got a |
| 10 | | complaint that Bianca was committing a crime |
| 11 | | on her property, a crime -- |
| 12 | A | For example? |
| 13 | Q | For example smoking crack in her front lawn |
| 14 | | where the police drive by on the road and |
| 15 | | everyone can see her smoking crack with her |
| 16 | | crack pipe.  Would you be able to go on -- |
| 17 | A | Would call the police. |
| 18 | Q | Would you have authority to go onto her |
| 19 | | property? |
| 20 | A | I think that would be outside of my scope.  I |
| 21 | | would have the ability to do an unannounced |
| 22 | | random inspection, no matter what.  But if the |
| 23 | | complaint was that she was smoking crack, I |
| 24 | | would call the police. |
| 25 | Q | So the only authority that you have to go onto |

125

```
 1        her property is specifically to determine
 2        whether or not she's caring for, possessing,
 3        harboring or keeping horses, correct?
 4  A     And other animals are kept in a humane manner.
 5  Q     The court order says that you're allowed to go
 6        on to check other animals, not just horses?
 7  A     I believe, so.
 8  Q     When was the last time you looked at that
 9        court order?
10  A     It's been a while.
11  Q     Did you provide that in discovery?
12             MR. BARINGER:      Objection.
13  A     I don't know.  I mean, it's public record, so.
14             MS. HUTH:          Matt, we didn't get
15        the court order, so if you could provide that
16        to us.
17  A     I think it was, though.
18  Q     Then you should be able to pull it up and see,
19        because I don't see it in discovery.  I never
20        got the court order.
21             MR. BARINGER:      It's not in discovery
22        because it's on the website and her
23        sentencing, and you have a copy of it, and we
24        don't have to create documents that are not in
25        our possession.  We've gone over this.  we all
```

| | | |
|---|---|---|
| 1 | | know what the court order is. |
| 2 | Q | Do you know who Bella Marcellino is? |
| 3 | A | I believe that's her sister. |
| 4 | Q | Have you ever seen her? |
| 5 | A | Yes. |
| 6 | Q | Was there one time that you were on the |
| 7 | | parents' property and ordered her father, |
| 8 | | Bianca's father, to tell the person that was |
| 9 | | in the parents' barn to come out so that you |
| 10 | | can make sure it's not Bianca. |
| 11 | A | I don't believe I ordered anybody to do |
| 12 | | anything. |
| 13 | Q | What did you do? |
| 14 | A | But yeah, I received the complaint that Bianca |
| 15 | | was out there taking care of horses.  So I |
| 16 | | went to the Chesterland Police department and |
| 17 | | went out with the police to determine if there |
| 18 | | was any veracity to that complaint. |
| 19 | Q | What day was that? |
| 20 | A | I don't recall the exact date.  It was shortly |
| 21 | | after her sentence. |
| 22 | Q | It was what? |
| 23 | A | It was shortly after her sentence. |
| 24 | Q | Explain what happened.  You drove up to whose |
| 25 | | property? |

| | | |
|---|---|---|
| 1 | A | So I drove up to the property. |
| 2 | Q | Whose property? |
| 3 | A | Bianca Marcellino's. |
| 4 | Q | You went on Bianca Marcellino's property, and |
| 5 | | then you walked over to the parents? |
| 6 | A | And I found Giancarlo Marcellino and -- |
| 7 | Q | Where? |
| 8 | A | I believe he was behind the house in the |
| 9 | | garage or at the barn -- |
| 10 | Q | On his property? |
| 11 | A | I don't know.  He met me when I arrived. |
| 12 | Q | He met you on his property or on Bianca's? |
| 13 | A | I don't recall specifically. |
| 14 | Q | And what happened? |
| 15 | A | I told him why I was out there, that I got a |
| 16 | | call that Bianca was there taking care of |
| 17 | | horses.  It turned out it was her sister.  I |
| 18 | | believe, Mr. Marcellino called Bianca.  So she |
| 19 | | was on the phone while I was out there, and we |
| 20 | | left shortly after. |
| 21 | Q | You came with the police that day? |
| 22 | A | Yes. |
| 23 | Q | Why did you come with the police? |
| 24 | A | The Marcellinos been volatile and combative, |
| 25 | | and I felt safer having an armed police |

128

```
1              officer with me.
2    Q    So the police would have an incident report?
3    A    Probably.
4    Q    The police were there when you told Giancarlo
5         to get Bella out of the barn?
6    A    I don't know if I ever ordered him to do
7         anything or told them to do anything.  Bella
8         may have come out of the barn on her own
9         volition.  I don't remember.
10   Q    So you didn't tell him that he needs to get
11        the person in the barn out or else you're
12        going to violate Bianca Marcellino; you never
13        said that?
14   A    I don't recall saying that.
15   Q    Are you aware that you were being recorded
16        most of the time you were on those properties?
17   A    Yeah.  She's go cameras everywhere.
18   Q    You don't remember if you said that?
19   A    I don't remember if I said that.  But if it
20        was Bianca Marcellino there taking care of the
21        horses, it would have been a violation.
22   Q    Was it?
23   A    No, it was her sister.
24   Q    Whose property was that barn on?
25   A    At that time, it was quitclaimed to Mr. And
```

```
 1          Mrs. Marcellino.
 2    Q     So as part of your probation inspection
 3          duties, do you have a right to go onto other
 4          people's property other than the person that
 5          is sentenced?
 6                MR. BARINGER:     Objection.
 7    A     No.
 8    Q     What gave you the right to inquire about who
 9          was in a barn that was not on Bianca
10          Marcellino's property?
11    A     Because if it was Bianca Marcellino in the
12          barn, it would have been a violation of her
13          probation.  If she's in there taking care of,
14          interacting with, caring for horses, that
15          would've been a violation.
16    Q     So if Bianca steps into a barn with horses, is
17          that a violation?
18    A     If she steps in to that barn, I think the
19          Judge would say that's a violation.
20    Q     Regardless of whether or not she was touching,
21          caring, just stepping in the barn's a
22          violation?
23    A     You would have to talk to the Judge.
24    Q     But you're the one --
25    A     He was pretty clear during one of the hearings
```

```
 1          we had, that she was not to have interaction
 2          with those horses.
 3    Q     Does interaction mean just stepping inside a
 4          barn?
 5               MR. BARINGER:     Objection.  You can
 6          answer.
 7    A     I don't know what the Judge would say to that.
 8          I wouldn't advise Marcellino to test that
 9          theory.
10    Q     But you're the Probation Officer.  Is that a
11          violation --
12    A     I'm not the Probation Officer.  I'm a Humane
13          Officer.
14    Q     Oh, I'm sorry.  So you're Humane Officer that
15          conducts probation inspections, but you don't
16          know whether her just stepping into a barn is
17          a probation violation?
18               MR. BARINGER:     Objection.
19    A     That would be up to the Judge.
20    Q     Do you think it's a violation.
21    A     My thoughts are irrelevant.  I would give the
22          facts and let --
23    Q     I'm asking you.  Do you think it's a
24          violation?
25               MR. BARINGER:     Objection.  He
```

```
 1            answered it.
 2                    MS. HUTH:          No, he didn't.
 3    A      Yeah.  I said my thoughts on that are
 4            irrelevant.
 5    Q      I'm not asking whether they're relevant.  I'm
 6            asking whether you think it's a probation
 7            violation for her to step inside a barn?
 8                    MR. BARINGER:        Objection.  You can
 9            answer.
10    A      I think that my job is to give the court the
11            facts and if the facts support a probation
12            violation, which would be her going into that
13            barn and providing care for her horses, then
14            yeah, that would be a probation violation.
15            But I don't make that call.
16    Q      But you said it is a probation violation, if
17            she steps in the barn?
18    A      I would believe it would be, if she was in
19            that barn providing care for her hoses.
20    Q      That's not what I asked.  I asked if she just
21            stepped in the barn, is that a probation
22            violation?  You told me it's irrelevant --
23                    MR. BARINGER:        Objection.
24    Q      But that's not for you to determine whether
25            it's irrelevant, I just need you to answer the
```

132

```
 1          question.  If she's stepping in the barn, is
 2          that a violation?
 3                   MR. BARINGER:     Objection.  Last
 4          time, you can answer.
 5   A      Again, I would say that it's not for me to
 6          determine.  I don't determine whether there's
 7          a probation violation or not, the Judge does.
 8          I don't know why I have to explain this to
 9          you.
10   Q      You do have to explain it to me, because
11          that's what depositions are about.
12                   If Bianca stepped inside a barn, would
13          that have violated her probation?
14   A      You would have to talk to Judge Stupica.
15   Q      So you have no idea?
16   A      It's not my call to make.
17   Q      But as a Humane Officer, you conduct probation
18          inspections.  Surely you know when someone's
19          violating their probation or not?
20                   MR. BARINGER:     Objection.  Asked and
21          answered.
22   Q      Right, don't you know, when someone's
23          violating their probation, as a Probation
24          Officer conducting probation inspections?
25   A      I would make a report on the facts of what I
```

```
 1            found, and whether it was a probation
 2            violation or not, it doesn't have anything to
 3            do with me.  I don't have that power or
 4            authority.  It would be the Judge.
 5     Q      You don't have power and authority to violate
 6            Bianca for probation violations?
 7     A      It would be the prosecuting attorney, who
 8            would put forth a probation violation and
 9            would be up to the Judge to say yes or no.
10     Q      Did anyone ever give you permission to go onto
11            Bianca's parents' property?
12     A      No, and they were pretty clear that I wasn't
13            to go over there.  They were pretty proud of
14            the quitclaim.
15     Q      Do you believe that Bianca quitclaiming part
16            of her property to her parents violated
17            probation?
18                   MR. BARINGER:    Objection.
19     A      Again, that's not my call to make.
20     Q      Well, let me take you back to -- the narrative
21            that you gave us on Bianca indicated that you
22            believe that the quitclaim was an evasion of
23            her probation; do you remember that?
24     A      Yes.
25     Q      What do you mean by that?
```

```
 1   A    I think it was done fully knowing that she was
 2        going to be sentenced and that she wouldn't be
 3        allowed to have horses, and it was a way for
 4        her to maintain some control over them.
 5   Q    Was there something illegal by quitclaiming
 6        the property to her parents?  Did she do
 7        something illegal?
 8             MR. BARINGER:     Objection.  You can
 9        answer.
10   A    Everybody who would determine that knows about
11        it.  So right now, no.
12   Q    No, there's nothing illegal?
13   A    There hasn't been that determination made yet.
14   Q    Did you make that determination?
15   A    It's not up for me to make.
16   Q    It's up to the Probation Officer and the
17        special prosecutor and the Judge, correct?
18   A    Yes.
19   Q    So let's go back again to the fence line.  So
20        you determined the property line based upon
21        the fence line where the fence line extends;
22        is that correct?
23             MR. BARINGER:     Objection.  That's no
24        what he testified to.
25   A    In the County records and where Bianca's home
```

| | | |
|---|---|---|
| 1 | | sits. |
| 2 | Q | Does the fence line go along the side of the |
| 3 | | barn?  It stops at the back; doesn't it? |
| 4 | A | It stops at the back, yes, as I've said. |
| 5 | Q | The fence line, you wouldn't be able to |
| 6 | | determine the property line from the fence |
| 7 | | line, right? |
| 8 | A | But the fence is connected to the barn. |
| 9 | Q | Right.  But you wouldn't be able to determine |
| 10 | | where the property line is -- |
| 11 | A | Where there's the fence, there's the barn, and |
| 12 | | that line continues. |
| 13 | Q | It continues down the side where you looked in |
| 14 | | the window, correct? |
| 15 | A | According to the County records, it's a pretty |
| 16 | | straight line. |
| 17 | Q | How many times have you used Bianca's property |
| 18 | | to plain view her parents' property? |
| 19 | | MR. BARINGER:     Objection.  You can |
| 20 | | answer. |
| 21 | A | I would say every time I'm on the property, I |
| 22 | | look over at the barn.  But that was the first |
| 23 | | time I walked all way back towards the back of |
| 24 | | her property. |
| 25 | Q | Is that the first time you approached the |

| | | |
|---|---|---|
| 1 | | barn? |
| 2 | A | Yes. |
| 3 | Q | That was on July 10, 2020, correct? |
| 4 | A | Yes. |
| 5 | Q | How many prior probation inspections on |
| 6 | | Bianca's property had you conducted prior to |
| 7 | | July 10, 2020? |
| 8 | A | Maybe five or six. |
| 9 | Q | You never approached the barn before that? |
| 10 | A | No. |
| 11 | Q | Do you know why? |
| 12 | A | I limited it to -- she has a back garage that |
| 13 | | use to be a barn where she kept the neglected |
| 14 | | horses that she was convicted of.  So I would |
| 15 | | go back there and look in that barn, make sure |
| 16 | | there weren't any animals in there.  I never |
| 17 | | walked back to the back of the property. |
| 18 | Q | So my question is, on July 10, 2020, you |
| 19 | | approached the barn, her parents' barn. |
| 20 | A | Okay, what's the question? |
| 21 | Q | How come you never did that prior to July 10, |
| 22 | | 2020? |
| 23 | A | I just didn't. |
| 24 | Q | Just didn't feel like it? |
| 25 | | MR. BARINGER:    Objection. |

```
 1   Q     Just didn't feel like it?
 2               MR. BARINGER:     Objection.
 3   A     Yeah, it wasn't where I was when I was doing
 4         the probation check.
 5   Q     I'm sorry, I didn't understand what you meant
 6         by that.
 7   A     I hadn't walked all the way in the back of
 8         Bianca's property before that.
 9   Q     Why not?
10   A     I just didn't.
11   Q     Your job was to determine that she wasn't
12         caring or possessing or harboring or keeping
13         any horses, correct?
14   A     Uh-huh, and on July 10th, I wanted to walk all
15         the way back there to make sure there wasn't
16         evidence that there were horses coming and
17         going.
18   Q     You never just decided not to do that before,
19         right?
20   A     Right.
21   Q     For no reason?
22               MR. BARINGER:     Objection.
23   Q     For no reason?
24               MR. BARINGER:     You can answer.
25   Q     Just because you felt like going back to the
```

```
 1           back of her property on July 10th?
 2    A      I wanted to be thorough because Bianca was
 3           going to be going in in a few days to do an
 4           in-person probation interview with her
 5           Probation Officer.  I wanted to be thorough.
 6    Q      Do you believe that the court order gave you a
 7           right to look at the horses on the parents'
 8           property?
 9                   MR. BARINGER:      Objection.  You can
10           answer.
11    A      I believe the court order allows me to be on
12           Bianca's property, and if I happen to see
13           things with my eyes, it allows me to do that.
14           So, yeah, I'm allowed to look at the barn or
15           the neighbor's backyard, because it's in plain
16           view.
17    Q      At any time during your probation inspections,
18           did you believe there was anything wrong with
19           the horses in the barn on Bianca parents'
20           property?
21    A      Are you asking about my belief?
22    Q      Yes.
23    A      I have grave concern for horses that remain in
24           any Marcellino's care.
25    Q      I'm talking about the parents.  I said, do you
```

139

```
 1        did you believe there was anything wrong with
 2        the horses in the barn on the parents'
 3        property?
 4   A    Right, and I'm answering you with my belief,
 5        that I believe any horse that remains in a
 6        Marcellino's care is in grave danger.
 7   Q    Including the parents?
 8   A    Yes.
 9   Q    What gives you the belief to say that?
10   A    Because they're not horseman.  They don't know
11        what they're doing.
12   Q    So any person that's not a horseman that has a
13        horse you suspect of cruelty?
14   A    I think Bianca Marcellino is guilty of it, and
15        she learned that behavior from somebody.
16   Q    So the reason for you looking at the horses in
17        the parents' barn was because the Marcellinos
18        have a propensity to commit cruelty?
19   A    They could.  I don't know.  I have concern for
20        any worse that remains in a Marcellino's care.
21        I'm not naive enough to think that it's only
22        Giancarlo and Karen taking care of those
23        horses.
24   Q    Who else do you think is taking are of the
25        horses?
```

```
 1   A     I think Bianca probably has a hand in it.
 2   Q     Have you ever done any other surveillance on
 3         Bianca's property other than the dates set
 4         forth in your narrative?
 5   A     Only those dates.
 6   Q     The only dates you were there were which?
 7   A     You have a list of all the dates.  I don't
 8         know them by memory.
 9   Q     So let's look --
10   A     There were occasions where I would park at the
11         neighbor's property.
12   Q     So let's look at this Word document.  Can you
13         see it?
14   A     Yes.
15   Q     So let's go down to the Marcellinos.  So it
16         says you conducted a probation check on
17         3-5-2019, correct?
18   A     Yes.
19   Q     But the answer to your Interrogatory No. 9
20         doesn't have 3-5-2019 on it.  Would that be in
21         the narrative?  Would 3-5-2019 probation check
22         be in your narrative?
23   A     Should be.
24   Q     So I'm going to pull up the narrative.
25               So you entered Marcellino's property on
```

```
 1          3-5-2019, according to the Word document,
 2          correct?
 3   A      Yes.
 4   Q      So I'm going to stop sharing that, and I'm
 5          going to try to share this Word document?
 6                MR. BARINGER:      After this line of
 7          questioning, he wants to take a restroom
 8          break.
 9                MS. HUTH:           Yeah.  You need to
10          let me finish this one.
11                MR. BARINGER:  That's okay.
12   Q      Which document do you see?
13   A      I see the larger narratives.
14   Q      So 3-5-2019, did you enter her property that
15          day?  We're looking at the Marcellino follow
16          up PDF, that's on the screen.
17   A      No, I didn't.
18   Q      But why does the Word document say you
19          conducted a probation inspection on 3-5-2019?
20   A      It was probably just logging that sentencing
21          hearing.
22   Q      Why does it say probation check next to
23          3-5-2019 on the Word document?
24   A      Because she's on probation on that point.
25   Q      She's on probation  at what point?
```

```
 1   A    When she was sentenced, she became a
 2        probationer.
 3   Q    So it wasn't really a probation check.  It was
 4        a sentencing?
 5   A    Yeah.  As part of her probation, she was
 6        sentenced, and we got word of her probation.
 7   Q    Do you see the next entry in the, I guess
 8        we're calling it the Marcellino follow up
 9        narrative?
10   A    Yes.
11   Q    What date is that?
12   A    3-6-19.
13   Q    Is that on your Word document?
14   A    Yes.
15   Q    I'm going to share the Word document again,
16        and you can show where.  Do you see the Word
17        document?
18   A    Yes, I see it.
19   Q    Where is it on here?
20   A    3-16-19.
21   Q    3-6-19.
22   A    Or 3-6-19.
23   Q    Where is it?
24   A    On my screen?
25   Q    Do you see the Word document, it's called
```

```
 1         prior Word document something?  Am I sharing

 2         it?

 3    A    This is Marcellino follow up.  That's the only

 4         one I see.

 5    Q    Where is the 3-6-19 probation check on the

 6         Word document?

 7    A    All I see is a Marcellino follow up PDF.

 8    Q    I'm not sharing the Word document.  It says it

 9         says you are sharing screen.

10    A    I don't see it.  I'm sorry.

11    Q    Does anyone else see it?

12              MR. BARINGER:     No.  We have the

13         follow up document.

14              MS. HUTH:         Let me stop sharing

15         that, and then I'll try to share this other

16         one.  I mean, maybe Matt if you could keep

17         that document open, we can would not be here

18         all day, you know.  Because you're the one

19         that provided me with a Word document, so

20         maybe you could just show your client it, so

21         I'm not switching between this stuff.

22    Q    So do you see the Word document in front of

23         you?

24    A    Yes.

25    Q    Do you see a 3-6-2019 entry?
```

144

| | | |
|---|---|---|
| 1 | A | I don't. |
| 2 | Q | Why not?  Why is it there no 3-6-2019 entry? |
| 3 | A | I don't know.  That must have been a mistake. |
| 4 | Q | This Word document, specifically as to the |
| 5 | | Marcellinos, where did you get this |
| 6 | | information from to put it on this document? |
| 7 | A | From the follow up narratives.  So it must |
| 8 | | have been a mistake for me not to have that |
| 9 | | date on there. |
| 10 | Q | Then let's talk about 4-11-2019 probation |
| 11 | | check.  Do you see the follow up document in |
| 12 | | front of? |
| 13 | A | I don't.  Why don't you share the follow up |
| 14 | | document, because I've got that one here. |
| 15 | Q | You have which one? |
| 16 | A | The Word document. |
| 17 | Q | So let's just focus on the follow up document |
| 18 | | so then I don't have to -- I'll stop sharing |
| 19 | | that, and then I'll share just the follow up, |
| 20 | | and you have the Word document.  Good. |
| 21 | | So do you see the 3-9-2019 probation |
| 22 | | check on your follow up? |
| 23 | A | I don't. |
| 24 | Q | Sorry, 4-11-19.  You said the 3-9-19 is a |
| 25 | | mistake, correct. |

```
 1   A     I don't.
 2   Q     Is the 3-9-2019 probation check entry in the
 3         Word document a mistake?
 4   A     Scroll up a little bit.  Yeah, okay, I don't
 5         see the 3-9.
 6   Q     How about 4-11-2019?  I'll scroll there.  Do
 7         you see a 4-11-2019 entry?
 8   A     No, I don't.
 9   Q     You conducted a probation check on April 11,
10         2019, correct?
11   A     Yeah.
12   Q     Why isn't it in the follow up narrative?
13   A     It may have just been stopped at the property
14         where nothing happened, no one was home.  I
15         don't recall.
16   Q     But Where did you get the 4-11-19 probation
17         check in the Word document?  You entered it on
18         a computer, I assume.  You put 4-11-19
19         probation check.  Where did you get that date
20         from?
21   A     It would be this document.  I'm not sure why
22         the dates are off.
23   Q     I mean, you're the one that did this.  Which
24         document is the accurate document of when you
25         conducted your probation checks, the Word
```

```
 1          document or the Marcellino follow up
 2          narrative?
 3   A      The Marcellino follow up narrative is.
 4   Q      So the Word document that you gave us is not
 5          the correct dates for probation checks,
 6          correct?  At least it contains some incorrect
 7          dates.
 8   A      It seems like there's some incorrect
 9          information.
10   Q      So show me where the 3-9-20 probation check is
11          from the Word document?
12   A      Again, that may have just been --
13              MR. BARINGER:     I'm showing him a
14          copy of it because he can't scroll.
15              MS. HUTH:          That's better if you
16          show him a copy.
17   A      So 3-9-19 --
18   Q      No, 3-9-20.  The Word document says you did a
19          probation inspection on March 9th of 2020.
20   A      Okay, yeah.  So it's not in the larger
21          narrative, so that may have just been a going
22          to the property and no contact was made.  So
23          it wouldn't have been entered in the
24          narrative.
25   Q      So you don't enter into narratives when you
```

147

| | | |
|---|---|---|
| 1 | | just leave a business card, for example? |
| 2 | A | Apparently a mistake was made with this one. |
| 3 | | I don't know why. |
| 4 | Q | So a mistake was made on the first entry, |
| 5 | | 3-5-2019 probation check didn't happen; a |
| 6 | | mistake was made on the 3-9-2019 probation |
| 7 | | check as well; a mistake was made on April 11, |
| 8 | | 2019 probation check; and a mistake was made |
| 9 | | on the March 9, 2020, probation check, |
| 10 | | correct?  In the Word document, would you |
| 11 | | agree with me? |
| 12 | A | The visits where no contact was made aren't |
| 13 | | entered into the narrative. |
| 14 | Q | So you're saying on 3-5-2019 probation check, |
| 15 | | you made an entry without contact, which is |
| 16 | | why it's not in your narrative? |
| 17 | A | Right. |
| 18 | Q | So on the day she was sentenced, you went to |
| 19 | | Bianca Marcellino's property, but did not |
| 20 | | enter it into your narrative, correct? |
| 21 | A | I didn't go to her property on 3-5-19. That |
| 22 | | was when she was sentenced.  It was 3-6-19 |
| 23 | | when we went -- |
| 24 | Q | So on 3-9-2019 the Word document says you did |
| 25 | | a probation check.  So on that day you entered |

148

```
 1           her property but made no contact, so you did

 2           not record it in your narrative; is that what

 3           you're say?

 4    A      3-9-19 --

 5    Q      Yeah, I'm looking at the Word document, and it

 6           has five dates that you entered her property

 7           --

 8    A      Right.  On 3-9-19, in the follow up, I arrived

 9           at Nicastro's property at around 6:00 p.m.  I

10           parked in her renter's driveway with a clear

11           view of the Marcellino barn.

12    Q      I understand.  I see that, but I'm asking you

13           about probation checks.  I'm not asking when

14           you went to Marcellino's neighbor --

15    A      Yeah, that was a probation check.  That was

16           because she was on probation and I was doing a

17           check at the property.

18    Q      What about 4-11-19?

19    A      Yeah, I don't have anything in here from 4-11

20           from 4-14.

21    Q      So on 4-11-2019, did you conduct a probation

22           and you just didn't put it in the narrative?

23    A      Perhaps.  I don't know.

24    Q      How would you recollect your memory on that?

25           Do you have any notes that you could look at?
```

149

```
1    A    Other than what you have, no.
2    Q    Because the notebooks are gone?
3    A    These notes are the notes that we have.
4    Q    Did you write any of these dates in your
5         notebooks that you throw in the trash or just
6         missed or deleted or don't know where they
7         are?
8    A    I don't know.
9    Q    Do you write dates of your entries in your
10        notebooks?
11   A    No.
12   Q    So when you take a notebook to a property, you
13        don't have the date at the top that you're
14        doing the probation inspection?
15   A    No.
16   Q    Then how do you know what date the notes refer
17        to?
18   A    Because, as I said before, when I'm writing
19        something in a notebook, it's usually a phone
20        number or someone's name.  It's not a
21        dictation of the events that are happening.
22   Q    So when you came from Bianca's property
23        4-11-2019, is that a mistake, or did you make
24        a no contact inspection that day?
25   A    It may have been a no contact inspection.
```

```
1   Q   And that would not be in your notebook?

2   A   Apparently it wasn't.

3   Q   Why do you say, apparently it wasn't; have you

4       looked at that notebook?

5   A   No.

6   Q   So would it be in the first Word document that

7       you create when you come back from the

8       property, and then you use that Word document

9       to put everything into the narrative, would it

10      be in that Word document that you create when

11      you come to the office?

12           MR. BARINGER:     We have been over

13      this a million times.

14           MS. HUTH:         No, I'm asking for

15      4-11-2019.

16           MR. BARINGER:     No, you're asking for

17      the, at least, tenth time.  He testified how

18      he deals with his notebooks and he comes back

19      and records them.

20           MS. HUTH:         Correct.  So I'm

21      asking was 4-11 --

22           MS. HUTH:         Let me ask the

23      question,.

24   Q   So I'm asking you, the 4-11-2019 probation

25      check --
```

| | | |
|---|---|---|
| 1 | A | If you look at 4-9-19, received a complaint |
| 2 | | from the neighbor. |
| 3 | Q | I don't see that -- |
| 4 | A | That she's out there on Sundays. |
| 5 | Q | Where's that? |
| 6 | A | 4-9-19. |
| 7 | Q | I'm not asking about that.  I'm asking April |
| 8 | | 11, 2019, probation check. |
| 9 | A | But if you read the 4-9-19, I said I advised |
| 10 | | her I would come out on Sunday and see for |
| 11 | | myself.  That would have been 4-11-19. |
| 12 | Q | So on 4-11-2019, did you create a Word |
| 13 | | document documenting that probation check? |
| 14 | A | I didn't, because it would be here.  So it |
| 15 | | probably was I went out there, didn't see |
| 16 | | anything, and didn't make a note of it, |
| 17 | | because there was nothing to note. |
| 18 | Q | Where did you get the date 4-11-2019 from to |
| 19 | | create this Word document? |
| 20 | A | If you look at 4-9-19 in my narrative, I say I |
| 21 | | advised her I would come out on a Sunday and |
| 22 | | see it for myself. |
| 23 | Q | Right, and you did on 4-14, right?  So you |
| 24 | | went out on 4-14, which was a couple days. |
| 25 | A | Okay. |

```
1   Q     So that is the same --
2   A     So perhaps 4-11, I went there to meet contact
3         just to do a probation check, and she wasn't
4         there.
5   Q     How would you know that you did a probation
6         check on 4-11-2019?
7   A     I don't know.  It was so long ago, I don't
8         know.
9   Q     Right.  So you have no notes.  So my question
10        is when you created this Word document and you
11        put down the date 4-11-2019, where did that
12        come from?  Where did that date come from?
13  A     It may have been put in there in error.
14  Q     You did do a probation check or you didn't, on
15        4-11-2019?
16  A     I don't recall.  That 4-11 may have been an
17        error.  It may have meant to say 4-14.  I
18        don't know.
19  Q     What about 3-9-20, probation check?
20  A     3-9-20?
21  Q     Yeah.
22  A     Again, there's no note in the narrative.
23  Q     Where did you get how did you know to put that
24        date on the Word document?
25  A     Because I probably went to the property and
```

153

```
 1          didn't make contact with anybody, and there
 2          was nothing to add to the narrative.
 3     Q    No, but you put it on this Word document,
 4          correct?
 5     A    Yes.
 6     Q    So where did you get that?  Was that something
 7          you remember you were there?
 8     A    I don't recall.  I don't remember.
 9     Q    Do you remember when you created this Word
10          document?
11     A    Yeah, vaguely.
12     Q    When?
13     A    So the 3-9-19 --
14     Q    When did you create this Word document, first?
15     A    I don't remember.
16     Q    I can tell you, you can look at the
17          properties, and it'll tell you exactly when
18          you created it.
19     A    So 3-9-19 may have been the mistake, or it
20          3-9-20, so the dates just might be put in
21          wrong.
22     Q    But I don't see 3-9-20 in your narrative.  So
23          you're saying the 3-9-19 and 3-9-20 are
24          supposed to be the same probation date?
25     A    It may have been just an honest mistake.
```

154

1   Q    Why do you say that?  How do you determine

2        it's a mistake?

3   A    Because the dates are similar.  It may have

4        just been a mistake.

5   Q    So when you wrote this Word document and you

6        put down Bianca Marcellino's dates of entry,

7        that was from memory, correct?

8   A    No, it would have been put in through the

9        narrative.

10  Q    You created the narrative before you created

11       this Word document?

12  A    Yes, and then those dates were taken from the

13       narrative.

14  Q    But 3-5-2019 didn't have a probation check.

15       There's no probation check in the narrative.

16       I don't understand how that happened.

17            MR. BARINGER:    We've been over this.

18  A    That was when her probation started.

19  Q    3-9-20 is a mistake as well?

20  A    3-9-20 may be referring to 3-9-19.  It was

21       just an honest administrative mistake.

