# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **BIANCA MARCELLINO, et al.,** | **CASE NO. 1:21-CV-01338** |
| **Plaintiffs,** | |
| -vs- | **JUDGE PAMELA A. BARKER** |
| **GEAUGA COUNTY HUMANE SOCIETY, INC., et al.,** | **MEMORANDUM OPINION AND ORDER** |
| **Defendants.** | |

Currently pending is Defendants Geauga County Humane Society, Inc.'s ("GCHS"), Christian Courtwright's, Hope Brustein's, and Kenneth Clarke's Motion for Summary Judgment. (Doc. No. 34.)  Plaintiffs Bianca Marcellino and Karen and Giancarlo Marcellino filed an Opposition to Defendants' Motion on October 6, 2022, to which Defendants replied on October 20, 2022.  (Doc. Nos. 39, 40.)

Also pending is Plaintiffs' Cross-Partial Motion for Summary Judgment.  (Doc. No. 35.)  Defendants filed an Opposition to Plaintiffs' Partial Motion on October 6, 2022, to which Plaintiffs replied on October 20, 2022.  (Doc. Nos. 38, 41.)

For the following reasons, Defendants' Motion is GRANTED and Plaintiffs' Partial Motion is DENIED.

## I.    Background

This § 1983 action stems from Plaintiff Bianca Marcellino's 2019 misdemeanor criminal conviction in Chardon Municipal Court on two counts of cruelty to non-companion animals.  (Doc. No. 39-1, PageID# 1315.)

### A.     Bianca's criminal conviction, sentencing, and direct appeal

On February 21, 2019, Bianca was convicted of two counts of animal cruelty after a jury found her guilty of failing to provide adequate care for two horses.  (Doc. No. 34-1, PageID# 495.)  On March 5, 2019, Judge Terri Stupica of the Chardon Municipal Court sentenced Bianca.  (*Id.*)  Judge Stupica imposed a suspended sentence of 90 days in jail, as well as active reporting probation/"community control" upon Bianca. (Doc. No. 39-1, PageID# 1322.)  Bianca's "Terms of Community Control/Probation" read as follows:

> 17. Defendant is prohibited from owning, possessing, caring for or residing on the property with any equine animal;
>
> That any other animal she cares for be kept in a humane, sanitary and lawful condition;
>
> The Defendant forfeits ownership of the two horses that are the subject of this case to the Geauga Humane Society;
>
> That the Geauga Humane Society and other law enforcement have authority to inspect her outdoor premises or any structure where equines may be kept on a random, unannounced basis to ensure she remains in compliance during the term of her probation.
>
> Pursuant to R.C. 2929.28, as a financial sanction, Defendant is ordered to pay restitution in the amount of $14,773.03 as and for the total costs incurred during the impoundment of the horses, payable by 3-5-21.

(*Id.* at PageID# 1324.)

On direct appeal, Bianca raised two assignments of error: (1) that the trial court erred in ordering restitution to the GCHS, and (2) that the trial court erred in denying Bianca's motion for a *Franks* hearing regarding allegedly false statements in an affidavit for a search warrant.  *State v. Marcellino*, 149 N.E.3d 927, 929-31 (11st Dist. Ohio Ct. App. Nov. 25, 2019).  The Ohio Court of Appeals noted that "the only portion of Marcellino's sentence that has been appealed in the matter *sub judice* is the court's order of restitution."  *Id.* at 931.  The appellate court affirmed the trial court's

2

denial of a *Franks* hearing but reversed and vacated that portion of Bianca's sentence that ordered her to pay restitution to GCHS.  *Id.* at 933.  The Supreme Court of Ohio did not accept Bianca's appeal for review.  *See State v. Marcellino*, 158 Ohio St.3d 1450 (2020).

**B.     Bianca's July 2019 probation hearing**

On July 2, 2019, Judge Stupica conducted a probation hearing to clarify the terms of Bianca's March 5, 2019 probation order.  (Doc. No. 39-1, PageID# 1325-42.)  At that hearing, Bianca's probation officer, Ann Elko, represented to Judge Stupica that Bianca "indicated understanding of what owning, possessing or residing on the property referred to" in Judge Stupica's sentencing order. (*Id.* at PageID# 1328.)  However, Elko represented that Bianca had expressed concerns around the word "caring, and what specifically [ ] that entailed."  (*Id.*)  During the hearing, Judge Stupica clarified what the word "caring" for a horse meant in the context of Bianca's terms of probation.  (*Id.* at PageID# 1329-42.)  At no time during the July 2, 2019 hearing did Bianca express concern about, or did Judge Stupica clarify, the term authorizing GCHS and other law enforcement to conduct random searches to ensure Bianca's compliance with her probation order.  (*Id.*)

On August 19, 2019, Bianca filed an emergency writ in the Supreme Court of Ohio, seeking an expedited alternative writ and peremptory writ of prohibition forbidding Judge Stupica from amending Bianca's sentence after Bianca had already been sentenced.  (*Id.* at PageID# 1314-15.) Bianca claimed that Judge Stupica had amended the sanctions and increased her punishment by barring Bianca from entering the horse barn on her parents' adjacent property and disallowing her from  being near horses except to "pet" them if they were out to pasture.  (*Id.* at PageID# 1319.) Again, Bianca did not challenge the random search condition or term of her probation.  (*Id.*)  The

Supreme Court of Ohio summarily denied the writ on November 6, 2019. *Marcellino v. Stupica*, 157 Ohio St.3d 1481 (2019).

### C. Boundaries of Bianca's property as of March 2019

Before discussing the GCHS probation inspections of Bianca's property, the Court must first discuss the boundaries of Bianca's property.

In 2016, Bianca purchased property at 7224 Wilson Mills Road in Chesterland, Ohio. (Doc. No. 35-7, PageID# 622.) This property consisted of two parcels of land, running north to south. (*Id.*; *see also* Doc. No. 34-5.) The parcels sit side-by-side, running east to west on Wilson Mills Road. (*Id.*) When Bianca purchased the .property in 2016, a house and garage stood on the eastern parcel, but the western parcel was only land. (*Id.* at PageID# 623.) In 2018, Bianca's parents, Plaintiffs Karen and Giancarlo Marcellino, paid to construct a barn on Bianca's western parcel of land. (*Id.*) According to Bianca, the western parcel of land with the barn was in the process of being transferred to her parents at the time of the barn's construction. (*Id.*) Bianca did not recall the exact date of transfer but remembered that she finalized transferring the parcel with the barn to her parents prior to her criminal trial in February 2019. (*Id.* at PageID# 624.) Karen and Giancarlo did not pay Bianca any money for the land and barn. (*Id.* at PageID# 624-25.) Bianca testified that this property "was a gift" to her parents and that it was always the plan to transfer the parcel the barn sat upon to her parents because they had paid to build the barn. (*Id.* at PageID# 625.)