22  Q    I don't understand what you mean by honest

23       administrative mistake.  I mean, if you're

24       using the narrative to create the Word

25       document, I don't understand how the dates are

```
 1        different.
 2              MR. BARINGER:    Objection.  Don't
 3        answer that.  This is done.
 4              MS. HUTH:         You probably should
 5        answer it, but okay, Matt.  You're lucky
 6        Richard's not here, because I don't think he
 7        would let you get away with so many
 8        objections, because I'm not as knowledgeable
 9        as him.
10   Q    So let's go to another follow up.  Let's go
11        to Sophia Applegate's narrative.  Can you see
12        it?
13   A    Yes.
14   Q    You guys have the Word document with you or
15        you don't?
16   A    We do.  I can see your screen.
17              MR. BARINGER:    For the record, this
18        was not provided to you in discovery, correct?
19              MS. HUTH:         That's correct, it
20        wasn't.
21              MR. BARINGER:    You might want to
22        mark it as an exhibit.
23              (Recess taken.)
24              (Exhibit A through F
25                marked for identification.)
```

```
 1   By Ms. Huth:
 2   Q    Do you remember a document that was called a
 3        modification document that was provided in
 4        discovery?  That's what's the title of the
 5        document.
 6   A    I don't recall specifically that document now.
 7   Q    Don't recall any modification document related
 8        to Bianca?
 9   A    No.
10   Q    Let's talk a little bit about if there's a
11        change in the law, Christian.  If there was a
12        change in the law that applied to humane law
13        enforcement work, how would you be notified
14        about it?
15   A    Jeff Holland is pretty good about
16        communicating with various agencies, so he
17        probably would let us know if something was
18        official.  I, on my own, try to keep abreast
19        of proposed laws.
20   Q    New laws, if the law changed?
21   A    New laws.
22   Q    How do you keep abreast of it?
23   A    Just from looking at just online sites that
24        watch these things.
25   Q    Have you ever looked for anything related to
```

| | | |
|---|---|---|
| 1 | | probation inspections? |
| 2 | A | No, ma'am. |
| 3 | Q | Why not? |
| 4 | A | As I said earlier, it's just such a small part |
| 5 | | of my day to day that it's really very simple. |
| 6 | | I go to the property, I make sure that they're |
| 7 | | following the rules.  A lot of it is just |
| 8 | | talking with these people and trying to |
| 9 | | establish some rapport, because we're going to |
| 10 | | be involved in each other's lives for a while, |
| 11 | | and just trying to make sure that they're |
| 12 | | doing the best that they can. |
| 13 | Q | So who told you that the court order is the |
| 14 | | only source of authority that governs whether |
| 15 | | or not you can do a probation objection? |
| 16 | | MR. BARINGER:    Objection.  You can |
| 17 | | answer. |
| 18 | A | The special prosecutor. |
| 19 | Q | The special prosecutor told you? |
| 20 | A | Yeah, I would get my advice on probation |
| 21 | | checks from the special prosecutor. |
| 22 | Q | Special Prosecutor told you that the court |
| 23 | | order is the only authority that you need to |
| 24 | | enter? |
| 25 | A | I don't think he would use those words, but it |

```
 1          was, you know, John Doe is on probation now,
 2          and your part of the sentence is you're
 3          supposed to do unannounced checks, so make
 4          sure that gets done.
 5    Q     No one ever told you that there's law that
 6          limits when and how you can enter a person's
 7          property for probation inspections?
 8    A     No, ma'am, not specific to probation, no,
 9          ma'am.
10    Q     But Holland told you that you can enter for
11          probation inspection because of the court
12          order?
13    A     Yes.
14    Q     Did anyone else tell you you could enter?
15    A     The Judge that passed the sentence.
16    Q     She didn't tell you, though, did she?
17    A     It's part of the sentence that the humane
18          agent is supposed to do unannounced random
19          inspections.
20    Q     Do you have access to, like Lexis or Westlaw
21          or any kind of legal research programs?
22    A     No, ma'am.
23    Q     Isn't it part of your job to understand what
24          the law is, related to what specific
25          activities you perform?  So for example, you
```

159

| | | |
|---|---|---|
| 1 | | know that you need a search warrant, correct, |
| 2 | | to go into someone's property most times, |
| 3 | | right? |
| 4 | A | Yes, ma'am. |
| 5 | Q | And you have obtained search warrants before? |
| 6 | A | Yes, ma'am. |
| 7 | Q | Have you also gone onto other people's |
| 8 | | property where you haven't obtained search |
| 9 | | warrants, correct? |
| 10 | A | Yes, ma'am. |
| 11 | Q | So were those times only for probation |
| 12 | | inspections, or have you entered other |
| 13 | | people's property without a search warrant for |
| 14 | | other reasons than probation? |
| 15 | A | For other reasons. |
| 16 | Q | What for example, knock and talks or |
| 17 | | something? |
| 18 | A | It would be a complaint about a specific |
| 19 | | property.  I would go out there and meet with |
| 20 | | the owners and if they're fine, showing me |
| 21 | | around, that's a voluntary consent. |
| 22 | Q | Do you inform them that they're not required |
| 23 | | to let you? |
| 24 | A | If they ask me.  If they say, do I have to let |
| 25 | | you on?  I tell them, no, you don't have to. |

```
 1   Q    But you don't tell them that they're not
 2        required to consent when you approach them at
 3        any time when you're --
 4   A    It's not part of it my routine conversation,
 5        no, ma'am.
 6   Q    Like, what do you say?  I need to come look at
 7        your animals?
 8   A    You know, generally speaking, it's hi, I'm
 9        Christian Courtwright from the Humane Society.
10        I received a complaints about your dog, is it
11        okay if we walk back there and get a look at
12        it.
13   Q    So you do ask them, is it okay?
14   A    Yeah.
15   Q    You don't say I need to inspect?
16   A    No, my approach is softer.
17   Q    But if they don't allow you to inspect, is
18        that a problem?
19   A    I mean, it's up to them.
20   Q    Let's talk about policies.  Can you identify
21        any specific policies and procedures as they
22        pertain to humane agents' probation
23        inspections?
24            MR. BARINGER:     Objection.  You asked
25        this already.
```

| | | |
|---|---|---|
| 1 | | MS. HUTH:        I know, I'm just |
| 2 | | going to go through them fast, Matt. |
| 3 | Q | There are none, correct? |
| 4 | A | No, ma'am. |
| 5 | Q | No, ma'am, there are none? |
| 6 | A | No ma'am, there are no probation specific |
| 7 | | policies. |
| 8 | Q | Are there any probation policies or procedures |
| 9 | | related to community control? |
| 10 | A | Within the Humane Society? |
| 11 | Q | Yes, at this point, I'm only asking about |
| 12 | | Geauga County Humane Society policies and |
| 13 | | procedures only. |
| 14 | A | There are not. |
| 15 | Q | Community control, is that the same thing as a |
| 16 | | probation? |
| 17 | A | Yes. |
| 18 | Q | Than the employee handbook that I showed you, |
| 19 | | the 2019 employee handbook, are there any |
| 20 | | other policies and procedures that govern your |
| 21 | | employment?  Before you answer, you're a |
| 22 | | Humane Officer, and you do different things. |
| 23 | | You do knock and talks.  You go onto people's |
| 24 | | property, say, hey, I got a complaint.  I want |
| 25 | | to look at your animals, blah, blah, blah. |

162

```
1              Sometimes you get a warrant, you go on the
2         property, then the criminal charges get filed,
3         and sometimes you do probation inspections.
4                   Does Geauga County Humane Society have
5         any policies and procedures for a humane
6         agent's duties and responsibilities and
7         activities?
8    A    I'm an employee of the Humane Society, so the
9         policies on social media use, harassment,
10        things like that all apply to me.  There are
11        no specific humane agent policies.
12   Q    There are none?
13   A    No, ma'am.
14   Q    Do you know what a policymaker is?
15   A    Broadly speaking, yes.
16   Q    Person who makes policy is that your
17        understanding?
18   A    Yeah, that's my understanding.
19   Q    Are you a policymaker?
20   A    I've never exercised those rights.  My
21        expertise and experience in the field, I'm
22        sometimes asked to give an opinion, but I
23        don't write them.
24   Q    Do you have any unofficial policies that
25        aren't written?
```

163

```
1    A    No.
2    Q    So as a Humane Officer with Geauga County
3         Humane Society, how do you know what to do if
4         there aren't any policies to guide you and
5         what you do, how do you know what to do in
6         your day to day business?
7    A    Through the years of training that I've gotten
8         and the Ohio Revised Code and through the
9         advice of the lawyers that we work with.
10   Q    So the Ohio Revised Code helps guide you in
11        terms of what you do and how you do it,
12        correct?
13   A    Yes.
14   Q    Which sections of the Ohio Revised Code?
15   A    The 1717 section, the 959.
16   Q    No other sections, no probation statutes,
17        nothing like that, that you're aware of?
18   A    If I looked at them, it was I read them once,
19        maybe.
20   Q    Are you aware if there's  Any statute in Ohio,
21        which would be under the Ohio Revised Code
22        that governs probation inspections?
23   A    No, ma'am, not to speak with any expertise.
24   Q    About speaking with any non-expertise?
25   A    No, ma'am.
```

164

```
 1    Q     Do you know policies the executive director
 2          creates?
 3    A     No, not specifically.
 4    Q     So those prior policies you're talking about,
 5          I don't know if you mentioned a vehicle
 6          policy, I'm sure there's one of those and some
 7          other policies.  Do you know who creates those
 8          policies?
 9    A     No.
10    Q     how do you get notice of those policies?
11    A     Either in an email or in a meeting.
12    Q     So you would know if there's any policies on
13          probation because you receive them and there
14          are none?
15    A     Yes, ma'am.
16    Q     In one of your answers, it asked to identify
17          all the people who create policies at Geauga
18          County Humane Society, and you said Hope and
19          Kenneth, in conjunction with prosecutors,
20          special prosecutors, training entities and the
21          board of directors.  Are you aware of any
22          policies that the special prosecutor has
23          created that apply to your humane law
24          enforcement work?
25                MR. BARINGER:     Object, but you can
```

```
 1            answer.
 2    A    I believe most recently our public records
 3            request policy, the special prosecutor helped
 4            us.
 5            MS. HUTH:            Yeah.  I'd like a
 6            copy of that.  I think I said that before.
 7    Q    Are there any unofficial policies?  In other
 8            words, are there any policies that you follow
 9            that are not written down, for example, custom
10            and practices?
11    A    Yeah, to respond quickly, promptly to
12            complaints, to the way that I approach cases,
13            would be considered an unofficial policy.
14    Q    Who created that unofficial policy?  You or
15            your supervisor or the Probation Department of
16            the city?
17    A    It would be me with advice and team meetings
18            with my supervisor.
19    Q    And nothing is written down?
20    A    No, ma'am.  I'm a department of one.
21    Q    You're your own department?
22    A    I'm a department within the Humane Society,
23            but it's just me.
24    Q    Do you have any people that you supervise?
25    A    No.
```

| | | |
|---|---|---|
| 1 | Q | There's no other humane agents in your -- |
| 2 | A | There are some humane agents now, but they |
| 3 | | don't work in the field. |
| 4 | Q | What are the names of the other humane agents? |
| 5 | A | Ken Clarke was recently sworn in as a humane |
| 6 | | agent, and another employee was also sworn in. |
| 7 | Q | What's the name of the other -- |
| 8 | A | Andrea Giordano. |
| 9 | Q | But neither of them actually do field work? |
| 10 | A | No, ma'am. |
| 11 | Q | Do you know why? |
| 12 | A | I can't speak to why they don't.  Ken Clarke's |
| 13 | | the Executive Director, he's got other things |
| 14 | | to do. |
| 15 | Q | So it seems like you're saying that there are |
| 16 | | unofficial policies that sort of guide how you |
| 17 | | do your job and what you do and all that.  Do |
| 18 | | you swing those by your supervisor and say, |
| 19 | | hey, here's how I think we should do it, and |
| 20 | | they're like, yeah, that's good? |
| 21 | A | Yeah.  So if I have a case where it's weird or |
| 22 | | there's something going on.  I'm not going to |
| 23 | | wait for my weekly meeting.  I'm going to say, |
| 24 | | hey, I've got this case going on.  What do you |
| 25 | | think?  This is my approach, do you think this |

| | | |
|---|---|---|
| 1 | | is the best way?  They'll give advice. |
| 2 | Q | So is it an unofficial policy that you conduct |
| 3 | | probation inspections under the authority of a |
| 4 | | court order? |
| 5 | A | As I said, we don't have anything written down |
| 6 | | that says probation should be done XYZ, |
| 7 | | because every case is different. |
| 8 | Q | Right.  So is it an unofficial policy that you |
| 9 | | enter property to conduct probation |
| 10 | | inspections? |
| 11 | A | Yes. |
| 12 | Q | With the court order? |
| 13 | A | Yes.  I wouldn't word it that way, but. |
| 14 | Q | How would you word it? |
| 15 | A | I would word that we're operating under |
| 16 | | direction Of The Court. |
| 17 | Q | Right, but is that an independent decision you |
| 18 | | made, or did someone tell you that that's the |
| 19 | | case? |
| 20 | A | I think when Judge Stupica tells me to do |
| 21 | | something, I'm going to do it. |
| 22 | Q | So if she tells you to enter someone's |
| 23 | | property without a warrant, you're going to do |
| 24 | | it? |
| 25 | A | I don't think Judge Stupica would give me that |

168

```
1         advice.
2    Q    I'm asking you, if she asked you to do
3         something that was not legal, would you do it?
4    A    No, of course not.
5    Q    If one of her order sentencing orders told you
6         to do something illegal, would you just on
7         your own decide not to do it, or would you
8         check with Holland, or would you check with
9         your supervisor, or how would you go about
10        determining whether or not this is something
11        you --
12   A    Yeah, all of the above.  Smarter people than
13        me, I would check with.
14   Q    So you already checked with the special
15        prosecutor that the sentencing order that can
16        conduct random on note inspections on Bianca's
17        property was legal?
18   A    They were present during sentencing.  If there
19        was a problem, they would have told me.
20   Q    Any time have you had a discussion with the
21        state attorney, the state prosecutor, the
22        public prosecutor, at any time, have you had a
23        discussion with him on whether or not random
24        unannounced inspections are legal?
25   A    No, ma'am.
```

| | | |
|---|---|---|
| 1 | Q | How about your supervisor? |
| 2 | A | Have we had conversations? |
| 3 | Q | About whether or not random unannounced |
| 4 | | inspections are legal or illegal? |
| 5 | | MR. BARINGER:    Objection.  Don't |
| 6 | | reveal any conversations if I was present. |
| 7 | | MS. HUTH:        With his supervisor? |
| 8 | | MR. BARINGER:    Yeah, he's a party to |
| 9 | | this case.  There's attorney-client privilege. |
| 10 | | MS. HUTH:        It's attorney-client |
| 11 | | privilege if I ask him if he's had discussions |
| 12 | | with his attorney about whether or not random |
| 13 | | unannounced inspections are legal? |
| 14 | | MR. BARINGER:    With me, yes. |
| 15 | | MS. HUTH:        No, I'm not talking |
| 16 | | about you.  I'm saying his supervisor. |
| 17 | | MR. BARINGER:    I said, if I was -- |
| 18 | | MS. HUTH:        You're not his |
| 19 | | supervisor, are you? |
| 20 | | MR. BARINGER:    I said if I was |
| 21 | | present during those conversations, it's |
| 22 | | attorney-client privilege. |
| 23 | | MS. HUTH:        I don't know if you |
| 24 | | were.  I'm asking him if he's had any |
| 25 | | conversations. |

170

```
 1    A    Let me answer the question then.  The only
 2         conversation we had about whether it was legal
 3         or not was with the attorney and my
 4         supervisor.
 5    Q    With Mr. Matt Baringer or Jeffrey Holland?
 6         There's a lot of attorneys.
 7    A    Matt Baringer.
 8    Q    So the answer is you had no conversations,
 9         other than with this legal counsel for this
10         lawsuit?
11    A    Correct.
12    Q    On whether or not inspections are allowed or
13         not?
14    A    Yes, ma'am.
15    Q    Have you, yourself, not through anything,
16         you've had discussions with your attorney,
17         have you, yourself, learned anything new about
18         probation inspection since this lawsuit was
19         filed?
20              MR. BARINGER:     Objection.  As she
21         said, nothing that we discussed.
22              MS. HUTH:         Nothing that you
23         discussed.  I'm asking to answer the question?
24    A    It was part of that same conversation.
25    Q    With Matt Baringer?
```

```
1   A    Yes.
2   Q    So you've never had a discussion with anyone,
3        anyone else, the special prosecutor, your
4        weekly meetings with your supervisors, the
5        Probation Department, Thrasher, Elko, you've
6        never had any discussions about whether or not
7        unannounced inspections are legal in Ohio for
8        probation inspections?
9   A    Right.  I've never had that conversation.
10  Q    So in discovery, it asked for you to identify
11       the training that you have taken.  Do you
12       recall did you provide all the training that
13       you've taken, as far as you know?
14  A    Probably not all of the training, but, yeah.
15       I mean, there may have been a day training
16       here or there, were I didn't have materials to
17       share, but --
18  Q    You didn't have to have materials to share.
19       The question was to identify the training.
20       Whether or not there were materials or not --
21             MR. BARINGER:     Objection.
22  A    You've got my training.
23  Q    So did you ever conduct a workshop?
24  A    You'll have to explain what you mean by
25       workshop.
```

```
 1   Q    Did you ever conduct a workshop called, Mad
 2        About Ewe?  E-w-e.
 3   A    Say what?
 4   Q    Did you ever conduct a workshop called, Mad
 5        About Ewe?
 6   A    I don't recall.
 7   Q    Do you ever recall hosting a workshop with
 8        Dr. Randy Alger of Alger Vet Clinic,
 9        discussing goats, sheep and pets, and that
10        your job was to do Ohio animal abuse law
11        review with Rescue Village Humane Officer
12        Christian Courtwright?  Does any of that sound
13        familiar?
14   A    Dr. Alger's our goat and pig vet.  I don't
15        recall doing a workshop with him though.
16             MS. HUTH:        So I'm going to share
17        a screen and Steve, G, I think.  Workshop is
18        going to be G.  So I'm going to share the
19        screen a second.
20             (Exhibit G shared on screen.)
21   Q    Do you see this?  It's called Alliance Review?
22   A    With the Happy Trails?
23   Q    Yes.
24   A    Okay, and this is 2014?
25   Q    Yes.  Do you see your name?  All right.  Do
```

```
1          you see your name at the bottom of the
2          document, Courtwright --
3    A     Yeah, I don't believe that I went to that
4          event.
5    Q     Well, it says that you're going to be
6          presenting animal abuse law review with Rescue
7          Village Humane Officer.  Are you with Rescue
8          Village?
9    A     I don't believe I ended up going to it.
10   Q     What is Rescue Village?
11   A     The Geauga Humane Society.
12   Q     It's the same thing?
13   A     Yeah, it's its name.
14   Q     What's its legal name?
15   A     Rescue Village, Inc.
16   Q     Oh, so it's not Geauga County  Humane Society?
17   A     It is Geauga County's Humane Society.
18   Q     Or is it Geauga Humane Society?
19   A     The Geauga Humane Society, I think, is what's
20         on our business card.
21   Q     The Rescue Village is just a name that you
22         guys use?
23   A     Rescue Village Inc. is the name of the
24         business, but our role within Geauga County is
25         as its humane society.
```

174

| | | |
|---|---|---|
| 1 | Q | So you didn't give a workshop on Ohio animal |
| 2 | | abuse law review? |
| 3 | A | I guess, 2014, I definitely didn't go to it. |
| 4 | | I don't have any memory of it.  Maybe they |
| 5 | | talked to me about going, and this is an old |
| 6 | | flyer, but I didn't go to it. |
| 7 | Q | Do you keep a written record of the training |
| 8 | | that you have received? |
| 9 | A | No. |
| 10 | Q | If I don't have to open the document up, be |
| 11 | | quicker, but if I have to, I will.  So I'm |
| 12 | | going to give you a chance before I take the |
| 13 | | time to do it. |
| 14 | A | If it's in the thing that you shared -- |
| 15 | Q | So you just testified you don't keep a record |
| 16 | | of your training? |
| 17 | A | Right.  I don't keep a written record, like an |
| 18 | | ongoing log of the training, no, ma'am. |
| 19 | Q | So Ohio animal cruelty law enforcement manual |
| 20 | | 2021 you gave in discovery. |
| 21 | A | Okay. |
| 22 | Q | In there on page 71, it says keep a record of |
| 23 | | every session you attend, including the date, |
| 24 | | place, sponsor and subject matters covered. |
| 25 | A | Okay. |

175

```
1    Q    Do you remember learning about that in
2         training?
3    A    Not specifically, that one page, no.
4    Q    You don't keep a record including date, place,
5         sponsor, subject matters covered of training?
6    A    No.
7    Q    Does anyone at Geauga County keep a written
8         record of the training that you've taken?
9    A    The required by the law, which is the OPATA
10        training, yes, they have a record of that.
11   Q    Does Geauga County Humane Society keep a
12        record of all training that you take?
13   A    No.
14   Q    Why not?
15             MR. BARINGER:     Objection.
16   A    I don't know that, it's just --
17   Q    Why don't you keep a record of all training
18        you take?
19             MR. BARINGER:     Objection.
20   A    If I go to a day training about cat nutrition,
21        that's just for my own benefit so I'm a
22        smarter person and a better Humane Officer.  I
23        don't need to keep a written record of that.
24   Q    So the Ohio quality law enforcement manual in
25        2021, you went to that training, correct?
```

```
 1   A      Yes.

 2   Q      Do you keep a record of it?

 3   A      I believe the certificate that I got

 4          afterwards was in my employee file, because

 5          that's what the State requires.

 6   Q      So you don't follow the training that says

 7          that you should keep a record of every

 8          session?

 9   A      I think I answered that already with, no, I

10          don't keep a record of every training I do.

11   Q      So the training that you received, for

12          example, from the Ohio animal cruelty law

13          enforcement training, which is this manual

14          2021 that I'm talking about.  So you follow

15          some of the training, some parts of the

16          training, but not other parts?

17                MR. BARINGER:     Objection.

18   A      About my professional development?  I don't

19          keep a written log of all the training I do,

20          no.

21   Q      So my question to you is, you go to this

22          training, and it says, here are the things you

23          should do.  You just pick and choose which one

24          you want to do and which one you don't want to

25          do?
```

```
1   A     No.

2   Q     But you testified you don't --

3   A     No, the state requires the OPATA training.

4         Any training I do too, would be approved by my

5         supervisor.  So if I was taking the day to go

6         down to Columbus, I would let my supervisor

7         know, hey, I'm going to go do this training.

8   Q     I understand that.  I'm not asking about that.

9   A     There'd be a written record of it through an

10        email or whatever.

11  Q     But you don't keep a log of all the training

12        you've attended?

13  A     No, ma'am.  I don't know any officers that do.

14  Q     But your training for the Ohio cruelty law

15        enforcement manual says to keep a record of

16        every session you attended, including date,

17        place --

18        MR. BARINGER:     Okay, let's move on.

19        He said he doesn't do that.

20  Q     Okay, so you don't follow all the training

21        that you've received?

22        MR. BARINGER:     Let's move on.

23  Q     Is that correct?

24  A     Not about my training.

25  Q     Is there any other training that you don't
```

178

```
1              follow, specifically, that you're trained on?
2                   MR. BARINGER:      Objection.  Ask him a
3              specific question.
4     A    Yeah, I'd be happy to answer any specifics you
5              have.
6     Q    So you don't follow it on the recordkeeping,
7              okay.
8                   MR. BARINGER:      Objection.  That's a
9              statement not a question.
10    Q    Did you enter Bianca's property on March 14th
11             of 2019?
12    A    Yes.
13    Q    The reason it's not in the Word document that
14             you provided, which is Exhibit E, is because
15             of an administrative error; is that what you
16             said?
17    A    Yes.
18    Q    What is an administrative error?
19                  MR. BARINGER:      Objection.  Let's
20             move on from that.
21    Q    Christian, what is an administrative error?
22    A    It just isn't in the larger narrative.
23    Q    Administrative error means it's in the larger
24             narrative or it's not?
25    A    It's in the main narrative.  As I said before,
```

```
 1          it -- which one are you asking about, I'm
 2          sorry?
 3    Q     You said you entered the property on March 14,
 4          2019?
 5    A     Yeah, 3-14-19, I went on the property.
 6    Q     On Bianca's property or on the parent's
 7          property?
 8    A     On Bianca's property.
 9    Q     And you conduct a probation inspection on that
10          day, correct?
11    A     Yes, ma'am.
12    Q     Did you tell Bianca on the phone that day that
13          you had a right to question people on her
14          mother's property?
15    A     I don't recall.
16    Q     Did you speak with Bianca on the phone on that
17          day?
18    A     I believe her father called her while I was
19          out there, and I spoke with her.
20    Q     So Bianca wasn't at the property on that day?
21    A     She was not, no.
22    Q     So you were conducting a probation inspection
23          without her on the property?
24    A     Right.
25    Q     But prior to just now, you had testified
```

180

```
 1            earlier that you don't conduct probation
 2            inspections if the person's not there,
 3            generally.
 4    A     Frequently, if they're not home, I don't know
 5            if they're going to be home, if I do a random
 6            inspection.  So sometimes they're not there.
 7    Q     And if they're not there, you still do the
 8            inspection?
 9    A     No.
10    Q     But on March 14, 2019, she wasn't there, and
11            you said you conducted an inspection?
12    A     I thought she was there.  The neighbors had
13            called to say that she was there.
14    Q     Did you knock on her door?
15    A     I either knocked on the door or her father met
16            me when I pulled up.  I don't remember.
17    Q     So you didn't see Bianca on that day, correct?
18    A     No, I just spoke with her on the phone.
19    Q     Did you walk around the property?
20    A     I think I was in the backyard at some point.
21    Q     So you did conduct a probation without her
22            being there.  So July 10, 2019, did you enter
23            the property on that day?
24    A     I'm sorry, what date did you say?
25    Q     July 10, 2019.
```

```
 1   A    2020?
 2   Q    No, July 10, 2019.  Were you on the property
 3        that day?
 4   A    You're saying July --
 5   Q    July 10 of 2019, July 10, 2019, were you on
 6        the property that day?
 7   A    I don't think so.
 8   Q    Because in your request for admissions, you
 9        admitted you were on the property on that day.
10        Was that a mistake?
11   A    That probably was a mistake.  We meant 2020,
12        if that's what we said, yeah.
13   Q    We already talked about July 13, 2019, that
14        you were on there that day, correct?
15   A    Say the date again.
16   Q    July 13, 2019?
17   A    Yes.
18   Q    And it's not in the Word document because of
19        administrative error, correct?
20            MR. BARINGER:      Objection.  Asked and
21        answered.  Move on.
22   Q    December 21, 2019, did you enter the property?
23        You can look at your follow up, it's not on
24        that.
25   A    I'm looking at them.
```

182

| | | |
|---|---|---|
| 1 | Q | Just to give you a notice that it's not on |
| 2 | | your follow up.  But I'm asking you a |
| 3 | | question.  I'm not asking whether it's on your |
| 4 | | follow up document.  I'm asking, did you the |
| 5 | | property on December 21, 2019? |
| 6 | A | I don't believe so. |
| 7 | Q | So if I show you a video, would it maybe jog |
| 8 | | your -- I'm going to show you a video. |
| 9 | | It seems like you're not recalling a |
| 10 | | lot, so I just want to see if I can jog your |
| 11 | | memory.  Do you recall doing any inspections |
| 12 | | during the snow? |
| 13 | A | I don't recall. |
| 14 | Q | So I'm going to share a screen here.  Do you |
| 15 | | see the document in front of you? |
| 16 | A | Okay. |
| 17 | | MS. HUTH:     So this is going to |
| 18 | | be pic that says December 21, at the top, of |
| 19 | | 2019.  That's going to be H. |
| 20 | | (Exhibit H shared on screen.) |
| 21 | Q | So, Christian, just look at the picture here, |
| 22 | | don't look at the time stamp at the top.  Do |
| 23 | | you recognize anyone in there? |
| 24 | A | Yeah, I think that's me. |
| 25 | Q | Because you wear a Geauga Humane jacket? |

| | | |
|---|---|---|
| 1 | A | Yes, ma'am. |
| 2 | Q | Do you recognize the property that you're on? |
| 3 | | Like there's a door on the side and a |
| 4 | | building.  Do you recognize that building? |
| 5 | A | That could be Marcellino's property. |
| 6 | Q | Any idea when that was that you were on that |
| 7 | | property? |
| 8 | A | Well, it says December 21, 2019. |
| 9 | Q | Were you on the property on December 21, 2019? |
| 10 | A | Looks like I was. |
| 11 | Q | So I'm going to ask you again, were you on the |
| 12 | | property on December 21, 2019, Christian? |
| 13 | A | Apparently, I was. |
| 14 | Q | Can you show me where in your narrative it is? |
| 15 | A | It's not there. |
| 16 | Q | Why not? |
| 17 | A | I don't know.  Maybe it was an impromptu |
| 18 | | inspection.  It didn't make it to the |
| 19 | | narrative.  I don't know. |
| 20 | Q | So not all the stuff makes it into the |
| 21 | | narrative; would you say that it's fair to |
| 22 | | say? |
| 23 | A | I would say this one did not. |
| 24 | Q | Let's look at March 14th.  Were you on the |
| 25 | | property on March 14th of 2020?  It's not in |

184

```
1              the narrative, I don't believe, but I'm asking
2              you, were you on the property on March 14th of
3              2020?
4    A    I don't have a record of it.  March 14, 2019?
5    Q    No, March 14, 2020.  Were you on the property
6              on March 14th of 2020?
7    A    No.
8    Q    No, or you don't know?
9    A    I don't know.
10   Q    So I'm going to show you a photo.  Oh, I think
11             I'm already sharing it, and I just stopped it.
12                  Do you see this photo?
13   A    Okay.
14   Q    Do you recognize the vehicles in that photo?
15   A    That looks like my work vehicle.
16   Q    Which one, the first or the second one?
17   A    The one in the back.
18   Q    The one in the front is who?
19   A    I don't know.
20   Q    Is that a cop car?
21   A    I don't think so.
22   Q    Do you know whose property that is?
23   A    I can't tell from the photo.
24   Q    I'm going to show you another picture.  Do you
25             see this?  Hold on, I've got to mark that.
```

185

```
 1              MS. HUTH:              So March 14, 2020,
 2         car driveway pic is going to be Exhibit I, and
 3         then March 14th, business card pic is going to
 4         be Exhibit J.
 5              (Exhibits I & J
 6                marked for identification.)
 7    Q    What do you see in the picture that's on the
 8         screen?
 9    A    It looks like me standing in front of my
10         vehicle.
11    Q    Do you see this one with the door?
12    A    That looks like my business card.
13    Q    Do you know whose door that is?
14    A    I can't tell from the photo.
15    Q    Any recollection of putting a business card in
16         someone's door like that?
17    A    I do it all the time.
18    Q    You never left a business card at Bianca's
19         house?
20    A    Like I said before, I may have.  I don't
21         remember.
22    Q    If you had left a business card it would not
23         be in your narrative; is that correct?
24    A    Probably not.  If I don't have contact,
25         there's nothing to narrate.
```

```
 1    Q    I'm going to show you a video now.  I got to
 2         share the screen again.
 3                   Do you see the video?
 4    A    Yes.
 5    Q    Did you hear that, Christian?
 6    A    I didn't hear any of it, no.
 7    Q    You guys couldn't hear?
 8    A    No, ma'am.
 9    Q    So we can move on.  So you weren't on the
10         property on March 14th, correct?
11    A    According to that, I stopped and left my
12         business card.
13    Q    And that's not on the narrative, correct?
14    A    No, ma'am.
15    Q    That's because when you leave your business
16         card, you don't put the stuff in the
17         narrative; is that correct?
18    A    If I just stopped and didn't make contact,
19         there wouldn't have been a need to.
20    Q    Would you have any records that would indicate
21         where you were on March 14th?
22    A    I don't know.
23    Q    Would you have any records that indicate where
24         you were on December 21st of 2019?
25    A    I don't know.
```

| | | |
|---|---|---|
| 1 | Q | What does I don't know mean? |
| 2 | A | I don't know what records you're talking |
| 3 | | about. |
| 4 | Q | What does it mean that you don't know?  You |
| 5 | | don't have records; you don't know if you have |
| 6 | | records; you don't know if you do; you don't |
| 7 | | know what you have? |
| 8 | A | If I was just stopping by and I left a |
| 9 | | business card, there might not be a record |
| 10 | | that I did that. |
| 11 | Q | So in the Word document you did other people |
| 12 | | that you've done probation inspections on. |
| 13 | | Would you record a business card as a |
| 14 | | probation inspection ever? |
| 15 | A | No. |
| 16 | Q | In request for admission number 50, it asked |
| 17 | | whether Bianca gave consent to enter onto her |
| 18 | | property.  And I know I've discussed this, so |
| 19 | | Matt don't panic.  I'm not going to spend a |
| 20 | | lot of time on this.  Your answer was it could |
| 21 | | be argued that she gave implied consent by |
| 22 | | agreeing to the terms of her probation.  Can |
| 23 | | you tell me what that means? |
| 24 | A | I don't think I said it that way.  That there |
| 25 | | is a consent there because she's on probation. |

188

| | | |
|---|---|---|
| 1 | | I mean, she sort of lost her ability to |
| 2 | | consent because she's been prosecuted for |
| 3 | | animal cruelty, and this is part of the |
| 4 | | sanction against her. |
| 5 | Q | So that's what implied consent means? |
| 6 | A | If she didn't want to do probation, she could |
| 7 | | have said, I'd rather go to jail than deal |
| 8 | | with Christian again.  She could have done |
| 9 | | that and never had to see me again.  But because |
| 10 | | she was sentenced for committing a crime, two |
| 11 | | crimes, this was part of that punishment. |
| 12 | Q | That's what you mean by implied consent? |
| 13 | A | Yeah.  I mean, her consent's sort of |
| 14 | | irrelevant when it comes to the probation |
| 15 | | check because it's the Judge who has given me |
| 16 | | the consent to do that. |
| 17 | Q | So when Michelle Nicastro -- I think you |
| 18 | | testified that Michelle Nicastro, some borders |
| 19 | | and renters made complaints about Bianca, |
| 20 | | correct? |
| 21 | A | Yeah. |
| 22 | Q | I forget, did you say those are logged into |
| 23 | | PetPoint or not? |
| 24 | A | No. |
| 25 | Q | They were logged into PetPoint? |

189

```
 1   A    No.

 2   Q    you stopped using PetPoint, you said in 2019?

 3   A    It's somewhere around there, yeah.

 4   Q    Why wouldn't they have been logged into --

 5   A    Her complaint would have been put into the

 6        narrative.  If I receive a complaint --

 7   Q    Every single complaint's in the narrative?

 8   A    Maybe not every one, because Michelle got --

 9        she was very active with calling me and

10        texting me and whatever.  So maybe not every

11        single one.

12   Q    So you have the text from Michelle Nicastro?

13   A    Not anymore, no, that was an old phone.

14   Q    You deleted them?

15   A    It was an old phone.  I don't have that phone

16        anymore.

17   Q    Is that a public records request?  I mean, is

18        the text from Michelle Nicastro to you

19        complaining about Bianca's property a public

20        record?

21             MR. BARINGER:     Objection.

22   A    I don't know that answer.

23   Q    Have you ever taken any public records courses

24        and training?

25   A    No.
```

190

```
 1   Q     By the way, it's free.  The attorney general
 2         gives it for free.
 3   A     Yeah, I downloaded the book and read the book.
 4         It seems like a good program.  I'll take your
 5         advice.
 6   Q     Did you say you read a book?
 7   A     Yeah, there was a book that was the sunshine.
 8   Q     Sunshine.  Did you read that?
 9   A     Yeah.
10   Q     Would you agree with me that humane law
11         enforcement officers, humane agents or Humane
12         Officers are subject to the public records
13         laws?
14   A     Yes.
15   Q     You had answered in one of your
16         interrogatories that you have not received any
17         training specifically to entries onto private
18         property other than through the Ohio Peace
19         Training Association.
20   A     Yes.
21   Q     So the training you received on entries onto
22         private property through the Ohio Peace
23         Training Association did not relate to
24         probation inspection entries, correct?
25   A     Correct.
```

1   Q    But it related to things like warrants and
2        exceptions to warrants, right?
3   A    Yes, ma'am.
4   Q    I asked you this question before, I don't
5        think I got an answer.  Can you list for me
6        what the exceptions to a search warrant are?
7        Can you list for me can you tell me when you,
8        as a Humane Officer, are not required to get a
9        search warrant before you enter the property?
10       You already said when you go and knock and
11       talk and ask them?
12  A    Exigent circumstances, there's voluntary
13       consent.
14  Q    Probation inspections, is that an exception?
15  A    As far as I know, yeah.  I don't need to
16       search want to do a court ordered probation
17       check.
18  Q    Let's say, hypothetically, the court had not
19       ordered random unannounced inspections for
20       Bianca Marcellino in her sentencing and
21       instead had simply sentenced her to probation,
22       and it had not allowed you to do random and
23       unannounced, would you have done probation
24       inspections if the court ordered?
25  A    No ma'am.

```
 1   Q    Who would have done those probation
 2        inspections, the Probation Department?
 3              MR. BARINGER:    Wait a second.  Could
 4        you repeat the question?
 5   Q    If hypothetically, Judge Stupica's order did
 6        not have the random unannounced inspection
 7        clause in it and simply committed or sentenced
 8        Bianca to probation, just to probation, active
 9        inactive, whatever you want; would you have
10        had the authority to enter her property?
11   A    No.
12   Q    For probation inspections?
13   A    No.
14              MR. BARINGER:    Objection.
15        Hypothetical.
16   A    It's hypothetical --
17              MS. HUTH:       Yeah, I understand.
18        Don't feed him the answers, Matt.  I
19        understand.
20   Q    Christian, if you had learned that she was
21        smoking crack on the front lawn and there was
22        not that random unannounced inspection clause
23        but she had been committed to probation,
24        inactive or active, would you have been
25        permitted to enter her property?
```

```
 1   A   Again, bear with me.  The hypothetical is
 2       she's not --
 3   Q   Subject to random unannounced inspections, and
 4       she's simply subject to probation.
 5   A   I'm not a drug enforcement officer, so no, I
 6       wouldn't.
 7   Q   If she was committing a crime on her property
 8       and was under a probation sentence that did
 9       not have random unannounced inspections, would
10       you have been able to inspect her property?
11           MR. BARINGER:      Objection.
12   A   If I received a complaint of animal cruelty,
13       again, I would have tried to make contact with
14       her.
15   Q   Through a probation inspection?
16   A   No, through a regular inspection, a regular
17       hey, I received a complaint, what's going on?
18   Q   Who would have done those probation
19       inspections, do you think, the Probation
20       Department?
21   A   I don't know that.  This is a hypothetical.
22   Q   If it didn't have a random unannounced clause
23       in there, who would be conducting probation
24       inspections?
25   A   I don't know that.
```