Defendant Christian Courtwright, a humane officer with GCHS, kept a probation inspection log in which he input notes regarding some, but not all, of his visits to Bianca's property. (*See* Doc. No. 34-3.) Courtwright's probation inspection log begins with an entry dated March 5, 2019, the

4

same date as Bianca's sentencing hearing.  (*Id.*)  After Bianca's sentencing, Courtwright made the

following entry:

> 3-5-19
>
> Marcellino sentenced: "Defendant Bian[c]a Marcellino was convicted of two counts of animal cruelty after a jury trial for failing to provide adequate food and water, and failing to prevent other unnecessary suffering (primarily rain rot) for two gelding thoroughbreds known as McKinney and Beaumont. Judge Stupica accepted our recommendations. Defendant was sentenced to 90 days in jail, all of which was suspended contingent upon successful completion of 5 years' probation. During that time, she may not own, possess, or live at a property with equines. All other animals must be kept in a humane, sanitary and lawful manner. She is subject to random inspections by a humane agent to ensure compliance. The two horses were forfeited to the Humane Society. Defendant was also ordered to pay $14,773.03 as an additional sanction based on costs associated with caring for and rehabilitating the animals. She was fined $50 plus costs."
>
> Later that evening I learned from Attorney Pannella that Marcellino quit claimed the western parcel of land with the barn on it to her parents, thus evading the terms of her probation.

(Doc. No. 34-3, PageID# 503.)  On March 6, 2019, Courtwright noted in his log that he confirmed

the date of Bianca's quitclaim to her parents on the county auditor's website as February 20, 2019.

(*Id.*)  Based on Courtwright's log notes, Bianca's transfer of the western parcel of land to her parents

was effectuated one day before she was convicted of two counts of animal cruelty on February 21,

2019.  (*Id.*; *see also* Doc. No. 34-1, PageID# 495.)

The precise boundary between Bianca's remaining property and her parents' property is

unclear.  Bianca repeatedly testified during her deposition that she could not say where the exact

property line fell between her property and her former property (i.e., her parents' land with the barn),

although she claimed during her deposition that there was fencing between the two properties.  (*Id.*

at PageID# 626-27.)  However, Bianca also testified that this pasture fencing did not run alongside

the barn, but started further back behind the barn, dividing her parents' pasture from her own pasture.

5

(*Id.* at PageID# 651-53.)  Thus, according to Bianca's own testimony, there were no fences or other property markers alongside the barn to delineate the property line between her property and her parents' property.  (*Id.* at PageID# 654.)

Further, Bianca testified that "the driveway" was "clearly on [her parents'] property" and each time Courtwright pulled into the driveway, he was trespassing on her parents' property.  (*Id.* at PageID# 628.)  In Defendants' Exhibit 4, an aerial map view of Bianca's house and her parents' barn, two driveways are visible.  (Doc. No. 34-5.)  These driveways run north and south along the eastern and western sides of Bianca's house.  (*Id.*)  The eastern driveway runs along the right side of Bianca's house and curves around behind her house to the garage.  (*Id.*)  The western driveway, which apparently falls on her parents' property, runs along the left side of Bianca's house and forks into three separate drives behind Bianca's house.  (*Id.*)  The left fork leads directly into the barn.  (*Id.*)  The middle fork continues behind Bianca's house and along the right side of the barn towards the pastures.  (*Id.*)  The right fork curves around Bianca's house and connects with the eastern driveway behind Bianca's house and garage. (*Id.*)

### D.    Courtwright's probation inspections of Bianca's property

Courtwright conducted probation inspections of Bianca's property, pursuant to Judge Stupica's sentencing order and terms of Bianca's probation.  (Doc. No. 34-3.)  Courtwright's inspection logs begin on March 5, 2019, the date of Bianca's sentencing.  (*Id.*)

Courtwright conducted his first probation visit on March 6, 2019.  (*Id.* at PageID# 503.)  He noted that he went to Bianca's property at 7224 Wilson Mills Road with the Chesterland Police Department.  (*Id.*)  He met with Bianca, who told him that he was not allowed to step onto her parents' property.  (*Id.*)  He wrote that he "told Marcellino [he] knew what she did and that [he] needed to

6

make sure any horses on her property were going to be moved." (*Id.*) Bianca testified that Courtwright entered her parents' property on March 6, 2019 when he "went up [her parents'] driveway." (Doc. No. 35-7, PageID# 634.)

On March 7, 2019, Courtwright wrote that he was contacted by one of Bianca's neighbors who reported seeing Bianca go into the barn on her parents' property. (Doc. No. 34-3, PageID# 503.) On March 9, 2019, Courtwright parked at the neighbor's property with a clear view of Karen's and Giancarlo's barn, but did not see anyone come or go during the two hours he spent watching the barn. (*Id.*)

Courtwright conducted another probation visit to Bianca's property on March 14, 2019. (Doc. No. 34-3, PageID# 503.) Bianca was not present. (*Id.* at PageID# 504.) Courtwright spoke with Giancarlo, as well as Bianca's younger sister. (*Id.*) Giancarlo called Bianca so that Courtwright could speak to her on speakerphone. (*Id.*) Courtwright told Bianca that he had a report that she was in the barn, but Bianca told him he was mistaken, and her sister had been in the barn. (*Id.*)

On July 13, 2019, Courtwright conducted another probation visit to Bianca's property. (*Id.* at PageID# 504.) Bianca asked if she had to let him on her property and Courtwright told her that she did. (*Id.*) Courtwright did not see any signs of horses on Bianca's property. (*Id.*) He described her demeanor as "genial and noncombative." (*Id.*)

According to Bianca's deposition testimony, Courtwright conducted another random inspection of her property on December 21, 2019. (Doc. No. 35-7, PageID# 644.) Courtwright did not drive onto her parents' driveway at that time. (*Id.*) Courtwright and Bianca walked around her house to a small storage barn behind her house. (*Id.*) He observed no signs of horses and subsequently ended his inspection. (*Id.*)

7

On March 9, 2020 and March 14, 2020, Courtwright attempted to conduct probation inspections of Bianca's property but no one was home.  (Doc. No. 35-10, PageID# 1148, 1188.)  He left his business card at Bianca's house on March 14, 2020.  (*Id.* at PageID# 1188.)