194

```
 1   Q    But you would have the authority to do it --
 2   A    If Judge Stupica said that there were not
 3        unannounced inspections, nobody would be doing
 4        the unannounced inspections, 'cause you just
 5        said that's not part of the sentence.
 6   Q    Right.  I'm asking if she was on probation,
 7        but the clause wasn't in there about
 8        unannounced inspections, would you have been
 9        able to conduct inspections?
10   A    No.
11             MR. BARINGER:      Objection.
12   Q    Because you're not a Probation Officer?
13   A    Because the part of doing unannounced
14        inspections wasn't part of her sentence.
15   Q    And that's the only authority you have is to
16        do unannounced inspections, as a Humane
17        Officer?
18   A    Yes.
19   Q    Have you ever announced any inspections
20        before?  Have you ever let anyone know in
21        advance that you're going to be conducting a
22        probation inspection on the property?
23   A    Sometimes.
24   Q    Did you ever talk to Bianca about saying, hey,
25        let's try to get some common times that I can
```

```
 1         come?
 2  A      Yeah.  It would be good just to know that,
 3         like every third Saturday, I might show up.
 4  Q      Did ever deviate from that?  Did you ever come
 5         on, like, a Friday instead of a Saturday after
 6         you told her you'd come on a Saturday?
 7  A      I didn't say it was going to be exclusive.
 8  Q      Oh, I see.  So it's in addition?
 9  A      Yeah.
10  Q      Every other Saturday in addition to random
11         unannounced inspections?
12  A      But having something regular where there
13         wouldn't be any surprises may have been good
14         for us to build rapport.
15  Q      So in any of the training that you took teach
16         you about updated case law or updated
17         statutes, any specific training?
18              MR. BARINGER:     Objection.  You know,
19         I'm giving you some leeway, but you're asking
20         the same --
21              MS. HUTH:       I'm allowed to keep
22         him here for seven hours.  I am not playing
23         frivolous here.  You might think I've asked it
24         before, but I haven't asked it before.  I
25         might have asked a different question, but I'm
```

```
 1            still -- and when you depose my clients, you
 2            asked six times the exact same question, Matt.
 3            So go ahead and object, but Christian answer
 4            and if I have to repeat the question --
 5                 MR. BARINGER:    If you're going to do
 6            a speaking objection, I spent two hours with
 7            your client, one hour with the other, a half
 8            hour with the other.  They wouldn't answer a
 9            simple question.  That's why I kept asking it.
10            He's answered this a million times about case
11            law.  He's answered all these questions a
12            million times.
13                 MS. HUTH:        I'm going to ask it
14            again.
15       By Ms. Huth:
16       Q    Identify specifically what training gave you
17            training on updated case law or updated
18            statutes?
19                 MR. BARINGER:  Objection.
20       A    During the OPATA training part of that
21            training was talking about some of the new
22            laws that were coming out, maybe some of the
23            laws that changed, but because laws are
24            changing all the time, there might not be
25            specific trainings, it might be an email or a
```

197

```
 1         phone call or an online article that I read.
 2    Q    Is there any policy that says that you have an
 3         obligation to keep up on current case law and
 4         current statutes if they change?
 5    A    No.
 6    Q    Any informal or formal policy?
 7    A    I think it's good practice.
 8    Q    To keep up on current case law?
 9    A    Yeah, specifically for the animal cruelty.
10    Q    You ever read any case law that specifically
11         says that you need reasonable suspicion or
12         reasonable grounds to enter?
13    A    This is like third time that I've said no, but
14         I'm going to say, no, again.
15    Q    Just confirming it, thank you.  Sometimes I
16         forget if I've asked before.
17    A    I understand.  It's been a long day.
18    Q    I just want to confirm, you didn't have any
19         search warrants when you entered Bianca's
20         property subsequent to her being sentenced,
21         correct?
22    A    No.
23    Q    Have you had any training on constitutional
24         rights?
25    A    It's in the humane agent training and a couple
```

```
1            of the national trainings I've gone to, they
2            talk about it, yes.
3    Q   Do they talk about what a person's
4            constitutional rights are, vis-a-vis you
5            entering onto a property?
6    A   Yes.
7    Q   So what for example?
8    A   Rights of privacy and --
9    Q   What about Fourth amendment; do you know about
10           that?
11   A   I'm sorry?
12   Q   The Fourth amendment?
13   A   Yes.
14   Q   What's that?
15   A   Protects against illegal search and seizure.
16   Q   Unreasonable search and seizures.  So do you
17           consider any of the probation inspections you
18           conducted on Bianca's property and the
19           parents' property to be an unreasonable search
20           and seizure?
21   A   I never did a search at her parents' property,
22           but at Ms. Marcellino's, I would say they were
23           reasonable, because it's part of the sentence.
24   Q   Reasonable because of what?  Pardon?  Because
25           it's part of the court order, correct?
```

| | | |
|---|---|---|
| 1 | A | Yes, ma'am. |
| 2 | Q | So if it's in the court order, then it's not |
| 3 | | an unreasonable seizure or search, correct? |
| 4 | A | Correct. |
| 5 | Q | So the Judge's order trumps everything?  The |
| 6 | | Judge's order trumps statute, and the Judge's |
| 7 | | order trumps case law. |
| 8 | A | I think the Judge knows the Constitution |
| 9 | | better than I do, and if the Judge thinks it's |
| 10 | | legal, then I'm not -- |
| 11 | Q | Who are you to question her, is that what |
| 12 | | you're saying? |
| 13 | A | Yeah, and I don't have any reason not to |
| 14 | | believe her or him. |
| 15 | Q | Are you aware that in Bianca's sentence, she |
| 16 | | was ordered to pay restitution, the Judge |
| 17 | | ordered her to pay restitution, correct? |
| 18 | A | Yes. |
| 19 | Q | Do you know that she appealed that, correct? |
| 20 | A | Yes. |
| 21 | Q | Because you have that in your narrative, so |
| 22 | | you know about that, right?  I think it's in |
| 23 | | your narrative or some other document I saw |
| 24 | | that you knew she was appealing. |
| 25 | A | Yeah, she appealed that. |

| | | |
|---|---|---|
| 1 | Q | Do you know that the appeals court said that |
| 2 | | she didn't have to pay restitution, right? |
| 3 | A | Yeah, that's fine. |
| 4 | Q | So the restitution was in the court order, |
| 5 | | would you agree, it was in her sentencing |
| 6 | | order? |
| 7 | A | It was, yeah. |
| 8 | Q | So the appeals court determined it was illegal |
| 9 | | for her to have to pay restitution, correct? |
| 10 | A | Yes. |
| 11 | Q | So sometimes court orders do have illegal |
| 12 | | clauses in them. |
| 13 | A | Yeah.  I mean, the justice system works.  It's |
| 14 | | great. |
| 15 | Q | So what do you do independently to determine |
| 16 | | whether or not a clause in a court order is |
| 17 | | legal or not legal? |
| 18 | | MR. BARINGER:    Objection. |
| 19 | A | If Ms. Marcellino wanted to appeal the terms |
| 20 | | of her sentence, it's her right as an American |
| 21 | | to do that. |
| 22 | Q | I know it's her right.  I didn't ask you that |
| 23 | | question.  What I asked you is, you said if |
| 24 | | it's in the court order, then it's legal, is |
| 25 | | that what you said? |

| | | |
|---|---|---|
| 1 | A | Yes.  So if it's appealed and it said, no, |
| 2 | | that's not how it's supposed to go, then I'm |
| 3 | | going to follow what the appeal is.  If it's |
| 4 | | appeal and it's upheld, then it's still -- |
| 5 | Q | So you would agree that sometimes court orders |
| 6 | | don't always have legal clauses in them; would |
| 7 | | you agree? |
| 8 | A | Naturally, that's why we have -- |
| 9 | Q | Appeal courts? |
| 10 | A | Appeal courts. |
| 11 | Q | Federal courts? |
| 12 | A | All of it. |
| 13 | Q | But you determined that the random announced |
| 14 | | inspection is legal? |
| 15 | | MR. BARINGER:    Objection. |
| 16 | Q | Asked and answered, correct? |
| 17 | A | It's not up for me to decide.  It's the Judge |
| 18 | | ordering it and I'm going to do it. |
| 19 | Q | What does HISOP mean?  Is that humane |
| 20 | | investigation standard operating procedure? |
| 21 | | Are you familiar with that word? |
| 22 | A | You'd have to use it in a sentence for me. |
| 23 | Q | Again, I'm trying not to show the documents |
| 24 | | unless we have to.  So if you remember, just |
| 25 | | let me know so we can save time.  In 2014, you |

```
1            completed a self appraisal, it's called.  In
2            there, it said you'd like to get back into
3            classes and expand working knowledge of humane
4            law, and you also put HISOP.
5    A       So yeah, Humane investigation standard
6            operating procedures.
7    Q       What is that?
8    A       You know, it's not anything specific.  It's
9            just how are other humane societies doing this
10           work.  What are humane societies doing that is
11           good that we can adapt?
12   Q       Is there a manual?
13   A       Some humane societies have  manuals.
14   Q       You don't?
15   A       No, ma'am.
16   Q       Your humane society does not?
17   A       For humane investigation --
18   Q       HISOP?
19   A       No.
20   Q       Standard operating procedure.
21   A       Because right now it's just me doing the work
22           in the field.
23   Q       So there's no standard operating procedure
24           that is formally written down for your job?
25   A       Correct.
```

| | | |
|---|---|---|
| 1 | Q | Do you have mandatory training?  I mean, this |
| 2 | | training you've taken, that's just something |
| 3 | | that you can if you want to, right?  Is there |
| 4 | | any mandatory training for your job? |
| 5 | A | Just the OPATA training, the state requires |
| 6 | | it. |
| 7 | Q | OPATA is a Peace Officer Association Training? |
| 8 | A | Yes, ma'am. |
| 9 | Q | Would you agree with me that plain view is an |
| 10 | | exception to the search warrant requirement; |
| 11 | | would you agree with me?  I'm just looking at |
| 12 | | one of your training things.  I'm just going |
| 13 | | to list them:  Exigent circumstances, stop and |
| 14 | | frisk; these are all exceptions to a search |
| 15 | | warrant; one's plain view, one's custody, |
| 16 | | one's probation searches.  So would you agree |
| 17 | | that plain view is an exception? |
| 18 | A | Yes, but I wouldn't use that as -- it's a |
| 19 | | nuanced answer you're asking for. |
| 20 | Q | What do you mean? |
| 21 | A | Because even if something is in plain view, |
| 22 | | doesn't mean that I'm not going to stop and go |
| 23 | | get a search warrant. |
| 24 | Q | But sometimes you don't get a search warrant? |
| 25 | A | If it's exigent circumstances and things are |

```
 1          in plain view, maybe not.
 2    Q     What about the horses in the parent's barn;
 3          was that an exigent circumstance?
 4    A     No.
 5    Q     What was that?
 6    A     They were horses in a barn.
 7    Q     Is that plain view?
 8    A     Them sticking your heads out the window, I
 9          would say is plain view.
10    Q     Did you approach them, the horses?
11    A     Yes.
12    Q     Did you look in the window?
13    A     Yes.
14    Q     That's plain view, too?
15    A     Yeah.  If I could see it from where I was
16          standing, it's plain view.  I didn't climb in
17          the window or open a door or --
18    Q     Would you agree that plain view requires you
19          to be lawfully on the place that you're
20          standing before you have a plain view
21          exception to the search warrant?
22    A     Yes, ma'am.
23    Q     And one of your interrogatories had asked for
24          you to describe in detail your training.  You
25          talked about a University of Colorado
```

```
 1            training.  I don't remember any manuals.  Was
 2            that something online that you didn't have
 3            manuals for or what?
 4    A       No, you got the manuals for that.  It was
 5            through an organization called Code Three and
 6            the University Of Colorado, and it's Level 1,
 7            2 and 3 Animal Cruelty Training Academy.
 8    Q       I don't think I got those.
 9    A       If you didn't get them, it's because I don't
10            have them anymore.
11    Q       Oh, you don't?
12    A       But I'm pretty sure you got them.
13                 MR. BARINGER:     Yeah, I thought he
14            gave them to me and I gave them to you.
15                 MS. HUTH:         What would it look
16            like?
17                 THE WITNESS:      It'd be a binder.
18                 MR. BARINGER:     I had a copy, so it
19            wouldn't be a binder to her.  Is there a
20            title?  Code three, I believe.
21                 THE WITNESS:      Yeah, Code 3.
22    Q       So I got Animal Agriculture 101, Animal
23            Control Officer Training Manual, Basic Humane
24            Society Agent Training Student Manual January
25            2022, National Cruelty Investigations School
```

```
 1        Level 2.
 2  A     That's the one.
 3  Q     That's Colorado?
 4  A     Yeah.
 5  Q     It doesn't say that.  It says University of
 6        Missouri - Columbia Humane Society United
 7        States --
 8  A     University of Missouri- Columbia did it first,
 9        and then it the University Of Colorado.
10  Q     So you would agree, I don't have a manual with
11        University of Colorado training, correct?
12  A     It's the same organization.  It was just
13        backed up by a different university.  So yeah,
14        it's not University of Colorado, it's
15        University of Missouri.
16  Q     But you said University of Colorado in your
17        answer, you meant University of Missouri?
18  A     For Level 1, it was Missouri.  I believe, for
19        Level 2, it was Colorado.  It's been a couple
20        of years, so.
21  Q     How do you decide what training you should
22        take?
23             MR. BARINGER:     Haven't we been
24        through this?
25  Q     Is it something that you're, like, well,
```

| 1 | | they're offering something today and it's |
| 2 | | available, and I'm going to take it, or I need |
| 3 | | I need to boost up in some certain area, and |
| 4 | | let me see if there's training; is that how |
| 5 | | that works? |
| 6 | A | Yes.  There's not a lot of training for humane |
| 7 | | agents, so it's low hanging fruit. |
| 8 | Q | So it's just when it becomes available, you |
| 9 | | take it? |
| 10 | A | Yes. |
| 11 | Q | And sometimes it becomes available and you |
| 12 | | don't take it? |
| 13 | A | Sometimes, yeah. |
| 14 | Q | Your supervisor doesn't come up to you and |
| 15 | | say, I think you should take this training? |
| 16 | A | If my supervisor came to me with training |
| 17 | | saying, I think you should take it, I'd take |
| 18 | | it. |
| 19 | Q | Do you do any continuing education?  Like in |
| 20 | | law, we do CLE, continuing legal education. |
| 21 | | Do you do any -- |
| 22 | A | It's not required for humane agents.  So I'm |
| 23 | | not required to do X amount of hours or |
| 24 | | anything like that, no. |
| 25 | Q | You're not required to do any, let alone X |

```
1          number of hours, correct?
2    A     According to the ORC, it's just that initial
3          training.
4    Q     Do you know what statute number that is?
5    A     Not off the side of my head.  It's in the 1717
6          Section, I believe.
7    Q     Do you know what probable cause means?
8    A     Yes.
9    Q     Can you just try to explain it to me?
10   A     That there is reason to believe that something
11         might be happening.
12   Q     About reasonable suspicion, define that for
13         me.
14               MR. BARINGER:      Objection.  You asked
15         that.
16   Q     What do you believe reasonable suspicion
17         means?
18   A     That a reasonable person would believe that
19         there's a crime happening.
20   Q     Did you have reasonable suspicion that a crime
21         was happening at any probation inspections for
22         Marcellino?  At any one of them, any given one
23         or all of them?
24   A     That wasn't the reason I was out there, no.
25   Q     So you did not have reasonable suspicion?
```

```
 1    A     No.
 2    Q     Do you know what knowingly means?
 3    A     Yes.
 4    Q     What does it mean?
 5    A     That you're aware of what you're doing and the
 6          consequences of it.
 7    Q     Do you know what intent means?
 8    A     Yes.
 9    Q     What's that mean?
10                MR. BARINGER:     Objection.  Go ahead.
11    Q     What do you believe intent means, intent?
12    A     Your reason for doing something.
13    Q     When you say that you did not intentionally go
14          onto the parents' property, what does
15          intentional mean?
16    A     My reason for being there wasn't to go on
17          their property or look in the window or look
18          at the horses.  The reason I was at the
19          property, my intent for being at the property,
20          was to conduct the probation check.
21    Q     On Bianca's property?
22    A     Yes.
23    Q     Did you intend to look at the horses on the
24          parents' property on July 10, 2020?
25    A     I didn't know the horses would be looking out
```

210

```
 1          the windows and when I was walking the
 2          property, when I saw the horses, I looked at
 3          them.
 4    Q     So they just caught your eye?
 5    A     Yes.
 6    Q     So you weren't intentionally looking at the
 7          barn?
 8    A     It wasn't my goal.
 9    Q     So you just tripped towards the barn?
10    A     I didn't see that.
11    Q     I'm asking.  Did you intend to walk towards
12          the barn when you looked at the horses?
13    A     When I approached the barn?  Yeah, there were
14          horses and I wanted to look --
15    Q     Did you intentionally approach the barn?
16    A     Yes.
17    Q     It wasn't an accident, is what I was trying to
18          get at.
19    A     You're right.
20    Q     Not like someone pushed you into the barn,
21          towards the barn, it was all on your own
22          volition, correct?
23    A     Yes, ma'am.
24    Q     In fact, people were telling you not to go
25          there and you still did; would you agree?
```

```
 1   A      Yes.
 2   Q      Pretty vociferously, weren't they?
 3   A      She's very loud.
 4   Q      Yeah, and you just ignored them.
 5   A      She was telling me not to go even in her
 6          backyard.
 7   Q      Bianca was?
 8   A      Yes.
 9   Q      Did anyone else tell you not to go towards the
10          barn at any time?
11   A      My only conversation was with Bianca when I
12          was up there.
13   Q      In any of your probation inspections, did
14          anyone ever tell you not to go towards the
15          barn?
16   A      I think Giancarlo may have said not to go over
17          there.
18   Q      And did you, after you told you that?
19   A      No.
20   Q      You never went over there again after they
21          told you not to go over?
22   A      No.
23                MS. HUTH:         So let's take some
24          time off so I can take care of my dogs.
25                (Recess taken.)
```

```
 1              MS. HUTH:          Christian, you back
 2       on?
 3              THE WITNESS:       Yes, ma'am.
 4   By Ms. Huth:
 5   Q     Did you have any discussions with anyone
 6         during the break about the deposition?
 7   A     No, ma'am.  Just Matt.
 8              MS. HUTH:          Matt, I'm not allowed
 9         to ask him what he talked about, correct?
10              MR. BARINGER:      Correct.  But I could
11         tell you it was hardly anything.
12              THE WITNESS:       Yeah, I took a walk
13         outside.
14              MR. BARINGER:      I took a drive.
15   Q     So, Christian, can you conduct probation
16         inspections outside of the County of Geauga?
17   A     No.
18   Q     Your jurisdiction is solely limited to
19         conducting humane law enforcement business
20         only within Geauga County, correct?
21   A     Yes.
22   Q     For a person that you have the court order
23         that authorizes you to conduct probation
24         inspections, what do you do when someone
25         leaves the County?
```

213

| | | |
|---|---|---|
| 1 | A | Hopefully, they went through the Probation |
| 2 | | Department to get approval, and then it's out |
| 3 | | of my hands from there. |
| 4 | Q | Do you recall a person whose property you |
| 5 | | inspected that moved out of state to New York? |
| 6 | A | Is that Sophia Applegate? |
| 7 | Q | Well, if it's Applegate or Livingston, I think |
| 8 | | it's whatever, but okay. |
| 9 | A | I didn't do the inspection. |
| 10 | Q | You didn't do those inspections? |
| 11 | A | Not personally, no.  Contact was made with |
| 12 | | local law enforcement, and they went out there |
| 13 | | just to make sure that wherever she was moving |
| 14 | | to didn't have horses. |
| 15 | Q | In what state? |
| 16 | A | I think it was New York. |
| 17 | Q | You made contact with the police in that |
| 18 | | state. |
| 19 | A | Yes. |
| 20 | Q | But if you don't have authority to conduct |
| 21 | | probation inspections outside of your county, |
| 22 | | what gave you the right to contact another |
| 23 | | state to do a probation inspection? |
| 24 | | MR. BARINGER:    Objection. |
| 25 | | MS. HUTH:        I'm asking his |

| | | |
|---|---|---|
| 1 | | opinion. |
| 2 | A | It was just to make sure that wherever she was |
| 3 | | going didn't have horses.  There was some |
| 4 | | concern between me and Ann Elko about whether |
| 5 | | she was going to be living with horses and |
| 6 | | picking back up.  I said, well, why don't I |
| 7 | | just call them and see if they can go out |
| 8 | | there and do a check. |
| 9 | Q | They just happily complied. |
| 10 | A | -- probation check, they just went out there |
| 11 | | as law enforcement to meet their new resident. |
| 12 | Q | So you didn't consider that a continuation of |
| 13 | | your probation inspection duties by calling |
| 14 | | police in another state? |
| 15 | A | I think it was the end of my duties as the |
| 16 | | Humane Officer. |
| 17 | Q | When she left the County, that was the end of |
| 18 | | your duties? |
| 19 | A | To ensure that wherever she was living didn't |
| 20 | | have horses. |
| 21 | Q | It was your duty to ensure that wherever she |
| 22 | | was living, she didn't have horses, regardless |
| 23 | | of whether it was in Geauga County or not? |
| 24 | A | I wanted to make sure that if she was living |
| 25 | | in a property that had horses, local law |

215

```
 1            enforcement would know about the history.
 2    Q     I know what you intended to do and the reason
 3            you did it.  I'm asking you, you said that
 4            your authority ends at some point and I was
 5            trying to figure out when does it end?
 6    A     In Geauga County when the person is no longer
 7            on probation.
 8    Q     But if a person is outside of Geauga County
 9            and still on probation, is that outside of
10            your authority, or still within it?
11    A     It's outside of my authority.
12    Q     So I think you testified that sometimes you
13            use your personal vehicle to conduct probation
14            inspections and surveillance for probation
15            purposes, correct?
16    A     Just in the Marcellino case.
17    Q     Why just the Marcellino case?
18    A     Because it warranted it.
19    Q     Does Geauga County Humane Society policies and
20            procedures, I might have asked you this, but
21            please just answer again 'cause I don't
22            remember, do they authorize you to use your
23            personal car for business?
24    A     They don't disallow it or allow it.  There's
25            no policy about using my own vehicle.
```

1   Q    Were you on the clock, so to speak, when you
2        were conducting surveillance on Nicastro's
3        property?
4   A    I don't remember.
5   Q    So you would have done it for free, free time?
6   A    I may have flexed hours.  If I did a couple
7        hours here, I might flex them out later.  But,
8        yeah, I don't remember whether I was clocked
9        in or not.
10  Q    Do you remember whether or not you reported
11       your time in any way in any other way?
12  A    I don't recall.
13  Q    Do you recall if you didn't record your time?
14            MR. BARINGER:    He doesn't recall.
15  A    Yeah, I don't recall one way or the other
16       whether my time was recorded.
17  Q    Do you have a GPS system installed on your
18       company vehicle?
19  A    No.
20  Q    How about on your personal vehicle?
21  A    No.
22  Q    At every probation inspection, where you
23       actually entered her property, not the
24       surveillance portion, but actually entered her
25       property, did every time you enter property,

```
 1          you call the police for them to accompany you?
 2     A    Not every time, no.
 3     Q    What was the deciding factor on whether or not
 4          you were going to call the police?
 5     A    Initially, I did, and it just sort of felt
 6          like a waste of taxpayer dollars to have the
 7          Chesterland Police Department out there every
 8          time.  I felt that -- I wasn't hopeless that
 9          rapport might become established and we can
10          have a good working relationship.
11     Q    I'm going to pop up a document.  Christian,
12          I'm going to pop up a document on the screen.
13               I think that's L.  It's going to be
14          called Statute document L.  It's 2951.02.
15               (Exhibit L on screen.)
16     Q    Christian, do you see Ohio Revised Code
17          Statute in front of you?
18     A    Yes, ma'am.
19     Q    It says Section 2951.02, Factor to consider in
20          granting probation or suspending sentence,
21          correct?
22     A    Yes, ma'am.
23     Q    Can you read the first paragraph?  The first
24          paragraph, I'm going to highlight it.
25               Do you see my highlighting?
```

218

```
 1   A     Yes, ma'am.

 2   Q     Just read that out loud if you can?

 3   A     During the period of a misdemeanor offender's

 4         community control sanction or during the

 5         period of a felony offender's nonresidential

 6         sanction, authorized probation officers, who

 7         are engaged within the scope of their

 8         supervisory duties or responsibilities, may

 9         search with or without a warrant, the person

10         of the offender, the place of the residence of

11         the offender, and a motor vehicle, another

12         item of tangible or intangible personal

13         property, or other real property in which the

14         offender has a right, title, or interest or

15         for which the offender has the express or

16         implied permission of a person with the right,

17         title, or interest to use, occupy, or possess

18         if the Probation Officers have reasonable

19         grounds to believe that the offender is not

20         abiding by the law or otherwise is not

21         complying with the conditions of the

22         misdemeanor offender's community control

23         sanction or the condition of the felony

24         offender's nonresidential sanction.

25   Q     Are you familiar with this Statute?
```

219

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Have you ever seen this Statute before? |
| 3 | A | No. |
| 4 | Q | Do you think this Statute applies to you as a |
| 5 | | Humane Agent? |
| 6 | | MR. BARINGER:     Objection.  You can |
| 7 | | answer. |
| 8 | A | Probably. |
| 9 | Q | Do you believe that this Statute applies to as |
| 10 | | a Humane Agent? |
| 11 | A | Probably some portions of it, yes. |
| 12 | Q | Which portion that you just read? |
| 13 | A | Knowing that I'm not a Probation Officer.  I'm |
| 14 | | acting for the Probation Office. |
| 15 | Q | So which part applies to you?  In your |
| 16 | | opinion, which part of this applies to you? |
| 17 | A | Authorized Probation Officers. |
| 18 | Q | What about the reasonable grounds language, |
| 19 | | does that apply to you? |
| 20 | A | Probably. |
| 21 | Q | Did you have any reasonable grounds to enter |
| 22 | | Bianca Marcellino's property? |
| 23 | A | Yes. |
| 24 | Q | What was that reasonable ground? |
| 25 | A | Because she was on probation, and part of that |

| | | |
|---|---|---|
| 1 | | probation was the unannounced inspections at |
| 2 | | the property. |
| 3 | Q | Did you have a belief when you entered her |
| 4 | | property that she wasn't abiding by the law? |
| 5 | A | Every time I go out there, it's a possibility. |
| 6 | Q | I'm not asking you that. It's also possibility |
| 7 | | that a hurricane's going to hit today, too, |
| 8 | | but I'm asking did you believe -- |
| 9 | A | But that's why there are the unannounced |
| 10 | | inspections, is to make sure that that isn't |
| 11 | | happening. |
| 12 | Q | When you went to conduct probation inspections |
| 13 | | on Bianca Marcellino's property, did you have |
| 14 | | a belief that she was not abiding by the law? |
| 15 | A | Yes. |
| 16 | Q | What law was she not abiding by when you |
| 17 | | entered her property for each of those |
| 18 | | probation inspections? |
| 19 | A | That she was keeping animals, that she was |
| 20 | | keeping horses.  It was a distinct possibility |
| 21 | | that any time I went out there, I could have |
| 22 | | found it. |
| 23 | Q | Well, that's true, you could have.  I mean, |
| 24 | | you could have found her smoking crack too, |
| 25 | | hypothetically, but that's not what I'm |

```
1         asking.  I'm asking, prior to you making each
2         of your probation inspections, did you have
3         any information in your brain that would lead
4         you to believe that she was breaking the law?
5              MR. BARINGER:      Objection.  He's
6         asked and answered that three times.
7              MS. HUTH:          I'd like him to
8         answer it again.
9    A    She broke the law once.
10   Q    Yes.  We know that.  We're not disputing the
11        probation here.
12   A    She was put on probation so she wasn't going
13        continue to break the law.  She was put on
14        probation for breaking that law, and in the
15        hopes of that probation, I'm sure it's that
16        she's not going to continue to break the law.
17        Part of the unannounced inspections are to
18        make sure that she's not, that's she's
19        vacating all of the animals in a humane
20        manner.
21   Q    So you didn't have a belief she wasn't abiding
22        by it, you entered her property to make sure
23        she was abiding by the law; would you say
24        that's a fair statement?
25   A    I would say both could be true.  It wouldn't
```

```
 1          have surprised me if I went there and found
 2          neglected horses on her property.
 3    Q     Did you ever find neglected horses on her
 4          property?
 5    A     No, ma'am, and I'm glad.
 6    Q     But no one ever called up and said, hey, she's
 7          not and abiding by the law, correct?
 8    A     Correct.
 9    Q     After sentencing, I'm always talking about
10          after sentencing.
11    A     After sentencing, correct.
12    Q     Did anyone ever call you up and say,
13          Christian, she's not abiding by the conditions
14          of her community control?
15    A     Yes.
16    Q     Who?
17    A     Michelle Nicastro.
18    Q     How many complaints do you estimate you
19          received from Michelle Nicastro?
20    A     Maybe half a dozen.
21    Q     Did any of those come to fruition?
22    A     No.
23    Q     So what, after a while, you're just like, oh,
24          I don't believe her complaints, or you went
25          out for everyone, or how did that work?
```

| | | |
|---|---|---|
| 1 | A | Didn't want to go out every week to the |
| 2 | | Marcellino property. |
| 3 | Q | She was calling you every week? |
| 4 | A | If a complaint came in and I had just been to |
| 5 | | the Marcellinos, I would acknowledge that |
| 6 | | whatever the complainant was telling me, and |
| 7 | | then I would go out to the Marcellino property |
| 8 | | when I felt it was appropriate. |
| 9 | Q | So none of the complaints from Michelle |
| 10 | | Nicastro ever -- |
| 11 | A | Right, no. |
| 12 | Q | Do you have any belief that Bianca was |
| 13 | | violating her probation? |
| 14 | A | Again, you're asking about belief.  I don't |
| 15 | | have any evidence that she was. |
| 16 | Q | Would you agree that the statute, what you |
| 17 | | just read, in your opinion, I'm only asking |
| 18 | | your opinion, I'm not asking you're not a |
| 19 | | lawyer, I get that, but you're a Humane |
| 20 | | Officer, would you believe that the statute |
| 21 | | requires you, as a humane agent, to have |
| 22 | | reasonable grounds to believe that the |
| 23 | | offender's not abiding by the law or otherwise |
| 24 | | not complying with their control sanctions, |
| 25 | | prior to you being able to go onto the |

224

```
 1        property?
 2  A     I would need a lot more time to review this
 3        and to discuss it with an attorney and to see
 4        what else is underneath this page that you've
 5        highlighted.  I can't just say, yeah, I agree.
 6  Q     Then let's go through it.  I will put the
 7        first page, you can read it, and then I'll go
 8        to the second page.
 9              MR. BARINGER:    He's not going to be
10        able to read and digest this.  He says he's
11        never seen it before.
12  Q     Have you ever heard about this statute?
13  A     No, ma'am.
14  Q     So you not only have not seen it, but no one's
15        told you about the statute?
16  A     No, ma'am.
17  Q     All that training you had, they never talked
18        about this statue.
19  A     2929, no ma'am.
20  Q     2951.02, the one you're --
21  A     No, ma'am.
22  Q     Did you know that the statute even existed?
23              MR. BARINGER:    He just answered no.
24  A     No.  If there was something within this law
25        that I needed to consider, smarter people than
```

225

```
 1        me would have let me know.
 2   Q    In your opinion, does this statute apply to
 3        you?
 4             MR. BARINGER:      Objection.  He said
 5        he isn't familiar with it.
 6   A    I would need to read it thoroughly and talk
 7        about it with the special prosecutor, the
 8        Probation Department.
 9   Q    Do you recall sending Probation Officer Elko
10        an email saying, I've just been sued.  They're
11        suing me for random unannounced inspections?
12   A    Yeah.
13   Q    What you remember that?
14   A    Yeah.  Yeah, I wanted to see What information
15        she would have.  That would have been a
16        perfect opportunity for her to tell me about
17        this law.
18   Q    And she didn't, correct?
19   A    Correct.
20   Q    Did you ask anyone else about it, about the
21        random -- the content of the email was, hey,
22        do you have any input into this?
23   A    Yeah.
24   Q    Did you get any input from anyone else on
25        that, not Jeff Holland?
```

| | | |
|---|---|---|
| 1 | A | They were aware of the lawsuit, and they |
| 2 | | didn't tell me about the statute. |
| 3 | Q | What about your supervisors? |
| 4 | A | Yes. |
| 5 | Q | Yes, what? |
| 6 | A | Yes, they were aware of the lawsuit. |
| 7 | Q | They did anyone come to you and talk to you |
| 8 | | about -- |
| 9 | A | No, ma'am. |
| 10 | Q | So your supervisor never mentioned 2951.02; |
| 11 | | Jeffrey Holland never mentioned 2951.02; Elko |
| 12 | | never mentioned it; Thrasher never mentioned |
| 13 | | it; and the Judge never mentioned it; would |
| 14 | | you agree? |
| 15 | A | Yes, ma'am. |
| 16 | Q | Did you ever spit in Giancarlo Marcellino's |
| 17 | | face? |
| 18 | A | No, I didn't.  I think I was wearing a mask |
| 19 | | during that. |
| 20 | Q | Who was? |
| 21 | A | I was. |
| 22 | Q | You never took it off? |
| 23 | A | No, ma'am. |
| 24 | Q | Would you agree that there was a new hire |
| 25 | | performance evaluation form that you |

```
 1          completed, and in there it stated that you're
 2          to stay current on certification, new laws and
 3          training; do you recall that?  If not, I can
 4          show the document, but that's what it says.
 5    A     I know what you're talking about, yes.
 6    Q     So do you follow that guidance or I don't know
 7          if it's a guidance or mandate.  It's a job
 8          requirement.  Do you follow that requirement?
 9    A     Yes, I do.
10    Q     You do?  But  you didn't know about 2951.02?
11    A     I know.
12    Q     Does 2951.02 take precedence over the Judge's
13          order that you followed to do random
14          unannounced inspections?
15               MR. BARINGER:     Objection.  That is a
16          purely legal question.  He has no idea.
17    Q     Now that you know about the statute which one
18          prevails and rules --
19    A     I wouldn't say that I know about the statute.
20          I would have to read it in depth and take
21          counsel from our special prosecutor, the
22          Probation Department, the Judge.
23    Q     Do you agree that the statute requires
24          reasonable cause before entering property on
25          what you just read?
```

```
 1              MR. BARINGER:      Objection.  He's

 2         answered that he hasn't --

 3    Q    Do you agree that the statute requires

 4         reasonable grounds?

 5              MR. BARINGER:      Objection.

 6    A    Again, I would have to read it to be able to

 7         give you an intelligent answer.

 8    Q    So hypothetically, if a statute is in conflict

 9         with the Court's order, which one is going to

10         prevail?

11              MR. BARINGER:      Objection.  He's not

12         a lawyer.

13    A    Yeah, I'm not a lawyer.

14              MS. HUTH:          I'm not asking that.

15         He's a humane agent, he's a law enforcement

16         officer.  He can answer whether or not the law

17         prevails or the court, in his opinion.

18              MR. BARINGER:      You know this issue

19         is before The Supreme Court of Ohio.  You're

20         asking the humane agent to determine what The

21         Supreme Court of Ohio hasn't even decided?

22              MS. HUTH:          No, I'm asking a

23         humane agent to tell me whether or not if the

24         statute requires reasonable cause as grounds

25         to enter property and the court order says you
```

```
 1          can answer whenever the hell you want, which
 2          one prevails.  I'm asking Christian.
 3                  THE WITNESS:      We're going to run
 4          out of time if we keep --
 5                  MS. HUTH:         If you keep not
 6          answering, we're going to take longer, since
 7          I'm almost at the end, but now you're making
 8          it go longer.
 9                  THE WITNESS:      I've answered it the
10          best that I can, that I would have to read
11          this in depth, with our attorney, to
12          understand how it affects our small little
13          world of humane law.
14   By Ms. Huth:
15   Q     But yet you did answer that you agree that
16          part of your job to understand what the law
17          is, correct?
18   A     Yes.
19   Q     So you don't understand what 2951.02 is,
20          correct?
21   A     Yes, ma'am, I don't.
22   Q     I can pull this document out again, if I have
23          to.  So page 6 of the Ohio Animal Cruelty Law
24          Enforcement Manual 2021, which is one of the
25          training documents you provided; do you recall
```

```
1          that?
2     A    Yes, ma'am.
3     Q    So page 6, there's a statement that's signed
4          by J. Jeffrey Holland on March 21st.  It says,
5          remember also that law changes, new case law
6          may be decided the day you open this book and
7          will alter some of the opinions and advice you
8          see here.  There is no substitute for reading
9          the statutes, understand it, case law, and
10         seeking advice from your attorney or
11         prosecutor to determine how the law may apply
12         to any specific situation.
13              Do you need me to open the document up
14         to show you that it says that?
15    A    No.
16    Q    Let me ask this:  Do you believe that you're
17         updated on all case law and statutes that
18         pertain to Humane Officer enforcement?
19    A    I do the best that I can.
20    Q    How's that?  What's that, is that waiting for
21         someone to tell you what the case law is, or
22         you go on your own initiative and look?
23              MR. BARINGER:  Objection.
24    A    All of the above.
25    Q    Did you take any pictures or videos on Bianca
```