On July 10, 2020, Courtwright performed another random inspection on Bianca's property.  (Doc. No. 34-3, PageID# 505.)  When Courtwright arrived, Bianca asked if she had to allow him onto her property and he said that she did, per the terms of her probation.  (*Id.*)  At that time, she began filming Courtwright.  (*Id.*)  She asked to know whether he had received a complaint or had another reason for conducting the inspection.  (*Id.*)  He responded that the probation department asked him to complete a random inspection prior to Bianca's scheduled July 13, 2020 meeting with her probation officer.  (*Id.*)  Bianca told Courtwright that these inspections were unconstitutional.  (*Id.*)

During the July 10, 2020 visit, Courtwright observed that she had set up stalls in her attached garage, but that there was no evidence that horses had been kept in the barn.  (*Id.*)  He also observed a horse trailer parked on Bianca's property.  (*Id.*)  Courtwright told Bianca he wanted to walk the length of her property to ensure there were no signs of horses coming or going on her property, and that he wanted to check the trailer for signs of recent use.  (*Id.*)  At that point, according to Courtwright, Bianca became angry and refused to give permission to walk the length of the property.  (*Id.*)  She accused him of using the inspection as an excuse to "creep" on her parents' property, including their barn.  (*Id.*)  Bianca testified that Courtwright "proceeded to look at [her] parents' property the entire time we were walking to the back" of her property.  (Doc. No. 35-7, PageID# 648.)  As Courtwright walked Bianca's property, he saw the horses in Karen's and Giancarlo's barn sticking their heads out of the barn windows.  (*Id.*; *see also* Doc. No. 35-10, PageID# 1212.)

8

According to Courtwright, Bianca became "very agitated" when he approached the barn and attempted to view the horses.  (Doc. No. 34-3, PageID# 505.)  He claimed that she tried to block his view of the horses with her body and cell phone.  (*Id.*)  Bianca claimed that Courtwright indicated to her that he could view the horses because they were in plain sight from her property.  (Doc. No. 35-7, PageID# 649.)  Bianca also testified that Courtwright walked alongside the barn and aligned his arms with the pasture fence running behind the barn to demonstrate that he knew where her property line was and that he was not standing on her parents' property.  (*Id.*)  However, Bianca claims that Courtwright proceeded to step over the invisible property line and trespass onto her parents' property anyway.  (*Id.*)

According to Courtwright, Bianca then told a friend to call the police because Courtwright was trespassing.  (Doc. No. 34-3, PageID# 505.)  Courtwright went to wait for the Chesterland Police Department near his vehicle.  (*Id.*)  According to Courtwright's inspection logs, Bianca's boyfriend threatened Courtwright with physical violence as Courtwright left Bianca's property.  (*Id.* at PageID# 506.)  During his deposition, Courtwright admitted that he has not performed any probation inspections on Bianca's property since July 10, 2020 because the last visit was "combative" and he believed it would be "counterproductive."  (Doc. No. 35-10, PageID# 1042.)  He testified that he described the July 10, 2020 inspection to the probation department and that they agreed with Courtwright's assessment of the situation.  (*Id.* at PageID# 1043.)

### E.    Bianca's initial challenge of her probation search term

On October 14, 2020, Bianca filed a second motion[1] to modify her sentence with Judge Stupica.  (Doc. No. 34-1.)  Therein, Bianca claimed that the probation term requiring her to submit

---

[1] According to Defendants' Motion, Bianca filed a "Motion for Order Barring the Humane Agent From Entering Defendant's Property Without Reasonable Suspension [*sic*]" on October 1, 2020.  (Doc. No. 34, PageID# 472.)

9

to random probation inspections and Courtwright's "four (4) warrantless entries upon Marcellino's property without reasonable suspicion . . . (1) March 14, 2019; (2) December 21, 2019; (3) March 14, 2020; and (4) July 10, 2020" violated Ohio Rev. C. § 2951.02(A) because Courtwright did not have reasonable suspicion to search her property.  (*Id.* at PageID# 496-98.)  On October 15, 2020, Judge Stupica denied Bianca's motion as not well taken.  (Doc. No. 34-2.)

## II.    Procedural History

On July 12, 2021, Bianca Marcellino and Karen and Giancarlo Marcellino filed the instant Complaint in this Court.  (Doc. No. 1.)  Bianca and her parents assert eleven claims against GCHS, Courtwright, former GCHS executive director Hope Brustein, and current GCHS executive director Kenneth Clarke.  (*Id.*)  Counts One through Six are asserted by Bianca and include individual § 1983 claims against Courtwright for unreasonable search and seizure, and several *Monell* claims against GCHS, Brustein, and Clarke.  (*Id.*)  Counts Seven through Eleven are brought by Karen and Giancarlo and include an individual § 1983 claim against Courtwright for unreasonable search, and several *Monell* claims against GCHS, Brustein, and Clarke.  (*Id.*)

On September 6, 2022, the parties filed cross-motions for summary judgment.  Defendants filed a Motion for Summary Judgment as to all of Plaintiffs' Claims.  (Doc. No. 34.)  Plaintiffs filed a Partial Motion for Summary Judgment as to Counts One and Two only.  (Doc. No. 35.)  On October 6, 2022, the parties filed their respective oppositions.  (Doc. Nos. 38, 39.)  On October 20, 2022, the parties filed their respective replies.  (Doc. Nos. 40, 41.)  Thus, the parties' Motions are now ripe for a decision.

### III.     Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006).  "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018).  In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014).  The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*,

11

593 F. App'x at 508-09.  "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'"  *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## IV.    Analysis

Defendants assert that they are entitled to summary judgment on all of Plaintiffs' claims. (Doc. No. 34.)  With respect to Bianca's Fourth Amendment claims, Defendants argue that Plaintiffs cannot establish that Courtwright violated Bianca's Fourth Amendment rights because he conducted random searches of her property pursuant to the conditions of her probation order and, further, that there "is absolutely no evidence" to support an unlawful seizure claim.  (*Id.* at PageID# 481-83.) Defendants assert that Karen's and Giancarlo's Fourth Amendment claim fails because Courtwright did not conduct a search of their property and, further, the area in question was an "open field" not entitled to Fourth Amendment protection.  (*Id.* at PageID# 487-91.)  Defendants further argue that the Plaintiffs' *Monell* claims fail because Plaintiffs cannot establish that Courtwright committed underlying Constitutional violations against any of the plaintiffs.  (*Id.* at PageID# 491-92.)