231

```
 1        Marcellino's property?
 2   A    After sentencing?
 3   Q    Yes.
 4   A    No.
 5   Q    Do you have a body camera?
 6   A    No.
 7   Q    Why not?
 8             MR. BARINGER:     Objection.
 9        Relevance.
10   Q    You still have to answer, Christian.
11   A    No, we don't, and it's just not something that
12        we do.
13   Q    I can pull the email up.  Do you recall an
14        email from Elko that recommended that you have
15        a body camera?
16   A    She recommended having a body camera or going
17        out there with police officers.
18   Q    And you just thought that wasn't necessary?
19   A    I haven't been to her property since.  I will
20        definitely have a law enforcement officer with
21        the body camera there.
22   Q    Are you planning on conducting any more
23        probation inspections on Bianca's property?
24   A    She's still on probation.
25   Q    Until when?
```

```
 1   A     I don't know the date off the top of my head.

 2         I think another year.

 3   Q     That's not really an answer that she still --

 4         do you plan on conducting further probation

 5         inspections on her property?

 6   A     I would have to talk to our attorney and the

 7         Probation Department and the Judge.  I haven't

 8         since July 10, 2020, so she's gotten she's

 9         gotten it pretty easy from me.

10   Q     That's your opinion?

11   A     Yeah.

12   Q     That the probation inspections you've

13         conducted have been pretty easy on her?

14   A     Yes.

15   Q     That they could get worse; is that what you're

16         say?

17               MR. BARINGER:     Objection.  Come on,

18         don't answer that.

19   Q     So let's look at the Word document.  You have

20         that Word document in front of you, Elko's,

21         correct?  The Word document that has an Elko

22         inspection, and that's Exhibit E, of all your

23         dates inspections.

24   A     Okay.

25   Q     Do you need me to put on the screen?
```

233

| | | |
|---|---|---|
| 1 | A | Yes, please. |
| 2 | Q | You can see it, right? |
| 3 | A | No.  It's the Ohio Revised Code, still. |
| 4 | Q | I'm going to try again.  So do you see it? |
| 5 | A | Yes, ma'am. |
| 6 | Q | So let's go to the Lester.  Thomas and Amanda |
| 7 | | Lester, do you see them? |
| 8 | A | Yes, ma'am. |
| 9 | Q | Do you recall producing or creating a |
| 10 | | narrative follow up Word document? |
| 11 | A | Yes, ma'am. |
| 12 | Q | You don't have that in front of you, do you? |
| 13 | A | No, ma'am. |
| 14 | Q | Hold on.  So I haven't figured out how to do |
| 15 | | both. |
| 16 | A | I think I have it here. |
| 17 | Q | You have the what, the Word or the Lester |
| 18 | | follow up? |
| 19 | A | Okay, I've got it. |
| 20 | Q | The Word document or the Lester follow up? |
| 21 | A | The Lester follow up. |
| 22 | Q | But you did not produce that in discovery, |
| 23 | | correct? |
| 24 | A | I don't know.  I don't think so.  I think you |
| 25 | | had it from previous discovery. |

```
 1   Q     So that's why you decided not to give it, is
 2         because I have it.
 3               MR. BARINGER:     Objection.  He didn't
 4         decide anything.  I made the decisions on
 5         discovery.
 6               MS. HUTH:          Well, Matt, just so
 7         you know, so I don't forget, when we end with
 8         Christian Courtwright.  I'm reserving the
 9         right to redepose him upon the documents that
10         I've requested, and we can go over those at
11         the end.  But anyway, let's look at Lester.
12               MR. BARINGER:     We're not agreeing to
13         that.
14               MS. HUTH:          I know we're not
15         agreeing, but I just want to get it on the
16         record because I'll be doing a position letter
17         tomorrow to the Judge on it.
18   By Ms. Huth:
19   Q     So Thomas and Amanda Lester, do you see the
20         5-1-2017 probation check on the Word document?
21   A     I don't, yeah.  Yeah, 5-1-17, yes.
22   Q     So can you go to the narrative that you have
23         and let me know where that is in the
24         narrative?
25   A     It's not.
```

235

| | | |
|---|---|---|
| 1 | Q | Why not? |
| 2 | A | I don't know.  It was probably where I went |
| 3 | | out there and didn't make contact, so there |
| 4 | | was nothing to narrate. |
| 5 | Q | Or administrative error, maybe. |
| 6 | A | Sure. |
| 7 | Q | I'm just wondering which one was it?  What's |
| 8 | | sure mean?  Why isn't it on there?  It's |
| 9 | | administrative error or -- |
| 10 | A | If it's not on there, it's because there was |
| 11 | | nothing of note to put on there.  So I |
| 12 | | probably stopped and made no contact and it |
| 13 | | wasn't put in the narrative. |
| 14 | Q | So let's go to the date 10-14-2017 in the |
| 15 | | narrative. |
| 16 | A | 10-4-17? |
| 17 | Q | Correct. |
| 18 | A | Okay. |
| 19 | Q | What does it say in the narrative under |
| 20 | | 10-4-17? |
| 21 | A | Unable to make contact. |
| 22 | Q | What else does it say? |
| 23 | A | Left card at front door. |
| 24 | Q | So sometimes you do put them in the probation |
| 25 | | checks inspections? |

236

| 1 | A | This particular case, I was having a long |
| 2 | | string of not having contact with them.  So |
| 3 | | this is sort of my way of saying, I'm not |
| 4 | | making contact with them.  And I even had an |
| 5 | | email exchange with the Probation Department, |
| 6 | | asking for their advice, saying what's going |
| 7 | | on.  Like, I haven't contacted them.  I'm |
| 8 | | having a hard time getting ahold of them. |
| 9 | Q | But would you agree that prior to this |
| 10 | | testimony just now that you testified that if |
| 11 | | you just leave a card, you don't notate that |
| 12 | | you did a probation inspection? |
| 13 | A | I didn't say always, sometimes. |
| 14 | Q | Sometimes you do and sometimes you don't? |
| 15 | A | Because the Lesters were -- it was very hard |
| 16 | | for me to get ahold of them for a long string. |
| 17 | Q | So look at the narrative, and do you see the |
| 18 | | date 4-19-17, which is the first entry? |
| 19 | A | Yes, ma'am. |
| 20 | Q | 4-27-17, which is the second entry? |
| 21 | A | Yes, ma'am. |
| 22 | Q | Is that in the Word document, which is the |
| 23 | | exhibit? |
| 24 | A | It's not. |
| 25 | Q | Why not? |

237

```
 1   A    I don't know.
 2   Q    So you don't know if that's administrative
 3        error OR how that works, or how it got
 4        omitted?
 5              MR. BARINGER:     Objection.
 6   A    Yeah, I don't know.  It should have been.  I
 7        don't know.
 8   Q    Look at the date in the Word document that
 9        says 5-1-17, 9-5-17 and 3-41-8, do you see
10        those?
11   A    Yes.
12   Q    Why are those not in the narrative?
13   A    I don't know, probably because there was
14        nothing of note there and they were shortly
15        off probation after that.
16   Q    How long was their probation?
17   A    It was only a couple of years.  They asked
18        that they had their probation reduced.
19   Q    And was it?
20   A    Yeah, they had walked the line and done a good
21        job, and we didn't see any reason to fight
22        them on it.
23   Q    Let's look at Emil Rapstine in the Word
24        document that's the exhibit.  Do you see her
25        or him?  I guess it's a him, right?
```

238

```
 1   A      I see it.
 2   Q      Do you have Rapstine's follow up narrative?
 3   A      I do.
 4               MS. HUTH:          I'm going to put this
 5          Lester follow up calls as an exhibit, Exhibit
 6          M, and then I'm also going to put the
 7          Marcellino narrative, which is the same kind
 8          of document, follow up narrative as Exhibit N.
 9               MR. BARINGER:      I believe you mean
10          the Rapstine follow up?
11               MS. HUTH:          Well, I want the
12          Lester follow up is M.  I want the Marcellino
13          as N, and then the Rapstine follow up as O.
14               (Exhibits M - O marked
15                for identification.)
16   Q      So let's look at the Lester follow up.
17   A      Rapstine.
18   Q      Rapstine, correct.  Do you have your Rapstine
19          follow up narrative?
20   A      Yes.
21   Q      Do you see any 10-1-2019 entry on there?
22   A      Yes.  Rapstine no longer lived there.
23   Q      Go to the Word document that's an exhibit.  Do
24          you see 10-1-2019 in the Word document?
25   A      No, ma'am.
```

```
1    Q    What do you think that's about?

2    A    Rapstine was no longer in the County, and that

3         last check was going to the property to make

4         sure he wasn't there.

5    Q    But you just didn't put in the Word document,

6         for what reason?

7    A    I guess it was an oversight on my part,

8         because I didn't talk to Rapstine.  It didn't

9         involve Rapstine, because different people

10        were living there and Rapstine was gone.  I

11        was just making a note that I went to that

12        property.

13   Q    Let's look at Cox.  Do you have Cox follow up

14        open or in front of you?

15   A    Yes, ma'am.

16             MS. HUTH:        Let's make Cox follow

17        up, P.

18             (Exhibit P marked

19              for identification.)

20   Q    Are there any dates in the Cox Word document

21        that are not in the narrative?

22   A    There are a lot of dates, but some of them

23        aren't probation checks, they're activity

24        about the property.  So some of them aren't

25        probation checks.
```

1   Q   The Word document has 9-18-18 probation check.

2       Is that in the Word document?

3   A   No, ma'am.

4   Q   I just want to explore a little bit more about

5       this, because I'm not understanding.  The Word

6       document, so when you enter 9-18-18 probation

7       check in the Word document, but it's not in

8       the narrative, where did you get the 9-18-18

9       probation check?  Like when you made the Word

10      document, where did you get that date from,

11      just memory?

12  A   From notes from that day that I had gone to

13      the property.

14  Q   Let me ask this:  Do you remember when you

15      created the entire Word document?

16  A   Yeah.

17  Q   And do you remember when you entered specific

18      names on there; was that at the same time or

19      different times?

20  A   I created it, and yes, it was on one day that

21      I created it.

22  Q   So the     9-18-18 probation check, do you

23      remember the day you created that?

24  A   No.

25  Q   Do you remember the year?

241

```
 1   A      No.
 2   Q      Was it this year?
 3   A      This year or last year.
 4   Q      You kind of do remember a little bit about
 5          when it was.  You said you got the 9-18-18
 6          probation check for Cox from your notes,
 7          correct?
 8   A      Yes.
 9   Q      Do you have those notes?
10   A      If it wasn't in the narrative, it was because
11          I, again, didn't make contact with the Cox's.
12   Q      I understand that, but I'm not talking about
13          the narrative.  I'm talking about the 9-18-18
14          probation check that came from your notes, and
15          you said you created the document last year,
16          this year.  Do you have those notes?
17   A      I have a note that gave me the 9-18-18.
18   Q      How about the other dates?  Do you have notes
19          for the other dates on the Cox case?
20   A      Maybe.
21   Q      How about for everyone else on that Word
22          document?
23   A      Maybe.
24   Q      Those notes would be on your computer or
25          handwritten notes?
```

242

```
 1   A     They'd be in the computer.
 2   Q     Those computer notes would have come from
 3         handwritten notes?
 4               MR. BARINGER:      We've been through
 5         this.
 6   A     Yes.
 7   Q     Or from your memory?
 8   A     Yes.
 9               MS. HUTH:          No, we actually
10         haven't because he told me he didn't have any
11         notes, Matt.  He said he discarded all of them
12         and he doesn't know where they are.  I just
13         find out all of a sudden, I just found out
14         that he actually has notes for each of those
15         probation inspections, which of course I want.
16               MR. BARINGER:      Yeah.  You're not
17         going to get them and what does have to do
18         with this case?  This irrelevant, and it's
19         bordering on harassment.
20               MS. HUTH:          Well, it's not
21         irrelevant because now it's a pattern and
22         practice.  So I think we have a right to ask
23         him whether or not he keeps notes, and if he
24         has notes, that we want to see them because I
25         want to see the notes.  I've said I want to
```

1    see everything for probation inspections, and
2    you didn't give them.
3         MR. BARINGER:     We'll see what the
4    Judge says.
5         MS. HUTH:     We will.  So,
6    actually, I think I'm done asking you
7    questions, Christian, but Matt we still have
8    stuff to talk about on the record.
9         MR. BARINGER:     What we need to talk
10    about on the record?  I'm not agreeing to talk
11    about things on the record.
12         MS. HUTH:     Well, the Excel, he
13    said he has Excel.  He said he has reports.
14    He said handwritten logs.  He said he has
15    daily logs.  He has Excel spreadsheets, the
16    public records request policy, Outlook time
17    sheets on his app, and he just testified that
18    he has notes in Word.
19         THE WITNESS:     You mentioned an app?
20         MS. HUTH:     Outlook Heartland
21    timesheets.
22         THE WITNESS:     That doesn't keep my
23    timesheet on the app.
24         MS. HUTH:     I'm not talking to
25    you.  I'm talking to Matt.  I want to see an

1          Outlook Heartland time records.

2                  THE WITNESS:      It's simply a clock

3          in, clock out app.

4                  MS. HUTH:         Yeah, I don't as I

5          want to see the for the times of Marcellino's

6          case.  So I'm just talking to your attorney.

7                  THE WITNESS:      My employment clock

8          in and clock out time.

9                  MS. HUTH:         Excel spreadsheet,

10         public policy records request, daily log,

11         handwritten logs, probation emails and

12         notebooks, notebook, and also the another one

13         I did receive was the Konst narrative follow

14         up K-o-n-s-t, which is the Konst narrative

15         follow up.  I don't have any narrative follow

16         ups either through public records request or

17         through discovery.  Of course, I didn't

18         receive any follow-ups except Marcellino's in

19         discovery.

20                 MR. BARINGER:     Because that's the

21         one --

22                 MS. HUTH:         I also want to see

23         the yearly reports, monthly reports, weekly

24         reports and daily reports.

25                 MR. BARINGER:     You can follow up off

1       the record with a request that those be

2       produced.  I will tell you right now, I'm

3       probably not going to.  I'm not going to get

4       in a fight on the record.  That's all I'm

5       saying.

6            MS. HUTH:       I understand, but

7       I'll talk to Richard as soon as we're done.

8       But I just wanted to make sure that you

9       understand that I'm not ending Courtwright's

10      deposition to end it permanently, that there

11      will be a need to bring him back upon receipt

12      of these documents if the court rules that we

13      have a right to them.  And we asked for these

14      documents in discovery, Matt.

15           MR. BARINGER:    I know, and I didn't

16      give them to you because they're irrelevant.

17           MS. HUTH:       They're relevant to

18      probation inspections.

19           MR. BARINGER:    You're not going to

20      do a complete investigation into this Humane

21      Society about every probation inspection.

22           MS. HUTH:       I am for pattern and

23      practice for Monell purposes.

24           MR. BARINGER:    You're not even going

25      to get to the Monell claim because they didn't

1       do anything wrong in this claim.

2             MS. HUTH:          They still have a

3       requirement to show the documents, and I want

4       this on the record, so that's fine.

5             MR. BARINGER:      It's on the record.

6             MS. HUTH:          Good.  We're done,

7       then.  I just wanted to talk about the

8       exhibits, but we can go off.

9             MR. BARINGER:      I need to advise my

10      client that he has the right to read this and

11      he will be reading it.  So Steve, we would

12      like a copy and he'll read and review.

13            (Signature not waived.)

14            (Deposition adjourned at 3:41 p.m.)

15                        - - -

16

17

18

19

20

21

22

23

24

25

```
1                           SIGNATURE PAGE
2      In Re:        Bianca Marcellino v. Geauga County
3                    Humane Society
4      Case Number:  1:21-CV-01338
5      Deponent:     Christian Courtwright
6      Date:         June 22, 2022
7
8      To the Reporter:
9            I have read the entire transcript of my
10     Deposition taken in the captioned matter or the same
11     has been read to me.  I request that the following
12     changes be entered upon the record for the reasons
13     indicated.
14           I have signed my name to the Errata Sheet and the
15     appropriate Certificate and authorize you to attach
16     both to the original transcript.
17
18
19
20                             _____
                               Christian Courtwright
21           Subscribed and sworn to before me this
22     _____day of _____, 2022.
23
24                             _____
                               Notary Public
25           My commission expires:_____.
```

```
 1         I have read the foregoing transcript from page 1

 2    through page 244 and note the following corrections:

 3    PAGE-LINE       REQUESTED CHANGE          REASON FOR CHANGE

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    _____   _____

25    Christian Courtwright              Date
```

```
 1   State of Ohio,            )
                               ) SS:   CERTIFICATE
 2   County of Cuyahoga,       )

 3        I, Steven E. Mengelkamp, Certified Digital

 4   Reporter and Notary Public in and for the State of

 5   Ohio, duly commissioned and qualified, do hereby

 6   certify that the within named witness, Christian

 7   Courtwright, was by me first duly sworn to testify

 8   the truth, the whole truth, and nothing but the

 9   truth in the cause aforesaid; that the testimony

10   then given by the witness was by me electronically

11   recorded in the presence of said witness, afterward

12   transcribed, and that the foregoing is a true and

13   correct transcript of the testimony so given by the

14   witness as aforesaid.

15        I do further certify that this deposition was

16   taken at the time and place in the foregoing caption

17   specified, and was adjourned.

18        I do further certify that I am not a relative,

19   counsel, or attorney of either party, or otherwise

20   interested in the event of this action.

21

22

23

24

25
```

1          IN WITNESS WHEREOF, I have hereunto set my

2    hand and affixed my seal of office at Cleveland,

3    Ohio, on this 7th day of July, 2022.

4

5

6          Steven E. Mengelkamp, Certified Digital
           Reporter and Notary Public in and for the
7          State of Ohio.
           My Commission expires February 12, 2026.



Bianca Marcellino vs
Geauga County Humane Society

Christian Courtwright
June 22, 2022

## $

**$25 (1)**
8:15

## A

**abiding (9)**
218:20;220:4,14,
16;221:21,23;222:7,
13;223:23
**ability (2)**
124:21;188:1
**able (12)**
80:21;94:14,17;
124:16;125:18;
135:5,9;193:10;
194:9;223:25;
224:10;228:6
**above (4)**
110:21,22;168:12;
230:24
**abreast (2)**
156:18,22
**abuse (3)**
172:10;173:6;
174:2
**Academy (2)**
106:10;205:7
**access (4)**
74:6;119:20,23;
158:20
**accesses (2)**
78:14,16
**accident (1)**
210:17
**accompany (1)**
217:1
**according (5)**
28:4;135:15;141:1;
186:11;208:2
**accurate (2)**
86:22;145:24
**acknowledge (1)**
223:5
**acronym (3)**
78:19;79:15,17
**acting (2)**
41:25;219:14
**active (4)**
12:5;189:9;192:8,
24
**activities (2)**
158:25;162:7
**activity (4)**
15:6;48:6;73:14;
239:23
**actual (8)**
20:2;48:16;50:13,
16;59:25;69:13;
97:14,15
**actually (8)**

83:8;104:5;166:9;
216:23,24;242:9,14;
243:6
**adapt (1)**
202:11
**add (1)**
153:2
**addition (3)**
124:3;195:8,10
**additional (1)**
55:14
**address (8)**
5:7,14,17;24:25;
25:8;55:10;59:12;
61:9
**addresses (1)**
52:1
**adjourned (1)**
246:14
**administrative (10)**
154:21,23;178:15,
18,21,23;181:19;
235:5,9;237:2
**admission (1)**
187:16
**admissions (1)**
181:8
**admitted (1)**
181:9
**advance (1)**
194:21
**advice (20)**
113:1,4,12,16,22,
23;115:6,23;116:15,
19,23;157:20;163:9;
165:17;167:1;168:1;
190:5;230:7,10;
236:6
**advise (3)**
16:3;130:8;246:9
**advised (2)**
151:9,21
**advocate (1)**
17:6
**affairs (1)**
12:10
**affect (3)**
38:5,10,23
**affected (4)**
38:7,8;39:14,25
**affects (1)**
229:12
**afterwards (3)**
44:8;52:22;176:4
**Again (38)**
25:4;28:2;32:1;
37:5;46:4;57:17,19;
78:4;104:2,25;
105:13;108:22;
118:1,3;132:5;
133:19;134:19;
142:15;146:12;
152:22;181:15;

183:11;186:2;188:8,
9;193:1,13;196:14;
197:14;201:23;
211:20;215:21;
221:8;223:14;228:6;
229:22;233:4;241:11
**against (4)**
26:18;93:22;188:4;
198:15
**age (1)**
4:17
**agencies (2)**
11:22;156:16
**agency (3)**
41:21;68:6;115:5
**agent (19)**
7:15;73:9;89:18;
90:5,17;91:1;101:10;
106:23;158:18;
162:11;166:6;
197:25;205:24;
219:5,10;223:21;
228:15,20,23
**agents (8)**
90:1,23;166:1,2,4;
190:11;207:7,22
**agents' (1)**
160:22
**agent's (1)**
162:6
**ago (3)**
10:13;20:15;152:7
**agree (23)**
33:1;86:20,24;
121:19;147:11;
190:10;200:5;201:5,
7;203:9,11,16;
204:18;206:10;
210:25;223:16;
224:5;226:14,24;
227:23;228:3;
229:15;236:9
**agreed (1)**
41:12
**agreeing (4)**
187:22;234:12,15;
243:10
**Agriculture (1)**
205:22
**ahead (5)**
6:10;23:12;42:17;
196:3;209:10
**ahold (2)**
236:8,16
**al (1)**
4:6
**Alger (2)**
172:8,8
**Alger's (1)**
172:14
**Alliance (1)**
172:21
**allow (5)**

19:21;40:14;
123:22;160:17;
215:24
**allowed (18)**
19:19,23,24;20:18,
21;23:11;29:17;
34:17;37:21;42:9;
110:12;125:5;134:3;
138:14;170:12;
191:22;195:21;212:8
**allowing (2)**
109:12;124:3
**allows (4)**
34:13;124:5;
138:11,13
**almost (1)**
229:7
**alone (1)**
207:25
**along (5)**
70:22;93:24;94:4,
9;135:2
**alter (1)**
230:7
**always (9)**
40:14;49:11;62:20;
86:23;97:23;99:23;
201:6;222:9;236:13
**Amanda (3)**
56:3;233:6;234:19
**amendment (2)**
198:9,12
**American (1)**
200:20
**amount (1)**
207:23
**Andrea (1)**
166:8
**animal (20)**
6:16,22;11:4,19;
33:21;36:4;106:15;
117:22;172:10;
173:6;174:1,19;
176:12;188:3;
193:12;197:9;205:7,
22,22;229:23
**animals (21)**
19:12,15,17,18;
20:21;33:13,16,18;
34:9,14,18;76:2,3;
81:22;125:4,6;
136:16;160:7;
161:25;220:19;
221:19
**Ann (6)**
17:1;56:1;62:10;
92:10,11;214:4
**announced (2)**
194:19;201:13
**annual (8)**
66:22,24;67:1,2;
72:14,17,20;77:23
**answered (26)**

17:23;22:13;31:9,
19;34:11;66:4,21;
71:3,6;85:25;86:11;
91:2;121:22;122:10;
131:1;132:21;176:9;
181:21;190:15;
196:10,11;201:16;
221:6;224:23;228:2;
229:9
**anymore (11)**
41:5;44:4;50:18;
60:14,16;61:1;82:11;
89:7;189:13,16;
205:10
**APL (1)**
7:21
**app (7)**
100:2,3,7;243:17,
19,23;244:3
**Apparently (4)**
147:2;150:2,3;
183:13
**appeal (5)**
200:19;201:3,4,9,
10
**appealed (3)**
199:19,25;201:1
**appealing (1)**
199:24
**appeals (2)**
200:1,8
**appears (1)**
28:4
**Applegate (4)**
53:24;55:23;213:6,
7
**Applegate's (1)**
155:11
**applied (1)**
156:12
**applies (4)**
219:4,9,15,16
**apply (5)**
162:10;164:23;
219:19;225:2;230:11
**appointed (3)**
44:16,17,20
**appraisal (1)**
202:1
**apprised (2)**
12:5;42:1
**approach (7)**
12:14;160:2,16;
165:12;166:25;
204:10;210:15
**approached (5)**
120:9;135:25;
136:9,19;210:13
**appropriate (1)**
223:8
**approval (1)**
213:2
**approved (1)**

177:4

**April (5)**
101:1,16;145:9;
147:7;151:7

**area (5)**
119:20,22,24;
123:6;207:3

**argued (1)**
187:21

**armed (2)**
40:25;127:25

**arms (1)**
92:25

**around (17)**
26:12;63:22,25;
64:18,23;94:17;
103:12,13,14,17,18;
122:8,24;148:9;
159:21;180:19;189:3

**arrive (1)**
122:17

**arrived (3)**
43:8;127:11;148:8

**article (1)**
197:1

**assessment (2)**
115:22,25

**assistant (1)**
117:1

**assisting (1)**
38:19

**Association (3)**
190:19,23;203:7

**assume (1)**
145:18

**attached (1)**
55:14

**attend (1)**
174:23

**attended (2)**
177:12,16

**attorney (29)**
5:10,13;8:6;42:3,8;
70:9;79:10,13;99:4,9,
13;116:2,9,11,13,18,
21,22;133:7;168:21;
169:12;170:3,16;
190:1;224:3;229:11;
230:10;232:6;244:6

**attorney-client (3)**
169:9,10,22

**attorneys (2)**
4:4;170:6

**Auditor (3)**
95:25;96:3;97:24

**aughts (1)**
7:3

**authority (23)**
17:17,20,24;18:7,
11;19:2;21:4,6;
117:11;124:18,25;
133:4,5;157:14,23;
167:3;192:10;194:1,

15;213:20;215:4,10,
11

**authorize (1)**
215:22

**authorized (3)**
17:11;218:6;
219:17

**authorizes (1)**
212:23

**available (3)**
207:2,8,11

**aware (12)**
70:23,24;71:1,8;
128:15;163:17,20;
164:21;199:15;
209:5;226:1,6

**away (7)**
60:12,25;61:2,6;
64:21;82:19;155:7

**B**

**back (44)**
6:14,21,22;25:17;
28:23;30:14;37:6;
44:9;45:24;50:20;
51:17;61:12;63:20;
65:5;93:6;94:3,11;
98:23;103:23;108:6;
122:21;123:3;
133:20;134:19;
135:3,4,23,23;
136:12,15,17,17;
137:7,15,25;138:1;
150:7,18;160:11;
184:17;202:2;212:1;
214:6;245:11

**backed (1)**
206:13

**backyard (4)**
27:5;138:15;
180:20;211:6

**bad (1)**
46:16

**bags (1)**
39:6

**Baringer (156)**
5:10,15,24;16:16;
23:2,8;31:17,25;
32:19;37:20;42:4,9;
46:3;49:20;52:10;
54:12,15;57:1,5,11,
16;64:16,25;65:24;
66:20;71:3;74:21,25;
75:10,15,18;79:3,14;
85:13;86:10,15;
98:21;99:6,10,14;
105:2;112:17,20;
113:10,25;114:8,16;
116:12,14,16;117:9,
19;119:14;121:7,11,
15,22;122:10;125:12,
21;129:6;130:5,18,

25;131:8,23;132:3,
20;133:18;134:8,23;
135:19;136:25;
137:2,22,24;138:9;
141:6,11;143:12;
146:13;150:12,16;
154:17;155:2,17,21;
157:16;160:24;
164:25;169:5,8,14,
17,20;170:5,7,20,25;
171:21;175:15,19;
176:17;177:18,22;
178:2,8,19;181:20;
189:21;192:3,14;
193:11;194:11;
195:18;196:5,19;
200:18;201:15;
205:13,18;206:23;
208:14;209:10;
212:10,14;213:24;
216:14;219:6;221:5;
224:9,23;225:4;
227:15;228:1,5,11,
18;230:23;231:8;
232:17;234:3,12;
237:5;238:9;242:4,
16;243:3,9;244:20,
25;245:15,19,24;
246:5,9

**barn (89)**
24:9;25:24;26:3,7,
12,16,23;27:6,11,14,
21,25;28:3,11,24;
29:21,25;30:25;
31:12,23;93:10,23,
25;94:2,3,5,11,12;
95:14,21;96:14,23,
24;108:6,7;119:13;
120:10,15,19;122:2,
3,19,25;123:13;
126:9;127:9;128:5,8,
11,24;129:9,12,16,
18;130:4,16;131:7,
13,17,19,21;132:1,
12;135:3,8,11,22;
136:1,9,13,15,19,19;
138:14,19;139:2,17;
148:11;204:2,6;
210:7,9,12,13,15,20,
21;211:10,15

**barn's (1)**
129:21

**Based (6)**
43:16;86:12;98:2;
114:11;118:13;
134:20

**Basher (1)**
17:3

**basic (2)**
4:14;205:23

**bear (1)**
193:1

**became (5)**

38:18;39:6;46:16;
72:17;142:1

**become (2)**
13:9;217:9

**becomes (2)**
207:8,11

**beginning (5)**
6:15;47:12;59:14;
98:14;104:5

**behavior (2)**
117:23;139:15

**behind (4)**
24:7;28:24;30:15;
127:8

**belief (9)**
35:14;138:21;
139:4,9;220:3,14;
221:21;223:12,14

**Bella (3)**
126:2;128:5,7

**belong (1)**
96:5

**Bendlak (1)**
42:19

**benefit (1)**
175:21

**besides (1)**
99:12

**best (5)**
12:14;157:12;
167:1;229:10;230:19

**better (3)**
146:15;175:22;
199:9

**beyond (2)**
78:11;96:22

**Bianca (90)**
10:9;13:15;16:6;
18:22;24:2;25:5;
26:1,15;28:12,15;
29:4,8;31:7,10;
32:12;33:3;36:5;
40:17;44:4;48:1,14;
50:1;51:15;56:9;
57:6;63:8;75:4;
76:22;81:11,16;
85:19;86:7;87:25;
88:19;91:21;96:5;
100:17;101:14;
103:20;107:19,22;
108:14,22;111:5;
115:8;119:7,11;
120:19;121:8;
122:15;123:4,18;
124:10;126:10,14;
127:3,4,16,18;
128:12,20;129:9,11,
16;132:12;133:6,15,
21;138:2,19;139:14;
140:1;147:19;154:6;
156:8;179:12,16,20;
180:17;187:17;
188:19;191:20;

192:8;194:24;211:7,
11;219:22;220:13;
223:12;230:25

**Bianca's (52)**
24:14;28:22;30:11;
31:15,18;34:5;36:22;
52:11;75:11,13;
84:18;85:2;86:14;
87:10;98:18;117:8;
118:5;119:13,24;
120:1,15;121:19,24;
122:1,4,6,9,19,21,24;
123:11;126:8;
127:12;133:11;
134:25;135:17;
136:6;137:8;138:12;
140:3;149:22;
168:16;178:10;
179:6,8;185:18;
189:19;197:19;
198:18;199:15;
209:21;231:23

**big (2)**
25:18,22

**binder (2)**
205:17,19

**birth (1)**
6:7

**bit (12)**
6:9;12:8;20:11;
23:20;78:22;95:23,
23;105:5;145:4;
156:10;240:4;241:4

**blah (3)**
161:25,25,25

**board (2)**
45:4;164:21

**body (7)**
30:5;92:24;95:4;
231:5,15,16,21

**book (5)**
190:3,3,6,7;230:6

**boost (1)**
207:3

**border (1)**
27:6

**bordering (1)**
242:19

**borders (1)**
188:18

**both (2)**
221:25;233:15

**bottom (3)**
22:10;25:12;173:1

**bound (1)**
13:19

**brain (1)**
221:3

**break (6)**
98:20;99:3;141:8;
212:6;221:13,16

**breaking (2)**
221:4,14

Bianca Marcellino vs
Geauga County Humane Society

Christian Courtright
June 22, 2022

**bring (3)**
62:25;105:2;
245:11
**bringing (1)**
36:19
**Broadly (1)**
162:15
**broke (1)**
221:9
**Brustein (8)**
12:3;13:12;41:16;
42:23;43:5,23;46:20;
67:11
**build (1)**
195:14
**building (6)**
20:2;25:9,18,22;
183:4,4
**buildings (1)**
24:17
**bunch (1)**
4:6
**bush (1)**
31:6
**business (17)**
103:10,20;147:1;
163:6;173:20,24;
185:3,12,15,18,22;
186:12,15;187:9,13;
212:19;215:23
**buying (1)**
92:9