In Plaintiffs' Partial Motion for Summary Judgment, Plaintiffs argue the inverse of Defendants' Motion with respect to Counts One and Two.  (Doc. No. 35.)  Plaintiffs argue that Courtwright's suspicionless searches of Bianca's property violated her Fourth Amendment rights for a variety of reasons, including that Judge Stupica's sentencing order is not binding on GCHS or Courtwright, that Courtwright lacks the authority to conduct such searches because he is a humane officer, and that Ohio law and the Fourth Amendment require a probation officer to possess reasonable suspicion before entering a probationer's property to conduct a search.  (*Id.* at PageID#

560-76.)   Plaintiffs do not move for summary judgment on Karen's and Giancarlo's Fourth Amendment claim, or on any of Plaintiffs' *Monell* claims.[2]  (*Id.* at PageID# 578.)

Thus, the central inquiry in resolving the parties' cross-motions is determining (1) whether Courtwright infringed on Bianca's Fourth Amendment rights, and (2) whether Courtwright infringed on Karen's and Giancarlo's Fourth Amendment rights.

### A.    Bianca's Claims (Counts One through Six)

### 1.    Counts One and Two: Unreasonable search and seizure under § 1983 against Defendant Courtwright

In Counts One and Two, Bianca asserts claims under 42 U.S.C. § 1983 against Courtwright. (*See* Doc. No. 1, ¶¶ 13-53.)  In Count One, Bianca claims that Courtwright subjected her to an unreasonable seizure in violation of the Fourth Amendment.  (*Id.* at ¶ 13-26.)  In Count Two, Bianca claims that Courtwright conducted unreasonable searches of her property in violation of the Fourth Amendment.  (*Id.* at ¶¶ 27-56.)  The Court will address Count Two, the unreasonable search claim, first.

To maintain a claim under 42 U.S.C. § 1983, a plaintiff must establish that he or she was deprived of a right secured by the Constitution or the laws of the United States, and that the deprivation was caused by a person acting under color of state law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Simescu v. Emmet Cnty. Dep't of Soc. Services*, 942 F.2d 372, 374 (6th Cir. 1991).  Here, there is no dispute that Courtwright acted under color of state law.  As such, the only remaining

---

[2] Instead, Plaintiffs request that, should the Court rule in their favor on Counts One and Two, they be permitted to file an entirely new and separate additional motion for summary judgment.  (Doc. No. 35-1, PageID# 578.)  In other words, even though Plaintiffs moved to strike Defendants' overlong brief,  complained in their Opposition that the Court denied Plaintiffs' Motion to Strike, and refused to avail themselves of the additional pages offered by the Court to more fully address Defendants' Motion (*see* Doc. No. 39, PageID# 1310-11), Plaintiffs believe that they should be entitled to another bite at the apple to file a whole separate motion for summary judgment and enjoy 20 additional pages in which to develop their arguments with respect to Karen's and Giancarlo's Fourth Amendment and all of the *Monell* claims.

question is whether Bianca was deprived of a right secured by the Constitution or the laws of the United States.

However, law enforcement officers "are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015). To determine whether an officer is entitled to qualified immunity, courts "apply a well-established two-prong test: (1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right violated was clearly established such 'that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). *See also Maye v. Klee*, 915 F.3d 1076, 1082 (6th Cir. 2019) ("In analyzing whether an official is entitled to qualified immunity, we must make two determinations: first, whether the plaintiff's version of the facts alleges the deprivation of a constitutional right; and second, whether that right was clearly established such that a reasonable official would have known his actions were unconstitutional."). These steps may be addressed in any order, and the defendant officer need only prevail on one of them to be granted qualified immunity. *See Coffey v. Carroll*, 933 F.3d 577, 584 (6th Cir. 2019); *Maben v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018).

The Court will first determine whether the facts, when taken in the light most favorable to Bianca, show that Courtwright's conduct violated a constitutional right. *Mullins*, 805 F.3d at 765. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend IV. However, the Supreme Court "has made clear that the nature of the relationship between state actors and individuals

14

subject to state supervision" alters the relevant Fourth Amendment analysis. *United States v. Herndon*, 501 F.3d 683, 687 (6th Cir. 2007).

In the context of probation, the Supreme Court has outlined two different approaches under which a warrantless search of a probationer's property may still meet the requirements of the Fourth Amendment: the *Griffin* framework and the *Knights* framework. *Compare Griffin v. Wisconsin*, 483 U.S. 808 (1987) *to United States v. Knights*, 534 U.S. 112 (2001). In *Griffin*, the Supreme Court held that a state's policy and/or statute allowing searches of probationers upon a finding of "reasonable grounds" satisfied the Fourth Amendment. 483 U.S. at 872-73. Thus, if a warrantless search is carried out "pursuant to a regulation that itself satisfies the Fourth Amendment's reasonableness requirement under well-established principles," the search is consistent with the Constitution. *Id.* at 873. *See also, e.g., United States v. Huber*, --- F. Supp. 3d ---, at *3 (N.D. Ohio 2022). Conversely, under the *Knights* framework, the Supreme Court held that a court must engage in a totality-of-the-circumstances inquiry to determine whether a warrantless search of a probationer's residence was reasonable under the Fourth Amendment. *Knights*, 534 U.S. at 119-21.

Which framework governs a court's Fourth Amendment inquiry depends on whether law enforcement conducted a warrantless search of a probationer pursuant to a state statute, or pursuant to a condition of probation. When a "search [is] made pursuant to a state policy" or statute, the *Griffin* framework applies. *U.S. v. Tessier*, 814 F.3d 432, 434 n.1 (6th Cir. 2016). Conversely, when "search [is] made pursuant to a condition of probation," the *Knights* framework applies. *Id.* Further, "[i]f a warrantless search is reasonable under either *Knights* **or** *Griffin*, it need not pass muster under the other." *United States v. Payne*, 588 Fed. App'x 427, 431 (6th Cir. 2014) (citing *Herndon*, 501 F.3d at 687) (emphasis added). Because Courtwright conducted his warrantless random inspections of

15

Bianca's property pursuant to a condition of Bianca's probation, the Court concludes that *Knights* supplies the proper framework to analyze Courtwright's searches of Bianca's property.