**C**

**calendar (6)**
102:9,10,10,15,16;
103:3
**call (20)**
10:4;48:5;62:19;
66:22;80:4,6;88:4;
99:21;100:24;
124:17,24;127:16;
131:15;132:16;
133:19;197:1;214:7;
217:1,4;222:12
**called (22)**
9:14,15;22:16;
66:23;69:20;78:13;
90:15;91:4;100:3;
104:17;127:18;
142:25;156:2;172:1,
4,21;179:18;180:13;
202:1;205:5;217:14;
222:6
**calling (6)**
21:18;122:16;
142:8;189:9;214:13;
223:3
**calls (7)**
15:5;75:25,25;
80:7;81:21;87:24;
238:5

**came (7)**
13:6;45:4;127:21;
149:22;207:16;
223:4;241:14
**camera (4)**
231:5,15,16,21
**cameras (1)**
128:17
**Can (96)**
4:22;5:20;6:24;
11:24;15:2;17:18;
22:21;24:12,16,21;
31:2,25;32:19;42:4,
11,12;46:3;48:10;
49:20;54:15;57:1,16;
63:16;65:24,25;
74:21;100:7;105:2;
110:13;113:10;
114:11,17;117:9,19;
119:5,14;121:11,15;
123:24;124:15;
126:10;130:5;131:8;
132:4;134:8;135:19;
137:24;138:9;
140:12;142:16;
143:17;153:16,16;
155:11,16;157:12,15,
16;158:6,10;160:20;
164:25;168:15;
181:23;182:10;
183:14;186:9;
187:22;191:5,7,7;
194:25;201:25;
202:11;203:3;208:9;
211:24;212:15;
214:7;217:9,23;
218:2;219:6;224:7;
227:3;228:16;229:1,
10,22;230:19;
231:13;233:2;
234:10,22;244:25;
246:8
**capacity (1)**
9:13
**car (6)**
122:22;123:10,12;
184:20;185:2;215:23
**card (15)**
103:10,20;147:1;
173:20;185:3,12,15,
18,22;186:12,16;
187:9,13;235:23;
236:11
**care (17)**
33:21,24;34:8,14;
87:18;102:11;
126:15;127:16;
128:20;129:13;
131:13,19;138:24;
139:6,20,22;211:24
**careful (1)**
38:12
**caretaker (1)**

46:17
**caring (6)**
19:12;120:6;125:2;
129:14,21;137:12
**carry (1)**
58:10
**case (39)**
15:13,13,15,16;
18:8;56:15;61:22;
105:5,6,8,9,11,16,17;
110:6,11,14;166:21,
24;167:7,19;169:9;
195:16;196:10,17;
197:3,8,10;199:7;
215:16,17;230:5,9,
17,21;236:1;241:19;
242:18;244:6
**cases (4)**
12:15;13:7;118:11;
165:12
**cat (2)**
33:20;175:20
**caught (1)**
210:4
**cause (13)**
21:2;27:3;110:4;
112:10,24;113:7,19;
123:18;194:4;208:7;
215:21;227:24;
228:24
**Cedar (2)**
7:19;21:25
**cell (2)**
5:25;6:1
**centimeter (1)**
96:18
**certain (4)**
26:21;70:3;110:12;
207:3
**certainly (2)**
38:8;70:3
**certificate (2)**
18:9;176:3
**certification (1)**
227:2
**certified (1)**
4:18
**chance (1)**
174:12
**change (4)**
112:25;156:11,12;
197:4
**changed (4)**
39:16;71:15;
156:20;196:23
**changes (2)**
71:11;230:5
**changing (1)**
196:24
**Chardon (4)**
15:6,7,9;16:22
**charges (1)**
162:2

**check (66)**
8:15;15:8,21;
29:17;32:7,22;36:25;
37:3,5,8;43:20;
48:15;56:13;61:12;
92:3;109:18;120:3,4,
5;125:6;137:4;
140:16,21;141:22;
142:3;143:5;144:11,
22;145:2,9,17,19;
146:10;147:5,7,8,9,
14,25;148:15,17;
150:25;151:8,13;
152:3,6,14,19;
154:14,15;168:8,8,
13;188:15;191:17;
209:20;214:8,10;
234:20;239:3;240:1,
7,9,22;241:6,14
**checked (2)**
77:3;168:14
**checks (23)**
14:20;20:7;34:23;
35:11;36:3;39:15;
45:2;48:22;55:12;
56:17;80:10;104:8;
110:25;111:25;
118:9;145:25;146:5;
148:13;157:21;
158:3;235:25;
239:23,25
**Chesterland (2)**
126:16;217:7
**Chillicothe (1)**
5:8
**choice (1)**
109:23
**choose (1)**
176:23
**chose (1)**
21:8
**Christian (37)**
4:2,16,24;8:6;
17:19,24;42:3,17;
47:8;52:13;57:12;
64:12,24;79:9,17;
83:24;86:12;99:2;
156:11;160:9;
172:12;178:21;
182:21;183:12;
186:5;188:8;192:20;
196:3;212:1,15;
217:11,16;222:13;
229:2;231:10;234:8;
243:7
**Christian's (1)**
57:20
**circumstance (1)**
204:3
**circumstances (3)**
191:12;203:13,25
**city (1)**
165:16

**claim (4)**
96:6,8;245:25;
246:1
**Clarke (16)**
5:10;12:1,2;13:9;
41:17,18;42:24;43:8,
24;44:21,23;45:4,8;
46:7;68:4;166:5
**Clarke's (2)**
5:4;166:12
**classes (5)**
7:18;21:22,25;
114:4;202:3
**clause (5)**
192:7,22;193:22;
194:7;200:16
**clauses (2)**
200:12;201:6
**CLE (1)**
207:20
**clean (1)**
19:14
**clear (6)**
85:15,17,17;
129:25;133:12;
148:10
**clearly (3)**
101:7,10;119:21
**Cleveland (2)**
6:21;7:21
**client (3)**
143:20;196:7;
246:10
**clients (1)**
196:1
**climb (1)**
204:16
**Clinic (1)**
172:8
**clock (11)**
72:25;73:1;99:23,
23;100:1;101:24;
216:1;244:2,3,7,8
**clocked (9)**
101:16,16,19,21,
23;102:1,3,8;216:8
**clock-in (1)**
72:24
**clocking (1)**
73:6
**close (6)**
26:23;28:6,7,7;
29:18;39:4
**closely (1)**
27:5
**Code (9)**
163:8,10,14,21;
205:5,20,21;217:16;
233:3
**college (10)**
7:18,19;21:13,17,
17,19,21,22,25;22:2
**Colorado (8)**

Case: 1:21-cv-01338-PAB  Doc #: 35-10  Filed:  09/06/22  254 of 272.  PageID #: 1256
Bianca Marcellino vs
Geauga County Humane Society

Christian Courtwright
June 22, 2022

204:25;205:6;
206:3,9,11,14,16,19
**Columbia (2)**
206:6,8
**Columbus (1)**
177:6
**combative (3)**
40:21,23;127:24
**combination (1)**
54:6
**combined (1)**
83:14
**combining (1)**
83:9
**coming (6)**
30:19,22;42:24;
43:25;137:16;196:22
**command (1)**
105:18
**commit (1)**
139:18
**committed (3)**
94:24;192:7,23
**committee (2)**
42:18;43:1
**committing (4)**
123:19;124:10;
188:10;193:7
**common (1)**
194:25
**communicating (2)**
9:2;156:16
**community (6)**
38:22;161:9,15;
218:4,22;222:14
**company (1)**
216:18
**complainant (2)**
10:17;223:6
**complaining (1)**
189:19
**complaint (17)**
10:1,6;87:24;88:4;
124:7,10,23;126:14,
18;151:1;159:18;
161:24;189:5,6;
193:12,17;223:4
**complaints (12)**
10:2;11:19;12:11;
59:16;87:10,20;
160:10;165:12;
188:19;222:18,24;
223:9
**complaint's (1)**
189:7
**Complete (3)**
43:20;94:14;
245:20
**completed (3)**
9:5;202:1;227:1
**compliance (1)**
33:12
**complied (1)**

214:9
**complying (2)**
218:21;223:24
**computer (19)**
12:18;53:1;55:20;
60:1,3,7;73:16,17;
74:2,6;78:5,15;
85:22;88:1,3;145:18;
241:24;242:1,2
**concern (3)**
138:23;139:19;
214:4
**concerned (1)**
32:4
**conclusion (1)**
32:14
**condition (2)**
120:14;218:23
**conditions (2)**
218:21;222:13
**conduct (43)**
14:25;17:17,20,24;
18:8,12;19:20;23:21;
35:21;39:8;44:13;
45:5,8;60:6;62:11;
75:20;81:4,12,15;
82:17;103:5;110:7;
111:2;112:2;123:20;
132:17;148:21;
167:2,9;168:16;
171:23;172:1,4;
179:9;180:1,21;
194:9;209:20;
212:15,23;213:20;
215:13;220:12
**conducted (15)**
40:3;45:2;64:6;
79:25;98:4;104:7;
118:5;136:6;140:16;
141:19;145:9,25;
180:11;198:18;
232:13
**conducting (14)**
33:9;44:22;50:25;
51:8;92:21;114:24;
132:24;179:22;
193:23;194:21;
212:19;216:2;
231:22;232:4
**conducts (2)**
130:15
**confirm (1)**
197:18
**confirming (1)**
197:15
**conflict (1)**
228:8
**confused (1)**
88:15
**conjunction (1)**
164:19
**connected (1)**
135:8

**connects (1)**
94:3
**consent (19)**
107:18,20,23;
108:2,12,18,24;
109:9,14;159:21;
160:2;187:17,21,25;
188:2,5,12,16;191:13
**consent's (1)**
188:13
**consequences (1)**
209:6
**consider (4)**
198:17;214:12;
217:19;224:25
**considered (1)**
165:13
**Constitution (1)**
199:8
**constitutional (2)**
197:23;198:4
**consult (2)**
44:11,12
**contact (23)**
16:10;17:2;33:13;
146:22;147:12,15;
148:1;149:24,25;
152:2;153:1;185:24;
186:18;193:13;
213:11,17,22;235:3,
12,21;236:2,4;241:11
**contacted (1)**
236:7
**contain (1)**
81:3
**contained (3)**
9:16;61:7;120:20
**contains (1)**
146:6
**contemporaneous (2)**
87:3,4
**content (1)**
225:21
**continual (1)**
33:11
**continually (1)**
32:4
**continuation (1)**
214:12
**continue (3)**
43:13;221:13,16
**continues (4)**
25:17;94:12;
135:12,13
**continuing (4)**
117:23,25;207:19,
20
**control (9)**
105:18;134:4;
161:9,15;205:23;
218:4,22;222:14;
223:24
**conversation (8)**

87:7,8;95:12;
160:4;170:2,24;
171:9;211:11
**Conversations (7)**
40:11;114:10;
169:2,6,21,25;170:8
**convicted (1)**
136:14
**coordinate (1)**
11:21
**cop (1)**
184:20
**copy (13)**
8:24;65:19,22;
67:13;77:21;89:24;
91:3;125:23;146:14,
16;165:6;205:18;
246:12
**core (1)**
39:7
**counsel (5)**
8:8;113:21,23;
170:9;227:21
**counter (2)**
40:22;41:11
**County (37)**
4:5;5:5;8:16;11:20,
23;16:24;73:8;77:17;
89:17;91:16;98:2;
99:17;100:19;115:3;
116:9;119:2,6;
134:25;135:15;
161:12;162:4;163:2;
164:18;173:16,24;
175:7,11;212:16,20,
25;213:21;214:17,
23;215:6,8,19;239:2
**County's (1)**
173:17
**couple (16)**
14:14;26:25;39:5;
60:19,19,21,22;
79:20;96:20;106:14,
24;151:24;197:25;
206:19;216:6;237:17
**course (4)**
104:24;168:4;
242:15;244:17
**courses (2)**
106:16;189:23
**court (51)**
4:9;5:19,20;14:19,
19;16:22;18:10;19:7;
33:15;35:10,12;
57:20;105:3;117:4,
14,17;123:16,22;
124:3;125:5,9,15,20;
126:1;131:10;138:6,
11;157:13,22;
158:11;167:4,12,16;
191:16,18,24;198:25;
199:2;200:1,4,8,11,
16,24;201:5;212:22;

228:17,19,21,25;
245:12
**courts (3)**
201:9,10,11
**Court's (1)**
201:13
**Courtwright (10)**
4:3,16,24;17:19;
46:19;47:8;160:9;
172:12;173:2;234:8
**Courtwright's (1)**
245:9
**covered (4)**
58:14,15;174:24;
175:5
**COVID (8)**
38:5,7,17;39:9,11,
16,21,25
**COVID's (1)**
39:12
**Cox (10)**
56:7;59:1,17;
104:3;239:13,13,16,
20;241:6,19
**Cox's (2)**
59:11;241:11
**crack (6)**
124:13,15,16,23;
192:21;220:24
**create (15)**
49:18;53:6,9,16;
82:18;85:18;104:10;
125:24;150:7,10;
151:12,19;153:14;
154:24;164:17
**created (26)**
53:3,11;54:9,19;
59:10,19;61:15,19;
74:7,10;82:8,9;
83:13;86:2;152:10;
153:9,18;154:10,10;
164:23;165:14;
240:15,20,21,23;
241:15
**creates (2)**
164:2,7
**creating (1)**
233:9
**credits (1)**
22:2
**crime (7)**
123:19;124:10,11;
188:10;193:7;
208:19,20
**crimes (1)**
188:11
**criminal (2)**
48:16;162:2
**criticisms (1)**
46:11
**CROSS (1)**
4:20
**crossing (1)**

30:17

**cruelty (13)**
11:19;117:22;
139:13,18;174:19;
176:12;177:14;
188:3;193:12;197:9;
205:7,25;229:23

**crystal (2)**
85:14,16

**curious (3)**
32:3;63:18;120:13

**current (4)**
197:3,4,8;227:2

**currently (1)**
4:25

**curves (1)**
26:12

**custody (1)**
203:15

**custom (1)**
165:9

**cut (1)**
98:1

**cutouts (1)**
98:2

**D**

**daily (35)**
15:7;47:22,23;
48:1;73:13,24,25;
74:8,12,17;75:1,8,23;
76:6;77:19,25;79:23;
80:24;81:7,18;88:9,
10,15,18,23,24;89:9,
11;90:1,2;91:7,13;
243:15;244:10,24

**Dallas (2)**
6:18;7:19

**Dana (1)**
116:24

**danger (1)**
139:6

**date (40)**
6:7,24;13:10;
18:17,20;36:11;43:6;
44:18;45:12;52:6;
53:10;70:15;81:3;
83:3;85:4;98:3,8;
108:9,10;126:20;
142:11;144:9;
145:19;149:13,16;
151:18;152:11,12,24;
153:24;174:23;
175:4;177:16;
180:24;181:15;
232:1;235:14;
236:18;237:8;240:10

**dates (33)**
6:24;7:2;36:17;
51:25;55:4,9,13;
59:21;81:16;82:3,5;
85:6;102:18;140:3,5,

6,7;145:22;146:5,7;
148:6;149:4,9;
153:20;154:3,6,12,
25;232:23;239:20,
22;241:18,19

**day (60)**
13:24;14:1,2,5,9,
22;45:23;47:24;48:3,
3,6;62:25;73:5,5,7,
10;75:1;76:11,12;
82:20,22;88:14,21;
91:10;94:15;98:5,5,
11;102:2;106:24;
118:23;126:19;
127:21;141:15;
143:18;147:18,25;
149:24;157:5,5;
163:6,6;171:15;
175:20;177:5;
179:10,12,17,20;
180:17,23;181:3,6,9,
14;197:17;230:6;
240:12,20,23

**days (7)**
14:14;100:14;
102:5;104:6,7;138:3;
151:24

**deal (4)**
40:23;57:6;91:12;
188:7

**deals (3)**
90:17;112:22;
150:18

**decade (2)**
70:1,2

**December (7)**
181:22;182:5,18;
183:8,9,12;186:24

**decide (8)**
14:24;37:7;62:24;
118:20;168:7;
201:17;206:21;234:4

**decided (7)**
41:8;89:12;95:10;
137:18;228:21;
230:6;234:1

**deciding (1)**
217:3

**decision (11)**
43:15;44:3,10,13;
45:10,11,23;46:1,2,5;
167:17

**decisions (3)**
39:22;43:4;234:4

**define (1)**
208:12

**definitely (2)**
174:3;231:20

**degree (1)**
21:13

**delete (1)**
83:6

**deleted (5)**

83:7,20;86:1;
149:6;189:14

**delivered (1)**
71:24

**deliveries (1)**
38:19

**demanding (1)**
35:10

**dementia (1)**
46:17

**Department (51)**
15:21;16:1,9,20,
23;17:7;34:19,22;
35:7,13,15,18,21;
36:7,24;37:14,18,24;
40:12;41:2,4,9;43:17,
19;50:23;72:3,3;
79:21;80:23;110:24;
111:13,15,23;115:1,
19;116:3;118:4;
126:16;165:15,20,21,
22;171:5;192:2;
193:20;213:2;217:7;
225:8;227:22;232:7;
236:5

**depend (1)**
15:4

**depends (2)**
15:16;37:9

**depose (1)**
196:1

**deposition (8)**
5:11;42:14;75:17,
20;99:8;212:6;
245:10;246:14

**depositions (1)**
132:11

**depth (2)**
227:20;229:11

**describe (5)**
15:2;22:6;24:16;
63:16;204:24

**described (1)**
10:17

**desk (1)**
5:4

**desperate (1)**
39:3

**destroyed (1)**
50:7

**detail (2)**
22:7;204:24

**detailed (3)**
66:11,13,15

**details (2)**
15:14;18:20

**determination (6)**
94:23;95:6,7;97:8;
134:13,14

**determine (23)**
23:22;26:20;30:12;
31:6;32:11;33:2;
94:18;97:4;123:7;

124:4;125:1;126:17;
131:24;132:6,6;
134:10;135:6,9;
137:11;154:1;
200:15;228:20;
230:11

**determined (5)**
97:17;123:11;
134:20;200:8;201:13

**determining (1)**
168:10

**development (1)**
176:18

**deviate (1)**
195:4

**device (1)**
73:15

**dictate (1)**
110:19

**dictates (1)**
35:16

**dictation (1)**
149:21

**difference (2)**
47:4;80:19

**different (12)**
15:16;76:8;82:23;
88:15,24;155:1;
161:22;167:7;
195:25;206:13;
239:9;240:19

**differentiate (1)**
80:21

**difficult (2)**
24:20;94:16

**digest (1)**
224:10

**digital (2)**
60:2;90:14

**direction (4)**
111:11;115:6;
119:11;167:16

**directly (1)**
115:18

**director (14)**
12:5;41:18,20;
43:10,10,25;44:15,
17,19;45:5;67:8,9;
164:1;166:13

**directors (1)**
164:21

**disallow (1)**
215:24

**discarded (1)**
242:11

**disciplined (1)**
8:17

**disciplines (1)**
9:8

**disclosed (1)**
5:18

**discoveries (1)**
54:20

**discovery (20)**
9:20;18:19;22:13,
16,19;48:12;56:20;
125:11,19,21;155:18;
156:4;171:10;
174:20;233:22,25;
234:5;244:17,19;
245:14

**discuss (8)**
12:24;13:2,5,14,
17;41:13;115:21;
224:3

**discussed (4)**
75:6;170:21,23;
187:18

**discussing (1)**
172:9

**discussion (6)**
14:17,21;58:21;
168:20,23;171:2

**discussions (4)**
169:11;170:16;
171:6;212:5

**dispatch (3)**
9:18;10:2,3,25

**disputing (1)**
221:10

**distances (1)**
39:18

**distancing (1)**
40:1

**distinct (1)**
220:20

**distinctly (1)**
29:6

**document (166)**
22:22;23:3,9,13;
47:4,6;49:5,7,8,13;
50:10,10,21;51:20,
22,24;52:8,15,18;
53:3,6,7,16,19;54:5,
9,18,19,24;55:16,17,
23;56:11;58:18,25;
59:10,19;61:15,17,
18,23;62:9;63:14;
64:11,12;66:17;69:4,
20;70:9,10,12,13;
71:10;73:18;74:16,
18;76:18,19;82:23,
24;83:14;85:1,5,7,9,
10,11;86:2,3;90:14;
103:24;104:2,7;
106:1,2;140:12;
141:1,5,12,18,23;
142:13,15,17,25;
143:1,6,8,13,17,19,
22;144:4,6,11,14,16,
17,20;145:3,17,21,
24,24;146:1,4,11,18;
147:10,24;148:5;
150:6,8,10;151:13,
19;152:10,24;153:3,
10,14;154:5,11,25;

155:14;156:2,3,5,6,7;
173:2;174:10;
178:13;181:18;
182:4,15;187:11;
199:23;217:11,12,14;
227:4;229:22;
230:13;232:19,20,21;
233:10,20;234:20;
236:22;237:8,24;
238:8,23,24;239:5,
20;240:1,2,6,7,10,15;
241:15,22
documenting (1)
  151:13
documents (27)
  11:13;54:7,8,10,
  25;55:2,9;56:13,16,
  19,20;57:8,10,13;
  73:19;74:10;83:2,18;
  85:5,7;125:24;
  201:23;229:25;
  234:9;245:12,14;
  246:3
Doe (2)
  84:5;158:1
dog (3)
  33:22,24;160:10
dogs (6)
  34:2,5,16;103:18,
  19;211:24
dollars (1)
  217:6
done (31)
  15:25;19:4;24:11;
  36:21;37:17;40:6,16;
  69:7;93:7;111:20;
  118:14,15;122:4,8,
  20,23;134:1;140:2;
  155:3;158:4;167:6;
  187:12;188:8;
  191:23;192:1;
  193:18;216:5;
  237:20;243:6;245:7;
  246:6
door (12)
  16:5;101:15;103:7,
  21;180:14,15;183:3;
  185:11,13,16;204:17;
  235:23
down (17)
  30:15;47:14;51:3,
  4;63:4;70:4;84:7;
  88:5;135:13;140:15;
  152:11;154:6;165:9,
  19;167:5;177:6;
  202:24
downloaded (1)
  190:3
dozen (1)
  222:20
Dr (3)
  42:20;172:8,14
drawer (3)

63:21;65:5;76:24
drive (6)
  78:6,8,9,10;
  124:14;212:14
driveway (12)
  25:15,17;26:7,9,11,
  14;98:10,12,14,18;
  148:10;185:2
dropping (1)
  39:5
drove (4)
  76:2;98:10;126:24;
  127:1
drug (1)
  193:5
due (1)
  37:2
duly (1)
  4:17
Duquesne (1)
  21:24
during (22)
  20:24;29:9;32:10;
  39:8,16,21;42:22;
  52:20;73:4,7,10;
  99:2;129:25;138:17;
  168:18;169:21;
  182:12;196:20;
  212:6;218:3,4;
  226:19
duties (16)
  11:18;12:4;17:10;
  35:6,9;38:24,25;39:1,
  1,17;129:3;162:6;
  214:13,15,18;218:8
duty (1)
  214:21

E

earlier (2)
  157:4;180:1
early (1)
  7:3
easy (3)
  76:10;232:9,13
edges (1)
  38:16
editing (1)
  83:4
education (3)
  21:15;207:19,20
effect (2)
  49:25;50:2
eight (1)
  99:20
either (7)
  22:8;23:11;69:7;
  72:2;164:11;180:15;
  244:16
electronic (2)
  73:13;102:11
Elko (14)

17:1;91:25,25;
92:10,12;111:1,6;
115:7;171:5;214:4;
225:9;226:11;
231:14;232:21
Elko's (1)
  232:20
else (23)
  35:3;40:1;44:11,
  12;46:1;68:3;73:23;
  77:8;82:13;99:12;
  122:12;123:13;
  128:11;139:24;
  143:11;158:14;
  171:3;211:9;224:4;
  225:20,24;235:22;
  241:21
else's (5)
  31:22,23;121:5,6,
  25
email (20)
  15:20,25;16:8;
  45:16;71:18,24,25;
  78:3;90:11;92:14,15;
  94:24;164:11;
  177:10;196:25;
  225:10,21;231:13,14;
  236:5
emailed (2)
  72:1;104:17
emails (7)
  16:12,13,13,14,15;
  91:24;244:11
emergency (1)
  100:24
Emil (3)
  56:5;64:8;237:23
employed (2)
  13:9;72:17
employee (28)
  9:4;67:12,25;68:5,
  21,22,24;69:14,21,
  21,23;70:4,17,19;
  71:1,8,10,14;72:8,13,
  16,20;89:4;161:18,
  19;162:8;166:6;
  176:4
employment (19)
  6:10,11,17;7:20;
  8:18,24;9:7;22:7;
  46:9;57:24;66:22;
  67:16,23;68:2,16,19;
  69:4;161:21;244:7
employments (1)
  6:25
end (11)
  22:24;30:20;69:16,
  17;214:15,17;215:5;
  229:7;234:7,11;
  245:10
ended (1)
  173:9
ending (1)

245:9
ends (1)
  215:4
enforcement (27)
  11:6,9,22;17:8,16,
  21;18:14;21:20;
  39:17;72:6;79:21;
  156:13;164:24;
  174:19;175:24;
  176:13;177:15;
  190:11;193:5;
  212:19;213:12;
  214:11;215:1;
  228:15;229:24;
  230:18;231:20
engaged (1)
  218:7
enough (2)
  22:1;139:21
ensure (8)
  19:12;30:7;33:11;
  34:8,14;120:5;
  214:19,21
enter (48)
  10:23;19:2,19,21,
  23,24;20:23,21;6;
  23:20;37:18;49:12;
  96:23;98:10;103:6;
  107:12,14,17;108:18,
  24;110:12;111:10;
  112:13;113:8,20;
  117:8,15,18;141:14;
  146:25;147:20;
  157:24;158:6,10,14;
  167:9,22;178:10;
  180:22;181:22;
  187:17;191:9;
  192:10,25;197:12;
  216:25;219:21;
  228:25;240:6
entered (36)
  10:16;20:4;36:5;
  44:23;48:14;50:1,4,
  9;51:14;59:17;60:6;
  62:9;79:24;81:3,11,
  17;84:22;85:4,6;
  103:1;111:5;140:25;
  145:17;146:23;
  147:13,25;148:6;
  159:12;179:3;
  197:19;216:23,24;
  220:3,17;221:22;
  240:17
entering (3)
  36:22;198:5;
  227:24
entire (2)
  75:10;240:15
entities (1)
  164:20
entries (5)
  51:25;149:9;
  190:17,21,24

entry (10)
  16:6,15;37:14;
  55:9;84:18;117:5;
  142:7;143:25;144:2;
  145:2,7;147:4,15;
  154:6;236:18,20;
  238:21
Erin (1)
  42:21
error (10)
  152:13,17;178:15,
  18,21,23;181:19;
  235:5,9;237:3
establish (1)
  157:9
established (1)
  217:9
estimate (1)
  222:18
et (1)
  4:6
evaluation (2)
  69:2;226:25
evaluations (1)
  66:24
evasion (1)
  133:22
even (10)
  28:1;34:13;45:14;
  96:16;203:21;211:5;
  224:22;228:21;
  236:4;245:24
evening (2)
  99:18,25
event (1)
  173:4
events (1)
  149:21
Everybody (1)
  134:10
everybody's (1)
  38:7
everyone (3)
  124:15;222:25;
  241:21
everywhere (1)
  128:17
evidence (6)
  30:16,19,21;31:10;
  137:16;223:15
Ewe (2)
  172:2,5
E-w-e (1)
  172:2
exact (8)
  13:10;19:5;44:18;
  45:12;53:10;91:6;
  126:20;196:2
exactly (2)
  93:12;153:17
EXAMINATION (1)
  4:20
examined (1)

4:18
**example (8)**
124:12,13;147:1;
158:25;159:16;
165:9;176:12;198:7
**Excel (14)**
11:13;48:9,11;
50:6;74:11,13,14;
75:6;76:18,20;
243:12,13,15;244:9
**except (1)**
244:18
**exception (4)**
191:14;203:10,17;
204:21
**exceptions (4)**
107:8;191:2,6;
203:14
**exchange (1)**
236:5
**exclusive (1)**
195:7
**executive (14)**
12:5;41:18,20;
43:9,10,25;44:15,17,
19;45:5;67:8,9;
164:1;166:13
**exercised (1)**
162:20
**exhibit (16)**
155:22,24;172:20;
178:14;182:20;
185:2,4;217:15;
232:22;236:23;
237:24;238:5,5,8,23;
239:18
**Exhibits (3)**
185:5;238:14;
246:8
**Exigent (4)**
191:12;203:13,25;
204:3
**exist (2)**
60:13,16
**existed (1)**
224:22
**exists (1)**
96:15
**expand (1)**
202:3
**experience (4)**
28:5;82:14;84:5;
162:21
**expertise (2)**
162:21;163:23
**explain (8)**
6:10;58:17;89:22;
126:24;132:8,10;
171:24;208:9
**explained (1)**
85:14
**explore (1)**
240:4

**expounded (1)**
18:1
**express (1)**
218:15
**expressed (1)**
41:10
**extended (1)**
97:10
**extends (1)**
134:21
**eye (1)**
210:4
**eyes (5)**
27:16;32:21;97:21;
123:3;138:13

**F**

**face (4)**
78:23;92:25;95:5;
226:17
**facility (1)**
5:5
**fact (1)**
210:24
**factor (2)**
217:3,19
**facts (5)**
58:18;130:22;
131:11,11;132:25
**fair (2)**
183:21;221:24
**fairly (1)**
67:4
**fall (1)**
117:13
**familiar (7)**
44:7;69:20;110:18;
172:13;201:21;
218:25;225:5
**familiarize (1)**
15:14
**familiarized (1)**
70:20
**far (6)**
6:14;73:6;94:2;
118:9;171:13;191:15
**fast (2)**
60:23;161:2
**father (4)**
126:7,8;179:18;
180:15
**Federal (1)**
201:11
**Federation (1)**
107:1
**feed (3)**
92:9,10;192:18
**feel (5)**
63:3;85:24;97:20;
136:24;137:1
**feet (7)**
26:16,25;27:25;

28:1;96:14,17,20
**felony (2)**
218:5,23
**felt (8)**
40:21;41:11;97:19;
127:25;137:25;
217:5,8;223:8
**fence (29)**
23:24;27:4;28:20,
22,23;29:5;30:18;
33:23;93:18,19,24,
25;94:2,3,4,8,8,9,9,
13;96:22;134:19,21,
21;135:2,5,6,8,11
**few (5)**
14:5;27:24;28:1;
44:15;138:3
**field (16)**
12:11;35:23;47:22,
25;58:19;59:8;83:24;
84:4;86:5,21;87:6;
91:18;162:21;166:3,
9;202:22
**fight (2)**
237:21;245:4
**figure (1)**
215:5
**figured (1)**
233:14
**file (10)**
8:24;56:14;59:17,
24,25;60:2;75:11;
76:24;90:16;176:4
**filed (2)**
162:2;170:19
**files (3)**
53:20;60:5,9
**fill (1)**
60:23
**filled (1)**
61:1
**final (2)**
95:6,7
**find (3)**
58:19;222:3;
242:13
**findings (1)**
115:21
**fine (5)**
23:4;98:22;159:20;
200:3;246:4
**finish (2)**
37:22;141:10
**first (25)**
4:17;6:17;13:6;
68:11;72:17;95:14;
98:3;103:7;105:9;
108:8,11,13,14;
115:20;135:22,25;
147:4;150:6;153:14;
184:16;206:8;
217:23,23;224:7;
236:18

**five (7)**
86:11;99:21;106:7,
19,21;136:8;148:6
**flex (1)**
216:7
**flexed (1)**
216:6
**fluid (1)**
86:23
**flyer (1)**
174:6
**focus (4)**
20:10,13;34:12;
144:17
**focused (2)**
21:20;107:3
**focusing (1)**
22:3
**folder (1)**
78:13
**follow (59)**
16:17;76:1;80:4,6,
14,16;81:22,24;82:1,
1;110:9,14,16;
141:15;142:8;143:3,
7,13;144:7,11,13,17,
19,22;145:12;146:1,
3;148:8;155:10;
165:8;176:6,14;
177:20;178:1,6;
181:23;182:2,4;
201:3;227:6,8;
233:10,18,20,21;
238:2,5,8,10,12,13,
16,19;239:13,16;
244:13,15,15,25
**followed (2)**
44:7;227:13
**following (3)**
9:6;14:19;157:7
**follows (1)**
4:19
**follow-ups (1)**
244:18
**food (2)**
38:19;39:6
**forcing (1)**
20:12
**forget (3)**
188:22;197:16;
234:7
**form (2)**
35:3;226:25
**formal (1)**
197:6
**formally (1)**
202:24
**forms (1)**
69:2
**forth (2)**
133:8;140:4
**forum (1)**
5:18

**found (4)**
20:16;21:18;
117:21;127:6;133:1;
220:22,24;222:1;
242:13
**Fourth (2)**
198:9,12
**frame (3)**
40:9;75:4;76:22
**free (4)**
190:1,2;216:5,5
**Frequently (1)**
180:4
**Friday (2)**
14:13;195:5
**frisk (1)**
203:14
**frivolous (1)**
195:23
**frog (1)**
31:4
**front (26)**
7:1;18:21;24:24;
25:3;26:7;47:6;
52:15;70:12;87:16;
92:24,25;95:4,5;
106:1;124:13;
143:22;144:12;
182:15;184:18;
185:9;192:21;
217:17;232:20;
233:12;235:23;
239:14
**fruit (1)**
207:7
**fruition (1)**
222:21
**full (5)**
9:13;23:9;34:4,5;
61:4
**fully (1)**
134:1
**function (1)**
39:7
**funding (1)**
8:13
**further (4)**
41:13;47:14;
122:25;232:4

**G**

**garage (2)**
127:9;136:12
**garbage (4)**
59:5;61:2,6;65:4
**gave (19)**
19:1;51:25;54:23;
64:11;108:2,12;
119:12;129:8;
133:21;138:6;146:4;
174:20;187:17,21;
196:16;205:14,14;

213:22;241:17

**Geauga (33)**
4:5;5:5;8:12;
11:20;73:8;77:17;
89:17;91:16;99:17;
100:19;115:3;116:9;
119:2,6;161:12;
162:4;163:2;164:17;
173:11,16,17,18,19,
24;175:7,11;182:25;
212:16,20;214:23;
215:6,8,19