Under the *Knights* analysis, the court must engage in a totality of the circumstances inquiry to determine whether a warrantless search of a probationer's or parolee's residence was reasonable under the Fourth Amendment. *See Knights*, 534 U.S. at 119-21; *Samson v. California*, 547 U.S. 843 (2006); and *Tessier*, 814 F.3d at 432. Reasonableness "'is determined by assessing on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Samson*, 547 U.S. at 848 (quoting *Knights*, 534 U.S. at 118-119). In *Samson*, the Supreme Court explained its approach in *Knights*, as follows:

> Applying this approach in *Knights*, the Court found reasonable the warrantless condition authorized by California law. In evaluating the degree of intrusion into Knights' privacy, the Court found his probationary status 'salient,' *id.*, at 118, 122 S.Ct. 587, observing that probation is on a continuum of possible punishments and that probationers 'do not enjoy 'the absolute liberty' " of other citizens, *id.*, at 119, 122 S.Ct. 587. It also found probation searches necessary to promote legitimate governmental interests of integrating probationers back into the community, combating recidivism, and protecting potential victim. Balancing those interests, the intrusion was reasonable. However, because the search was predicated on both the probation search condition and reasonable suspicion, the Court did not address the reasonableness of a search solely predicated upon the probation condition. Pp. 2197-2198.

*Samson*, 547 U.S. at 843.

Five years after *Knights*, the Supreme Court in *Samson v. California* proceeded to address "a variation of the question" left open in *Knights*: whether a search predicated solely upon a condition of parole can so diminish or eliminate a parolee's expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment. *Id.* at 847-50. The Supreme Court concluded that the Fourth Amendment does not prohibit a police officer from conducting a

16

suspicionless search predicated solely upon a warrantless search provision in the parolee's parole release terms. *Id.* at 850. The Supreme Court reasoned that "[a]s we noted in *Knights*, parolees are on the 'continuum' of state-imposed punishments," and, as in *Knights*, it was "salient" that the warrantless parole search condition "was 'clearly expressed' to petitioner." *Id.* at 850, 852 (quoting *Knights*, 534 U.S. at 119). The Supreme Court concluded that, in "[e]xamining the totality of the circumstances pertaining to petitioner's status as a parolee, 'an established variation on imprisonment,' . . . including the plain terms of the parole search condition, . . . petitioner did not have an expectation of privacy that society would recognize as legitimate." *Id.* at 852 (internal citations omitted). The Supreme Court further reasoned that the State's interests were "substantial," compared to the petitioner-parolee's significantly reduced expectation of privacy. *Id.* at 853. The Supreme Court emphasized that it had "repeatedly acknowledged that a State has an 'overwhelming interest' in supervising parolees because 'parolees . . . are more likely to commit future criminal offenses,'" and that it had "repeatedly acknowledged that a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Id.* (quoting *Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 365 (1998); citing *Griffin*, 483 U.S. at 879; *Knights*, 534 U.S. at 121). Therefore, the Supreme Court held that the Fourth Amendment did not prohibit a police officer from conducting a suspicionless search of a parolee. *Id.* at 857.

In *U.S. v. Tessier*, the Sixth Circuit addressed an issue left open in both *Knights* and *Samson*: "[w]hether, under the Fourth Amendment, a *probationer* whose *probation* order contains a search condition may be subjected to a search in the absence of reasonable suspicion." 814 F.3d at 433

(emphasis added). The Sixth Circuit concluded that the "district court's well-reasoned opinion correctly denied Tessier's motion to suppress under the Fourth Amendment totality-of-the-circumstances reasonableness approach employed by the Supreme Court in *Knights*," and adopted the district court's reasoning in its entirety. *Id.* The district court case and its reasoning are discussed below.

In *Tessier*, a defendant was charged with a single federal child pornography charge after law enforcement discovered evidence of such pornography on the defendant's computer during a 2012 search of his residence. *U.S. v. Tessier*, No. 3:13–00077, 2014 WL 4851688, at *1 (M.D. Tenn. Sept. 29, 2014). At the time of the search, the defendant was on probation for a 2011 state conviction related to possession of child pornography. *Id.* The defendant had previously pleaded guilty to the felony possession of child pornography charge and received a suspended six-year prison sentence and a six-year supervised probation period. *Id.* The defendant's probation order provided, in relevant part, that he agreed "to a search without a warrant, of my person, vehicle, property, or place of residence by any Probation/Parole officer or law enforcement officer, at any time." *Id.* at *2. The defendant signed the order, acknowledging that he fully understood and agreed to comply with all terms of his probation order. *Id.* Several months into his probation period, the United States Marshal's Service, Metro Nashville Police Department, and the Davidson County Probation Office initiated "Operation Sonic Boom," in which, over the course of three days, "officers searched all residences of known sex offenders in Davidson County." *Id.* During the warrantless search of the defendant's residence, an officer found a laptop hidden under the defendant's mattress. *Id.* at *3. The laptop yielded evidence of child pornography and the defendant was arrested and charged with a single federal child pornography offense. *Id.* The defendant moved to suppress the evidence

18

discovered on his laptop, arguing that the officers violated the Fourth Amendment when they conducted a suspicionless search of a probationer.  *Id.*

The district court observed that neither the Supreme Court nor Sixth Circuit had yet considered whether a search of a probationer, rather than a parolee, subject to a warrantless search term in a probation order could lessen the probationer's protections under the Fourth Amendment. *Id.*  After reviewing *Knights*, *Samson*, and authorities from other circuit courts, the district court concluded that the search of the defendant's residence, which was conducted pursuant to a condition of the defendant's probation order, did not violate the Fourth Amendment and that this conclusion was a permissible extension of the *Knights* and *Samson* analyses.  *Id.* at *7.  Under the totality of the circumstances, the defendant-probationer had a diminished privacy interest because his probation order specified that he would be subject to searches by probation or other law enforcement officers "without a warrant," which informed the defendant that judicial preview was not necessary before a search occurred.  *Id.*  Conversely, the district court concluded that the governmental interest was significant because the defendant had already been convicted of sexual exploitation of a minor and was previously convicted of trafficking in child pornography by a military court.  *Id.* at *8.  The district court reasoned that the state's interest in protecting children "is paramount" and that child pornography is a "serious crime."  *Id.*

Here, under the *Knights* framework, and *Samson*'s and *Tessier*'s extensions thereof, the Court concludes that Courtwright's random suspicionless searches of Bianca's outdoor property do not violate the Fourth Amendment.  According to *Knights*, a defendant's "'status as a probationer subject to a search condition informs both sides of that balance' because '[i]nherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled.'"