**general (3)**
80:14;114:9;190:1

**generally (3)**
114:18;160:8;
180:3

**gesticulating (1)**
28:25

**gets (6)**
76:12,13;78:1;
82:23;83:1;158:4

**Giancarlo (9)**
10:10;26:4,10;
27:8;127:6;128:4;
139:22;211:16;
226:16

**Giancarlo's (1)**
27:18

**Giordano (1)**
166:8

**given (9)**
62:25;65:10,19;
68:17;107:22;112:1;
113:23;188:15;
208:22

**gives (6)**
18:7,11;117:7,11;
139:9;190:2

**giving (2)**
113:16;195:19

**glad (1)**
222:5

**glowing (1)**
9:6

**goal (1)**
210:8

**goat (1)**
172:14

**goats (1)**
172:9

**goes (10)**
18:3;24:7;26:18,
23;51:7;56:15;76:14;
82:23,25;94:11

**good (16)**
37:5;46:12,20;
47:15;110:24;
144:20;156:15;
166:20;190:4;195:2,
13;197:7;202:11;
217:10;237:20;246:6

**Google (2)**

78:8,9

**govern (1)**
161:20

**governing (3)**
46:12,21;47:15

**government (1)**
8:13

**governs (2)**
157:14;163:22

**GPS (1)**
216:17

**grab (1)**
63:5

**grade (3)**
78:12;110:21,22

**granting (1)**
217:20

**grave (2)**
138:23;139:6

**great (2)**
40:14;200:14

**ground (1)**
219:24

**grounds (14)**
109:25;112:9,14,
25;113:8,18;123:17;
197:12;218:19;
219:18,21;223:22;
228:4,24

**group (2)**
41:24;42:2

**guess (4)**
142:7;174:3;
237:25;239:7

**guidance (2)**
227:6,7

**guide (3)**
163:4,10;166:16

**guilty (3)**
20:16;117:21;
139:14

**guys (3)**
155:14;173:22;
186:7

---

**H**

**half (2)**
196:7;222:20

**hallway (1)**
45:20

**hand (3)**
63:24;71:24;140:1

**handbook (11)**
69:21,21;70:14,18,
19;71:2,10,14;72:9;
161:18,19

**handle (1)**
12:15

**hands (2)**
95:5;213:3

**handwritten (13)**
49:8,10,11,16;

50:19,24;59:7;60:11;
75:9;241:25;242:3;
243:14;244:11

**hanging (1)**
207:7

**happen (4)**
32:23;40:15;
138:12;147:5

**happened (5)**
85:15;126:24;
127:14;145:14;
154:16

**happening (7)**
20:20;68:5;149:21;
208:11,19,21;220:11

**happens (3)**
32:7;56:18;88:3

**happily (1)**
214:9

**happy (6)**
5:18,25;22:22;
42:15;172:22;178:4

**harassment (2)**
162:9;242:19

**harboring (2)**
125:3;137:12

**harbors (1)**
124:5

**hard (2)**
236:8,15

**hardly (1)**
212:11

**Hawes (1)**
42:21

**head (8)**
29:24;30:1,4;72:3;
98:7;108:10;208:5;
232:1

**heads (4)**
29:22;32:2;119:16;
204:8

**healthy (1)**
33:21

**hear (4)**
78:24;186:5,6,7

**heard (5)**
79:7;112:8,12,19;
224:12

**hearing (4)**
38:2;95:18,19;
141:21

**hearings (1)**
129:25

**Heartland (3)**
100:9;243:20;
244:1

**H-e-a-r-t-l-a-n-d (1)**
100:10

**hell (1)**
229:1

**help (8)**
32:21,21;38:21;
59:8;65:9;84:13,14;

110:7

**helped (1)**
165:3

**helping (1)**
39:2

**helps (1)**
163:10

**hereinafter (1)**
4:18

**here's (1)**
166:19

**hey (11)**
14:17;45:20;62:6;
161:24;166:19,24;
177:7;193:17;
194:24;222:6;225:21

**hi (1)**
160:8

**Hicks (1)**
116:12

**highlight (1)**
217:24

**highlighted (1)**
224:5

**highlighting (1)**
217:25

**hire (1)**
226:24

**hired (5)**
8:3;70:5,6,20;
71:14

**HISOP (3)**
201:19;202:4,18

**history (4)**
6:10,11;7:20;215:1

**hit (1)**
220:7

**Hold (5)**
25:2;52:8;103:25;
184:25;233:14

**Holland (14)**
104:17;105:14;
114:2,14;115:24;
116:6,18;156:15;
158:10;168:8;170:5;
225:25;226:11;230:4

**Holland's (2)**
115:20;116:25

**home (19)**
16:3;20:1,2,4,12,
24;21:1,3,6;29:4,7;
97:7,9,21;100:22;
134:25;145:14;
180:4,5

**honest (3)**
153:25;154:21,22

**Hope (11)**
12:3;13:12;14:18,
21;41:16,21;42:23;
43:5,23;67:11;
164:18

**Hopefully (1)**
213:1

**hopeless (1)**
217:8

**hopes (1)**
221:15

**horse (5)**
25:24;31:5;92:9;
139:5,13

**horseman (2)**
139:10,12

**horses (96)**
19:17,18;20:10,10,
14,16,19;21:1,11;
27:23;29:22;30:3,8,
17,19,21,22;31:3,7,
10,14,18,22;32:2,4,5,
8,12;33:3;34:9,13;
87:18;93:9;94:18;
108:5;118:2;119:12;
120:7,12,14,20,24,
24;121:1,3,17,18,21,
23,25;122:2,4,13;
123:8,14,25;124:5,7;
125:3,6;126:15;
127:17;128:21;
129:14,16;130:2;
131:13;134:3;
136:14;137:13,16;
138:7,19,23;139:2,
16,23,25;204:2,6,10;
209:18,23,25;210:2,
12,14;213:14;214:3,
5,20,22,25;220:20;
222:2,3

**hoses (1)**
131:19

**hosted (1)**
106:25

**hosting (1)**
172:7

**hour (2)**
196:7,8

**hours (9)**
99:16,22;102:7;
195:22;196:6;
207:23;208:1;216:6,
7

**house (20)**
19:19,25;21:11;
23:25;27:4;30:14,15;
34:2,10,20;62:7;97:9,
12,15,17,23;103:17;
123:4;127:8;185:19

**How's (1)**
230:20

**HSUS (2)**
106:14,24

**Humane (120)**
4:5;5:5;7:6,15;
8:12;11:6,9;17:13,16,
21;18:3,13;19:4,14;
21:20;33:14,25;36:2;
38:5,23,24;39:1,2,17;
43:2;46:6;72:6;73:8,

8;77:17;79:20;89:17,
18,25;90:4,17,23;
91:1,16;99:17;
100:19;101:7,8,10;
106:15,23;107:2;
111:20;115:3;116:9;
118:11;119:6;121:4;
125:4;130:12,14;
132:17;156:12;
158:17;160:9,22;
161:10,12,22;162:4,
5,8,11;163:2,3;
164:18,23;165:22;
166:1,2,4,5;172:11;
173:7,11,16,17,18,19,
25;175:11,22;
182:25;190:10,11,11;
191:8;194:16;
197:25;201:19;
202:3,5,9,10,13,16,
17;205:23;206:6;
207:6,22;212:19;
214:16;215:19;
219:5,10;221:19;
223:19,21;228:15,20,
23;229:13;230:18;
245:20
**hurricane's (1)**
220:7
**hurt (2)**
38:15,17
**Husky (1)**
33:22
**HUTH (102)**
4:2,3,21;9:22;
16:11,18;18:1;23:5,
10,16;24:10;42:6,11,
17;48:10;51:12;
54:14;55:22;56:24;
57:4,7,12,18,23;
65:22;71:5;74:19,23;
75:3,14,16,19,21;
76:21;78:21;79:6,16;
85:16;88:22;98:19,
23;99:1;104:24;
105:4;112:18;
125:14;131:2;141:9;
143:14;146:15;
150:14,20,22;155:4,
19;156:1;161:1;
165:5;169:7,10,15,
18,23;170:22;
172:16;182:17;
185:1;192:17;
195:21;196:13,15;
205:15;211:23;
212:1,4,8;213:25;
221:7;228:14,22;
229:5,14;234:6,14,
18;238:4,11;239:16;
242:9,20;243:5,12,
20,24;244:4,9,22;
245:6,17,22;246:2,6

**Hypothetical (4)**
192:15,16;193:1,
21
**hypothetically (5)**
113:17;191:18;
192:5;220:25;228:8

**I**

**idea (5)**
28:17;96:9;132:15;
183:6;227:16
**identification (4)**
155:25;185:6;
238:15;239:19
**identified (1)**
66:16
**identify (6)**
6:12;160:20;
164:16;171:10,19;
196:16
**ignored (1)**
211:4
**illegal (8)**
134:5,7,12;168:6;
169:4;198:15;200:8,
11
**image (1)**
28:4
**imagined (1)**
93:16
**implied (4)**
187:21;188:5,12;
218:16
**important (1)**
87:2
**impromptu (2)**
59:7;183:17
**improvement (1)**
9:5
**inactive (2)**
192:9,24
**inaudible (1)**
63:14
**Inc (2)**
173:15,23
**inches (1)**
28:8
**incident (1)**
128:2
**incidents (1)**
115:10
**include (2)**
60:9;90:25
**includes (1)**
56:16
**Including (4)**
139:7;174:23;
175:4;177:16
**inconsequential (2)**
65:7,8
**incorrect (2)**
146:6,8

**independent (3)**
83:17;85:18;
167:17
**independently (1)**
200:15
**Indiana (1)**
21:23
**indicate (2)**
186:20,23
**indicated (1)**
133:21
**indicator (3)**
23:25;80:9,11
**Indicators (2)**
78:20;79:18
**individual (7)**
15:18;59:23;65:9;
83:8,11;98:1;117:21
**individually (1)**
86:4
**inform (1)**
159:22
**informal (2)**
48:7;197:6
**information (23)**
10:15,20,23;53:18;
54:23,23;55:8;61:13,
14,17,24;62:5;63:3;
65:11;71:11;74:5;
81:1;86:13;89:1;
144:6;146:9;221:3;
225:14
**initial (10)**
4:14;9:18;10:1,2,6;
59:16;71:14;107:21;
108:1;208:2
**Initially (1)**
217:5
**initiative (1)**
230:22
**in-person (5)**
36:16;38:3,3;
43:21;138:4
**input (2)**
225:22,24
**inquire (1)**
129:8
**ins (1)**
98:2
**inside (6)**
21:1,2;34:2;130:3;
131:7;132:12
**inspect (5)**
33:15;113:20;
160:15,17;193:10
**inspected (1)**
213:5
**inspection (84)**
14:9,25;15:2,24;
16:8;19:20;28:13;
29:3,10;32:11,17;
33:2,10,19;34:7;36:8,
10,12,20;37:23;40:4,

6;48:19;50:25;51:7,
8;57:8;58:9;62:11,
18,22;63:1;65:17;
81:13,15;82:18;85:1;
92:22;94:15,22;98:4,
8;103:5;108:11;
110:8,20;112:2,6;
115:16;118:5;119:8,
9;122:20;123:20;
124:22;129:2;
141:19;146:19;
149:14,24,25;158:11;
170:18;179:9,22;
180:6,8,11;183:18;
187:14;190:24;
192:6,22;193:15,16;
194:22;201:14;
213:9,23;214:13;
216:22;232:22;
236:12;245:21
**inspections (130)**
13:3,14;14:3;
15:10;17:11,14,20,
25;18:8,12;19:3,10;
20:24;23:21;30:7;
35:22;37:17;39:8,24;
40:16;43:13;44:4,14,
23;45:6,9;48:20;
51:16;52:21;53:14;
57:10;58:5;60:7;
61:5;62:15;64:5;
75:5;76:23;80:1,6,
12;81:1,5,14;86:7;
88:19;102:19;
105:18,19;107:6;
109:4,7;111:2,20;
112:23,24;113:24;
114:7,15,21,25;
118:14,15;124:1,2;
130:15;132:18,24;
136:5;138:17;157:1;
158:7,19;159:12;
160:23;162:3;
163:22;167:3,10;
168:16,24;169:4,13;
170:12;171:7,8;
180:2;182:11;
187:12;191:14,19,24;
192:2,12;193:3,9,19,
24;194:3,4,8,9,14,16,
19;195:11;198:17;
208:21;211:13;
212:16,24;213:10,21;
215:14;220:1,10,12,
18;221:2,17;225:11;
227:14;231:23;
232:5,12,23;235:25;
242:15;243:1;245:18
**installed (1)**
216:17
**instead (2)**
191:21;195:5
**instruct (1)**

41:6
**instructions (2)**
110:9,25
**intakes (1)**
11:4
**intangible (1)**
218:12
**intelligent (1)**
228:7
**intend (2)**
209:23;210:11
**intended (1)**
215:2
**intent (4)**
209:7,11,11,19
**intentional (1)**
209:15
**intentionally (5)**
27:10;96:13;
209:13;210:6,15
**interacting (2)**
38:12;129:14
**interaction (2)**
130:1,3
**interest (4)**
32:24;56:18;
218:14,17
**interim (1)**
41:24
**internal (2)**
78:10;102:21
**interrogatories (3)**
22:17;190:16;
204:23
**Interrogatory (3)**
22:6,23;140:19
**interview (2)**
36:19;138:4
**into (5)**
10:16;15:7;20:12;
26:7;30:5;34:10,20;
36:19;42:24;48:9;
49:6,6,12,25;50:9,15,
20,20;52:25;53:19;
56:15;59:17;61:12,
13;62:3,5,9;64:10;
65:11;76:12,13,14;
78:13;79:24;82:23,
25;83:1,9,15;86:3,13;
121:5;129:16;
130:16;131:12;
146:25;147:13,20;
150:9;159:2;183:20;
188:22,25;189:4,5;
202:2;210:20;
225:22;245:20
**investigate (1)**
11:19
**investigation (10)**
48:16;56:17;
106:15;107:21;
108:1,13;201:20;
202:5,17;245:20

**Bianca Marcellino vs**
**Geauga County Humane Society**

**Christian Courtwright**
**June 22, 2022**

investigations (2)
12:6;205:25
**invisible (1)**
96:9
**involve (1)**
239:9
**involved (5)**
10:14;56:15;78:4;
116:21;157:10
**involving (2)**
22:8,8
**irrelevant (8)**
130:21;131:4,22,
25;188:14;242:18,
21;245:16
**issue (3)**
5:19;9:11;228:18
**issues (1)**
8:25
**item (1)**
218:12

**J**

**jacket (1)**
182:25
**jail (1)**
188:7
**Jane (1)**
84:7
**January (5)**
70:16;72:8,10,11;
205:24
**Jean (1)**
84:6
**Jeff (6)**
105:14;115:20,24;
116:24;156:15;
225:25
**Jeffrey (8)**
104:17;114:2,14;
116:6,18;170:5;
226:11;230:4
**job (30)**
7:22,23;8:2,20,23;
11:10,18;12:4;17:25;
32:6;35:6,9;38:7,9,
10,11,14,18;39:7,14;
131:10;137:11;
158:23;166:17;
172:10;202:24;
203:4;227:7;229:16;
237:21
**jog (2)**
182:7,10
**John (9)**
58:19,22;59:8;
61:25;62:2,4,7;84:5;
158:1
**Judge (31)**
13:19;92:2,18;
95:10;110:17;
115:18;116:3;

129:19,23;130:7,19;
132:7,14;133:4,9;
134:17;158:15;
167:20,25;188:15;
192:5;194:2;199:8,9,
16;201:17;226:13;
227:22;232:7;
234:17;243:4
**Judge's (6)**
18:14;35:17;199:5,
6,6;227:12
**Judy (2)**
17:3,5
**July (38)**
16:12;28:13;29:1;
30:11;31:7;32:10;
36:13,14,23;37:13,
25;40:17;41:19,20,
22;92:7,19;115:9,10;
120:2,21;121:9;
136:3,7,18,21;
137:14;138:1;
180:22,25;181:2,4,5,
5,13,16;209:24;232:8
**jurisdiction (1)**
212:18
**justice (1)**
200:13

**K**

**Karen (6)**
10:9;26:4,10;27:7,
18;139:22
**keep (45)**
12:4;20:11,18;
34:15;39:6;47:22,23;
48:4;49:11,13,15;
54:7;60:21;66:11,13;
72:23;73:12;76:10;
86:4;91:7;117:4;
143:16;156:18,22;
174:7,15,17,22;
175:4,7,11,17,23;
176:2,7,10,19;
177:11,15;195:21;
197:3,8;229:4,5;
243:22
**keeping (9)**
21:1;29:3,6;48:7;
118:2;125:3;137:12;
220:19,20
**keeps (3)**
78:24;124:5;
242:23
**Ken (18)**
5:4,10;12:1,2,7;
13:6;41:17,18;44:21,
23;45:20;68:4,11,17,
18;69:10;166:5,12
**Kenneth (8)**
13:9;42:24;43:8,
24;45:4,8;46:7;

164:19
**kept (10)**
33:14;34:2;42:1;
73:15,16;74:5;97:6;
125:4;136:13;196:9
**Key (3)**
78:19;79:18;80:9
**kind (5)**
68:2;78:10;158:21;
238:7;241:4
**knew (6)**
14:11;28:15,25;
57:9;95:19;199:24
**knock (6)**
103:7,14;159:16;
161:23;180:14;
191:10
**knocked (2)**
16:4;180:15
**Knowing (4)**
110:22,23;134:1;
219:13
**knowingly (3)**
27:10;96:13;209:2
**knowledge (1)**
202:3
**knowledgeable (1)**
155:8
**knows (3)**
23:6;134:10;199:8
**Konst (12)**
53:13,19,20,22;
54:24;55:16,18;59:2;
104:6,20;244:13,14
**K-o-n-s-t (1)**
244:14
**Konst's (1)**
54:17
**KPI (1)**
78:18
**KPIs (1)**
78:17

**L**

**Lab (1)**
33:25
**land (3)**
68:7,14,15
**language (3)**
19:5,13;219:18
**large (3)**
101:6,8;106:15
**larger (20)**
49:6,7,12;50:9,10,
21;61:13;63:14;
64:10;65:11;82:7;
83:1,5,9,12;86:3;
141:13;146:20;
178:22,23
**last (12)**
36:9,9,12;60:19;
86:15,16;106:7;

125:8;132:3;239:3;
241:3,15
**late (1)**
100:24
**later (1)**
216:7
**law (81)**
11:6,9,21;17:8,16,
21;18:9,13;21:20;
39:17;50:2;72:6;
79:21;105:6,6,8,9,11;
107:3;110:6,11,15;
112:21;113:2,6,17;
156:11,12,12,20;
158:5,24;164:23;
172:10;173:6;174:2,
19;175:9,24;176:12;
177:14;190:10;
195:16;196:11,17;
197:3,8,10;199:7;
202:4;207:20;
212:19;213:12;
214:11,25;218:20;
220:4,14,16;221:4,9,
13,14,16,23;222:7;
223:23;224:24;
225:17;228:15,16;
229:13,16,23;230:5,
5,9,11,17,21;231:20
**lawful (4)**
4:17;119:20,23,23
**lawfully (1)**
204:19
**lawn (2)**
124:13;192:21
**laws (13)**
105:15,16,17;
110:22,23;156:19,20,
21;190:13;196:22,23,
23;227:2
**lawsuit (11)**
44:6,9,14;45:7,15,
25;104:16;170:10,
18;226:1,6
**lawyer (3)**
223:19;228:12,13
**lawyers (1)**
163:9
**lay (3)**
68:7,14,15
**lead (1)**
221:3
**leadership (3)**
41:25;42:18;43:1
**League (1)**
6:22
**learn (3)**
95:14;96:2;106:11
**learned (6)**
58:12;71:15;
105:17;139:15;
170:17;192:20
**learning (1)**

175:1
**least (2)**
146:6;150:17
**leave (12)**
43:5;73:1;99:21;
103:10,10,11,12,15,
20;147:1;186:15;
236:11
**leaves (1)**
212:25
**led (1)**
48:16
**leeway (1)**
195:19
**left (19)**
25:14,20,22,23;
32:15;43:8,23;51:15;
67:11;109:19;
122:23,25;127:20;
185:18,22;186:11;
187:8;214:17;235:23
**legal (22)**
113:1,4,12,16;
158:21;168:3,17,24;
169:4,13;170:2,9;
171:7;173:14;
199:10;200:17,17,24;
201:6,14;207:20;
227:16
**legs (1)**
12:13
**Lester (12)**
56:3;59:1;233:6,7,
17,20,21;234:11,19;
238:5,12,16
**Lesters (1)**
236:15
**letter (2)**
57:19;234:16
**letting (2)**
104:23;109:18
**level (5)**
7:18;205:6;206:1,
18,19
**Lexis (1)**
158:20
**life (2)**
38:17;46:19
**light (1)**
71:12
**limit (1)**
75:3
**Limited (3)**
114:16;136:12;
212:18
**limits (2)**
112:23;158:6
**line (54)**
24:4,6;26:17,19,
22;27:22,24;28:2,16;
29:1;30:18;31:1;
32:6;41:2;93:8,11,12,
15,16,18,22;94:7,9,9,

10,12;95:22;96:7,9,
10,12,15,21;97:1,4,6,
18,25;98:8;120:11;
123:12;134:19,20,21,
21;135:2,5,6,7,10,12,
16;141:6;237:20
**lined (3)**
29:3,6;97:7
**lines (4)**
23:22;24:5;27:5;
97:22
**lingo (1)**
66:25
**list (6)**
78:17;105:24;
140:7;191:5,7;
203:13
**listed (2)**
25:1,8
**literally (1)**
63:17
**little (15)**
6:9;12:8;20:11;
23:20;63:24;77:16;
78:22;95:23,23;
105:5;145:4;156:10;
229:12;240:4;241:4
**live (1)**
20:18
**lived (2)**
34:4;238:22
**lives (5)**
15:6;20:2;58:20,
22;157:10
**livestock (1)**
106:15
**living (9)**
39:5;71:10;87:14,
15;214:5,19,22,24;
239:10
**Livingston (1)**
213:7
**local (2)**
213:12;214:25
**located (1)**
4:25
**location (1)**
5:1
**log (20)**
15:7;47:22,22,24;
48:5,9,13;49:16;
75:9;77:5;88:9,10,15,
18;89:9,9;174:18;
176:19;177:11;
244:10
**logged (9)**
10:4;12:18;80:3;
87:20,23;88:6;
188:22,25;189:4
**logging (1)**
141:20
**logs (38)**
46:12,21,23,24;

47:1,15,18,21;48:1,
19,20,21,23;49:6,8,
10,11,18;50:4,7;
57:25;58:1,2;66:1,7;
88:23;89:2,6,11;90:1,
2;91:8,10,13,14;
243:14,15;244:11
**long (10)**
6:19;7:8,14;
106:22,25;152:7;
197:17;236:1,16;
237:16
**longer (9)**
7:10;10:11;41:21;
96:4;215:6;229:6,8;
238:22;239:2
**look (65)**
22:22;27:3,21;
30:2;31:14;32:9,18,
23,25;34:16,18;42:2,
4,7,9;49:4;52:24;
65:25;69:1;77:5;
93:9;95:25;98:24;
100:7;103:19;108:4;
119:12;121:9,18,20,
24;122:24;123:2,25;
135:22;136:15;
138:7,14;140:9,12;
148:25;151:1,20;
153:16;160:6,11;
161:25;181:23;
182:21,22;183:24;
204:12;205:15;
209:17,17,23;210:14;
230:22;232:19;
234:11;236:17;
237:8,23;238:16;
239:13
**looked (20)**
27:11,16,17;30:3;
64:2;96:24;103:24;
120:20;122:1,3,12,
18;123:6;125:8;
135:13;150:4;
156:25;163:18;
210:2,12
**looking (29)**
8:5,5;27:23;28:10;
29:20,25;30:3;31:12,
22;32:8;78:24;79:8,
12;80:16;96:2;97:21;
120:12;121:2,17;
122:4,8;139:16;
141:15;148:5;
156:23;181:25;
203:11;209:25;210:6
**Looks (10)**
25:15,17;26:6,11;
53:13;62:10;183:10;
184:15;185:9,12
**lose (1)**
39:21
**losing (1)**

39:4
**lost (1)**
188:1
**lot (14)**
15:6;22:20;38:15,
15,18;50:17;106:6;
157:7;170:6;182:10;
187:20;207:6;224:2;
239:22
**loud (2)**
213:3;218:2
**low (1)**
207:7
**lucky (1)**
155:5
**lying (1)**
29:15

## M

**ma'am (61)**
5:6;33:8;53:15;
100:11,13;157:2;
158:8,9,22;159:4,6,
10;160:5;161:4,5,6;
162:13;163:23,25;
164:15;165:20;
166:10;168:25;
170:14;174:18;
177:13;179:11;
183:1;186:8,14;
191:3,25;199:1;
202:15;203:8;
204:22;210:23;
212:3,7;217:18,22;
218:1;222:5;224:13,
16,19,21;226:9,15,
23;229:21;230:2;
233:5,8,11,13;
236:19,21;238:25;
239:15;240:3
**Mad (2)**
172:1,4
**Main (5)**
58:20,23;84:7,8;
178:25
**maintain (2)**
39:18;134:4
**maintained (1)**
61:14
**majority (1)**
15:4
**makes (5)**
37:7;62:24;87:24;
162:16;183:20
**making (4)**
221:1;229:7;236:4;
239:11
**manager (1)**
42:21
**mandate (1)**
227:7
**mandated (1)**

14:20
**mandatory (2)**
203:1,4
**manner (5)**
19:14;33:14,25;
125:4;221:20
**manual (15)**
69:21,25;70:5;
71:9;72:13,16;
174:19;175:24;
176:13;177:15;
202:12;205:23,24;
206:10;229:24
**manuals (4)**
202:13;205:1,3,4
**many (14)**
26:16;36:6;58:10;
80:10,12;81:21,21,
22;87:5;96:14;
135:17;136:5;155:7;
222:18
**map (1)**
25:6
**Marcellino (57)**
4:5;10:15;13:8,15;
16:7,10;18:23;26:5,
10;27:8;37:23;40:17;
43:21;48:2;56:9,21;
57:6;62:14,21;64:13,
14;83:22;87:25;92:9;
96:5;101:14;107:19,
22;108:14,23;118:2;
119:11;126:2;127:6,
18;128:12,20;129:1,
11;130:8;139:14;
141:15;142:8;143:3,
7;146:1,3;148:11;
191:20;200:19;
208:22;215:16,17;
223:2,7;238:7,12
**Marcellinos (10)**
10:9,21,24;11:16;
12:25;127:24;
139:17;140:15;
144:5;223:5
**Marcellino's (52)**
17:1;20:5;24:2;
25:6,10;26:1,4,15,19,
24;27:4,8;28:12;
29:4;31:11;36:6;
44:5;45:3;48:14;
50:1;51:15;63:8;
75:4;81:12,16;85:19;
86:7;88:19;97:7;
103:1,21;111:5;
119:8;121:8;127:3,4;
129:10;138:24;
139:6,20;140:25;
147:19;148:14;
154:6;183:5;198:22;
219:22;220:13;
226:16;231:1;244:5,
18

**March (16)**
146:19;147:9;
178:10;179:3;
180:10;183:24,25;
184:2,4,5,6;185:1,3;
186:10,21;230:4
**mark (2)**
155:22;184:25
**marked (7)**
24:6;101:7,10;
155:25;185:6;
238:14;239:18
**marker (1)**
24:19
**mask (3)**
38:13;39:25;
226:18
**masks (1)**
39:19
**materials (3)**
171:16,18,20
**Matt (38)**
5:10;9:22;23:12,
17;42:11;48:10;
51:13;57:9;65:23;
71:6;74:19;75:17,20;
76:23;78:21,22,23;
79:2;98:19;105:1;
116:14;125:14;
143:16;155:5;161:2;
170:5,7,25;187:19;
192:18;196:2;212:7,
8;234:6;242:11;
243:7,25;245:14
**matter (1)**
124:22
**matters (2)**
174:24;175:5
**Maureen (2)**
56:7;104:3
**may (25)**
15:13;16:3;62:4;
103:14;119:4;128:8;
145:13;146:12,21;
149:25;152:13,16,17;
153:19,25;154:3,20;
171:15;185:20;
195:13;211:16;
216:6;218:8;230:6,
11
**Maybe (33)**
27:1;48:3,3;60:19;
61:9;63:9,19,20;
64:1;72:3;75:12,14;
85:24;95:23;103:22;
104:16;106:18;
115:2;136:8;143:16,
20;163:19;174:4;
182:7;183:17;189:8,
10;196:22;204:1;
222:20;235:5;
241:20,23
**mean (56)**

5:3;10:3;16:2,14;
17:4;22:23;23:1,6;
24:20;37:2;41:24;
46:23;49:23,24;
50:17;63:16;68:23;
73:19;79:17;84:10;
85:13,24;88:12;89:6;
90:10;97:22;100:23;
109:11;119:19;
125:13;130:3;
133:25;143:16;
145:23;154:22,23;
160:19;171:15,24;
187:1,4;188:1,12,13;
189:17;200:13;
201:19;203:1,20,22;
209:4,9,15;220:23;
235:8;238:9

**means (17)**
22:11;43:11;47:2;
89:9;105:9;109:9,25;
110:2,4;178:23;
187:23;188:5;208:7,
17;209:2,7,11

**meant (6)**
39:5;89:10;137:5;
152:17;181:11;
206:17

**measured (1)**
96:16

**media (1)**
162:9

**Medina (2)**
7:4,15

**meet (8)**
12:7;15:18;58:19;
69:2,10;152:2;
159:19;214:11

**meeting (13)**
12:16;36:16;38:3,
4;43:21;45:13,14,22;
62:8;92:7,19;164:11;
166:23

**meetings (12)**
12:9,22,25;13:3,
12;22:7;69:12;
102:17,21,21;165:17;
171:4

**memory (17)**
12:21,22;45:21;
47:3;59:20;82:15;
85:12;86:13,18,22;
140:8;148:24;154:7;
174:4;182:11;
240:11;242:7

**mentioned (8)**
58:25;164:5;
226:10,11,12,12,13;
243:19

**merged (1)**
83:1

**met (13)**
5:13;13:13,13;

33:20;36:21;58:22;
68:4,18;108:14;
116:12;127:11,12;
180:15

**Michela (3)**
4:3;5:15;37:20

**Michelle (13)**
10:7,17;87:14;
100:15,25;188:17,18;
189:8,12,18;222:17,
19;223:9

**middle (3)**
24:19;25:12,23

**might (33)**
14:12,14;15:7,14;
36:17;51:4;55:13;
61:8;62:6;63:22,25;
64:18;82:25;83:4,7,
7;84:15;93:17;96:10;
103:10;115:23;
153:20;155:21;
187:9;195:3,23,25;
196:24,25;208:11;
215:20;216:7;217:9

**mileage (2)**
48:8;88:13

**miles (1)**
76:2

**million (3)**
150:13;196:10,12

**Mills (1)**
24:21

**mine (3)**
38:8;92:24;95:5

**minutes (2)**
12:16;20:15

**misdemeanor (2)**
218:3,22

**misplace (1)**
65:2

**missed (1)**
149:6

**Missouri (4)**
206:6,15,17,18

**Missouri- (1)**
206:8

**misspoke (1)**
67:10

**mistake (19)**
144:3,8,25;145:3;
147:2,4,6,7,8;149:23;
153:19,25;154:2,4,
19,21,23;181:10,11

**modification (2)**
156:3,7

**Monell (2)**
245:23,25

**month (4)**
8:15;39:11;40:9,13

**monthly (18)**
73:20,21;74:7,12,
14;75:22,23;76:13,
14;77:18,23;78:2;

79:22;80:25;81:6,18;
91:14;244:23

**months (3)**
44:15;60:19,22

**more (9)**
10:25;11:4;38:12;
44:13;45:6;78:22;
224:2;231:22;240:4

**morning (4)**
15:1;37:12;72:25;
99:17

**most (5)**
17:2;60:18;128:16;
159:2;165:2

**mother (1)**
46:17

**mother's (1)**
179:14

**motor (1)**
218:11

**move (8)**
23:7;65:1;83:5;
177:18,22;178:20;
181:21;186:9

**moved (3)**
6:20,22;213:5

**moving (1)**
213:13

**Mrs (1)**
129:1

**much (3)**
8:4;28:2;38:21

**Municipal (2)**
16:22;110:16

**must (2)**
144:3,7

**mutual (2)**
45:10,11

**myself (10)**
15:14;20:12;29:3,
6;46:5;70:21;97:7;
105:13;151:11,22

## N

**naive (1)**
139:21

**name (16)**
4:3,22;51:4;54:17;
55:10;73:18;90:16;
91:6;149:20;166:7;
172:25;173:1,13,14,
21,23

**named (1)**
100:15

**names (2)**
166:4;240:18

**narrate (2)**
185:25;235:4

**narrative (87)**
51:18,19;55:17,24;
56:20;59:18;60:9;
61:22,23;62:3;64:10;

65:12;82:7,8,9,18,22;
83:10,12;86:9,14;
87:23;88:1,6;104:10,
20,25;133:20;140:4,
21,22,24;142:9;
145:12;146:2,3,21,
24;147:13,16,20;
148:2,22;150:9;
151:20;152:22;
153:2,22;154:9,10,
13,15,24;155:11;
178:22,24,25;183:14,
19,21;184:1;185:23;
186:13,17;189:6,7;
199:21,23;233:10;
234:22,24;235:13,15,
19;236:17;237:12;
238:2,7,8,19;239:21;
240:8;241:10,13;
244:13,14,15

**narratives (19)**
55:14,15;56:11,16;
57:14,15,21;58:1;
61:14;64:13,15;83:8,
11;85:18;104:13,19;
141:13;144:7;146:25

**national (2)**
198:1;205:25

**Naturally (1)**
201:8

**near (3)**
28:19,21;93:18

**necessary (1)**
231:18

**necropsy (1)**
56:13

**need (28)**
51:3;61:1;62:20,
21;63:3;79:8;98:19;
108:19;113:13;
131:25;141:9;
157:23;159:1;160:6,
15;175:23;186:19;
191:15;197:11;
207:2,3;224:2;225:6;
230:13;232:25;
243:9;245:11;246:9