19

*Knights*, 534 U.S. at 119 (quoting *Griffin*, 483 U.S. at 874). The random search provision in Bianca's probation order was "clearly expressed" to Bianca during her sentencing and she was "unambiguously informed" that she would be subject to random searches as a condition of her probation terms. *Knights*, 534 U.S. at 592. Though Bianca claims in her Opposition that she "did not sign any form which waived her right to have searches conducted pursuant to a warrant, and never consented to the probation searches," it is apparent, after a thorough review of the record, that Bianca was "unambiguously informed" about the random search provision at the time of her March 2019 sentencing. Bianca admitted during her deposition that she was aware that Judge Stupica stated during Bianca's "original sentencing" that Bianca would be subject to "the random inspections" as provided in the probation order. (Doc. No. 35-7, PageID# 613; *see also* PageID# 614-15, admitting that, during her sentencing, Bianca was "told that Christian [Courtwright] or the police could do random, unannounced inspections of my property," and that she "understood that [she] was being told that they could enter [her] property at any point.") Further, during Bianca's July 2, 2019 probation hearing, Judge Stupica stated that "Officer Courtwright was to do the checks as ordered," and that these checks "will continue . . . ." (Doc. No. 39-1, PageID# 1329.) Bianca further admitted during her deposition that she never challenged Judge Stupica's authority to order such searches, or GCHS's authority to conduct such searches, until well after her sentencing, probation hearing, and exhaustion of her direct appeals. (Doc. No. 35-7, PageID# 615-16.) Thus, the Court concludes that, at the time of Bianca's sentencing, the probation search term was "clearly expressed" to Bianca and she was "unambiguously aware" that she would be subjected to random searches. *Knights*, 534 U.S. at 592. As a result of her status as a probationer and her understanding of her probation condition

20

requiring random searches, Bianca had a reduced privacy interest under the Fourth Amendment. *See also, e.g., United States v. Bell*, No. 1:20-CR-5, 2020 WL 5849376, at *5 (N.D. Ohio Sept. 30, 2020).

On the other side of the totality-of-the-circumstances balance, the State of Ohio has interests in ensuring that probationers convicted of animal cruelty do not reoffend or cause further harm to animals, and in promoting reintegration and positive citizenship among probationers. As the Supreme Court noted in *Knights*, "it must be remembered that 'the very assumption of the institution of probation' is that the probationer 'is more likely than the ordinary citizen to violate the law.'" *Knights*, 534 U.S. at 592 (quoting *Griffin*, 483 U.S. at 880). The State of Ohio's dual interests in both preventing further acts of animal cruelty, and promoting reintegration and positive citizenship among probationers, warrants privacy intrusions not otherwise tolerated under the Fourth Amendment. *Samson*, 547 U.S. at 853.

Moreover, even taking the State of Ohio's interests into account, Judge Stupica expressly limited her probation order to provide for random searches limited only to Bianca's "outdoor premises or any structure where equines may be kept" for the purpose of "ensur[ing] she remains in compliance during the term of her probation" with the trial court's order that Bianca not own, possess, care for or reside on any property with horses. (Doc. No. 35-4, PageID# 592.) The limited nature of the probation search condition, which restricted searches only to Bianca's "outdoor premises or any structure where equines may be kept" further weighs against finding a Fourth Amendment violation. Judge Stupica authorized an intrusion into Bianca's privacy interests only to the extent that law enforcement could search a narrowly defined area: Bianca's outdoor premises and/or structures where horses could be kept. These were not searches in which GCHS attempted to enter Bianca's residence or search her person, her vehicle, or her personal effects. *See, e.g., United States v. Fletcher*, 978

21

F.3d 1009, 1013 (6th Cir. 2020) (concluding that a probation officer did not have reasonable suspicion to search a probationer's cell phone and that the probationer's probation agreement did not authorize the search).  Instead, these limited searches had an express purpose: to protect the State of Ohio's dual interests in ensuring Bianca did not reoffend and, thus, cause further harm to horses, and ensuring Bianca successfully reintegrated by completing all terms of her probation.  Accordingly, the Court concludes that, under these circumstances, Courtwright's suspicionless searches of Bianca's outdoor property did not violate the Fourth Amendment.

Bianca's arguments in favor of summary judgment with respect to Count Two and her arguments in opposition to Defendants' Motion, are unpersuasive.  First, Bianca's argument that Judge Stupica's sentence and probation order are only binding on Bianca and do not "order" GCHS to conduct probation searches is baffling to the point that it borders on disingenuous and bad faith. (Doc. No. 35-1, PageID# 560-64, "The fact is, the Judgment of Sentencing and Conviction is not an 'order' forcing the Defendants to do anything. It is a sentencing judgment which sets forth the parameters of Bianca's sentence and the only person that it applies to is Bianca, and the only person who can be found in violation of that "order" is Bianca"; *see also* Doc. No. 39, PageID# 1297-99.) Bianca offers absolutely no case law to suggest that law enforcement cannot conduct probation searches—or carry out any other aspect of a criminal sentence—because the law enforcement agency is not a "party" to the sentence.

Second, the Court is equally unpersuaded by Bianca's argument that Courtwright had no authority to conduct probation searches because a humane agent's authority is statutorily limited. (Doc. No. 35-1, PageID# 564-66.)  As Bianca points out in her *own* Motion, in *City of Cleveland v. Turner*, the Ohio Court of Appeals held that county humane agents "constitute 'law enforcement

22

officers' authorized to request and execute a search warrant as well as arrest any person guilty of an act of cruelty to persons or animals," and also recognized that "a court has authority to appoint a humane agent of the APL as a 'law enforcement officer' to assist with the enforcement of a probationer's community control conditions."  *City of Cleveland v. Turner*, 132 N.E.3d 766, 782-83 (Ohio 8th Dist. Ct. App. Aug. 22, 2019).  It is irrelevant that Bianca "disagree[s] with the majority opinion in *Turner* because a humane agent is not a probation officer" and that she "posit[s] that the Dissent in *Turner* aligns with the statutory limitations of a humane agents [*sic*] police power . . . ." (Doc. No. 35-1, PageID# 566.)  The *Turner* majority concluded that a court has the statutory authority to appoint a humane agent as a "law enforcement officer" capable of assisting with the enforcement of a probationer's community control conditions.  *Turner*, 132 N.#.3d at 782-83.  Thus, Judge Stupica had the authority to appoint GCHS humane agents as officers capable of assisting with enforcement of Bianca's probation.

Third, whether Courtwright committed a statutory violation of Ohio Rev. C. § 2951.02(A) is irrelevant to the question of whether Courtwright violated Bianca's Fourth Amendment rights under the U.S. Constitution because Bianca only brings constitutional claims against Defendants.