**needed (1)**
224:25

**needs (4)**
23:5,8;37:21;
128:10

**neglect (2)**
11:20;118:3

**neglected (3)**
136:13;222:2,3

**neglecting (1)**
20:16

**neighbor (3)**
84:6;148:14;151:2

**neighbors (1)**
180:12

**neighbor's (4)**

32:18,23;138:15;
140:11

**neither (1)**
166:9

**Networks (1)**
78:11

**new (19)**
68:6;71:11,11,16,
17,21,23;75:25;
81:21;156:20,21;
170:17;196:21;
213:5,16;214:11;
226:24;227:2;230:5

**next (5)**
93:25;101:15;
106:13;141:22;142:7

**Nicastro (10)**
10:7,18;87:14;
188:17,18;189:12,18;
222:17,19;223:10

**Nicastro's (7)**
100:15,25;101:18;
102:6;103:2;148:9;
216:2

**night (1)**
73:1

**nobody (2)**
103:15;194:3

**nod (1)**
4:8

**nods (1)**
4:10

**none (7)**
69:7;83:17;161:3,
5;162:12;164:14;
223:9

**non-expertise (1)**
163:24

**nonresidential (2)**
218:5,24

**non-specifically (1)**
105:21

**nor (1)**
87:5

**notate (1)**
236:11

**notations (1)**
88:18

**note (16)**
16:2,17;51:3;
61:10;63:24,24;
77:16;84:4;151:16,
17;152:22;168:16;
235:11;237:14;
239:11;241:17

**notebook (38)**
51:5,6,10;52:20;
54:4;55:6;58:4,7,9,
13,24;61:4,10,18,19,
24;62:1,6,16,18,19,
25;63:5;64:9;82:6,9;
84:1,10,19,22;86:6;
88:11,16;149:12,19;

150:1,4;244:12

**notebooks (26)**
51:11,13;58:2,10;
59:2;60:13,16,18,21;
61:7;62:12,14;63:15,
23;64:18,21;66:3;
77:1,5;82:10,12;
149:2,5,10;150:18;
244:12

**notes (69)**
12:16;15:15,22;
48:25;50:8,9,11,14,
14,16,17,19,24;
51:14;52:3,4,5,6,11,
11,20,25;53:20,22;
54:2,4,7;55:6;58:5,
21,24;59:7;60:11;
61:5;63:6,7,12;64:9;
83:24;84:9,12,19;
86:5,6,21;87:3,4;
91:18;148:25;149:3,
3,16;152:9;240:12;
241:6,9,14,16,18,24,
25;242:2,3,11,14,23,
24,25;243:18

**notetaking (2)**
91:13,17

**notice (2)**
164:10;182:1

**notified (3)**
14:3,5;156:13

**Novelty (1)**
5:8

**nuanced (1)**
203:19

**number (16)**
5:23;59:9,12;
65:10;75:25;76:1,1,
2;81:20;82:1;84:15,
16;149:20;187:16;
208:1,4

**numbers (6)**
61:7;76:16;77:24;
79:19,20;81:19

**nutrition (1)**
175:20

# O

**object (4)**
5:16;8:9;164:25;
196:3

**objected (1)**
112:20

**objecting (1)**
23:16

**objection (78)**
5:24;8:9;31:17,25;
32:19;46:3;49:20;
66:20;99:6,10,14;
112:17;113:10,25;
114:8,16;116:16;
117:9,19;119:14;

121:7,11,15;125:12;
129:6;130:5,18,25;
131:8,23;132:3,20;
133:18;134:8,23;
135:19;136:25;
137:2,22;138:9;
155:2;157:15,16;
160:24;169:5;
170:20;171:21;
175:15,19;176:17;
178:2,8,19;181:20;
189:21;192:14;
193:11;194:11;
195:18;196:6,19;
200:18;201:15;
208:14;209:10;
213:24;219:6;221:5;
225:4;227:15;228:1,
5,11;230:23;231:8;
232:17;234:3;237:5

**objections (3)**
23:11,17;155:8

**obligation (1)**
197:3

**observed (1)**
103:2

**obstruct (3)**
92:21,23;94:21

**obtained (2)**
159:5,8

**obviously (3)**
76:22;89:24;91:4

**occasions (1)**
140:10

**occupy (1)**
218:17

**occurred (1)**
85:4

**o'clock (1)**
99:20

**off (17)**
26:16;28:2;39:5;
83:4;95:2;96:14;
108:10;109:17,18;
145:22;208:5;
211:24;226:22;
232:1;237:15;
244:25;246:8

**offender (5)**
218:10,11,14,15,19

**offender's (5)**
218:3,5,22,24;
223:23

**offering (1)**
207:1

**office (15)**
5:4;18:4;36:19;
50:20;51:17;52:24;
61:12;74:3;76:24;
77:10;90:11;115:20;
116:25;150:11;
219:14

**Officer (58)**

7:6;10:4;17:1,8,13,
16,22;18:3,4,13,14;
19:4;35:25;36:2;
38:4,6,23,24;39:1,2;
43:2;46:6;73:9;
91:25;101:7;106:10;
111:1,6;115:7,8;
121:4;128:1;130:10,
12,13,14;132:17,24;
134:16;138:5;
161:22;163:2;
172:11;173:7;
175:22;191:8;193:5;
194:12,17;203:7;
205:23;214:16;
219:13;223:20;
225:9;228:16;
230:18;231:20

**officers (11)**
16:25;58:10;87:5;
111:24;177:13;
190:11,12;218:6,18;
219:17;231:17

**officer's (1)**
5:17

**official (2)**
101:20;156:18

**Ohio (27)**
5:8;6:21;106:10;
107:1,3;112:12,21;
113:6;163:8,10,14,
20,21;171:7;172:10;
174:1;19;175:24;
176:12;177:14;
190:18,22;217:16;
228:19,21;229:23;
233:3

**Old (5)**
77:13;83:6;174:5;
189:13,15

**older (1)**
15:13

**omitted (1)**
237:4

**once (5)**
33:23;49:12;
122:12;163:18;221:9

**one (99)**
4:3;10:16;13:8;
15:1;16:3,23;17:2;
25:2;33:6,7,20,25;
35:15;36:9;40:13;
41:6;46:11;48:5,6;
51:21;53:25;54:20;
67:5;69:15,17;76:13;
82:23,25;83:1,4,6,6,
15;85:5,6,9,10,11;
86:20;89:10;92:13;
96:4,18;97:16;
106:11,13;111:1,6;
112:1,4;116:10;
118:11;126:6;
129:24,25;141:10;

143:4,16,18;144:14,
15;145:14,23;147:2;
158:5;164:6,16;
165:20;168:5;175:3;
176:23,24;179:1;
183:23;184:16,16,17,
18;185:11;189:8,11;
190:15;196:7;
203:12;204:23;
206:2;208:22,22;
216:15;222:6;
224:20;227:17;
228:9;229:2,24;
235:7;240:20;
244:12,21

**one's (5)**
74:14;203:15,15,
16;224:14

**ongoing (4)**
13:7;69:14;117:25;
174:18

**online (5)**
21:24;72:24;
156:23;197:1;205:2

**only (34)**
9:25;10:8,15;
16:23;37:23;46:6;
55:8;60:21;66:7;
82:5;91:16;97:8;
106:20;114:8;
116:18,22;118:13;
124:25;139:21;
140:5,6;143:3;
157:14,23;159:11;
161:11,13;170:1;
194:15;211:11;
212:20;223:17;
224:14;237:17

**on-site (3)**
43:20;111:25;
118:9

**onto (20)**
12:18;16:6;27:7;
61:17;75:13;103:6;
123:19,24;124:18,25;
129:3;133:10;159:7;
161:23;187:17;
190:17,21;198:5;
209:14;223:25

**OPATA (8)**
105:12;106:8,9;
175:9;177:3;196:20;
203:5,7

**open (6)**
143:17;174:10;
204:17;230:6,13;
239:14

**opened (2)**
7:12;47:3

**operate (1)**
38:5

**operating (6)**
38:16;167:15;

201:20;202:6,20,23

**operations (1)**
79:19

**opinion (8)**
162:22;214:1;
219:16;223:17,18;
225:2;228:17;232:10

**opinions (1)**
230:7

**opportunity (1)**
225:16

**opposed (1)**
115:2

**ORC (1)**
208:2

**order (50)**
14:19;17:18;18:15,
18,20;19:7,8,21;
33:12,15;34:15,17;
35:12;110:13,14;
117:4,7,14,17;
123:16,22;124:3;
125:5,9,15,20;126:1;
138:6,11;157:13,23;
158:12;167:4,12;
168:5,15;192:5;
198:25;199:2,5,6,7;
200:4,6,16,24;
212:22;227:13;
228:9,25

**ordered (8)**
126:7,11;128:6;
191:16,19,24;199:16,
17

**ordering (1)**
201:18

**orders (7)**
5:20;18:14;35:10;
87:15;168:5;200:11;
201:5

**organization (11)**
6:23;7:13;43:2,5,
24;65:14;70:21;
71:12;91:12;205:5;
206:12

**organization's (1)**
41:25

**others (1)**
56:22

**other's (1)**
157:10

**otherwise (2)**
218:20;223:23

**out (108)**
10:5;13:21,23;
14:8,13,16,18,22;
15:8,12,17;16:4;
18:3;27:23;28:5;
29:22;30:3;32:13;
34:25,25;36:14;37:4;
38:21;39:2;40:5,5,7;
41:5,13;44:9;45:24;
47:25;50:20;62:4,16,

Bianca Marcellino vs
Geauga County Humane Society

Christian Courtwright
June 22, 2022

20;73:2,6;82:14;
87:6,17;88:13,21;
92:3;97:25;99:23;
101:16,19,21,23,25;
111:3,21,23;113:2;
118:8,24,24;119:3,4,
7,16;120:12;121:17;
126:9,15,17;127:15,
17,19;128:5,8,11;
151:4,10,15,21,24;
159:19;179:19;
196:22;204:8;
208:24;209:25;
213:2,5,12;214:7,10;
215:5;216:7;217:7;
218:2;220:5,21;
222:25;223:1,7;
229:4,22;231:17;
233:14;235:3;
242:13,13;244:3,8
**outcome (1)**
95:13
**Outlook (3)**
102:15;243:16,20;
244:1
**outreach (1)**
38:18
**outside (10)**
33:23;34:3;103:18;
124:20;212:13,16;
213:21;215:8,9,11
**over (22)**
30:17,20;31:14;
32:5;78:24;85:14,14;
96:11,21,25;125:25;
127:5;133:13;134:4;
135:22;150:12;
154:17;211:16,20,21;
227:12;234:10
**overlapping (1)**
28:9
**oversight (1)**
239:7
**own (15)**
41:8;44:3;75:20;
82:25;111:10;
118:25;119:3;128:8;
156:18;165:21;
168:7;175:21;
210:21;215:25;
230:22
**owners (1)**
159:20
**owning (1)**
120:6
**owns (1)**
124:4

**P**

**pacifist (1)**
41:1
**pads (2)**

63:24;77:16
**page (8)**
70:12;174:22;
175:3;224:4,7,8;
229:23;230:3
**pages (1)**
23:14
**paid (2)**
101:24;102:1
**pandemic (1)**
39:13
**panic (1)**
187:19
**Pannela (1)**
116:24
**paper (8)**
11:14;12:19;50:19;
59:25;88:12;102:10,
11,14
**paperwork (2)**
77:11,13
**paragraph (4)**
47:11,17;217:23,
24
**parameters (4)**
110:19;112:5;
114:15;120:4
**parcel (1)**
95:16
**parcels (2)**
96:4;97:25
**Pardon (2)**
54:14;198:24
**parents (12)**
24:9;26:2,4;29:19;
95:17,21;120:17;
127:5;133:16;134:6;
138:25;139:7
**parents' (23)**
29:8;95:3,15;
119:13;120:21;
121:9,20,21,23;
122:19;126:7,9;
133:11;135:18;
136:19;138:7,19;
139:2,17;198:19,21;
209:14,24
**parent's (3)**
27:14;179:6;204:2
**park (2)**
98:12;140:10
**parked (5)**
98:17,18;101:15;
123:10;148:10
**part (46)**
11:10;12:4;17:10,
21,25;18:9;20:1;
22:9,16;25:6;32:6,
17;34:7;35:6;39:22;
42:14;81:14;87:1;
111:14,17,18;114:19;
118:21;129:2;
133:15;142:5;157:4;

158:2,17,23;160:4;
170:24;188:3,11;
194:5,13,14;196:20;
198:23,25;219:15,16,
25;221:17;229:16;
239:7
**particular (3)**
22:4;48:3;236:1
**parts (2)**
176:15,16
**party (1)**
169:8
**passed (1)**
158:15
**passing (1)**
45:20
**past (2)**
106:19,21
**pasture (1)**
28:23
**Patrick (2)**
56:7;104:3
**pattern (2)**
242:21;245:22
**pay (7)**
78:11;110:21,22;
199:16,17;200:2,9
**pays (1)**
8:11
**PDF (2)**
141:16;143:7
**peace (7)**
5:16;20:11;34:15;
106:10;190:18,22;
203:7
**people (20)**
38:13,15,16,21;
39:3;40:24;57:14;
58:24;60:5;79:24;
118:14;157:8;
164:17;165:24;
168:12;179:13;
187:11;210:24;
224:25;239:9
**people's (5)**
81:4;129:4;159:7,
13;161:23
**per (1)**
108:20
**perfect (1)**
225:16
**perform (1)**
158:25
**performance (8)**
8:23;9:4;47:8;
66:23;69:13;78:19;
79:18;226:25
**performed (1)**
72:14
**Perhaps (2)**
148:23;152:2
**period (3)**
39:11;218:3,5

**permanently (1)**
245:10
**permission (2)**
133:10;218:16
**permitted (2)**
33:15;192:25
**person (16)**
66:16;87:9;104:10;
126:8;128:11;129:4;
139:12;162:16;
175:22;208:18;
212:22;213:4;215:6,
8;218:9,16
**personal (7)**
46:19;101:3,12;
215:13,23;216:20;
218:12
**personally (2)**
118:8;213:11
**persons (1)**
22:9
**person's (3)**
158:6;180:2;198:3
**pertain (2)**
160:22;230:18
**PetPoint (22)**
9:15,17,19,23,25;
10:8,11,12,16,20,24,
25;47:19,21;58:3;
66:5,8;89:3,6;188:23,
25;189:2
**pets (1)**
172:9
**phone (20)**
5:23,25;6:1;59:9,
11;61:7;65:9;75:6;
84:15,16;100:5;
127:19;149:19;
179:12,16;180:18;
189:13,15,15;197:1
**photo (5)**
184:10,12,14,23;
185:14
**photographic (1)**
86:18
**physical (3)**
4:25;50:13,16
**physically (1)**
27:7
**pic (3)**
182:18;185:2,3
**pick (2)**
4:10;176:23
**picking (1)**
214:6
**picture (8)**
24:12,14,23;35:2;
44:24;182:21;
184:24;185:7
**pictures (1)**
230:25
**piece (3)**
12:19;59:25;88:12

**pig (1)**
172:14
**pipe (1)**
124:16
**place (7)**
6:17;77:10;174:24;
175:4;177:17;
204:19;218:10
**placed (1)**
86:13
**plain (15)**
119:17,19;135:18;
138:15;203:9,15,17,
21;204:1,7,9,14,16,
18,20
**plaintiffs (1)**
4:4;22:14
**plaintiff's (1)**
9:16
**plan (2)**
9:5;232:4
**planning (1)**
231:22
**play (2)**
34:24;44:9
**playing (1)**
195:22
**please (10)**
4:12,23;6:11,25;
9:23;48:11;64:25;
79:7;215:21;233:1
**pm (2)**
148:9;246:14
**point (10)**
32:10;33:20;34:1;
101:21;122:20;
141:24,25;161:11;
180:20;215:4
**pointing (1)**
24:15
**police (18)**
122:16,17;124:14,
17,24;126:16,17;
127:21,23,25;128:2,
4;213:17;214:14;
217:1,4,7;231:17
**policies (36)**
39:16;70:3,21,22;
71:15,16,17,21,23;
90:4,9,10;91:12;
160:20,21;161:7,8,
12,20;162:5,9,11,24;
163:4;164:1,4,7,8,10,
12,17,22;165:7,8;
166:16;215:19
**policy (35)**
43:4;65:13,16,20;
72:2,4,5;89:18,20,21,
23,25;90:17,20,21,
22,25;91:3,5,8,11,16,
19;162:16;164:6;
165:3,13,14;167:2,8;
197:2,6;215:25;

243:16;244:10
**policymaker (2)**
  162:14,19
**pop (2)**
  217:11,12
**portion (3)**
  111:4;216:24;
  219:12
**portions (1)**
  219:11
**position (3)**
  7:12;57:19;234:16
**possess (2)**
  94:18;218:17
**possesses (1)**
  124:4
**possessing (3)**
  120:6;125:2;
  137:12
**possession (1)**
  125:25
**possibility (3)**
  220:5,6,20
**post (1)**
  108:17
**potentially (1)**
  77:11
**power (2)**
  133:3,5
**practice (3)**
  197:7;242:22;
  245:23
**practices (4)**
  46:12,21;47:15;
  165:10
**precedence (1)**
  227:12
**preconviction (1)**
  80:18
**preparation (1)**
  82:17
**prepare (2)**
  5:11;15:11
**present (3)**
  168:18;169:6,21
**presentence (1)**
  80:17
**presenting (1)**
  173:6
**presume (1)**
  69:3
**pretty (10)**
  27:5;129:25;
  133:12,13;135:15;
  156:15;205:12;
  211:2;232:9,13
**prevail (1)**
  228:10
**prevails (3)**
  227:18;228:17;
  229:2
**previous (1)**
  233:25

**previously (1)**
  30:6
**primary (1)**
  46:16
**prior (17)**
  12:2;13:11,23;
  42:23;43:24;83:9;
  104:16;120:17;
  136:5,6,21;143:1;
  164:4;179:25;221:1;
  223:25;236:9
**privacy (1)**
  198:8
**private (3)**
  114:10;190:17,22
**privilege (3)**
  169:9,11,22
**privy (1)**
  95:13
**probable (1)**
  208:7
**probably (40)**
  11:23;22:1;45:19;
  54:22;59:5;63:13;
  64:20;70:1;71:25;
  83:6,19,21,23;85:24;
  86:3;93:20;98:9,12,
  18;101:19;106:22,
  23;117:13;128:3;
  140:1;141:20;
  151:15;152:25;
  155:4;156:17;
  171:14;181:11;
  185:24;219:8,11,20;
  235:2,12;237:13;
  245:3
**Probate (1)**
  18:10
**probation (386)**
  13:3,14,18;14:2,9,
  20,25;15:8,10,21,24,
  25;16:4,7,8,15,20,22,
  25;17:1,7,11,20,25;
  18:2,4,8,12;19:20;
  20:7,24;29:9,17;
  30:7;32:7,11,17,22;
  33:2,10,18;34:7,13,
  19,21,23;35:7,11,13,
  15,18,19,20,21,25;
  36:3,7,24,25;37:3,8,
  14,18,24;38:4,4;39:8,
  15,24;40:3,11,16;
  41:1,4,9;43:16,18,20;
  44:4,14,22;45:2,6,9;
  48:15,19,20,21;
  50:22,25;51:7,8,16;
  52:21;53:1;55:12;
  56:17;57:8,10,10;
  58:4,9;60:7;61:5,11;
  62:11,17;64:5;65:17;
  75:5;76:23;79:25;
  80:3,5,8,10,12,17;
  81:1,4,12,14,15;85:1;

88:19;91:21,25;92:2,
  6,16,20;94:14,21,25;
  95:8,11;98:4;102:18,
  18;103:5;104:8;
  105:18;106:11,17,18;
  107:6,7,10;108:11,
  21;109:4,18,20;
  110:7,19,23,23,25;
  111:1,2,4,6,13,14,15,
  18,23,24;112:2,6,11,
  23,23;113:24;114:6,
  13,15,19,25,25;
  115:7,7,9,16,16,19;
  116:1,2,15,19,23;
  117:24;118:4,14,15;
  119:9;120:3,4,5;
  123:20;129:2,13;
  130:10,12,15,17;
  131:6,11,14,16,21;
  132:7,13,17,19,23,23,
  24;133:1,6,8,17,23;
  134:16;136:5;137:4;
  138:4,5,17;140:16,
  21;141:19,22,24,25;
  142:3,5,6;143:5;
  144:10,21;145:2,9,
  16,19,25;146:5,10,
  19;147:5,6,8,9,14,25;
  148:13,15,16,21;
  149:14;150:24;
  151:8,13;152:3,5,14,
  19;153:24;154:14,15,
  18;157:1,15,20;
  158:1,7,8,11;159:11,
  14;160:22;161:6,8,
  16;162:3;163:16,22;
  164:13;165:15;
  167:3,6,9;170:18;
  171:5,8;179:9,22;
  180:1,21;187:12,14,
  22,25;188:6,14;
  190:24;191:14,16,21,
  23;192:1,2,8,8,12,23;
  193:4,8,15,18,19,23;
  194:6,12,22;198:17;
  203:16;208:21;
  209:20;211:13;
  212:15,23;213:1,21,
  23;214:10,13;215:7,
  9,13,14;216:22;
  217:20;218:6,18;
  219:13,14,17,25;
  220:1,12,18;221:2,
  11,12,14,15;223:13;
  225:8,9;227:22;
  231:23,24;232:4,7,
  12;234:20;235:24;
  236:5,12;237:15,16,
  18;239:23,25;240:1,
  6,9,22;241:6,14;
  242:15;243:1;
  244:11;245:18,21
**probationer (3)**

15:5;35:3;142:2
**probationer's (5)**
  23:21;59:24;
  112:13;113:8,20
**problem (3)**
  66:9;160:18;
  168:19
**problems (1)**
  21:2
**procedure (3)**
  201:20;202:20,23
**procedures (7)**
  160:21;161:8,13,
  20;162:5;202:6;
  215:20
**PROCEEDINGS (1)**
  4:1
**process (2)**
  14:24;15:2
**produce (5)**
  48:11;57:2;64:4,
  16;233:22
**produced (3)**
  11:15;70:9;245:2
**producing (1)**
  233:9
**productive (2)**
  40:22;41:11
**professional (3)**
  71:12;115:5;
  176:18
**professionals (1)**
  35:5
**program (1)**
  190:4
**programs (1)**
  158:21
**promptly (1)**
  165:11
**propensity (1)**
  139:18
**properly (1)**
  9:2
**properties (5)**
  24:23;52:12;98:1;
  128:16;153:17
**property (328)**
  13:20,22,23,25;
  15:12,20;16:3,7;19:2,
  22,24;20:1;23:21,22;
  24:1,2,4,4,6,7,8,14;
  25:3,6,15,25;26:1,3,
  9,16,19,22,24;27:9,
  15,19,22,24;28:2,6,
  11,16,20,22;29:1,5,9,
  16,18,19;30:8,12,13,
  20;31:1,8,11,15,18,
  23,24;32:6,13,18,23;
  33:4,19,22;34:25;
  35:1;36:6,23;40:18;
  44:5;45:3,25;48:14;
  50:1,5,8;51:2,15,16;
  52:11;59:22;60:6;

61:11,25;62:2,4;
  63:8;75:11,13;79:25;
  81:4,12,16;84:19,23;
  85:2,19;86:7;87:5,11,
  16;88:20;93:2,4,6,8,
  11,12,14,22;94:7,8,
  10,17;95:3,15,20;
  96:7,10,11,14,21;
  97:1,4,6,18,19,22;
  98:7,10,16;100:15;
  101:1,18;102:6;
  103:1,2,6;107:12,14,
  17,20,23;108:3,7,14,
  18,20,24;109:3,17,
  19;110:12;111:6;
  112:13;113:9,20;
  117:8,11,15,18;
  118:6,8;119:8,24;
  120:2,11,15,21;
  121:5,8,10,20,20,24,
  25;122:1,5,6,9,14,19,
  21,23,24;123:7,11,
  15,25;124:11,19;
  125:1;126:7,25;
  127:1,2,4,10,12;
  128:24;129:4,10;
  133:11,16;134:6,20;
  135:6,10,17,18,21,
  24;136:6,17;137:8;
  138:1,8,12,20;139:3;
  140:3,11,25;141:14;
  145:13;146:22;
  147:19,21;148:1,6,9,
  17;149:12,22;150:8;
  152:25;157:6;158:7;
  159:2,8,13,19;
  161:24;162:2;167:9,
  23;168:17;178:10;
  179:3,5,6,7,8,14,20,
  23;180:19,23;181:2,
  6,9,22;182:5;183:2,5,
  7,9,12,25;184:2,5,22;
  186:10;187:18;
  189:19;190:18,22;
  191:9;192:10,25;
  193:7,10;194:22;
  197:20;198:5,18,19,
  21;209:14,17,19,19,
  21,24;210:2;213:4;
  214:25;216:3,23,25,
  25;218:13,13;
  219:22;220:2,4,13,
  17;221:22;222:2,4;
  223:2,7;224:1;
  227:24;228:25;
  231:1,19,23;232:5;
  239:3,12,24;240:13
**proposed (1)**
  156:19
**propounded (1)**
  22:13
**prosecuted (1)**
  188:2

Bianca Marcellino vs
Geauga County Humane Society

Christian Courtright
June 22, 2022

prosecuting (2)
116:2;133:7

prosecution (1)
48:17

prosecutions (1)
12:6

prosecutor (17)
116:7,20;117:2;
134:17;157:18,19,21,
22;164:22;165:3;
168:15,21,22;171:3;
225:7;227:21;230:11

prosecutors (2)
164:19,20

Protective (1)
6:22

Protects (1)
198:15

proud (1)
133:13

prove (1)
91:23

provide (11)
5:21,21;9:20;
16:18;56:19;74:24;
100:19;104:20;
125:11,15;171:12

provided (11)
23:14;49:3;55:12;
57:22;104:19;
114:10;143:19;
155:18;156:3;
178:14;229:25

providing (8)
54:13,16;74:22,25;
104:13;105:3;
131:13,19

proxy (1)
35:25

prudent (1)
44:8

public (28)
5:18;38:18;49:16,
18,25;50:2;65:13,19;
89:21,23,25;90:21,
22,25;91:4,11,18;
104:14;125:13;
165:2;168:22;
189:17,19,23;190:12;
243:16;244:10,16

pull (4)
125:18;140:24;
229:22;231:13

pulled (1)
180:16

punishment (1)
188:11

purely (1)
227:16

purpose (11)
19:11;29:20,24;
30:6,24;31:12,13;
33:1;84:11,14;120:1

purposes (6)
11:1;16:7;83:5;
114:24;215:15;
245:23

pushed (1)
210:20

put (45)
9:4;11:6;35:20;
36:1;42:11;48:9;
50:14,20;53:19;
54:17;61:13,17;62:5;
64:10;76:12,13;
78:13;86:2;92:24;
111:18;133:8;144:6;
145:18;148:22;
150:9;152:11,13,23;
153:3,20;154:6,8;
186:16;189:5;202:4;
221:12,13;224:6;
232:25;235:11,13,24;
238:4,6;239:5

putting (3)
29:24;95:4;185:15

Q

quality (1)
175:24

quick (1)
62:7

quicker (1)
174:11

quickly (1)
165:11

quitclaim (2)
133:14,22

quitclaimed (5)
24:8;26:2;95:16;
120:17;128:25

quitclaiming (2)
133:15;134:5

R

raise (1)
68:18

ran (1)
93:22

random (24)
17:13;19:3,10;
124:1,2,22;158:18;
168:16,23;169:3,12;
180:5;191:19,22;
192:6,22;193:3,9,22;
195:10;201:13;
225:11,21;227:13

randomly (1)
61:8

Randy (1)
172:8

rapport (3)
157:9;195:14;
217:9

Rapstine (12)
56:5;237:23;
238:10,13,17,18,18,
22;239:2,8,9,10

Rapstine's (2)
64:8;238:2

rather (1)
188:7

read (34)
15:15;23:3,8,9;
69:25;70:4;71:13,16,
17,21;72:8,11,16;
110:6;151:9;163:18;
190:3,6,8;197:1,10;
217:23;218:2;
219:12;223:17;
224:7,10;225:6;
227:20,25;228:6;
229:10;246:10,12

reading (2)
230:8;246:11

real (1)
218:13

really (8)
38:17,17;39:3,3;
115:25;142:3;157:5;
232:3

reason (29)
7:10;8:22;20:23;
21:2;33:5;36:12,22;
37:13;38:1;84:10;
103:13,16;110:13;
115:17;120:9;121:2;
137:21,23;139:16;
178:13;199:13;
208:10,24;209:12,16,
18;215:2;237:21;
239:6

reasonable (40)
109:25;110:2,4;
112:8,9,9,14,14,24,
24;113:7,7,8,18,19,
19;117:7,12,14,17;
123:17,17,18;197:11,
12;198:23,24;208:12,
16,18,20,25;218:18;
219:18,21,24;223:22;
227:24;228:4,24

reasons (9)
14:7;33:6,7,9;84:9;
86:20;124:6;159:14,
15

Rebecca (1)
42:19

recall (39)
28:13;46:9,11;
67:15,16;72:19;
91:24;95:24;98:15,
17;100:14;104:13,
22;119:10;126:20;
127:13;128:14;
145:15;152:16;
153:8;156:6,7;

171:12;172:6,7,15;
179:15;182:11,13;
213:4;216:12,13,14,
15;225:9;227:3;
229:25;231:13;233:9

recalling (1)
182:9

receipt (1)
245:11

receive (9)
8:13;71:23;105:6,
8,11;164:13;189:6;
244:13,18

received (16)
9:23;12:12;18:19;
105:24;106:4;
126:14;151:1;
160:10;174:8;
176:11;177:21;
190:16,21;193:12,17;
222:19

recently (5)
54:21,21;105:12;
162:5;166:5

Recess (3)
98:25;155:23;
211:25

recognize (9)
24:23;25:3;47:6;
70:10,11;182:23;
183:2,4;184:14

recollect (2)
47:3;148:24

recollection (1)
185:15

recommended (2)
231:14,16

record (46)
4:22;9:25;10:8;
25:5;49:16;50:2;
51:6;65:13,20;73:9,
12,13;102:16,18,25;
125:13;148:2;
155:17;174:7,15,17,
22;175:4,8,10,12,17,
23;176:2,7,10;177:9,
15;184:4;187:9,13;
189:20;216:13;
234:16;243:8,10,11;
245:1,4;246:4,5

recorded (4)
59:13,15;128:15;
216:16

recordkeeping (8)
58:15;89:18;90:3,
5,18;91:1,1;178:6

records (45)
9:16,24;49:19,25;
57:8;64:4,7,8,8;
65:17;66:12,13,15;
72:23;73:4;89:21,23,
25;90:21,22,25;91:5,
11,19;95:25;96:3;

98:2;104:14,21;
134:25;135:15;
150:19;165:2;
186:20,23;187:2,5,6;
189:17,23;190:12;
243:16;244:1,10,16

redepose (1)
234:9

reduced (1)
237:18

refer (3)
66:1;113:21;
149:16

reference (1)
45:22

references (1)
47:19

referencing (1)
47:1

referred (2)
89:3;91:19

referring (5)
16:20;18:18;19:8;
117:4;154:20

refers (1)
66:7

reflected (1)
9:3

refresh (1)
105:13

regard (1)
24:3

regarding (4)
52:11,12;91:17;
105:17

Regardless (2)
129:20;214:22

regards (1)
107:10

regular (4)
67:4;193:16,16;
195:12

regularly (1)
11:2;40:13

relate (2)
9:8;190:23

related (9)
11:15;39:16;72:5;
90:4;156:7,25;
158:24;161:9;191:1

relationship (1)
217:10

relatively (1)
54:21

Relevance (1)
231:9

relevant (2)
131:5;245:17

relies (1)
111:3

rely (6)
110:24;111:9;
113:1,4,12;115:5

**remain (1)**
138:23

**remained (1)**
33:11

**remains (2)**
139:5,20

**remember (56)**
22:19;28:25;29:2,
6;49:1;54:18;59:8,
11;63:5,10;64:21,24;
65:9;67:24;79:15;
84:13,14,16;85:8,20;
86:8,23;87:8;88:7;
92:4;100:25;101:19,
22;102:2,4;104:16;
128:9,18,19;133:23;
153:7,8,9,15;156:2;
175:1;180:16;
185:21;201:24;
205:1;215:22;216:4,
8,10;225:13;230:5;
240:14,17,23,25;
241:4

**remembered (2)**
59:21;62:8

**remove (1)**
81:23

**removed (1)**
76:3

**renters (1)**
188:19

**renter's (1)**
148:10

**repeat (2)**
192:4;196:4

**report (14)**
9:8,11,19;35:6;
43:3,9;73:20;76:18;
78:2;80:19;89:7;
91:17;128:2;132:25

**reported (1)**
216:10

**reporter (1)**
4:10

**reporting (1)**
91:13

**reports (69)**
11:7,9,14,14;46:13,
21,24;47:15,18;
56:13,14;57:25;58:1,
2;66:1,7;73:21,25,25;
74:2,7,8,8,12,17,22,
24;75:1,7,7,8,22,22,
23,24;76:4,6,8,15;
77:19,22,23,25;
78:14;79:22,22,23,
23,24;80:11,16,24,
24,25;81:6,7,9,13,18,
25;88:24;91:14;92:8,
10;243:13;244:23,23,
24,24

**request (17)**
37:24;54:15;55:11;

57:1,16;74:21;90:21;
104:14,21;165:3;
181:8;187:16;
189:17;243:16;
244:10,16;245:1

**requested (1)**
234:10

**requesting (2)**
57:18;104:25

**require (2)**
72:17;77:17

**required (14)**
10:23;69:23;72:21,
22;112:10;113:18;
114:21;159:22;
160:2;175:9;191:8;
207:22,23,25

**requirement (4)**
203:10;227:8,8;
246:3

**requires (10)**
72:13;113:6;176:5;
177:3;203:5;204:18;
223:21;227:23;
228:3,24

**reread (1)**
15:13

**Rescue (12)**
7:12;8:21;70:14;
71:13;116:13;
172:11;173:6,7,10,
15,21,23

**research (1)**
158:21

**reserving (1)**
234:8

**reside (1)**
20:18

**residence (4)**
24:7,18;25:10;
218:10

**resident (1)**
214:11

**residential (2)**
5:14,17

**respect (2)**
35:4;114:9

**respond (3)**
57:2,17;165:11

**response (1)**
29:13

**responsibilities (2)**
162:6;218:8

**restitution (5)**
199:16,17;200:2,4,
9

**restrictions (1)**
15:17

**restroom (1)**
141:7

**result (1)**
115:16

**resume (1)**

7:1

**retention (3)**
65:13,16,20

**reveal (1)**
169:6

**review (22)**
9:4,7;46:9;47:9;
57:25;67:2,12,23;
68:1,5,19,21;69:4,15;
89:4;92:3;172:11,21;
173:6;174:2;224:2;
246:12

**reviewed (1)**
92:17

**reviews (12)**
22:7;66:23,24;
67:1,16;68:16,24;
69:13,23;72:14,18,21

**Revised (6)**
163:8,10,14,21;
217:16;233:3

**Richard (1)**
245:7

**Richard's (1)**
155:6

**right (78)**
5:3,22;17:15;19:9;
25:18,20;26:12,18;
31:3,9,15;42:13;
57:11;61:25;62:19;
68:24;69:11;82:19;
83:13;89:8;93:16,22,
24,25;94:4;97:11,18,
22,23;98:21;109:9;
115:22;119:12,23;
123:8;129:3,8;
132:22;134:11;
135:7,9;137:19,20;
138:7;139:4;147:17;
148:8;151:23,23;
152:9;159:3;167:8,
17;171:9;172:25;
174:17;179:13,24;
191:2;194:6;199:22;
200:2,20,22;202:21;
203:3;210:19;
213:22;218:14,16;
223:11;233:2;234:9;
237:25;242:22;
245:2,13;246:10