Ohio Rev. C. § 2951.02(A) provides:

[D]uring the period of a felony offender's nonresidential sanction, authorized probation officers who are engaged within the scope of their supervisory duties or responsibilities may search, with or without a warrant, the person of the offender, the place of residence of the offender, and a motor vehicle, another item of tangible or intangible personal property, or other real property in which the offender has a right, title, or interest * * * **if the probation officers have reasonable grounds to believe that the offender is not abiding by the law or otherwise is not complying with the conditions of * * * the felony offender's nonresidential sanction.**

(Emphasis added).

23

As an initial matter, the Court notes that this Ohio statute applies specifically to the "period of a **felony** offender's nonresidential sanction." *Id.* (emphasis added). Bianca was convicted of two misdemeanors, not felonies. *See State v. Marcellino*, 149 N.E.3d at 928. Thus, according to the plain language of the statute, § 2951.02(A) does not apply to Bianca's period or terms of probation or the instant dispute. However, both parties spend a significant amount of time addressing § 2951.02(A) and a recent Ohio Supreme Court case, *State v. Campbell*, Slip Op. No. 2022-Ohio-3626, and whether Courtwright's suspicionless searches of Bianca's outdoor property were violations of § 2951.02(A). Accordingly, the Court will briefly address *Campbell* and § 2951.02(A) to the extent they are instructive in this case.

In *Campbell*, a defendant-probationer sought to exclude evidence obtained from an allegedly unconstitutional, suspicionless search conducted pursuant to his probation conditions. *Campbell*, 2022-Ohio-3626, ¶ 5. In *Campbell*, the defendant-probation was granted judicial release and ordered to serve community control for the remainder of his sentence. *Id.* Among other conditions, the defendant agreed to searches of his person, property, vehicle, and residence "at any time without a warrant." *Id.* Relying on this condition, the defendant's probation officer conducted a random search of his home and searched the contents of the defendant's cell phone. *Id.* at ¶ 6. The officer discovered evidence of child pornography. *Id.* This discovery led to the seizure of numerous other electronic devices, and ultimately, the defendant was changed with nine felony offenses related to the evidence found on these devices. *Id.* The defendant moved to suppress evidence uncovered during this search, arguing that the suspicionless search violated the Fourth Amendment, as well as § 2951.02(A), and therefore, the evidence should be excluded. *Id.* at ¶ 7.

24

Regarding the defendant's constitutional challenge, the Ohio Supreme Court applied the *Knights* framework to conclude that the search did ***not*** violate the Fourth Amendment. *Id.* at ¶¶ 9-14. Under the totality of the circumstances, the defendant's reduced privacy interest because of his probation conditions did not outweigh the state's competing interests in preventing recidivism and rehabilitating the defendant. *Id.* Nevertheless, the Ohio Supreme Court also concluded that the probation officer's "search was not authorized by R.C. 2951.02(A)" because the probation officer "lacked the necessary reasonable grounds to search Campbell's cell phone . . . ." *Id.* at ¶ 16. Despite the probation officer's statutory violation, however, the Ohio Supreme Court concluded that the evidence was not subject to the Fourth Amendment's Exclusionary Rule because the probation officer only committed a statutory, not a constitutional, violation. *Id.* at ¶¶ 20-23.

*Campbell* is useful for two reasons. First, it reinforces what the Court already concluded above: that courts apply the *Knights* totality-of-the-circumstances framework when evaluating whether a suspicionless search conducted pursuant to a condition of probation violates a probationer's Fourth Amendment rights. *See supra.* Second, *Campbell* illustrates that a statutory violation alone is an insufficient basis to exclude evidence under the Fourth Amendment because no constitutional violation took place. *Id.* at ¶ 24. Bianca's claims relate only to constitutional violations, not statutory ones. The Court need not decide whether Courtwright's suspicionless searches violate Ohio Rev. C. § 2951.02(A). Even if Courtwright violated Ohio Rev. C. § 2951.02(A), his supposed statutory violation does not create a constitutional violation under the Fourth Amendment. *Id.*

Finally, the Court rejects Bianca's argument that the *Griffin* framework applies here. (Doc. No. 35-1, PageID# 572.) As discussed above, the *Griffin* "special needs" framework applies when a "search is made pursuant to a state policy" or statute while the *Knights* framework applies when a

suspicionless search is conducted pursuant to a condition of probation. *Tessier*, 814 F.3d at 434 n.1. Courtwright conducted his searches pursuant to a condition of Bianca's probation. Thus, the *Knights* framework applies. *Id.* Because the Court concludes these searches were reasonable under *Knights*'s totality-of-the-circumstances framework, the searches "need not pass muster" under *Griffin*. *Payne*, 588 Fed. App'x at 431. Accordingly, the Court concludes that, with respect to Count Two, Courtwright did not "unreasonably search" Bianca or her property in contravention of the Fourth Amendment. Count Two fails as a matter of law.

With respect to Count One, Bianca's claim that Courtwright "unreasonably seized" her in violation of the Fourth Amendment, the Court concludes that Bianca provides no evidence to suggest that a genuine issue of material fact exists as to whether she was "seized." Though Bianca requests "partial summary judgment as to Causes of Action I [unreasonable seizure] and II" in her Motion, Bianca fails to address the issue of seizure anywhere in her Motion. (*See* Doc. No. 35-1.) Instead, in her Reply in support of her partial Motion, Bianca merely asserts that Courtwright told her that she could not terminate his random search of her property. (Doc. No. 41, PageID# 1373.) Beyond quoting her own deposition testimony that Courtwright informed her that his random searches were not optional under the terms of her probation, Bianca offers no other support or argument for her illegal seizure claim. Thus, Bianca's unreasonable seizure claim fails as a matter of law.