**rights (4)**
162:20;197:24;
198:4,8

**Road (5)**
5:8;25:14;26:12,
14;124:14

**Robert (10)**
53:12,19,20,22;
54:17,24;55:16,18;
59:2;104:6

**Roberta (2)**
56:1;62:10

**role (2)**

34:24;173:24

**roof (1)**
25:13

**room (1)**
5:9

**rough (2)**
96:9,11

**routine (1)**
160:4

**rules (3)**
157:7;227:18;
245:12

**run (3)**
94:4;97:23;229:3

**runs (1)**
94:9

## S

**safer (1)**
127:25

**safety (1)**
14:7

**salary (2)**
8:11,14

**Same (22)**
5:24;6:23;47:17;
76:5,7,9,16;78:2;
81:8;84:1;88:10;
89:1;152:1;153:24;
161:15;170:24;
173:12;195:20;
196:2;206:12;238:7;
240:18

**sanction (5)**
188:4;218:4,6,23,
24

**sanctions (1)**
223:24

**sat (2)**
70:4;95:14

**Saturday (5)**
99:19;195:3,5,6,10

**save (1)**
201:25

**saw (4)**
33:23;70:18;
199:23;210:2

**saying (25)**
9:25;18:2;24:16;
37:11;51:21;57:13,
21;79:7;80:12,13;
109:13;113:16;
128:14;147:14;
153:23;166:15;
169:16;181:4;
194:24;199:12;
207:17;225:10;
236:3,6;245:5

**SBC (1)**
6:17

**schedule (1)**
37:9

**scheduled (2)**
36:17,18

**School (1)**
205:25

**science (1)**
71:11

**scope (2)**
124:20;218:7

**screaming (1)**
122:16

**screen (22)**
23:19;24:11,19;
25:12,23;53:4,7;
70:8;141:16;142:24;
143:9;155:16;
172:17,19,20;182:14,
20;185:8;186:2;
217:12,15;232:25

**screens (1)**
103:25

**Scroll (3)**
145:4,6;146:14

**search (28)**
48:4;107:8,11,13,
16,18,20,23;108:2;
159:1,5,8,13;191:6,9,
16;197:19;198:15,16,
19,21;199:3;203:10,
14,23,24;204:21;
218:9

**searches (1)**
203:16

**searching (1)**
79:4

**second (9)**
53:25;79:3,4;
104:1;172:19;
184:16;192:3;224:8;
236:20

**section (5)**
16:12;105:15;
163:15;208:6;217:19

**sections (2)**
163:14,16

**seeing (1)**
32:22

**seeking (1)**
230:10

**seemed (1)**
33:24

**seems (6)**
12:12;97:24;146:8;
166:15;182:9;190:4

**seizure (3)**
198:15,20;199:3

**seizures (1)**
198:16

**self (2)**
69:2;202:1

**semi (1)**
40:12

**send (1)**
15:20

Bianca Marcellino vs
Geauga County Humane Society

Christian Courtwright
June 22, 2022

sending (1)
225:9
sent (4)
10:4;15:25;16:8;
72:4
sentence (17)
20:9;111:17,19;
120:18;126:21,23;
158:2,15,17;193:8;
194:5,14;198:23;
199:15;200:20;
201:22;217:20
sentenced (17)
13:19;87:11;
100:17;108:23;
109:24;114:19;
120:19;129:5;134:2;
142:1,6;147:18,22;
188:10;191:21;
192:7;197:20
sentencing (34)
15:15;17:12;18:3,
16,21,23;19:1,8;
20:13;35:17;95:18,
19;98:6;108:15,17;
110:10;111:11,12,14,
16;117:5;118:21;
125:23;141:20;
142:4;168:5,15,18;
191:20;200:5;222:9,
10,11;231:2
separate (5)
83:2,13;85:5,7;
86:2
served (1)
48:4
service (1)
11:22
services (1)
38:20
session (3)
174:23;176:8;
177:16
set (1)
140:3
settled (1)
45:25
seven (1)
195:22
several (4)
6:20;23:14;51:11;
73:19
share (19)
5:25;23:18;24:10;
52:9;70:8;78:1;
103:25;104:2;141:5;
142:15;143:15;
144:13,19;171:17,18;
172:16,18;182:14;
186:2
shared (7)
50:10,21,22;78:5;
172:20;174:14;

182:20
sharing (7)
141:4;143:1,8,9,
14;144:18;184:11
sheep (1)
172:9
sheets (1)
243:17
shelter (7)
9:12,14;11:5,21;
38:25;42:20;79:19
shortly (8)
44:7;45:15;95:16,
17;126:20,23;
127:20;237:14
show (21)
22:21;23:2,13;
52:8;90:13;92:14;
142:16;143:20;
146:10,16;182:7,8;
183:14;184:10,24;
186:1;195:3;201:23;
227:4;230:14;246:3
showed (5)
59:11,20;61:16;
108:6;161:18
showing (5)
24:21;25:7;28:5;
146:13;159:20
side (11)
25:15,18;27:14,16;
94:5;97:9,16;135:2,
13;183:3;208:5
sight (1)
123:12
sign (1)
35:3
Signature (1)
246:13
signed (1)
230:3
signs (1)
98:13
similar (1)
154:3
simple (2)
157:5;196:9
Simply (6)
55:3;58:18;191:21;
192:7;193:4;244:2
single (4)
66:16;75:1;189:7,
11
sister (3)
126:3;127:17;
128:23
sit (3)
26:3;27:18;120:15
sites (2)
58:9;156:23
sits (3)
24:1;95:21;135:1
sitting (4)

5:3;63:20;65:5;
101:17
situation (1)
230:12
six (3)
86:11;136:8;196:2
small (5)
31:3;63:24;81:14;
157:4;229:12
smaller (1)
70:11
Smarter (3)
168:12;175:22;
224:25
Smith (4)
58:19,22;84:6,7
Smith's (5)
59:8;61:25;62:2,4,
7
smoking (5)
124:13,15,23;
192:21;220:24
snapshot (1)
80:22
snow (1)
182:12
social (5)
11:22;22:5;39:18;
40:1;162:9
Societies (4)
107:2;202:9,10,13
Society (33)
4:5;8:12;17:13;
73:8;77:17;89:17;
91:16;99:17;100:19;
111:20;115:3;
118:11;119:7;160:9;
161:10,12;162:4,8;
163:3;164:18;
165:22;173:11,16,17,
18,19,25;175:11;
202:16;205:24;
206:6;215:19;245:21
Society's (2)
5:5;116:9
softer (1)
160:16
software (6)
9:12,14;10:25;
11:5;47:19;58:3
sole (1)
33:5
solely (2)
33:2;212:18
somebody (4)
61:8,9;87:7;139:15
someone (16)
31:22,23;46:1;
63:2;71:18;80:15;
87:24;103:17;
114:18;121:5,6,25;
167:18;210:20;
212:24;230:21

someone's (10)
103:6;107:12,14,
17;132:18,22;
149:20;159:2;
167:22;185:16
Sometimes (27)
51:9;52:21,23;
55:7;82:16;83:25;
100:23;108:19;
111:9;118:19,23;
162:1,3,22;180:6;
194:23;197:15;
200:11;201:5;
203:24;207:11,13;
215:12;235:24;
236:13,14,14
somewhere (4)
28:19,21;65:6;
189:3
soon (2)
82:17;245:7
Sophia (4)
53:24;55:23;
155:11;213:6
sorry (13)
17:5;26:22;42:3;
67:10;71:20;89:22;
130:14;137:5;
143:10;144:24;
179:2;180:24;198:11
sort (10)
6:16;23:24;68:5;
115:1;116:1;166:16;
188:1,13;217:5;
236:3
sound (1)
172:12
source (1)
157:14
spay-neuter (1)
38:20
SPCA (2)
7:4,15
speak (8)
39:23;68:17;99:2,
12;163:23;166:12;
179:16;216:1
speaking (4)
160:8;162:15;
163:24;196:6
special (15)
116:6,20;117:1;
134:17;157:18,19,21,
22;164:20,22;165:3;
168:14;171:3;225:7;
227:21
specific (24)
7:2;35:2;45:22,23;
79:18;80:2,25;87:19;
106:18;114:13;
118:23;119:10;
158:8,24;159:18;
160:21;161:6;

162:11;178:3;
195:17;196:25;
202:8;230:12;240:17
specifically (43)
14:23;18:11,22,24;
19:1;20:9,14;22:20;
24:3;38:14;46:23,25;
58:13;65:18;67:15,
18,25;68:3;80:8;
82:12;84:17;85:20;
89:5;91:9;92:15,18;
95:24;98:17;105:20;
107:7;112:11,22;
125:1;127:13;144:4;
156:6;164:3;175:3;
178:1;190:17;
196:16;197:9,10
specifics (2)
85:8;178:4
spend (1)
187:19
spent (1)
196:6
spit (1)
226:16
splits (1)
25:20
spoke (3)
41:9;179:19;
180:18
sponsor (2)
174:24;175:5
spreadsheet (5)
48:9,11;50:6;
74:14;244:9
spreadsheets (4)
11:13;74:11,13;
243:15
staff (2)
11:21;39:21
stamp (1)
182:22
stand (2)
41:10;44:9
standard (4)
201:20;202:5,20,
23
standing (7)
28:11;29:2,5;
119:18;185:9;
204:16,20
start (9)
4:13;44:22;46:24;
63:5;75:12;82:25;
83:4;104:5,6
started (5)
6:15;7:3;39:13;
68:11;154:18
starting (1)
118:1
starts (1)
47:11
state (13)

FINCUN-MANCINI -- THE COURT REPORTERS
(216) 696-2272 -- email@fincunmancini.com

4:22;12:10;21:23;
168:21,21;176:5;
177:3;203:5;213:5,
15,18,23;214:14
**stated (1)**
227:1
**statement (3)**
178:9;221:24;
230:3
**States (1)**
206:7
**statue (1)**
224:18
**statute (24)**
5:16;112:22;
163:20;199:6;208:4;
217:14,17;218:25;
219:2,4,9;223:16,20;
224:12,15,22;225:2;
226:2;227:17,19,23;
228:3,8,24
**statutes (7)**
110:18;163:16;
195:17;196:18;
197:4;230:9,17
**stay (1)**
227:2
**step (1)**
131:7
**stepped (5)**
27:7;96:11,21;
131:21;132:12
**stepping (4)**
129:21;130:3,16;
132:1
**steps (3)**
129:16,18;131:17
**Steve (3)**
24:11;172:17;
246:11
**stick (2)**
30:1,4
**sticking (4)**
29:22;32:2;119:16;
204:8
**still (26)**
31:21;39:12,14;
47:18;63:22,25;
64:18;87:14,17;88:6;
97:19;122:6,14;
123:3;180:7;196:1;
201:4;210:25;215:9,
10;231:10,24;232:3;
233:3;243:7;246:2
**stood (1)**
79:15
**stop (6)**
10:12;141:4;
143:14;144:18;
203:13,22
**stopped (8)**
21:19;39:13;
145:13;184:11;

186:11,18;189:2;
235:12
**stopping (1)**
187:8
**stops (2)**
135:3,4
**storage (1)**
77:10
**store (1)**
92:10
**straight (2)**
97:25;135:16
**Street (4)**
58:20,23;84:7,8
**string (2)**
236:2,16
**structure (3)**
97:14,15,16
**Student (1)**
205:24
**stuff (7)**
63:16;85:11;90:23;
143:21;183:20;
186:16;243:8
**Stupica (4)**
132:14;167:20,25;
194:2
**Stupica's (1)**
192:5
**subject (5)**
174:24;175:5;
190:12;193:3,4
**submit (1)**
77:20
**subsequent (1)**
197:20
**substitute (1)**
230:8
**succinct (1)**
11:23
**sudden (1)**
242:13
**sued (3)**
6:3,5;225:10
**suggested (1)**
89:14
**suing (1)**
225:11
**Sunday (2)**
151:10,21
**Sundays (1)**
151:4
**sunshine (2)**
190:7,8
**supervise (2)**
35:19;165:24
**supervisor (40)**
9:3;11:25;12:2;
17:6;34:22;41:14,22;
43:7,12;44:1;46:6;
57:24;69:3;70:25;
72:2;77:20,21;80:15;
89:14;90:13;115:1,2,

4;119:2,4,6;165:15,
18;166:18;168:9;
169:1,7,16,19;170:4;
177:5,6;207:14,16;
226:10
**supervisors (4)**
42:22,25;171:4;
226:3
**supervisory (2)**
34:24;218:8
**supplement (4)**
22:9,11,25;23:1
**supplemental (1)**
36:3
**support (1)**
131:11
**supposed (5)**
80:22;153:24;
158:3,18;201:2
**Supreme (2)**
228:19,21
**sure (35)**
20:19;25:16;30:15,
18;33:12;34:6,12;
47:5;56:4;84:17;
86:25;95:22;117:13,
24;118:1;126:10;
136:15;137:15;
145:21;157:6,11;
158:4;164:6;205:12;
213:13;214:2,24;
220:10;221:15,18,22;
235:6,8;239:4;245:8
**Surely (1)**
132:18
**surprise (1)**
113:9
**surprised (2)**
113:2;222:1
**surprises (1)**
195:13
**surveillance (4)**
140:2;215:14;
216:2,24
**survey (1)**
26:20
**suspect (1)**
139:13
**suspending (1)**
217:20
**suspicion (16)**
110:2;112:9,15;
113:7,19;117:8,12,
14,18,22;123:17;
197:11;208:12,16,20,
25
**swing (1)**
166:18
**switching (1)**
143:21
**sworn (3)**
4:17;166:5,6
**system (4)**

72:24;78:15;
200:13;216:17

---

**T**

**talk (32)**
12:10,13,14;15:19;
23:20;34:21;43:12;
47:23;84:6;92:11;
99:5,8;105:5;115:11;
129:23;132:14;
144:10;156:10;
160:20;191:11;
194:24;198:2,3;
225:6;226:7;232:6;
239:8;243:8,9,10;
245:7;246:7
**talked (9)**
41:1;58:23;62:2;
91:25;174:5;181:13;
204:25;212:9;224:17
**talking (34)**
18:22;22:21;23:11,
17;48:18,18;51:24;
52:18;63:2;78:25;
79:1,7;84:2;89:9;
92:13;108:8,15,17;
111:12,13;138:25;
157:8;164:4;169:15;
176:14;187:2;
196:21;222:9;227:5;
241:12,13;243:24,25;
244:6
**talks (6)**
89:25;90:2;105:15,
16;159:16;161:23
**tangible (1)**
218:12
**taught (1)**
87:2
**taxpayer (1)**
217:6
**teach (2)**
114:4;195:15
**team (1)**
165:17
**tech (4)**
7:17,21,23,24
**technically (1)**
99:21
**technology (2)**
74:4;78:4
**telling (7)**
25:5;57:17;62:17;
95:2;210:24;211:5;
223:6
**tells (3)**
110:17;167:20,22
**ten (1)**
86:11
**tend (1)**
40:25
**ten-minute (1)**

98:20
**tenth (1)**
150:17
**terms (5)**
13:18;39:24;
163:11;187:22;
200:19
**test (1)**
130:8
**testified (15)**
4:18;30:6;40:4,5;
64:19;93:21;134:24;
150:17;174:15;
177:2;179:25;
188:18;215:12;
236:10;243:17
**testimony (1)**
236:10
**Texas (3)**
6:18,18,23
**texting (1)**
189:10
**theory (1)**
130:9
**There'd (1)**
177:9
**thinking (2)**
41:3;67:10
**third (2)**
195:3;197:13
**Thomas (3)**
56:3;233:6;234:19
**thorough (2)**
138:2,5
**thoroughly (1)**
225:6
**though (6)**
31:16;34:13;57:3;
125:17;158:16;
172:15
**thought (8)**
29:15;81:24;90:22;
93:21;115:12;
180:12;205:13;
231:18
**thoughts (2)**
130:21;131:3
**Thrasher (5)**
17:4,5;115:8;
171:5;226:12
**three (4)**
76:8;205:5,20;
221:6
**threw (4)**
60:12;61:2,6;65:4
**throw (3)**
60:25;63:17;149:5
**throwing (1)**
64:21
**T-i-m-e (1)**
100:12
**times (17)**
36:5,6;81:11;

Bianca Marcellino vs
Geauga County Humane Society

Christian Courtwright
June 22, 2022

86:11;102:25;103:1;
135:17;150:13;
159:2,11;194:25;
196:2,10,12;221:6;
240:19;244:5
**timesheet (1)**
243:23
**timesheets (1)**
243:21
**title (6)**
7:22,23;156:4;
205:20;218:14,17
**titles (1)**
8:2
**today (4)**
5:12;62:7;207:1;
220:7
**Todd (1)**
116:12
**told (33)**
28:17;29:12;36:14,
24;37:15;58:4,6,8;
66:13;76:17;109:6;
111:1,7;112:21;
113:5;115:12;119:7;
127:15;128:4,7;
131:22;157:13,19,22;
158:5,10;168:5,19;
195:6;211:18,21;
224:15;242:10
**tomorrow (2)**
57:20;234:17
**took (14)**
7:18;21:22,24;
50:8;53:21;60:11;
61:5;62:16;68:14;
105:25;195:15;
212:12,14;226:22
**top (8)**
25:22,23;52:1;
108:10;149:13;
182:18,22;232:1
**touching (1)**
129:20
**towards (10)**
28:23;30:24;69:16;
93:5;135:23;210:9,
11,21;211:9,14
**track (2)**
48:7;76:10
**Trails (1)**
172:22
**trained (3)**
40:23;66:11;178:1
**training (98)**
58:12,14,15;66:12;
86:21;87:2;105:5,6,8,
11,12,14,23;106:3,6,
7,8,10,23,25;107:5,6;
112:1,4;114:4,9,9,12,
17;163:7;164:20;
171:11,12,14,15,19,
22;174:7,16,18;

175:2,5,8,10,12,17,
20,25;176:6,10,11,
13,15,16,19,22;
177:3,4,7,11,14,20,
24,25;189:24;190:17,
19,21,23;195:15,17;
196:16,17,20,21;
197:23,25;203:1,2,4,
5,7,12;204:24;205:1,
7,23,24;206:11,21;
207:4,6,15,16;208:3;
224:17;227:3;229:25
**trainings (4)**
106:21,24;196:25;
198:1
**transferred (2)**
50:6;95:20
**translated (2)**
49:6;65:11
**transporting (1)**
38:19
**trash (3)**
63:17,20;149:5
**trespassing (2)**
97:2;98:13
**Tri-C (1)**
21:22
**tried (1)**
193:13
**tripped (1)**
210:9
**true (2)**
220:23;221:25
**trumps (3)**
199:5,6,7
**truthful (1)**
29:14
**try (7)**
20:11;141:5;
143:15;156:18;
194:25;208:9;233:4
**trying (10)**
31:21;37:21;38:20;
79:5;92:21;157:8,11;
201:23;210:17;215:5
**Tuesday (2)**
14:12;99:19
**turn (1)**
78:22
**turned (1)**
127:17
**two (11)**
20:15,16;28:6;
40:9;96:4;97:25;
103:25;106:20,21;
188:10;196:6
**two-minute (1)**
62:8
**type (2)**
50:20;52:25

**U**

**uh-huhs (1)**
4:11
**uh-uh (1)**
4:9
**uh-uhs (1)**
4:11
**Unable (1)**
235:21
**unannounced (32)**
17:14;19:3,10;
111:19;114:20;
124:1,2,21;158:3,18;
168:24;169:3,13;
171:7;191:19,23;
192:6,22;193:3,9,22;
194:3,4,8,13,16;
195:11;220:1,9;
221:17;225:11;
227:14
**under (7)**
31:5;111:11;
163:21;167:3,15;
193:8;235:19
**underneath (2)**
12:13;224:4
**unfortunately (1)**
111:21
**United (1)**
206:6
**University (13)**
21:23,24;204:25;
205:6;206:5,8,9,11,
13,14,15,16,17
**Unless (3)**
23:13;112:13;
201:24
**unmarked (1)**
93:16
**unofficial (7)**
162:24;165:7,13,
14;166:16;167:2,8
**Unreasonable (3)**
198:16,19;199:3
**up (93)**
4:10;7:12;15:1;
16:17;24:12;26:18;
27:5;29:3,6;31:4;
37:12;42:18;53:3;
60:23;61:1;63:3;
80:4,6,14,17;85:9,10;
97:7;98:10;105:2;
116:1,4;117:24;
118:1;125:18;
126:24;127:1;
130:19;133:9;
134:15,16;140:24;
141:16;142:8;143:3,
7,13;144:7,11,13,17,
19,22;145:4,12;
146:1,3;148:8;
155:10;160:19;
173:9;174:10;
180:16;181:23;

182:2,4;195:3;197:3,
8;201:17;206:13;
207:3,14;211:12;
214:6;217:11,12;
222:6;12;230:13;
231:13;233:10,18,20,
21;238:2,5,8,10,12,
13,16,19;239:13,17;
244:14,15,25
**upcoming (1)**
38:2
**update (3)**
12:11;71:13;72:4
**updated (9)**
70:2,3,22;71:21;
195:16,16;196:17,17;
230:17
**updates (1)**
72:5
**upheld (1)**
201:4
**upon (5)**
22:14;111:9;
134:20;234:9;245:11
**ups (6)**
76:1;81:22,24;
82:1,1;244:16
**use (15)**
10:11;58:7;84:25;
101:9,12;136:13;
150:8;157:25;162:9;
173:22;201:22;
203:18;215:13,22;
218:17
**used (8)**
11:2,4;60:25;
101:3;121:5,8,24;
135:17
**using (9)**
9:12;10:12;47:20;
66:10;97:21;121:19;
154:24;189:2;215:25
**usually (10)**
11:3;15:23;17:12;
23:25;99:20,20;
100:23;103:7,14;
149:19

**V**

**vacating (1)**
221:19
**vaguely (1)**
153:11
**Valley (2)**
7:19;21:25
**Various (4)**
8:23,25;12:15;
156:16
**vary (1)**
99:22
**vehicle (17)**
100:20,22;101:3,7,

11,12,18;122:15;
123:3;164:5;184:15;
185:10;215:13,25;
216:18,20;218:11
**vehicles (1)**
184:14
**vehicle's (2)**
101:6,8
**veracity (1)**
126:18
**verbal (1)**
45:18
**vet (7)**
7:17,21,23,24;
56:13;172:8,14
**veterinarian (1)**
42:20
**victim's (1)**
17:6
**video (7)**
42:12,13;78:22;
182:7,8;186:1,3
**videos (2)**
98:24;230:25
**view (16)**
119:17,19;135:18;
138:16;148:11;
203:9,15,17,21;
204:1,7,9,14,16,18,20
**Village (12)**
7:12;8:21;70:14;
71:13;116:13;
172:11;173:7,8,10,
15,21,23
**violate (3)**
91:21;128:12;
133:5
**violated (5)**
95:8;115:9;116:1;
132:13;133:16
**violates (1)**
115:15
**violating (4)**
95:11;132:19,23;
223:13
**violation (27)**
46:12,20;92:2,6,17,
20;94:25;109:21;
128:21;129:12,15,17,
19,22;130:11,17,20,
24;131:7,12,14,16,
22;132:2,7;133:2,8
**violations (2)**
47:14;133:6
**vis-a-vis (1)**
198:4
**visit (1)**
80:18
**visits (1)**
147:12
**vociferously (1)**
211:2
**volatile (1)**

Bianca Marcellino vs
Geauga County Humane Society

Christian Courtwright
June 22, 2022

127:24

**volition (2)**
128:9;210:22

**Volpe (1)**
42:20

**voluntary (4)**
107:18,19;159:21;
191:12

**vs (1)**
4:5

---

**W**

---

**wait (5)**
79:3,3;122:17;
166:23;192:3

**waiting (1)**
230:20

**waived (1)**
246:13

**wake (2)**
14:25;37:11

**walk (17)**
15:20;29:17;30:18;
31:1,4;93:5;103:12,
13,14,16,18;122:14;
137:14;160:11;
180:19;210:11;
212:12

**walked (9)**
30:14,14;108:5;
123:3;127:5;135:23;
136:17;137:7;237:20

**walking (10)**
27:22;29:16;32:5;
93:2,3,8,14;97:6;
122:21;210:1

**wall (2)**
90:12;94:12

**wants (4)**
42:5,10;86:21;
141:7

**warrant (17)**
48:4;107:9,12,13,
16;159:1,13;162:1;
167:23;191:6,9;
203:10,15,23,24;
204:21;218:9

**warranted (1)**
215:18

**warrants (5)**
159:5,9;191:1,2;
197:19

**waste (1)**
217:6

**watch (1)**
156:24

**waved (1)**
92:24

**waving (1)**
95:5

**way (22)**
12:14;36:1;39:24;

41:6;70:22;76:11;
82:5;91:22,23;134:3;
135:23;137:7,15;
165:12;167:1,13;
187:24;190:1;
216:11,11,15;236:3

**wear (4)**
38:13;39:18,25;
182:25

**wearing (1)**
226:18

**website (2)**
97:24;125:22

**Wednesday (1)**
14:12

**week (10)**
12:7;68:4,6,18,21;
69:10;106:22,25;
223:1,3

**weekly (27)**
12:8,22,25;13:11,
13;45:13,14;69:12;
73:24,25;74:8,12,15;
75:7,22;76:4,12;
77:18,25;79:23;
80:24;81:9,18;91:14;
166:23;171:4;244:23

**weeks (3)**
14:5;60:20,22

**weird (1)**
166:21

**welfare (1)**
36:4

**weren't (8)**
34:12;45:24;98:1;
101:20;136:16;
186:9;210:6;211:2

**Westlaw (1)**
158:20

**What's (26)**
5:7,23;6:7;9:14;
10:3;14:24;18:17,20;
22:16;66:1,24;78:18;
84:11;90:15;100:3;
136:20;156:4;166:7;
173:14,19;193:17;
198:14;209:9;
230:20;235:7;236:6

**whatsoever (1)**
107:5

**Whenever (2)**
16:10;229:1

**Where's (3)**
24:4;94:10;151:5

**wherever (8)**
38:13;42:4,10;
123:13;213:13;
214:2,19,21

**white (1)**
101:6

**whole (3)**
30:18;56:14;67:9

**Whose (14)**

25:25;26:3,9,14;
28:11;79:24;98:16;
120:24;126:24;
127:2;128:24;
184:22;185:13;213:4

**Wilson (1)**
24:21

**window (18)**
27:11,17,17,23;
28:10;29:25;30:1,5;
32:3,8;119:16;
120:12;121:18;
135:14;204:8,12,17;
209:17

**windows (8)**
27:21;29:20,23;
30:2,4;96:24;122:18;
210:1

**within (9)**
9:17;11:22;161:10;
165:22;173:24;
212:20;215:10;
218:7;224:24

**without (8)**
25:4;26:19;147:15;
159:13;167:23;
179:23;180:21;218:9

**WITNESS (13)**
23:18;42:15;79:12;
205:17,21;212:3,12;
229:3,9;243:19,22;
244:2,7

**woman (1)**
100:14

**wondering (1)**
235:7

**Word (125)**
11:13;51:20,21,24;
52:8,15;53:7,16,19;
54:5,6,8,9,10,18,19,
24,25;55:2,9,16,17,
23;56:11,13,16,19,
20;57:13;58:1,25;
59:10,19;61:15,17,
18,23;66:16;74:10,
16,18;76:19;79:4;
82:9,18;83:14,17;
84:25;85:5;86:2,3;
103:24;104:2,7;
113:15;140:12;
141:1,5,18,23;142:6,
13,15,16,25;143:1,6,
8,19,22;144:4,16,20;
145:3,17,25;146:4,
11,18;147:10,24;
148:5;150:6,8,10;
151:12,19;152:10,24;
153:3,9,14;154:5,11,
24;155:14;167:13,14,
15;178:13;181:18;
187:11;201:21;
232:19,20,21;233:10,
17,20;234:20;

236:22;237:8,23;
238:23,24;239:5,20;
240:1,2,5,7,9,15;
241:21;243:18

**words (3)**
14:23;157:25;
165:8

**work (30)**
5:25;6:1,16,19,23;
7:4,8,13;11:20;15:7;
21:18;22:5;73:7;
87:6;99:16,19;
100:20;101:6,20;
106:5;115:2;156:13;
163:9;164:24;166:3,
9;184:15;202:10,21;
222:25

**worked (5)**
6:12,20,21;7:11;
73:5

**working (2)**
202:3;217:10

**works (4)**
116:24;200:13;
207:5;237:3

**workshop (8)**
171:23,25;172:1,4,
7,15,17;174:1

**world (1)**
229:13

**worse (2)**
139:20;232:15

**wound (2)**
85:9,10

**write (16)**
51:3,4,21;58:5;
63:4;77:18;84:7,19;
86:8;88:1,5,9,12;
149:4,9;162:23

**writing (3)**
9:9,11;149:18

**written (13)**
11:14;48:25;
162:25;165:9,19;
167:5;174:7,17;
175:7,23;176:19;
177:9;202:24

**wrong (5)**
36:17;138:18;
139:1;153:21;246:1

**wrote (5)**
51:17,17,19;92:14;
154:5

---

**X**

---

**XYZ (1)**
167:6

---

**Y**

---

**year (22)**
7:9;8:4,10;9:6;

10:13;46:16;47:12;
67:2,3;68:10,12,15;
69:16,18;80:23;
232:2;240:25;241:2,
3,3,15,16

**yearly (8)**
76:14,15,18;77:18;
78:13;79:22;81:17;
244:23

**years (10)**
6:13,20;105:25;
106:5,7,19,21;163:7;
206:20;237:17

**yelling (2)**
122:15;123:5

**York (2)**
213:5,16

---

**1**

---

**1 (6)**
70:16;72:8,10,11;
205:6;206:18

**10 (25)**
28:13;31:7;32:10;
36:13,14,23;37:13;
40:17;41:19,22;
115:10;120:2,21;
121:9;136:3,7,18,21;
180:22,25;181:2,5,5;
209:24;232:8

**101 (1)**
205:22

**10-1-2019 (2)**
238:21,24

**10-14-2017 (1)**
235:14

**10-4-17 (2)**
235:16,20

**10th (10)**
16:12;29:1;30:11;
37:25;41:20;92:7,19;
115:9;137:14;138:1

**11 (3)**
145:9;147:7;151:8

**123 (4)**
58:20,22;84:7,8

**13 (2)**
181:13,16

**13th (1)**
36:18

**14 (5)**
179:3;180:10;
184:4,5;185:1

**14th (10)**
101:1,17;178:10;
183:24,25;184:2,6;
185:3;186:10,21

**154 (1)**
5:2

**15463 (1)**
5:8

**1717 (2)**

163:15;208:5

## 2

**2 (3)**
205:7;206:1,19
**20 (1)**
106:5
**2008 (1)**
7:7
**2009 (4)**
70:7,18,20;72:17
**2014 (3)**
172:24;174:3;
201:25
**2015 (4)**
53:14,16;59:2;
60:13
**2016 (9)**
46:9;47:8;53:14;
57:24;60:15;66:9;
89:4,6,10
**2017 (1)**
60:17
**2018 (8)**
62:11;63:11;67:5,
9,11,17;108:1,2
**2019 (32)**
67:14,17;70:16;
71:8;72:8,10,11;
101:1,17;145:10;
147:8;151:8;161:19;
178:11;179:4;
180:10,22,25;181:2,
5,5,13,16,22;182:5,
19;183:8,9,12;184:4;
186:24;189:2
**2020 (31)**
28:13;31:7;32:10;
36:13,15,23;37:13;
40:17;41:19,23;
67:11,19;115:10;
120:2,21;121:9;
136:3,7,18,22;
146:19;147:9;181:1,
11;183:25;184:3,5,6;
185:1;209:24;232:8
**2021 (7)**
67:21,23;68:19;
174:20;175:25;
176:14;229:24
**2022 (7)**
68:20,22;69:7,8,14,
15;205:25
**21 (7)**
68:13;181:22;
182:5,18;183:8,9,12
**21st (2)**
186:24;230:4
**2929 (1)**
224:19
**2951.02 (8)**
217:14,19;224:20;

226:10,11;227:10,12;
229:19

## 3

**3 (4)**
22:6,24;205:7,21
**3:41 (1)**
246:14
**3-14-19 (1)**
179:5
**3-16-19 (1)**
142:20
**3-41-8 (1)**
237:9
**3-5-19 (1)**
147:21
**3-5-2019 (10)**
140:17,20,21;
141:1,14,19,23;
147:5,14;154:14
**3-6-19 (5)**
142:12,21,22;
143:5;147:22
**3-6-2019 (2)**
143:25;144:2
**3-9 (1)**
145:5
**3-9-19 (8)**
144:24;146:17;
148:4,8;153:13,19,
23;154:20
**3-9-20 (9)**
146:10,18;152:19,
20;153:20,22,23;
154:19,20
**3-9-2019 (4)**
144:21;145:2;
147:6,24

## 4

**4-11 (4)**
148:19;150:21;
152:2,16
**4-11-19 (5)**
144:24;145:16,18;
148:18;151:11
**4-11-2019 (12)**
144:10;145:6,7;
148:21;149:23;
150:15,24;151:12,18;
152:6,11,15
**4-14 (4)**
148:20;151:23,24;
152:17
**4-19-17 (1)**
236:18
**4-27-17 (1)**
236:20
**440-669-5919 (1)**
6:2
**44072 (1)**

5:8
**4-9-19 (4)**
151:1,6,9,20

## 5

**50 (1)**
187:16
**5-1-17 (2)**
234:21;237:9
**5-1-2017 (1)**
234:20
**57,000 (1)**
8:10

## 6

**6 (2)**
229:23;230:3
**6:00 (1)**
148:9

## 7

**71 (1)**
174:22
**7224 (1)**
25:12

## 9

**9 (2)**
140:19;147:9
**9-18-18 (7)**
240:1,6,8,22;241:5,
13,17
**9-25-76 (1)**
6:8
**9-5-17 (1)**
237:9
**959 (1)**
163:15
**9th (1)**
146:19