As concluded above, Courtwright did not commit any underlying constitutional violations against Bianca because he neither unreasonably searched, nor unreasonably seized, her in contravention of the Fourth Amendment. Therefore, the Court is not required to reach the question whether Bianca's rights were clearly established at the time of the searches. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The Court further concludes that Courtwright is entitled to qualified

immunity as to Counts One and Two. *See Katz*, 533 U.S. at 201; *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Pearson*, 555 U.S. at 224. As set forth above, Bianca failed to show that Courtwright committed any underlying constitutional violation. Accordingly, the Court concludes that Courtwright is entitled to qualified immunity on Bianca's § 1983 claims. *Id.*

> **2.    Counts Three through Six: *Monell* claims against Defendants GCHS, Brustein, and Clarke**

In Counts Three through Six, Bianca seeks to hold Defendants GCHS, Brustein, and Clarke liable for alleged illegal official policies or customs of GCHS, ratification of Courtwright's allegedly illegal actions, an alleged custom or tolerance of acquiescence of illegal searches, and alleged failure to train and/or supervise Courtwright. (Doc. No. 1, ¶¶ 54-133.) In *Monell v. Dep't of Soc. Services of City of New York*, the Supreme Court held that § 1983 "imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights." 436 U.S. 658, 692 (1978). However, "[t]here can be no liability under *Monell* without an underlying constitutional violation." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014); *accord France v. Lucas*, 836 F.3d 612, 631 (6th Cir. 2016). Because the Court has found that Courtwright is entitled to summary judgment and no underlying constitutional violation against Bianca occurred, GCHS, Brustein, and Clarke are likewise entitled to summary judgment on Bianca's *Monell* claims.

> **B.    Karen's and Giancarlo's Claims (Counts Seven through Eleven)**

> **1.    Count Seven: Unreasonable search under § 1983 against Defendant Courtwright**

In Count Seven, Karen and Giancarlo assert a claim under 42 U.S.C. § 1983 against Courtwright. (*See* Doc. No. 1, ¶¶ 134-52.) Therein, Karen and Giancarlo allege that Courtwright

conducted a warrantless search of their property, in contravention of the Fourth Amendment.  (*Id.* at ¶¶ 138-39.)

Defendants move for summary judgment on this claim, proffering three arguments in support: (1) that Courtwright did not conduct a "search" of Karen's and Giancarlo's property under the Fourth Amendment; (2) that area Courtwright allegedly "searched" constituted an "open field" not subject to protection under the Fourth Amendment; and (3) any alleged Fourth Amendment violation was *de minimis* and covered by qualified immunity.  (Doc. No. 34, PageID# 487.)

Karen and Giancarlo do not move for summary judgment on this claim in their partial Motion. (*See* Doc. No. 35-1.)  However, Plaintiffs concede that if Courtwright "has not violated Plaintiff Bianca Marcellino's constitutional rights, then the remaining causes of action will fail as a matter of law . . . ."  (*Id.* at PageID# 578.)

The Court will first determine whether the facts, when taken in the light most favorable to Karen and Giancarlo, show that Courtwright's conduct violated a constitutional right.  *Mullins*, 805 F.3d at 765.  Though Count Seven does not clearly identify when Courtwright's alleged illegal search of Karen's and Giancarlo's property took place, it appears to refer to the events of July 10, 2020, when Courtwright walked along Bianca's property while looking at Karen's and Giancarlo's property and allegedly crossed Bianca's property line onto Karen's and Giancarlo's property.  (*Id.* at ¶¶ 98-105, 108.)

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."  U.S. Const. amend IV. However, "naked eye" observations of a property's exterior from a neighboring property or sidewalk "are not Fourth Amendment searches."  *Widgren v. Maple Grove Tp.*, 429 F.3d 575, 581 (6th Cir.

28

2005); *see also, e.g., Conrad v. City of Berea*, 243 F. Supp. 3d 896, 907 (N.D. Ohio 2017).  Here, Courtwright was permitted to be on Bianca's property to conduct random probation inspections, pursuant to the conditions of her probation.  *See supra*.  Thus, Courtwright's naked-eye observations of Karen's and Giancarlo's property, including their barn, from Bianca's property is not a Fourth Amendment search.

Further, the only evidence that Courtwright ever crossed Bianca's property line onto her parents' property is Bianca's testimony, but this testimony conflicts with, or is somewhat inconsistent with her other testimony.  Bianca testified during her deposition that Courtwright crossed over her property line and onto her parents' property during the July 10, 2020 inspection.  (Doc. No. 35-7, PageID# 626-27.) She also admitted that she did not know where her property line fell in relation to her parents' barn, testifying: "I'm not a surveyor, so I can't tell you the exact location."  (Doc. No. 35-7, PageID# 625-27.)   However, construing Bianca's conflicting or inconsistent testimony as demonstrating that Courtwright did step back and forth across Bianca's property line, such a minor "trespass alone does not implicate the Fourth Amendment."  *Hauman v. City of Youngstown*, No. 4:19-cv-1806, 2022 WL 1304593, at *7 (N.D. Ohio May 2, 2022) (citing *Oliver v. United States*, 466 U.S. 170, 183-84 (1984)).  Karen and Giancarlo do not allege that Courtwright used unduly intrusive methods beyond naked-eye observations of the barn.  (*See* Doc. No. 1.)  Accordingly, the Court concludes that Courtwright did not conduct a Fourth Amendment search by observing Karen's and Giancarlo's property with his naked eye from Bianca's property and perhaps committing a minor trespass by stepping back and forth across what may or may not be the property line.

Because the Court has determined that Courtwright did not conduct a Fourth Amendment search and, therefore, that no underlying constitutional violation against Karen and Giancarlo

occurred, it is not required to reach the question whether Karen's and Giancarlo's rights were clearly established at the time Courtwright observed their property.  *Pearson*, 555 U.S. at 236.  The Court concludes that Courtwright is entitled to qualified immunity as to Count Seven, Karen's and Giancarlo's § 1983 claim.  *See supra*.

> ## 2.     Counts Eight through Eleven: *Monell* claims against Defendants GCHS, Brustein, and Clarke

In Counts Eight through Eleven, Karen and Giancarlo seek to hold Defendants GCHS, Brustein, and Clarke liable for alleged illegal official policies or customs of GCHS, ratification of Courtwright's allegedly illegal actions, an alleged custom or tolerance of acquiescence of illegal searches, and alleged failure to train and/or supervise Courtwright.  (Doc. No. 1, ¶¶ 153-224.)  As discussed above, "[t]here can be no liability under *Monell* without an underlying constitutional violation."  *Robertson*, 753 F.3d at 622.  Because the Court has found that Courtwright is entitled to summary judgment on Count Seven and no underlying constitutional violation against Karen or Giancarlo occurred, GCHS, Brustein, and Clarke are entitled to summary judgment on Karen's and Giancarlo's *Monell* claims.

## V.     Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. No. 34) is GRANTED.  Plaintiffs' Partial Motion for Summary Judgment (Doc. No. 35) is DENIED.

**IT IS SO ORDERED.**

       *s/Pamela A. Barker*
       PAMELA A. BARKER
Date:  November 15, 2022        U. S. DISTRICT JUDGE